## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK



HOWARD K. STERN,      )
          )
    Plaintiff,     )
          )
vs.          )
          )   Civil Action File No.
RITA COSBY,      )
HACHETTE BOOK GROUP USA, INC.  )
d/b/a Grand Central Publishing, and  )
JOHN OR JANE DOE,    )
          )
    Defendants.   )
          )

**JUDGE CHIN**

**07 CIV 8536**

RECEIVED
OCT 02 2007
U.S.D.C. S.D.N.Y.
CASHIERS

## COMPLAINT FOR LIBEL

COMES NOW Plaintiff, Howard K. Stern, and states his Complaint for Libel against Defendants, Rita Cosby, Hachette Book Group USA, Inc. d/b/a Grand Central Publishing, and John or Jane Doe, as follows:

## PRELIMINARY STATEMENT

1.    This Complaint for Libel arises from the publication of a book entitled BLONDE AMBITION: THE UNTOLD STORY BEHIND ANNA NICOLE SMITH'S DEATH, written by Rita Cosby with the assistance of John or Jane Doe, and published by Hachette Book Group USA, Inc. (collectively, "Defendants"). The book is an attempt to capitalize financially on the life and tragic death of Vickie Lynn Marshall, better known as Anna Nicole Smith, an internationally-acclaimed model, actress, corporate spokeswoman, producer, reality television star, and celebrity. Defendants have exploited Ms. Smith's life and death by publishing false and defamatory factual accusations against Howard K. Stern, who was Ms. Smith's longtime lawyer, friend and companion. Defendants falsely accuse Stern of, among other things:

- Criminal lewd acts;

- Homosexual acts;

- Illegal possession and use of cocaine;

- Filing a false police report;

- Conspiring to commit murder;

- Perjury;

- Pimping;

- Fraudulent inducement of prostitution;

- Destruction of evidence and obstruction of justice;

- Theft, money laundering and wire fraud;

- Kidnapping for ransom;

- Extortion and blackmail;

- Criminal involvement in the death of Ms. Smith's son, Daniel Smith; and

- Criminal involvement in the death of Anna Nicole Smith.

## THE PARTIES

2.      Plaintiff Howard K. Stern ("Stern") is domiciled and resides in the State of California.

3.      Stern is a licensed attorney in good standing, admitted to practice law in the State of California.

4.      Before the accidental death Vickie Lynn Marshall on February 8, 2007, Stern was her longtime personal attorney, friend and companion. Vickie Lynn Marshall is better known as Anna Nicole Smith.

5.    Ms. Smith was an internationally-acclaimed model, actress, corporate spokeswoman, producer, reality television star and celebrity.

6.    Defendant Rita Cosby ("Cosby") is an individual who resides at 146 W. 57th Street, New York, New York 10019.

7.    Cosby claims she is an Emmy Award-winning former cable television news host.

8.    Cosby describes herself as an investigative journalist.

9.    For many years, in her role as the host of various cable television news programs, Cosby specialized in reporting on current events.

10.    Cosby claims that her coverage of current events has included, among other things, interviews of Yasser Arafat, Slobodan Milosevic, Michael Jackson, David Berkowitz and Dr. Jack Kevorkian.

11.    Cosby claims that she has been a featured guest on hundreds of television and radio shows worldwide and has provided viewers and listeners with commentary on current events.

12.    As a result of her prominent role over the years in covering and commenting about current events, Cosby claims that she has attained a high level of credibility with the American public with respect to her statements about such matters.

13.    Defendant Hachette Book Group USA, Inc. ("Hachette Book Group") is a Delaware corporation with its principal place of business being located at 237 Park Avenue, New York, New York 10017.

14.    Among other corporate activities, Hachette Book Group has a number of publishing divisions, including Grand Central Publishing.

15.    Hachette Book Group publishes, markets, distributes and sells hardback books throughout the nation on a regular basis.

16.    John or Jane Doe is the currently unidentified ghost writer of Blonde Ambition, who will be substituted as a defendant as soon as he or she is identified.

17.    Cosby and Hachette Book Group through its division Grand Central Publishing, as part of a joint venture, agreed to write, publish, market, distribute and sell a hardback book entitled BLONDE AMBITION: THE UNTOLD STORY BEHIND ANNA NICOLE SMITH'S DEATH ("Blonde Ambition").

18.    Defendants have published, marketed, distributed and sold Blonde Ambition throughout the nation and continue to do so as of the date of the filing of this Complaint.

19.    Defendants have engaged in efforts via the Internet, national television and national radio to solicit and increase sales of Blonde Ambition.

## JURISDICTION AND VENUE

20.    Stern is a citizen of the State of California for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

21.    Cosby is a citizen of the State of New York for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

22.    Hachette Book Group is a citizen of the State of New York for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

23.    This Court has original subject matter jurisdiction with respect to this action pursuant to 28 U.S.C. § 1332 as there exists complete diversity of citizenship between Stern and Defendants and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

- 4 -

24.     Cosby and Hachette Book Group are subject to the jurisdiction of this Court pursuant to 28 U.S.C. § 1332.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).

## FACTUAL BACKGROUND

### Stern's Relationship with Anna Nicole Smith

26.     Stern first met Anna Nicole Smith ("Ms. Smith") in 1997.

27.     Stern served as Ms. Smith's personal attorney from 1997 through the time of her death in February 2007. He represented her in connection with a number of legal matters, including litigation over the estate of her deceased husband, J. Howard Marshall.

28.     From the summer of 2000 through the time of Ms. Smith's death in February 2007, Stern and Ms. Smith also maintained a personal relationship. They kept that relationship secret until September 2006.

29.     Stern and Ms. Smith lived together in a house in Studio City, California, from early 2002 through July 2006. Ms. Smith's son, Daniel Wayne Smith, also lived with them in the Studio City house.

30.     In July 2006, Ms. Smith moved to the Bahamas where she established residency.

31.     In September 2006, Ms. Smith gave birth to a daughter, Dannielynn Hope Marshall Stern (now Birkhead). Stern believed he was Dannielynn's biological father, and Ms. Smith listed him as the father on Dannielynn's birth certificate.

32.     Several other men claimed to be Dannielynn's father, including Larry Birkhead, who was a celebrity photographer who at one time had a personal relationship with Ms. Smith.

***Daniel Smith's Death***

33.    Daniel Smith was twenty (20) years old when his sister, Dannielynn, was born in the Bahamas.

34.    On September 10, 2006, Daniel was visiting his mother in her hospital room in the Bahamas, when he died suddenly and unexpectedly.

35.    Daniel Smith died accidentally from a cardiac dysrhythmia after taking a combination of methadone, Zoloft, and Lexapro.

36.    No criminal charges have been filed against any individual in connection with the death of Daniel Smith.

37.    Stern was not involved criminally, or otherwise, in the death of Daniel Smith.

38.    Stern was not responsible for the death of Daniel Smith.

39.    The death of Daniel Smith became the subject of a media frenzy by members of the print and broadcast media.

40.    Cosby covered Daniel Smith's death on the cable television news program that she hosted at that time on MSNBC. Her program was aired nationally.

***California Paternity Action***

41.    Shortly after Daniel Smith's death, Birkhead filed a paternity action against Ms. Smith in California, claiming that he was Dannielynn's biological father.

42.    Birkhead was represented in his paternity action by Debra Opri, an attorney to whom he was referred by Cosby.

### *Litigation over Horizons*

43.    Ms. Smith was also sued after Daniel's death in connection with a dispute over ownership of the house, known as "Horizons," in which she and Stern were living in the Bahamas.

44.    G. Ben Thompson ("Thompson"), a former friend of Ms. Smith's, claimed that he owned Horizons. Thompson contended that he had helped Ms. Smith purchase the house from a third party so that she could obtain residency in the Bahamas and that she had promised to sign a mortgage, but had never done so.

45.    Ford Shelley, Thompson's son-in-law ("Shelley"), assisted Thompson in the litigation. Shelley and his wife, Gina Shelley, had also previously been friends of Ms. Smith's.

46.    Among other things, Thompson and Shelley had Ms. Smith served with an eviction notice the day after Daniel Smith's funeral took place in the Bahamas, and they attempted to have the power turned off at Horizons despite the fact that Dannielynn, who was residing in the house, was less than three (3) months old at the time.

### *Anna Nicole Smith's Death*

47.    Ms. Smith was devastated after her son's death.

48.    On February 5, 2007, Ms. Smith and Stern traveled to Hollywood, Florida, to pick up a boat that Ms. Smith had purchased.

49.    Ms. Smith became ill during that trip, and on February 8, 2007, she died suddenly and unexpectedly.

50.    Ms. Smith was found unresponsive at the Seminole Hard Rock Hotel & Casino in Hollywood, Florida, at approximately 1:00 on February 8, 2007, and she was pronounced dead later that afternoon at Memorial Regional Hospital.

51.    No criminal charges have been filed against any individual in connection with the death of Anna Nicole Smith.

52.    Stern was not involved criminally, or otherwise, in the death of Anna Nicole Smith.

53.    Stern was not responsible for the death of Anna Nicole Smith.

54.    In the official report on the autopsy performed on Ms. Smith, released on March 26, 2007, Chief Medical Examiner Joshua Perper concluded that Ms. Smith died "of acute combined drug intoxication" and that "[a]bscesses of buttocks, and viral enteritis were contributory causes of death." The autopsy report concluded that the manner of death was an "ACCIDENT."

55.    In a press conference held in Fort Lauderdale, Florida, on March 26, 2007, Seminole Chief of Police Charles Tiger stated that, "We are convinced, based on extensive review of the evidence, that this case is an accidental overdose with no other criminal element present."

56.    The death of Ms. Smith became the subject of a media frenzy with literally round-the-clock coverage by members of the print and broadcast media of the medical and law enforcement investigation of Ms. Smith's death.

57.    Cosby has repeatedly admitted in numerous television and radio interviews that she was caught up in the media "frenzy" and "fevered pitch" surrounding the death of Ms. Smith.

58.    Cosby provided extensive coverage of the death of Ms. Smith during the national broadcast of the cable television news program that she hosted on MSNBC.

*Custody Hearings over Anna Nicole Smith's Body*

59.    After Ms. Smith's death, Stern, as the nominated executor under Ms. Smith's Last Will and Testament, filed a petition seeking custody of Ms. Smith's body so that he could carry out Ms. Smith's intent to be buried in the Bahamas next to her son, Daniel.

60.    The petition for custody of Ms. Smith's body for the purpose of burial became the subject of nationally broadcast court hearings in Broward County, Florida.

61.    Stern's petition was opposed by Ms. Smith's birth mother, Virgie Arthur ("Arthur"), who wanted Ms. Smith to be buried in Texas.

62.    Arthur was represented in the Florida custody hearings by Texas attorney John O'Quinn ("O'Quinn").

63.    O'Quinn hired at least one investigator to assist him in his representation of Arthur.

64.    Cosby provided extensive coverage of the court hearings regarding Ms. Smith's burial during the national broadcast of the cable television news program that she hosted on MSNBC.

*Paternity of Dannielynn*

65.    After Ms. Smith's death, Birkhead attempted to add Stern as a party to his California lawsuit asserting paternity of Dannielynn.

66.    Birkhead also filed a paternity action in the Bahamas, in which he sought custody of Dannielynn.

67.    After a DNA test ordered by a Bahamian court revealed that Birkhead was Dannielynn's biological father, Stern did not oppose Birkhead's request for custody of Dannielynn.

68.    After the DNA test results were known, Stern cooperated with Birkhead in facilitating the transition of custody of Dannielynn to Birkhead. Birkhead took physical custody of Dannielynn in the Bahamas in May 2007, and she returned with him to the United States.

69.    Arthur opposed, and continues to oppose, Birkhead's custody petition. She seeks custody for herself, as Dannielynn's grandmother.

70.    Cosby provided extensive coverage of the court hearings regarding paternity and custody of Dannielynn during the national broadcast of the cable television news program that she hosted on MSNBC.

### *Publication of Blonde Ambition*

71.    MSNBC did not renew Cosby's contract, which expired on April 1, 2007.

72.    Cosby signed a book-publishing contract with Hachette Book Group to author a book about Ms. Smith's death.

73.    Upon information and belief, Cosby received a substantial financial advance from Hachette Book Group for authoring Blonde Ambition.

74.    Upon information and belief, Cosby receives royalties from Hachette Book Group for sales of Blonde Ambition.

75.    On August 31, 2007, prior to publication of Blonde Ambition, counsel for Stern learned of the pending publication and advised Cosby and Hachette Book Group not to publish defamatory statements about Stern in Blonde Ambition, including any such statements based on information from Jackie Hatten. (See Exhibits A-C, attached hereto, which are true and correct copies of correspondence between counsel for Stern and Cosby and Hachette Book Group, respectively.)

76.    Prior to publication of Blonde Ambition, Defendants had actual notice that numerous statements published in Blonde Ambition are not true.

77.    Prior to publication of Blonde Ambition, Cosby made no effort whatsoever to contact Stern to verify the truth or accuracy of the false factual accusations made about Stern in Blonde Ambition.

78.    Prior to publication of Blonde Ambition, Hachette Book Group made no effort whatsoever to contact Stern to verify the truth or accuracy of the false factual accusations made about Stern in Blonde Ambition.

79.    On September 4, 2007, Cosby and Hachette Book Group published the hardback book entitled BLONDE AMBITION: THE UNTOLD STORY BEHIND ANNA NICOLE SMITH'S DEATH.

80.    An unknown number of copies of Blonde Ambition have been sold. The book has been on the New York Times Bestseller List for three (3) weeks.

81.    In numerous television, radio and Internet interviews conducted for the purpose of promoting sales of Blonde Ambition, Cosby uttered slanderous statements against Stern.

82.    Stern has demanded retractions from Defendants and the various media outlets which broadcast the slanderous statements by Cosby in her interviews and after the time period requested by Stern for the retractions expires, shall amend this Complaint to add a cause of action against Defendants for slander.

## CAUSE OF ACTION FOR LIBEL

83.    Stern hereby incorporates, adopts and re-alleges Paragraphs 1 through 82 of this Complaint as if fully set forth herein.

84.    The gist of Blonde Ambition, published by Cosby and Hachette Book Group, is that Stern is a despicable person worthy of public contempt, falsely stating that he engaged in a number of crimes and other violent, unsavory and disreputable acts, including, but not limited to, criminal lewd acts involving homosexuality; illegal possession and use of cocaine; perjury; filing a false police report; conspiring to commit murder; pimping; fraudulent inducement of prostitution; destruction of evidence; obstruction of justice; theft, money laundering and wire fraud; kidnapping for ransom; extortion and blackmail; criminal involvement in the death of Daniel Smith; and criminal involvement in the death of Anna Nicole Smith.

85.    Stern did not engage in any of the crimes or other violent, unsavory and disreputable acts for which he stands accused by Defendants in Blonde Ambition.

86.    The gist of Blonde Ambition is false and defamatory and constitutes libel per se in that it accuses Stern of the numerous crimes and other unsavory and disreputable acts described in this Complaint.

87.    The gist of Blonde Ambition is false and defamatory and constitutes libel per se in that it imputes actions to Stern that injure his professional reputation as an attorney.

88.    The gist of Blonde Ambition is false and defamatory and constitutes libel per se in that it imputes actions to Stern that are defamatory and injurious to reputation on their face and can be so understood without reference to any additional facts.

89.    The libelous statements published by Defendants were published without any privilege.

90.    The libelous statements published by Defendants were subsequently republished in a number of major newspapers around the country, in magazines and on Internet websites. The

libelous statements were also republished on various television and radio shows across the country.

91.    In addition to the false and defamatory false factual accusations against Stern, Blonde Ambition contains many other statements about Stern and Ms. Smith that are false but not actionable as libel.

### *Libelous Statement 1:*
### *Criminal Lewd Act and Homosexuality*

92.    Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern had engaged in a criminal lewd act involving homosexuality and that Stern is homosexual:

One of Anna's closest friends, Jackie Hatten, says she knows what Howard has on Larry.

One night at a friend's house in Los Angeles, Jackie was supposed to meet Larry Birkhead for the first time. Anna had been telling her about the blond-haired, blue-eyed photographer that she'd been seeing, and wanted her to meet him. Late that night at the party, Jackie went looking for Anna around the house. Jackie walked down a hallway, peaking into rooms. In one darkened bedroom, she came upon two men – Howard K. Stern and another man, whom she was about to discover, was Anna's boyfriend, Larry Birkhead.

She says both men had their shirts off and Howard was down on his knees. Larry was sitting in a big oversized loveseat chair and both men had their pants down around their ankles. "Howard's head was down into Larry's crotch," Jackie told me. "Their bodies were intermingled. It was obvious what was happening." Anna suddenly walked up behind her and laughed out loud when she also saw what the two men were doing.

"The boys didn't stop," Jackie said. "They were engrossed and making their own sounds." Jackie said she and Anna watched the scene from about fifteen feet away. "Definitely close enough to see what was happening."

Jackie was shocked. Anna wasn't. She grabbed her friend's arm. "Come here, come here, come here," Anna said. "Howard...you know he's gay, I told you. And if Larry wants to do it, I can't complain because I do, what I do." Anna's sexual escapades with women were openly discussed between she and her friends. "I guess anything goes," Anna had laughed.

* * * * *

The following day after the Howard and Larry man-on-man shenanigans, Jackie and Anna talked about what they had seen in the bedroom at their friend's house. "Oh, you were freaked out about last night," Anna giggled.

"I wasn't expecting to see that!" Jackie said. Anna laughed and laughed. She thought it was the funniest thing ever that the night Jackie was supposed to meet Anna's boyfriend, Larry Birkhead, he was being intimate with her lawyer, Howard K. Stern. They never discussed it again. And Jackie never met Larry face to face.

(Blonde Ambition, 202-04.)

According to Jackie Hatten, Daniel's godmother, Anna Nicole told her, "Eeeew! I'd never sleep with Howard, if he's the last person on earth. He's gay!"

(Blonde Ambition, 67.)

93.    Libelous Statement 1 is false because Stern has never engaged in any type of sexual activity whatsoever with Birkhead. The incident described in Libelous Statement 1 never occurred.

94.    Libelous Statement 1 is false because Stern is not homosexual, and he has never engaged in any type of sexual activity with a male.

95.    Libelous Statement 1 is defamatory because, among other things, it conveys to the reader that Stern is homosexual and committed a criminal lewd act involving homosexuality by exposing himself in a place where others might be present who would be offended by such conduct.

96.    Libelous Statement 1 was published with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

97.    Defendants have no corroboration for the false factual accusations contained in Libelous Statement 1.

- 14 -

98.    Defendants failed to seek corroboration for Libelous Statement 1 from Stern and Birkhead, the most obvious sources.

99.    In failing even to attempt an interview of Stern and Birkhead, Defendants intentionally avoided ascertaining whether Libelous Statement 1 was true, thereby evidencing a reckless disregard for truth or falsity.

100.    Birkhead has stated publicly that he did not engage in any type of sexual act with Stern at any time. Defendants had knowledge of such statements prior to publication of Blonde Ambition.

101.    The false factual accusations in Libelous Statement 1 are so highly implausible that to publish them without independent corroboration was publication with reckless disregard for truth or falsity.

102.    Defendants published Libelous Statement 1 without making further inquiry even though Stern gave notice to Defendants prior to publication that Libelous Statement 1 is false.

103.    In support of Libelous Statement 1, Defendants cite to statements allegedly made by Jackie Hatten.

104.    Defendants had clear and compelling reasons to doubt the veracity of Jackie Hatten and the truth or accuracy of her implausible and uncorroborated false factual accusations against Stern.

105.    Cosby has herself admitted that the things Jackie Hatten told her "sounded . . . pretty fantastic."

106.    Jackie Hatten falsely describes herself as Ms. Smith's friend at the time of her death and as the godmother to Daniel Smith.

- 15 -

107.    Jackie Hatten was friends with Ms. Smith for a brief period of time only, from approximately mid-1999 until June 2000.

108.    Ms. Smith dated Jackie Hatten's brother, Mark Hatten, for a few months during early 2000.

109.    In June 2000, Mark Hatten threatened Ms. Smith with a knife, and she thereupon ended their relationship.

110.    In 2002, Mark Hatten was arrested for making criminal threats against Ms. Smith and for battery with a deadly weapon upon Ms. Smith's neighbor, who had come to her aid. Mark Hatten was convicted in November 2003 and is currently serving a nearly seven (7) year prison term.

111.    Ms. Smith had no contact with Jackie Hatten after 2002.

112.    Ms. Smith did not meet Birkhead until May 2003 and did not begin a personal relationship with Birkhead until after May 2004.

113.    Jackie Hatten never met Birkhead while Ms. Smith was alive.

114.    Jackie Hatten gave many media interviews immediately following Ms. Smith's death during which she made numerous false factual accusations against Stern.

115.    Upon information and belief, Jackie Hatten received financial remuneration in connection with many of those interviews.

116.    In all of the interviews that she gave after Ms. Smith's death, despite her obvious disdain for Stern and her desire to discredit him, Jackie Hatten never uttered the false factual accusations described in Libelous Statement 1.

117.    Prior to the publication of the false factual accusations in Libelous Statement 1, it was established during other media interviews that many of the statements made by Jackie Hatten during her interviews following Ms. Smith's death were false.

118.    Defendants knew prior to the publication of Libelous Statement 1 that Jackie Hatten was not a reliable source.

### Libelous Statement 2:
### Videotaped Homosexual Act

119.    Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern engaged in a videotaped homosexual act:

> Without knowing what Jackie Hatten had seen, Anna's nannies, Quethlie Alexis and Nadine Alexie, accompanied by their attorney, told private investigators some details about Howard and Anna's home life. Howard, they said, was always on his computer and Anna often stayed in bed and watched movies. "Is there one video she loved watching?" an investigator asked.
>
> "Yes," one of the nannies surprisingly said, "the one with Larry Birkhead and Howard…doing that thing."
>
> "You mean like two gay guys?" the investigator asked. "Having sex?"
>
> "Just like that," she nodded. The investigators were taken aback and told me that the nannies were clearly embarrassed about it, since they were quite religious.
>
> "She'd lie in her bed and watch it," Nadine affirmed.
>
> According to the nannies, she watched it over and over again.

(Blonde Ambition, 204.)

120.    Libelous Statement 2 is false because Stern never engaged in any type of sexual activity whatsoever with Birkhead.

121.    Libelous Statement 2 is false because Stern is not homosexual, and he has never engaged in any type of sexual activity with a male.

122.    Libelous Statement 2 is false because no videotape exists of any type of sexual activity whatsoever between Stern and Birkhead.

123.    Libelous Statement 2 is defamatory because, among other things, it conveys to the reader that Stern engaged in a videotaped homosexual act.

124.    Libelous Statement 2 was published with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

125.    Defendants failed to seek corroboration for Libelous Statement 2 from Stern and Birkhead, the most obvious sources.

126.    In failing even to attempt an interview of Stern and Birkhead, Defendants intentionally avoided ascertaining whether Libelous Statement 2 was true, thereby evidencing a reckless disregard for truth or falsity.

127.    Birkhead has stated publicly that he did not engage in any type of sexual act with Stern at any time. Defendants had knowledge of such statements prior to publication of Blonde Ambition.

128.    Defendants have no corroboration for the false factual accusations contained in Libelous Statement 2.

129.    In an egregious breach of professional standards, Defendants published the false factual accusations of the existence of the videotape of homosexual acts between Stern and Birkhead without ever seeing the alleged videotape and without ever seeking to obtain and review the alleged videotape. This breach by Defendants establishes publication with a reckless disregard for truth or falsity.

130.    The false factual accusations in Libelous Statement 2 are so highly implausible that to publish them without independent corroboration was publication with reckless disregard for truth or falsity.

131.    Defendants published Libelous Statement 2 without making further inquiry even though Stern gave notice to Defendants prior to publication that Libelous Statement 2 is false.

132.    In support of Libelous Statement 2, Defendants cite to statements allegedly made by Quethlie Alexis and Nadine Alexie to an unidentified investigator.

133.    Prior to publishing Libelous Statement 2, neither Cosby nor Hachette Book Group contacted Alexis or Alexie to verify the truth or accuracy of Libelous Statement 2.

134.    Defendants had clear and compelling reasons to doubt the veracity of Alexis and Alexie as sources as well as the accuracy of any statements they might make regarding Ms Smith and Stern.

135.    Alexis and Alexie were employed as nannies by Ms. Smith and Stern from September 2006 through November 2006. They were fired prior to Ms. Smith's death.

136.    Prior to the alleged republication of Libelous Statement 2, Quethlie Alexis publicly admitted that she was paid by an attorney on behalf of Thompson and Shelley for executing an affidavit which she admitted contained false information concerning Ms. Smith.

137.    Based on readily available public information, among other things, Defendants knew or should have known that Quethlie Alexis and Nadine Alexie lack any credibility or reliability as sources for information about Stern.

138.    Alexis and Alexie's false and defamatory statements were purportedly based on second-hand hearsay as such statements were allegedly conveyed to Cosby by an unknown and unidentified investigator who claimed that Alexis and Alexie made such statements to him.

- 19 -

139.    Defendants had clear and compelling reasons to doubt the veracity of the unidentified investigator and the truth or accuracy of any statements he made about Stern.

140.    Upon information and belief, the unknown and unidentified investigator was employed by O'Quinn.

141.    O'Quinn represented Ms. Smith's birth mother, Virgie Arthur, in connection with legal proceedings adverse to Stern in Florida involving custody of Ms. Smith's body and continues to represent Arthur in legal proceedings in California and the Bahamas involving custody of Dannielynn.

142.    During and after the course of those legal proceedings, O'Quinn made a number of media appearances in which he made slanderous statements about Stern, accusing him of criminal involvement in the deaths of Daniel Smith and Ms. Smith.

143.    On April 13, 2007, Stern filed a lawsuit against O'Quinn in the United States District Court for the Southern District of Florida asserting claims against him for slander.

144.    Defendants had actual knowledge that Stern was engaged in civil litigation with O'Quinn prior to the publication of the false factual accusations about Stern in Libelous Statement 2.

145.    Defendants had actual knowledge prior to publishing the false factual accusations in Libelous Statement 2 that any investigator working for O'Quinn would be biased against Stern and would not be a reliable source for uncorroborated false factual accusations against Stern.

146.    Based on readily available public information, among other things, Defendants knew or should have known that the unidentified investigator lacks any credibility or reliability as a source for information about Stern.

### *Libelous Statement 3:*
### *Illegal Cocaine Use*

147.    Defendants published the following false and defamatory statements in Blonde

Ambition conveying that Stern had used cocaine and supplied Ms. Smith with cocaine:

> Hotel workers say Anna and Howard often partied in their room during prior
> visits with what they believe was cocaine and that both were often heard sniffling
> and cleaning up "stuff" around the room when hotel staff came in, while others
> saw white powder on the counters.

(Blonde Ambition, 5.)

> And, he [the employee confidante] says, the drugs were bad – both before
> Daniel's death when she was pregnant and after Daniel's death when she was not.
> He said he saw Anna using numerous drugs, including both methadone and
> cocaine while pregnant. "Every other day Howard would give her a little snort in
> the nose and get her high . . . ."

(Blonde Ambition, 79.)

148.    Libelous Statement 3 is false because Stern has never used cocaine.

149.    Libelous Statement 3 is false because Stern has never supplied Ms. Smith with

cocaine.

150.    Libelous Statement 3 is defamatory because, among other things, it conveys to the

reader that Stern committed a crime by using cocaine and supplying Ms. Smith with cocaine.

151.    Libelous Statement 3 was published by Defendants with actual malice, that is,

with actual knowledge of falsity or with reckless disregard for truth or falsity.

152.    At the time of publication, Defendants had actual knowledge that Libelous

Statement 3 was unverified and unsubstantiated.

153.    Defendants cite unidentified "hotel workers" as the sources of information for

Libelous Statement 3.

154.    Upon information and belief, the alleged "hotel workers" were not reliable sources of information about Stern.

155.    With respect to Libelous Statement 3, Defendants also cite to statements allegedly made by an unidentified male employee "confidante" who allegedly worked for Ms. Smith in the Bahamas.

156.    Defendants had clear and compelling reasons to doubt the veracity of the "confidante" and the truth or accuracy of any statements he made about Stern.

157.    During the time that Ms. Smith was pregnant with Dannielynn, she had a single male employee in the Bahamas.

158.    The male Bahamian employee, who speaks very little English, worked as a yardman and did not enter the house.

159.    The male Bahamian employee was never a "confidante" of Ms. Smith.

160.    There was no male employee in the Bahamas who was a "confidante" of Ms. Smith.

161.    The male Bahamian employee is not a reliable source for information about Stern or Ms. Smith.

### Libelous Statement 4:
### *Filing a False Police Report*

162.    Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern had filed a false police report:

> Anna dated Jackie's brother, Mark. That relationship ended in his arrest and imprisonment. Hatten, an artist, served a seven-year sentence for making "terrorist threats" against Anna and blames Howard K. Stern for his imprisonment. Hatten claims that it was all a setup by Howard K. Stern, who, he says, called police and told them Anna had a stalker that was on his way to his house with a gun. Jackie said that her brother and Anna had just had a big fight and he was coming over to pack up his stuff since they had been living together.

- 22 -

> When I spoke to Mark Hatten from prison in the spring of 2007, he told me, "Howard wanted me out of Anna's life, he was jealous that we were close. He did this to silence me."

(Blonde Ambition, 102.)

163.    Libelous Statement 4 is false because Stern never filed a false police report and never attempted to "setup" Mark Hatten.

164.    Stern did report to the police that Mark Hatten was heading to Ms. Smith's house, and he told the truth to the police when he did so.

165.    Libelous Statement 4 is defamatory because, among other things, it accuses Stern of the crime of filing a false police report.

166.    Libelous Statement 4 is defamatory because, among other things, it imputes to Stern dishonesty and a lack of integrity with the judicial and prosecutorial system, all of which injure Stern's personal and professional reputation.

167.    Libelous Statement 4 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

168.    Defendants have no corroboration for the false factual accusations contained in Libelous Statement 4.

169.    Libelous Statement 4 is so highly implausible that to publish it without independent corroboration constitutes publication with reckless disregard for truth or falsity.

170.    Defendants cite Mark Hatten as the alleged source for information set forth in Libelous Statement 4.

171.    Defendants had clear and compelling reasons to doubt the veracity of Mark Hatten and the truth or accuracy of any statements he might make regarding Stern.

172.    Mark Hatten dated Ms. Smith very briefly in early 2000.

- 23 -

173.    Ms. Smith ended her relationship with Mark Hatten in June 2000, after he threatened her with a knife.

174.    In 2002, Mark Hatten was arrested for making criminal threats against Ms. Smith and for battery with a deadly weapon upon Ms. Smith's neighbor, who had come to her aid. He was convicted in November 2003 and is currently serving nearly a seven (7) year prison term.

175.    Defendants were aware of Mark Hatten's criminal record prior to republishing the false factual accusations contained in Libelous Statement 4.

176.    On September 7, 2007, Mark Hatten filed a frivolous lawsuit against Stern and six co-defendants – including the trial judge, his own public defender, the prosecutor, the Attorney General, and the District Attorney – in which he recites some of the same outrageous and false statements against Stern that Defendants republished in Blonde Ambition.

177.    The publication of Libelous Statement 4 demonstrates a purposeful avoidance of the truth and a deliberate disregard of the evidence developed in the well-publicized investigation and publicly-available documents pertaining to the Mark Hatten criminal arrest and conviction.

178.    Defendants knew that Mark Hatten was biased against Stern and could not be considered a reliable source for uncorroborated factual accusations against Stern.

### Libelous Statement 5:
### Conspiracy to Commit Murder

179.    Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern had conspired to commit murder:

Law enforcement sources confirmed that in June 2000, the FBI interviewed Hatten in prison. He claimed Anna Nicole and Howard K. Stern wanted him to arrange a hit on Pierce Marshall, J. Howard Marshall's son and their bitter rival in the war for her late husband's money. The FBI asked him to wear a wire and secretly tape Anna Nicole, which he later refused to do. Hatten told me on the

phone from prison that he still loved her and didn't want to see her get sent to prison. He also claims that Howard once gave him two small pills, saying they were aspirin. Hatten says the pills knocked him out, and he was unconscious for at least twenty-four hours.

(Blonde Ambition, 102.)

180.    Libelous Statement 5 is false because Stern never conspired to "arrange a hit" on Pierce Marshall or on anyone else.

181.    Libelous Statement 5 is defamatory because, among other things, it accuses Stern of the crime of conspiracy to commit murder.

182.    Libelous Statement 5 is defamatory because, among other things, it conveys to the reader that Stern has a violent, malicious, disreputable character, injurious to both his personal and professional reputation.

183.    Libelous Statement 5 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

184.    Defendants have no corroboration for Libelous Statement 5.

185.    Libelous Statement 5 is so highly implausible that to publish it without independent corroboration was publication with reckless disregard for truth or falsity.

186.    Defendants cite Mark Hatten as the alleged source for information set forth in Libelous Statement 5.

187.    Defendants had clear and compelling reasons to doubt the veracity of Mark Hatten and the truth or accuracy of any statements he might make concerning Stern, as more fully set forth in Paragraphs 172 through 178 of this Complaint.

188.    The FBI questioned Stern and Ms. Smith in relation to Mark Hatten's claims about a "hit on Pierce Marshall" and, after investigating the matter, took no action.

189.    On information and belief, Defendants failed to contact the FBI to ascertain information about its investigation of Mark Hatten's claim, further evidencing publication with a reckless disregard for truth or falsity.

### Libelous Statement 6:
### Perjury

190.    Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern had committed perjury:

> "I just want her to be with Daniel," Howard K. Stern cried to *Entertainment Tonight* cameras on his flight from Florida to the Bahamas on *Entertainment Tonight*'s private plane. Even though Howard testified under oath during the Florida court hearing over Anna's burial that he only received the free flight, he was reportedly paid one million dollars to allow the entertainment news magazine to exclusively tape him and tag along as he went back to the Bahamas to secure Anna's five-month-old baby, Dannielynn – the baby he was claiming to be the father of.

(Blonde Ambition, 28.)

191.    Libelous Statement 6 is false because Stern did not commit perjury. He told the truth when he testified during the Florida court hearing that he received only a free flight from *Entertainment Tonight*.

192.    Libelous Statement 6 is false because Stern did not receive One Million Dollars from *Entertainment Tonight*.

193.    Stern has not been paid any money by *Entertainment Tonight* or by any third person or entity in connection with Ms. Smith's death.

194.    Libelous Statement 6 is defamatory because, among other things, it accuses Stern of committing perjury during his testimony in the Florida hearings.

195.    Libelous Statement 6 is defamatory because, among other things, it imputes to Stern dishonesty and a lack of integrity with the judicial and prosecutorial system, all of which injure Stern's personal and professional reputation.

196.    Libelous Statement 6 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

197.    In an intentional avoidance of the truth, Defendants did not contact *Entertainment Tonight* to verify the truth or accuracy of Libelous Statement 6, thereby further evidencing publication with a reckless disregard for truth or falsity.

### *Libelous Statement 7:*
### *Pimping*

198.    Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern had pimped Ms. Smith:

> Daniel also told the private investigator that Howard was having people "lay his mom" -- pimping her for sex. Daniel didn't elaborate further to Harding.

(Blonde Ambition, 31.)

199.    Libelous Statement 7 is false because Stern did not pimp Ms. Smith.

200.    Libelous Statement 7 is defamatory because, among other things, it accuses Stern of the crime of pimping.

201.    Libelous Statement 7 is defamatory because, among other things, it imputes an unsavory, salacious and disreputable character to Stern, injurious to both his personal and professional reputation.

202.    Libelous Statement 7 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

- 27 -

203.   At the time of the publication of Libelous Statement 7, Defendants knew that the false factual accusations about Stern were unverified and unsubstantiated.

204.   Libelous Statement 7 is so highly implausible that to publish it without independent corroboration constitutes publication with reckless disregard for truth or falsity.

205.   Defendants cited Jack Harding, a purported private investigator, as the alleged source of the information set forth in Libelous Statement 7.

206.   Defendants had clear and compelling reasons to doubt the veracity of Harding and the truth or accuracy of any statements he might make regarding Stern.

207.   Harding's statements about his meetings with Daniel Smith have never been independently corroborated.

208.   Prior to the publication of Blonde Ambition and after Daniel Smith's death, Harding gave several media interviews in which he made inconsistent, contradictory and implausible statements about Stern and Ms. Smith.

### *Libelous Statement 8:*
### *Fraudulent Inducement for Prostitution*

209.   Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern had drugged Ms. Smith and then profited from prostituting her:

> However, Jackie Hatten, Daniel's godmother, told me Daniel confided in her that "he'd seen Howard give his mom uppers and downers and then guys would come to the house, talk to Howard and go into his mom's bedroom and close the door." According to Jackie, Daniel called it the "Millionaire's Club," a reference to an episode on Anna's E! Entertainment Television reality show, in which she had gone out on arranged dates with super wealthy men. Unlike the show, however, Daniel told Jackie that the men he saw, at least fifty of them in a year, would go into his mom's bedroom for hours. Then, from his vantage point hiding behind the door in his bedroom, he'd see the guys coming out adjusting their clothes and discretely palming Howard money on the way out the door. Daniel said he'd then see his mom being "all drugged out and groggy" in her bedroom.

. . . Jackie said she and Daniel firmly believed Anna had no idea Howard was getting paid on the side. "When Anna was not sober, she was easy to take advantage of. My friend Anna was Howard Stern's cash cow. Howard was taking advantage of Anna in every way, up until, and including, her death."

(Blonde Ambition, 31.)

210.    Libelous Statement 8 is false because Stern never gave Ms. Smith uppers and downers and then took men into Ms. Smith's bedroom.

211.    Libelous Statement 8 is false because Stern never accepted remuneration or profited from permitting other men to have sexual relations with Ms. Smith.

212.    Libelous Statement 8 is defamatory because, among other things, it accuses Stern of the crime of fraudulently inducing Ms. Smith to engage in prostitution.

213.    Libelous Statement 8 is defamatory because, among other things, it imputes an unsavory, salacious and disreputable character to Stern, injurious to both his personal and professional reputation.

214.    Libelous Statement 8 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

215.    At the time of the publication of Libelous Statement 8, Defendants knew that it was unverified and unsubstantiated.

216.    Libelous Statement 8 is so highly implausible that to publish it without independent corroboration constitutes publication with reckless disregard for truth or falsity.

217.    In support of the false factual accusations contained in Libelous Statement 8, Defendants cite to statements allegedly made by Jackie Hatten.

218.    Defendants had clear and compelling reasons to doubt the veracity of Jackie Hatten and the truth or accuracy of any statements she made about Stern, as more fully set forth in Paragraphs 105 through 118 of this Complaint.

219.    Allegedly according to Jackie Hatten, "from his vantage point hiding behind the door in his bedroom" Daniel Smith would see "guys coming out [of Ms. Smith's bedroom] adjusting their clothes and discretely palming Howard money on the way out the door."

220.    Daniel Smith's bedroom was on the first floor of the house, the front door was on the second floor of the house, and Ms. Smith's bedroom was on the third floor of the house.

221.    Daniel Smith therefore would have been unable to see anyone entering or exiting Ms. Smith's bedroom or the front door while simultaneously hiding behind the door in his bedroom.

222.    Jackie Hatten has never been inside the house in which Stern, Ms. Smith, and Daniel Smith lived because she was no longer friends with Ms. Smith when they moved into the house in 2002.

223.    Jackie Hatten is not a credible or reliable source.

### Libelous Statement 9:
### Obstruction of Justice and Destruction of Evidence

224.    Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern had obstructed justice and destroyed evidence in connection with the investigation into the death of Daniel Smith:

> When they got back to the Horizons house the day Daniel died, Ben and Anna went to Howard's bedroom, while Gaither Thompson, Ben's son, and Ford Shelley, Ben's son-in-law, went to Anna's bedroom where Howard had started rifling through all of Daniel's things. Howard and Anna had separate bedrooms, approximately one hundred feet apart. While Ben comforted Anna, Ford says Howard was aggressively searching through Daniel's jeans, his shoes, his t-shirt, and baseball cap, which were all laid out on the bed in Anna's room.

> Both Gaither and Ford saw two pills fall out of Daniel's front pocket. "They were two white tablets," Ford Shelley said, "odd shaped. I'm not sure what they were."

> Howard took the pills, went into the bathroom and closed the door. Suspicious of what Howard was doing, Ford walked over to the bathroom door and heard the

toilet flush. When he came out of the bathroom, Ford Shelley says Howard proclaimed, "I took care of the problem."

"Why are you doing this?" Ford asked. "I wouldn't have done that if I were you."

After a long pause, Howard said, "Well, I did."

Ford believes Howard was protecting Daniel and Anna, but told me, "Jesus Christ! I can't believe he'd destroy evidence like that."

(Blonde Ambition, 51.)

On the drive back to the house Howard and Ford Shelley were in a separate vehicle from [coroner Linda] Virgill. According to Shelley, Howard called and told someone on the other end of the phone, "Go put the pills away now!" He explained the coroner was on the way. . . .

"What are you doing?" Ford asked. "Maybe Daniel took something that would've killed him."

For the rest of the drive, Howard was silent. "He clearly wanted to hide those pills before the coroner got there and started snooping around."

\* \* \* \*

. . . Ford Shelley says Howard repeatedly told Linda Virgill, as he would also tell other Bahamian authorities, that there were no drugs present and no drug history for Daniel. "There is no way any drugs could've played a role," Howard said.

Ford says he was shocked by Howard's clear lie. They knew Howard had taken those pills out of Daniel's pocket before he made those statements to the coroner and also had all the pills in the house as well as the "goodie bag" put away. "He had already tampered with evidence," Ford said.

(Blonde Ambition, 52-53.)

225.    Libelous Statement 9 is false because Stern never removed or flushed any pills from Daniel Smith's pocket. The incident described on page 51 of Blonde Ambition never occurred.

226.    Immediately after Daniel's death, prior to Stern returning home to Horizons, police searched Daniel Smith's clothing in Stern's presence. The police search of Daniel Smith's clothing did not reveal any drugs.

227.    Libelous Statement 9 is false because Stern never lied to Linda Virgill or any other Bahamian authorities.

228.    Libelous Statement 9 is false because Stern never had any pills in the house put away and never had a "goodie bag."

229.    Libelous Statement 9 is defamatory because, among other things, it accuses Stern of the crimes of obstructing justice and destroying evidence in connection with the investigation into the death of Daniel Smith.

230.    Libelous Statement 9 is defamatory because, among other things, it imputes to Stern dishonesty and a lack of integrity with the judicial and prosecutorial system, all of which injure Stern's personal and professional reputation.

231.    Libelous Statement 9 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

232.    At the time of the publication of Libelous Statement 9, Defendants knew that the false factual accusations about Stern were unverified and unsubstantiated.

233.    In support of Libelous Statement 9, Defendants cite to statements allegedly made by Ford Shelley.

234.    Upon information and belief, neither Cosby nor Hachette Book Group made any effort to contact Ford Shelley to verify the truth or accuracy of the false factual accusations contained in Libelous Statement 9 prior to publishing them.

235.    Defendants had clear and compelling reasons to doubt the veracity of Ford Shelley and the truth or accuracy of any statements he made about Stern.

236.    Shelley was present for Bahamian Magistrate Linda Virgill's examination of Stern regarding Daniel Smith's death, which included questions about drugs.

237.    Shelley made no mention of the alleged destruction of evidence at that time. In fact, he never made that allegation until months after Linda Virgill's examination of Stern.

238.    Shortly after Daniel's death, Shelley and his father-in-law, Ben Thompson, had initiated litigation against Ms. Smith regarding ownership of Horizons.

239.    That litigation intensified after Ms. Smith's death.

240.    The day after Ms. Smith's death, despite an injunction prohibiting Thompson and his agents from entering the property, Shelley entered Horizons without authorization and took Ms. Smith's personal belongings, including computers, videotapes, confidential documents, and paintings that Ms. Smith painted for Dannielynn. Shelley admitted to having taken items from Horizons on national television prior to the publication of the false factual accusations in Libelous Statement 9.

241.    Defendants knew that Shelly was biased against Stern and could not be considered a reliable source for uncorroborated factual accusations against Stern.

### Libelous Statement 10:
### Theft, Money Laundering and Wire Fraud

242.    Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern had committed the crimes of theft, money laundering and wire fraud:

> Going on record, Larry Birkhead told police that Howard was funneling approximately $15,000 at least every other week, wiring it to his parents in offshore accounts. According to Larry, several million dollars had been wired. He

said that Bahamian police should check Howard's bank accounts and Anna's checkbook.

\* \* \* \* \*

Birkhead had also told Bahamian police that he often saw Howard injecting Anna and that "Howard was stealing money from Anna, sending money to his parents and offshore banks in the amount of $15,000 every week or two weeks." Larry further said that millions of dollars were funneled from Anna's accounts to Howard's. "I saw Howard signing checks to himself and to Howard's banks in the States and offshore."

(Blonde Ambition, 165-66.)

She [Tas Brighthaupt] also made a surprising discovery. When she sat in one of two chairs at the foot of Anna's bed to work on the computer, she noticed Howard's computer was on and open on the floor to the right of the chair. A $37,000 wire transfer he had made that morning was still illuminated on the screen. Tas says she was on the phone with Moe when she saw the wire transfer message. (Police did check Howard's computer for e-mails sometime after her death, but were not informed of any wire transfers and therefore did not check for any.) Both the boat broker and handyman know of no large amount like this that would have been associated with the boat.

(Blonde Ambition, 233-34.)

243.     Libelous Statement 10 is false because Stern never stole any money from Ms. Smith. He never transferred money from Ms. Smith's accounts to his parents, to offshore accounts, to his own accounts or to himself.

244.     Libelous Statement 10 is false because Ms. Smith did not even have online access to her bank accounts.

245.     Libelous Statement 10 is false because Stern did not make any wire transfers the morning Ms. Smith died.

246.     Stern has never made online wire transfers or conducted any online banking activities whatsoever.

247.    Libelous Statement 10 is defamatory because, among other things, it accuses Stern of committing the crimes of theft, money laundering and wire fraud.

248.    Libelous Statement 10 is defamatory because, among other things, it imputes to Stern dishonesty and a lack of integrity with the judicial and prosecutorial system, all of which injure Stern's personal and professional reputation.

249.    Libelous Statement 10 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

250.    At the time of their publication, Defendants knew that the false factual accusations about Stern were unverified and unsubstantiated.

251.    Neither Cosby nor Hachette Book Group made any effort to contact Stern's parents to verify the accuracy of the false factual accusations contained in Libelous Statement 10.

252.    In support of the false factual accusations contained in Libelous Statement 10, Defendants cite to statements allegedly made by Larry Birkhead in the presence of a private investigator, Mark Speer ("Speer").

253.    The attribution of these statements to Larry Birkhead is false. Birkhead has publicly stated that he never made the statements attributed to him to the effect that Stern engaged in theft, money laundering or wire fraud.

254.    Birkhead has publicly stated that Defendants did not contact him prior to publishing Blonde Ambition to ascertain whether the statements attributed to him in Libelous Statement 10 were accurate.

255.    Upon information and belief, Birkhead's interviews with Bahamian authorities, in which he purportedly made certain of these statements, were recorded.

256.    Upon information and belief, Cosby made no effort to review recordings of Birkhead's interviews with Bahamian authorities prior to attributing the false statements to Birkhead.

257.    Upon information and belief, Cosby made no effort to interview any Bahamian authorities involved in the Birkhead interview prior to attributing the false statements to Birkhead.

258.    Defendants also had clear and compelling reasons to doubt the veracity of Speer and the truth or accuracy of any statements he made about Stern.

259.    At the time the false factual accusations in Libelous Statement 10 were allegedly made, Birkhead was engaged in contentious paternity litigation with respect to Dannielynn and seeking custody of her.

260.    Birkhead was represented in those proceedings by Debra Opri, a California attorney well-known for her frequent media appearances in connection with high-profile cases.

261.    Speer is a private investigator who was hired by Opri.

262.    Opri no longer represents Birkhead. Prior to the publication of Libelous Statement 10, Opri and Birkhead filed various claims against each other, and they are currently involved in contentious litigation with respect to payment of attorney's fees and allegations of defamation.

263.    Cosby referred Birkhead to Opri so that Opri could represent him in his paternity and custody hearings over Dannielynn.

264.    Opri has given numerous media interviews in which she made statements antagonistic to Stern.

265.    Speer was never present during any conversation between Stern and Birkhead at Ms. Smith's home in the Bahamas.

266.    Although Speer was in the Bahamas when Birkhead went there to see Dannielynn, Speer never came into the house. Instead, Speer remained in the car the entire time.

267.    Given his employer's bias against both Stern and Birkhead, Defendants knew that Speer was biased against Stern and could not be considered a reliable source for uncorroborated factual accusations against Stern.

268.    In support of the false factual accusations contained in Libelous Statement 10, Defendants cite to statements allegedly made by Tas Brighthaupt.

269.    Defendants had clear and compelling reasons to doubt the veracity of Tas Brighthaupt and the truth or accuracy of any statements she made about Stern.

270.    Prior to the publication of Libelous Statement 10, Tas Brighthaupt gave a number of media interviews, in which she made inconsistent and contradictory statements.

271.    Defendants recognized at least one inconsistency in Tas Brighthaupt's statements, thereby establishing that they knew prior to the publication of Libelous Statement 10 that Tas was not a reliable source. (See Blonde Ambition, 231.)

272.    Tas Brighthaupt's husband, Moe Brighthaupt ("Big Moe"), was employed as a bodyguard for Ms. Smith in Florida and prior to the publication of Blonde Ambition publicly stated that he disagreed with statements by his wife.

273.    Big Moe has publicly stated that Cosby never interviewed him in connection with her book about Stern and Ms. Smith.

### Libelous Statement 11:
### Fraudulent and Perjurious Statements Regarding Dannielynn's Paternity

274.    Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern had fraudulently stated that he was Dannielynn's biological father even though he knew the claim was false:

Even though Howard K. Stern testified on the stand that he was the father of Dannielynn, he privately made this offer to Larry: "I will give you your baby if you leave me as executor of the estate."

(Blonde Ambition, caption to photograph on unnumbered page.)

275.    Libelous Statement 11 is false because Stern was not lying when he testified and made public statements regarding his belief that he was Dannielynn's biological father.

276.    Libelous Statement 11 is false because Stern has never stated that he would give Birkhead his baby if Birkhead would leave Stern as executor of the estate

277.    Libelous Statement 11 is defamatory because, among other things, it accuses Stern of committing the crime of perjury and of committing fraud by asserting his belief that he was Dannielynn's biological father.

278.    Libelous Statement 11 is defamatory because, among other things, it imputes to Stern dishonesty and a lack of integrity with the judicial and prosecutorial system, all of which injure Stern's personal and professional reputation.

279.    Libelous Statement 11 is defamatory because, among other things, it imputes an unsavory, salacious and disreputable character to Stern, injurious to both his personal and professional reputation.

280.    Libelous Statement 11 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

281.    In support of the false factual accusations contained in Libelous Statement 11, Defendants had no sources for the published statements.

282.    If Defendants are relying on Shelley as the source for Libelous Statement 11, Defendants had clear and compelling reasons to doubt the veracity of Shelley and the truth or

accuracy of any statements he made about Stern, as set forth more fully in Paragraphs 234 through 241 of this Complaint.

### *Libelous Statement 12*
### *Kidnapping for Ransom*

283.    Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern had committed the crime of kidnapping for ransom by fraudulently withholding custody of Dannielynn until Birkhead agreed not to contest Stern's role as executor of Ms. Smith's estate:

> On the drive home from that secret meeting, Mark Speer, who was in the car, overheard the discussions taking place between Larry Birkhead and Ford Shelley. They were talking about Howard's offer to Larry behind closed doors. The deal was if Larry agreed not to contest Howard remaining as executor of Anna's estate, then Larry could have his baby.

> Mark Speer said later that he was surprised Larry seemed receptive to the idea. As conversations with Howard continued over the next few days, Howard sweetened the deal. If Larry agreed not to contest the will and allowed Howard to remain executor of Anna's estate as well as keep control of Anna's "name and likeness," Howard would:

> - Drop all legal claims for custody of Dannielynn and "give you your baby."
> - Allow Larry to "run the show" in California.
> - Let Larry live in Anna's Studio City house. . . .
> - Pay all the bills.
> - Provide several thousand dollars a month in allowance…and pay for a rental car.

> He also promised Larry that he would "take care of you the way I took care of Anna."

(Blonde Ambition, 175-76.)

> Mark Speer heard first hand Howard's proposal to Larry: "I will give you your baby, if you leave me as executor of the estate." Speer, a retired deputy sheriff later told me, "I felt like arresting Howard then and there for kidnapping and holding the baby for ransom. If I could have."

> Larry responded to Howard: "I'm not going to leave you as executor."

Howard then said to Larry: "It only makes sense if I keep running her businesses. I'll also pay you an on-going fee."

(Blonde Ambition, 198.)

284.    Libelous Statement 12 is false because Stern and Birkhead did not make a secret deal through which Stern would give Dannielynn to Birkhead if Birkhead would not contest Stern being named executor of the Estate of Anna Nicole Smith.

285.    In fact, Stern was the nominated executor in Ms. Smith's will, and Birkhead had no power to prevent Stern from being named as executor.

286.    Stern could not have kidnapped Dannielynn at the time of the alleged statements in Libelous Statement 12 because he honestly believed he was Dannielynn's biological father, and he was Dannielynn's legal father under Bahamian law, having been identified as her father on her birth certificate.

287.    After it was determined that Birkhead was Dannielynn's biological father, Stern never asserted any legal claims for custody of Dannielynn, even though as her legal father, he was entitled to do so.

288.    Libelous Statement 12 is defamatory because, among other things, it essentially accuses Stern of the crime of kidnapping for ransom in that it accuses him of wrongfully taking custody of a child who was not his and refusing to turn over custody to her rightful father until Birkhead agreed not to contest Stern's role as executor of Ms. Smith's Estate.

289.    Libelous Statement 12 is defamatory because, among other things, it imputes an unsavory, salacious and disreputable character to Stern, injurious to both his personal and professional reputation.

290.    Libelous Statement 12 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

- 40 -

291.    At the time of their publication, Defendants knew that the false factual accusations about Stern in Libelous Statement 12 were unverified and unsubstantiated.

292.    Upon information and belief, neither Cosby nor Hachette Book Group made any effort to contact Birkhead to verify the accuracy of Libelous Statement 12.

293.    Birkhead has publicly denied that he entered into any deal with Stern to trade Dannielynn for permitting Stern to remain as executor of Ms. Smith's estate.

294.    In support of the false factual accusations contained in Libelous Statement 12, Defendants cite to a conversation allegedly heard "first hand" by Mark Speer.

295.    Defendants had clear and compelling reasons to doubt the veracity of Speer and the truth or accuracy of any statements he made about Stern, as more fully set forth in Paragraphs 258 through 267 of this Complaint.

### Libelous Statement 13:
### Extortion or Blackmail of Larry Birkhead

296.    Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern had committed the crime of extortion or blackmail by threatening to disclose secrets about Birkhead if he did not enter into an agreement with Stern:

> She [Debra Opri] worried that since they were so close to getting a positive resolution in court without any side deals, Larry would be making a big mistake cutting a deal.

> As they prepared for the funeral of Anna Nicole Smith, why was Larry going against both his family's wishes and those of his counsel?

> What did Howard K. Stern have on Larry Birkhead?

(Blonde Ambition, 176.)

> At the Hilton Hotel the day that Virgie and Larry had met, Virgie says she had an eye-opening conversation with a desperate and nervous young man. Virgie asked Larry Birkhead about Howard. "What does he have on you?"

"They have so much stuff on me," Larry told her.

"Son, what kind of stuff?" Virgie asked.

"They're fixing to tell all about me," he said. "They say they caught me dating other men. That I'm queer."

\* \* \* \*

What Howard knew about Larry was something Larry didn't want the world – but perhaps more importantly his devout Southern Baptist family – to find out. It is his skeleton in the closet. And, like others involved in this sordid tale, it is often these kept secrets that make people act in ways and do things that they normally would not do.

● ● ●

One of Anna's closest friends, Jackie Hatten, says she knows what Howard has on Larry.

(Blonde Ambition, 201-02.)

297.    Libelous Statement 13 is false because Stern never threatened to reveal any secrets about Birkhead unless Birkhead agreed to enter into a deal with Stern.

298.    Libelous Statement 13 is defamatory because, among other things, it accuses Stern of the crime of extortion by asserting that Stern threatened to disclose a personal secret about Birkhead's sexuality unless Birkhead agreed to enter into a deal with Stern regarding Ms. Smith's estate.

299.    Libelous Statement 13 is defamatory because, among other things, it imputes an unsavory, salacious and disreputable character to Stern, injurious to both his personal and professional reputation.

300.    Libelous Statement 13 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

301.    Upon information and belief, neither Cosby nor Hachette Book Group made any effort to contact Birkhead to verify the accuracy of Libelous Statement 13.

302.    Birkhead has publicly denied that he entered into any deal with Stern to trade Dannielynn for permitting Stern to remain as executor of Ms. Smith's estate.

303.    In support of the false factual accusations contained in Libelous Statement 13, Defendants cite to statements allegedly made by Larry Birkhead to Virgie Arthur.

304.    Defendants had clear and compelling reasons to doubt the veracity of Arthur and the truth or accuracy of any statements made by her about Stern.

305.    Arthur had engaged in a very public legal battle with Stern in her attempt to have Ms. Smith buried in Texas instead of in the Bahamas and continues to be involved in custody litigation against Birkhead.

306.    Arthur has made numerous media appearances in which she made false factual accusations about Stern. Upon information and belief, Arthur received remuneration for some of those media appearances.

307.    During her interviews, Arthur made numerous false statements of fact.

308.    Arthur's lawyer, O'Quinn, has been sued by Stern for his slanderous statements against Stern.

309.    Defendants knew that Arthur was biased against Stern and could not be considered a reliable source for uncorroborated factual allegations against Stern.

### Libelous Statement 14:
### Drugging Anna Nicole Smith

310.    Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern had drugged Ms. Smith in order to maintain control over her:

> He [Daniel Smith] told Harding he wanted him to investigate what Howard K. Stern was doing to his mom and people around her. . . . "Howard also keeps feeding my mom drugs," he continued, "mind-bending drugs. He has total control over her like a, like a . . ."

"Svengali?" Harding asked.

"Yeah," Daniel said. "That's it! He's a Svengali. . . ." He explained that ever since Howard had come into their lives, he had purposely kept his mother "out of it all the time." Harding said Ray Martino had told him before that Anna had cleaned up for a while, but had gone "off the deep end with drugs" when she hooked up with Howard.

(Blonde Ambition, 30-31.)

311.    Libelous Statement 14 is false because Stern never gave Ms. Smith drugs in an attempt to control her. He never kept Ms. Smith "out of it."

312.    Libelous Statement 14 is defamatory because, among other things, it accuses Stern of illegally drugging Ms. Smith against her will so that he could maintain control over her.

313.    Libelous Statement 14 is defamatory because, among other things, it imputes an unsavory, salacious and disreputable character to Stern, injurious to both his personal and professional reputation.

314.    Libelous Statement 14 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

315.    In support of the false factual accusations contained in Libelous Statement 14, Defendants cite to statements allegedly made by Jack Harding.

316.    Defendants had clear and compelling reasons to doubt the veracity of Harding and the truth or accuracy of any statements he made about Stern, as set forth more fully in Paragraphs 206 through 208 of this Complaint.

***Libelous Statement 15:***
***Criminal Involvement in the Death of Anna Nicole Smith***
***As Evidenced by Financial Motive***

317.   Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern was criminally involved in the death of Ms. Smith and that he had a financial motive:

> Jackie told Peter that Anna was in imminent danger. She felt Howard was increasingly drugging her so he could inherit the money. She said someone needed to save Anna's life to "take her away from Howard."

(Blonde Ambition, 104.)

> Jackie Hatten did speak to Larry Birkhead on the phone shortly after Daniel died. She told Larry, "I am worried about Anna, that she'll be next."

(Blonde Ambition, 204.)

318.   Libelous Statement 15 is false because Stern never drugged Ms. Smith or took any adverse action toward her in an attempt to inherit her money. Stern had no involvement in Ms. Smith's death.

319.   Libelous Statement 15 is defamatory because, among other things, it accuses Stern of illegally drugging Ms. Smith against her will so that he could inherit her money and of being involved in her death for his own financial gain.

320.   Libelous Statement 15 is defamatory because, among other things, it imputes an unsavory, salacious and disreputable character to Stern, injurious to both his personal and professional reputation.

321.   Libelous Statement 15 is defamatory because, among other things, it conveys to the reader that Stern has a violent and malicious character, injurious to both his personal and professional reputation.

322.    Libelous Statement 15 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

323.    Defendants ignored contradictory evidence in publishing Libelous Statement 15.

324.    Defendants knew at the time of the publication of Libelous Statement 15 that Stern was not a beneficiary under Ms. Smith's will and that Stern therefore would not inherit any money from Ms. Smith upon her death.

325.    Defendants therefore knew that Stern had no financial motive to be involved in Ms. Smith's death.

326.    In support of the false factual accusations contained in Libelous Statement 15, Defendants cite to statements allegedly made by Jackie Hatten.

327.    Defendants had clear and compelling reasons to doubt the veracity of Jackie Hatten and the truth or accuracy of any statements made by her about Stern, as set forth more fully in Paragraphs 105 through 118 of this Complaint.

### Libelous Statement 16:
### Criminal Involvement in the Death of Anna Nicole Smith
### As Evidenced by Financial Motive

328.    Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern was criminally involved in the death of Ms. Smith and that he had a financial motive:

> Anna's mother Virgie Arthur also felt that Howard K. Stern was after Anna's money and went on television to say so. . . .
>
> * * * * *
>
> A week before Daniel's funeral, Virgie went on CNN and said, ". . . But if Howard marries Vickie and Daniel's gone, that leaves Howard and the baby to inherit whatever money she has." And then she made her point even clearer. "If Howard Stern marries her and she ends up dead, then who does the money go to?" Howard K. Stern.

(Blonde Ambition, 105.)

329.    Libelous Statement 16 is false because Stern never took any adverse action toward Ms. Smith in an attempt to inherit her money. Stern had no involvement in Ms. Smith's death.

330.    Libelous Statement 16 is defamatory because, among other things, it implies that Stern was involved in Ms. Smith's death for his own financial gain.

331.    Libelous Statement 16 is defamatory because, among other things, it imputes an unsavory, salacious and disreputable character to Stern, injurious to both his personal and professional reputation.

332.    Libelous Statement 16 is defamatory because, among other things, it conveys to the reader that Stern has a violent and malicious character, injurious to both his personal and professional reputation.

333.    Libelous Statement 16 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

334.    Defendants ignored contradictory evidence in publishing Libelous Statement 16.

335.    Defendants knew at the time of the publication of Libelous Statement 16 that Stern was not a beneficiary under Ms. Smith's will and that Stern therefore would not inherit any money from Ms. Smith upon her death.

336.    Defendants therefore knew that Stern had no financial motive to be involved in Ms. Smith's death.

337.    In support of the false factual accusations contained in Libelous Statement 16, Defendants cite to statements allegedly made by Virgie Arthur.

338. Defendants had clear and compelling reasons to doubt the veracity of Arthur and the truth or accuracy of any statements made by her about Stern, as set forth more fully in Paragraphs 305 through 309 of this Complaint.

### Libelous Statement 17:
### Criminal Involvement in the Death of Anna Nicole Smith
### As Evidenced by the Fax of Ms. Smith's Will

339. Defendants published the following false and defamatory statements in Blonde Ambition conveying that Stern was criminally involved in the death of Anna Nicole Smith as evidenced by Stern purportedly obtaining a copy of Ms. Smith's will prior to her death:

> On the top of the faxed copy of the will sent from Anna's attorney and Howard's good friend, Ron Rale, to Howard's Florida attorney, Krista Barth, it said "2/3 RAR" and "2:18 a.m." February 3 – which would indicate that it was sent just five days before Anna died and several months after Daniel was already dead. Her will possibly being faxed five days before her death had tongues wagging outside and inside the courthouse. On the face of it, such an action would seem to be quite suspicious.

> \* \* \* \* \*

> Judge Seidlin pointed out what many were thinking – no woman in her right mind would ever sign a will that excludes her future children. But then he took Krista Barth's word that her fax machine in her office was messed up since she was claiming her daily office logs could confirm that the fax came after Anna died. But it seemed to go unnoticed that normally the time stamped on top of a fax is from the outgoing fax machine, not the incoming fax machine. The outgoing fax machine belonged to Ron Rale, Howard's long-time friend.

(Blonde Ambition, 170, 172.)

340. Libelous Statement 17 is false because Stern did not request or obtain a copy of Ms. Smith's will prior to her death.

341. Libelous Statement 17 is false to the extent it implies that Stern was involved in the death of Ms. Smith, because he was not.

342.    Law enforcement authorities have thoroughly investigated Ms. Smith's death and have determined that it was "accidental."

343.    Libelous Statement 17 is defamatory because, among other things, it implies that Stern knew about Ms. Smith's death ahead of time, as evidenced by him obtaining a copy of her will.

344.    Libelous Statement 17 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

345.    Libelous Statement 17 is defamatory because, among other things, it imputes an unsavory, salacious and disreputable character to Stern, injurious to both his personal and professional reputation.

346.    Libelous Statement 17 is defamatory because, among other things, it conveys to the reader that Stern has a violent and malicious character, injurious to both his personal and professional reputation.

347.    Defendants ignored contradictory evidence in publishing Libelous Statement 17.

348.    The publication of Libelous Statement 17 demonstrates a purposeful avoidance of the truth. Defendants completely disregarded the publicly available court transcript explaining that Ms. Smith's will was faxed after she had died and that the time stamp problem was indeed with Ron Rale's fax machine, which could be verified through Krista Barth's fax log.

349.    Barth had her fax log in her hand at the time she made the statement reprinted in Libelous Statement 17, and Defendant Cosby was present in court that day.

350.    Cosby had actual knowledge that the statements in Blonde Ambition about the date of faxing the will were false and without any factual support whatsoever.

### *Libelous Statement 18:*
### *Criminal Involvement in the Death of Daniel Smith*

351.    Defendants published the following false and defamatory statements in Blonde

Ambition conveying that Stern was criminally involved in the death of Daniel Smith:

> She [Ms. Smith] told several employees, who have gone on record, that she was
> afraid Howard may have had something to do with Daniel's death.

* * * *

> Both nannies have repeatedly said that they overheard Anna telling Howard K.
> Stern around the time of Daniel's funeral: "You did this! You killed him! You
> caused this!" And that they had also heard Anna scream at him: "Get out of here!
> Just wait for the inquest!"

(Blonde Ambition, 76, 78.)

> Even more shocking perhaps, Quethlie Alexis and Nadine Alexie told
> investigators that when Howard tried to console Anna and gently get her to
> release Daniel's body, she looked right at Howard and screamed, "You caused
> this! You did this. Get away from me, you bastard!" It was a surprising and
> uncomfortable moment for the small crowd.

(Blonde Ambition, 91.)

> "He may try to kill her," Jackie said. "Howard is responsible for killing the boy
> and Anna's next."

(Blonde Ambition, 104.)

> Speer told me that Larry's mission at the time was to get Howard arrested and
> convicted for the death of Daniel and the continued drugging of Anna Nicole.

(Blonde Ambition, 166.)

352.    Libelous Statement 18 is false because Stern had no involvement in Daniel

Smith's death.

353.    Libelous Statement 18 is false because Ms. Smith never accused Stern of

involvement in Daniel Smith's death.

354.    Libelous Statement 18 is defamatory because, among other things, it accuses Stern of having criminal involvement in Daniel Smith's death.

355.    Libelous Statement 18 is defamatory because, among other things, it imputes an unsavory, salacious and disreputable character to Stern, injurious to both his personal and professional reputation.

356.    Libelous Statement 18 is defamatory because, among other things, it conveys to the reader that Stern has a violent and malicious character, injurious to both his personal and professional reputation.

357.    Libelous Statement 18 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

358.    In support of the false factual accusations contained in Libelous Statement 18, Defendants cite to statements allegedly made by Quethlie Alexis and Nadine Alexie.

359.    Defendants had clear and compelling reasons to doubt the veracity of Alexis and Alexie and the truth or accuracy of any statements they made about Stern, as set forth more fully in Paragraphs 133 through 137 of this Complaint.

360.    In support of the false factual accusations contained in Libelous Statement 18, Defendants cite to statements allegedly made by Jackie Hatten.

361.    Defendants had clear and compelling reasons to doubt the veracity of Jackie Hatten and the truth or accuracy of any statements she made about Stern, as set forth more fully in Paragraphs 105 through 118 of this Complaint.

362.    In support of the false factual accusations contained in Libelous Statement 18, Defendants cite to statements allegedly made by Mark Speer.

363.    Defendants had clear and compelling reasons to doubt the veracity of Speer and the truth or accuracy of any statements he made about Stern, as set forth more fully in Paragraphs 258 through 267 of this Complaint.

### Libelous Statement 19:
### Criminal Involvement in the Death of Anna Nicole Smith

364.    Throughout Blonde Ambition, in describing the events surrounding Ms. Smith's death, Defendants published a number of false and misrepresentative statements, which, when considered together and in the context of the entire book, clearly imply to the reader that Stern was criminally involved in the death of Ms. Smith:

> Apparently, none of them wanted to argue with Anna to make her go to the hospital, not her medically trained friends or her live-in lawyer Howard K. Stern.

(Blonde Ambition, 7.)

> Whether because of the insanity of the day – or the confusion of trying to keep a story straight – the times that certain things occurred on the day Anna died get blurry among all those involved.

(Blonde Ambition, 9.)

> But Moe says something was peculiar that morning. Howard's behavior.

(Blonde Ambition, 10.)

> They were waiting at the elevator bank to go up to the room when Howard came out of the elevator they were about to get into. Tas says he was "fidgety, strange acting" and that "he seemed surprised when he saw us."
>
> "What's up?" Moe asked.
>
> "I just came down to use my cell phone," Howard said.
>
> "Why?" Moe asked. "It works just fine in the room."
>
> Howard stuttered. "Ah, ah."

According to Tas, "He didn't say anything, and then just went upstairs in the elevator with all of us." When she thinks back on the day, she said, "I still cannot get over his behavior at that moment."

The entire group walked into Room 609 and Tas says Howard was "talking in a normal, in a loud voice, which in hindsight seems strange given that Anna was supposed to be sleeping. He wasn't whispering." He shouted out to Anna, saying, "Anna we have guests." Also, Howard did something that in retrospect seems "calculated," Tas says. "He stood in front of the living room area in between the two rooms, with his back to the master bedroom. So we could barely look into 607." Tas also recalled it was "like he was intentionally blocking our view of Anna inside the next room."

(Blonde Ambition, 11-12.)

The strange thing about Howard's noon appointment was that it wasn't at noon at all. "Howard had a one o'clock appointment with me," the boat handyman told me. "Definitely one o'clock."

(Blonde Ambition, 12.)

Anna was lying on her right side and right shoulder, facing the left wall, atop soft Egyptian cotton sheets. She was naked. Friends and former boyfriends of Anna's told me that her sleeping in the nude was very strange – that Anna never slept in the nude. . . . It is one of the many details that doesn't seem right about the scene in room 607 that day.

(Blonde Ambition, 18.)

. . . Howard's first visible reaction when he got the news that all was not well with Anna could be described as surprising by some. "It didn't seem like an upsetting call to him at all," the handyman told me. . . . After Howard ended his call, he said in a monotone, unemotional voice, "I have an emergency and have to leave."

In fact, after Howard got the call, the handyman says Howard answered several questions for him. . . Howard then said goodbye and walked back to the car.

(Blonde Ambition, 22.)

. . . But when Howard got back to the hotel in front of a crowd of eyewitnesses, his response was much more heightened. He was seen running through the hotel and was very upset, quite different from his initial response when he received the call at the boat basin.

(Blonde Ambition, 25.)

Approximately 2:15 p.m., it was Moe, rather than Howard, who ran beside the gurney carrying the tabloid icon to the waiting ambulance below. . . . But it was Moe, rather than Howard, who took the ride in the ambulance with Anna to the hospital. And it was Moe, about a half an hour later in the emergency room of Memorial Regional Hospital, who gave doctors the nod to stop their resuscitation efforts.

* * * * *

Howard eventually went to the hospital, but not at his request. An eyewitness says after thirty minutes to an hour of him being in the room and talking to detectives, the hospital called and asked for Howard's presence. Another person on the scene told me, "He was in no rush to go."

• • •

Howard K. Stern had been quite busy. He began talking to his media contacts right away. . . . *Entertainment Tonight* . . . was already en route to Hollywood, Florida, and was confirmed for a block of rooms at the Hard Rock that Howard personally called to reserve before 4 p.m. Given that Anna had just been pronounced dead at 2:49 p.m., it was shocking to many of those present that Howard could even think of any media at that moment, much less make an exclusive deal so soon after her death pronouncement. But he did. . . .

(Blonde Ambition, 26.)

But did authorities have all the information they needed when they closed the case?

From the night before her death to the night after her death, there were numerous calls and frenetic activity that are now confirmed that raise new questions. The facts I have discovered in my investigation show a broad series of inconsistencies -- outright untruths and questionable circumstances -- which add to the mysterious death of Anna Nicole Smith.

* * * * *

**The night before she died, February 7**

**5:13 p.m.**
Howard received a call from Dr. Khris Eroschevich, Anna's psychiatrist and close friend. It was a seven-minute conversation. Dr. Khris left the Florida hotel that day for an evening flight to California.

**6:38 p.m.**
During the afternoon and evening, Howard called Ron Rale, Anna's attorney and Howard's longtime friend, at least five times. The last call to Rale that night was at 6:38 p.m.

(Blonde Ambition, 215.)

**6:41 p.m.**
Howard received his final call of the evening on his cell phone from Alex Goen, CEO of TrimSpa – a man in the middle of several lawsuits, including two class action suits against his company, both for false advertising. One of the suits named Anna Nicole, TrimSpa's spokesperson as a defendant.

(Blonde Ambition, 216.)

***The Day Anna Nicole Smith Died, February 8***

* * * * *

**9:00 a.m. – 9:30 a.m.**
Moe said he went into Anna's room and "thought he saw her moving, but was not certain." He told Howard he was going down to meet his wife, Tas, for breakfast. Howard was now left alone in the suite with Anna.

**10:00 am. and 10:03 a.m.**
Howard used his cell phone to check his voicemail.

**10:42 a.m.**
. . . Seminole Detective Marian Bryant reported that: "At about 11:00 a.m. or 11:15 a.m., Mr. Stern spoke with the decedent [Anna] and informed her he was picking up guests from the airport."
But in actuality Howard did not go to the airport. He sent Moe.

(Blonde Ambition, 217.)

* * * * *

**10:51 a.m.**
Howard called Alex Goen of TrimSpa.

**10:53 a.m.**
Howard called Ron Rale. It is perhaps interesting to note it was still early in California, 7:53 a.m., where Rale lives.

* * * * *

**Around 11:50 a.m.**

Howard walked down the hall and got in the elevator – leaving Anna in bed and completely alone. . . . According to both Tas and Moe's statements to private investigators, Howard was "acting strange." He was very "fidgety." Howard said rather peculiarly that he had to come to the lobby because his cell phone wasn't working in the room. . . .

(Blonde Ambition, 218-19.)

**11:54 a.m.**

. . . Howard walked up to the bedroom door where Anna was "not feeling well" and, according to his visitors shouted, "Anna, we have guests."

. . . It also did not go unnoticed that Howard then made three phone calls on his cell phone. The cell phone that five minutes earlier he said wasn't working in the room.

The first of those calls was made at 11:59 a.m. Howard was calling the hotel liaison – *twice* – as she was almost simultaneously calling him. . . .

Today's needs would be a bit more urgent . . . in fact they would be critical.

**Noon**

Howard called boat broker Mark Dekema. . . . According to both Dekema and the boat handyman, Howard had a 1 p.m. appointment at the marina, scheduled and confirmed. But when the ten-minute phone call with Dekema ended, Howard immediately announced to his guest that he had to do something between 12 and 1 p.m. . . .

(Blonde Ambition, 219-20.)

\* \* \* \* \*

**12:14 p.m.**

. . . A hotel employee, who is familiar with the couple, told me that Howard had not left her side all week. The employee thought it was very "unusual" that Howard would not even be in the hotel when Anna was found dead, especially after her being so sick.

(Blonde Ambition, 220.)

\* \* \* \* \*

**12:17 p.m.**

. . . Howard called Mark Dekema five times between twelve and one o'clock.

(Blonde Ambition, 221.)

* * * * *

**1:15 – 1:22 p.m.**
Howard called boat broker Mark Dekema. . . . Dekema says Howard ended the call abruptly saying, "I have another call, I gotta take this." According to Dekema, he sounded a little urgent, a little desperate. But we now know that at that time, Howard didn't click over to another call. He would first check his voice mail (at 1:23 p.m.), and then he'd receive a call from Moe at 1:24.

(Blonde Ambition, 222.)

* * * * *

**1:27 p.m. – 1:34 p.m.**
For seven minute Howard does not use his phone. The boat handyman says after Moe's call, Howard did not seem upset at all. . . . He then said in a monotone voice, "I have an emergency and have to leave."

     The handyman said Howard "seemed very nonchalant when he said it. He didn't seem distressed . . .acted like it was a minor business issue versus a personal crisis." He walked back to his car. He didn't rush. Given what he knows now, the handyman said Howard's behavior was "extremely odd."

(Blonde Ambition, 223.)

* * * * *

**1:33 p.m., 1:34 p.m., 1:35 p.m., 1:36 p.m.**
Howard, now en route back to the hotel, called Moe over and over again.

* * * * *

**1:37 p.m.**
Howard made two calls to the hotel liaison back to back.

(Blonde Ambition, 224.)

**1:51 p.m.**
Howard entered the room. Tas said, "He had no reaction at first, he was unemotional."

     Paramedics asked Howard," How long has she been like this?" and "What was she taking?" According to Tas, Howard answered, "I don't know. I don't know."

     Howard then called Dr. Khris, who was back in California.

(Blonde Ambition, 215.)

**1:54 p.m.**
Howard called Dr. Khris, who prescribed all nine medications found in Anna's system when she died, including the chloral hydrate, which was prescribed to Howard Stern.

**1:59 p.m.**
Seminole Police Detectives arrived on the scene. Howard told Seminole Police, "that he did not see her take medication, but believed she was taking her medication."

**2:02 p.m. and 2:09 p.m.**
Howard called Dr. Khris again. . . .

**Approximately 2:15 p.m.**
Anna was wheeled out of the Hard Rock Hotel, Howard followed the gurney to the hallway elevator, but then stayed upstairs as Moe left with Anna to the hospital.

**2:27 p.m., 2:30 p.m., 2:32 p.m.**
Howard repeatedly called Moe.

(Blonde Ambition, 226.)

* * * * *

**3:12 p.m.**
Howard called Alex Goen of TrimSpa.

**3:13 p.m.**
Howard called the Hard Rock Hotel's main number.

**3:14 p.m.**
Howard called Alex Goen of TrimSpa.

**3:17 p.m.**
Alex Goen called Howard.

**3:21 p.m.**
Howard called the Horizons house in the Bahamas.

(Blonde Ambition, 227.)

**3:23 p.m.**
Alex got a call from the Boesch Law Firm, which handles Anna's case against J. Howard Marshall's family.

**3:37 p.m. and 3:38 p.m.**
Howard called attorney Ron Rale.

\* \* \* \* \*

**3:49 and 3:51 p.m.**
Howard wasn't quite speechless. He called *Entertainment Tonight/* Paramount and spoke with them first for two minutes, then for four minutes. According to eyewitnesses, he quickly reserved a block of rooms for the *Entertainment Tonight* crew. . . .

**4:15 p.m.**
Howard got a call from Alex Goen of TrimSpa.

**4:26 p.m.**
Howard called Ray Martino in California (where Anna's son Daniel used to live).

**4:27 p.m.**
Howard called the hotel liaison.

**4:34 p.m.**
Howard called the hotel liaison again.

(Blonde Ambition, 228.)

\* \* \* \* \*

**4:49 p.m.**
Howard called "information."

**4:51 p.m. and 4:52 p.m.**
Howard called a local elementary school and then its aftercare program.

\* \* \* \* \*

• • •

Although the coroner has never given an exact time of death, the last person to see Anna alive was, according to his own comments to the police, Howard K. Stern. But Howard is quick to point out that he wasn't the one to discovery her body. In fact, he made an unusual comment to a close friend that "He is tormented by Anna's death and felt if he was the one who found her body, after being there during Daniel's death, he would've killed himself too. That the pain of finding her, after what happened with Daniel, would've been too much for Howard."

(Blonde Ambition, 229-30.)

> Detectives found eleven prescription medications in various places in the suite, including the nightstand, the dresser drawer, and especially in Howard's now infamous duffel bag. The bag was found on the floor and was full of prescription medicine mostly written to Howard. Among the medications found in Howard's duffel bag was chloral hydrate, considered by Dr. Perper to be "the most significant drug implicated in this fatality."

(Blonde Ambition, 230.)

> It seemed as if Dr. Khris – like other "Anna close confidants," including Howard K. Stern, Alex Goen, and Ron Rale – was already positioning Anna's death as a suicide, or at least tied to her depression. In fact, I am aware that both Dr. Khris and Howard tried to convince Dr. Perper that Anna committed suicide, even before the autopsy was completed.

(Blonde Ambition, 235-36.)

365.    Libelous Statement 19 is false in its implication that Stern was criminally involved in the death of Ms. Smith, because Stern was not involved in the death of Ms. Smith

366.    Libelous Statement 19 is defamatory in that it conveys, among other things, that Stern was criminally involved in the death of Ms. Smith.

367.    Libelous Statement 19 is defamatory because, among other things, it imputes an unsavory, salacious and disreputable character to Stern, injurious to both his personal and professional reputation.

368.    Libelous Statement 19 is defamatory because, among other things, it conveys, among other things, to the reader that Stern has a violent and malicious character, injurious to both his personal and professional reputation.

369.    Libelous Statement 19 was published by Defendants with actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.

370.    Defendants were aware prior to the publication of Libelous Statement 19 that Ms. Smith's death had been declared accidental and that any statements conveying that Stern was involved in her death were false.

### Joint and Several Liability

371.    Cosby authored Blonde Ambition.

372.    Hachette Book Group is the publisher of Blonde Ambition.

373.    The acts and omissions of Cosby are imputed to Hachette Book Group as a matter of law.

374.    The state of mind of Cosby with respect to the publication of the false and defamatory statements about Stern, including her knowledge or lack of knowledge regarding the truth or falsity of those statements, is imputed to Hachette Book Group as a matter of law.

375.    The publication of Blonde Ambition was a joint venture of Cosby and Hachette Book Group.

### Publication with Actual Malice

376.    The false and defamatory statements about Stern identified as Libelous Statements 1 through 19 were negligently published by Defendants and were published with actual malice.

377.    Defendants possessed actual knowledge of the falsity of certain of their libelous statements made against Stern and acted with a reckless disregard for the truth or falsity in publishing all of the false and defamatory statements against Stern.

378.    Defendants negligently published the false and defamatory statements about Stern and published the statements with actual malice by failing prior to publication to conduct a

reasonable investigation of the veracity of the statements and in many instances, no investigation at all.

379.    Defendants had no sources for certain of their libelous statements.

380.    Defendants knowingly published the false and defamatory statements about Stern without any reliable, trustworthy or credible sources for said statements and with no independent corroboration for said statements.

381.    Defendants knowingly published the false and defamatory statements about Stern relying on sources known to them to be unreliable, lacking credibility, biased and untrustworthy with no independent corroboration for statements allegedly made by these sources.

382.    In publishing the false and defamatory statements about Stern, Defendants purposely avoided learning the truth by, among other things, failing to attempt to interview many individuals who could confirm or deny the things stated in the statements.

383.    In publishing the false and defamatory statements about Stern, Defendants purposely avoided learning the truth by, among other things, failing to review publicly available documents and information that could confirm or deny the things stated in the statements.

384.    Defendants intentionally published the false and defamatory statements about Stern in a calculated effort to gain a competitive and financial advantage in the media frenzy surrounding Ms. Smith's death.

385.    Defendants intentionally published false and defamatory statements about Stern related to Ms. Smith's death in a calculated effort to increase sales and increase profits by falsely sensationalizing and fictionalizing information about Stern and the circumstances surrounding Ms. Smith's life and death.

*Damages*

386.    As a direct and proximate result of the libelous statements published by Defendants, Stern's reputation has been permanently damaged.

387.    As a direct and proximate result of the libelous statements published by Defendants, Stern has suffered adverse physical consequences from stress, emotional distress and mental pain and suffering.

388.    As a direct and proximate result of the libelous statements published by Defendants, Stern has suffered public hatred, contempt and ridicule.

389.    As a direct and proximate result of the libelous statements published by Defendants, Stern has suffered a permanent impairment to his ability to obtain or maintain gainful employment, including employment as an attorney.

390.    The false and defamatory statements published by Defendants were defamatory and libelous per se in that they charge Stern with crimes and impute actions to Stern that injure his professional reputation as an attorney, entitling Stern to presumed damages.

391.    The false and defamatory statements published by Defendants were defamatory and libelous per se in they impute to Stern dishonesty and a lack of integrity with the judicial and prosecutorial system, all of which injure Stern's personal and professional reputation.

392.    The false and defamatory statements published by Defendants were defamatory and libelous per se in they convey to the reader that Stern has a violent and malicious character, injurious to both his personal and professional reputation.

393.    The false and defamatory statements published by Defendants were defamatory and libelous per se in they impute an unsavory, salacious and disreputable character to Stern, injurious to both his personal and professional reputation.

394.    The conduct of Defendants demonstrated willful misconduct and that entire want of care that raises a presumption of conscious indifference to consequences.

395.    The false and defamatory statements of Defendants were published with Constitutional actual malice.

396.    Stern is entitled to an award of punitive damages from Defendants in order to punish and penalize Defendants and deter them from repeating their unlawful conduct.

397.    Prior to the filing of this Complaint for Libel, Stern sent letters to Defendants demanding that Defendants retract the libelous statements published in Blonde Ambition. In response to Stern's retraction demands, Defendants refused to retract the libelous statements.

WHEREFORE, Plaintiff Howard K. Stern demands:

(a)    That judgment be entered against Defendant Rita Cosby, Defendant Hachette Book Group, Inc., and Defendant John or Jane Doe, jointly and severally, on Count One of this Complaint for compensatory damages in an amount not less than Ten Million Dollars ($10,000,000.00);

(b)    That judgment be entered against Defendant Rita Cosby, Defendant Hachette Book Group, Inc., and Defendant John or Jane Doe, jointly and severally, on Count One of this Complaint for punitive damages in an amount not less than Fifty Million Dollars ($50,000,000.00) to punish and penalize Defendants and to deter Defendants from repeating their unlawful conduct;

(c)    That all costs of this action be assessed against Defendant Rita Cosby, Defendant Hachette Book Group USA, Inc., and Defendant John or Jane Doe; and

(d)    That this Court award such other relief as it deems equitable, just and proper.

## TRIAL BY JURY DEMANDED.

Respectfully submitted this 2nd day of October, 2007.

L. Lin Wood
Georgia Bar No. 774588
Nicole Jennings Wade
Georgia Bar No. 390922
John C. Patton
Georgia Bar No. 567232
Luke A. Lantta
Georgia Bar No. 141407

**POWELL GOLDSTEIN LLP**
One Atlantic Center
Fourteenth Floor
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
(404) 572-6600
Facsimile: (404) 572-6999

Applications to Appear *Pro Hac Vice* Pending or to be Submitted

William J. Gilberti, Jr.
SDNY Bar Roll Number _____
Lisa DiPoala Haber
SDNY Bar Roll Number _____
Belina Anderson
SDNY Bar Roll Number BA5133

**GILBERTI STINZIANO HEINTZ & SMITH, P.C.**
555 East Genesee Street
Syracuse, New York 13202
(315) 442-0100
Facsimile: (315) 442-0106

**ATTORNEYS FOR PLAINTIFF HOWARD K. STERN**

- 65 -

# EXHIBIT "A"



POWELL
GOLDSTEIN LLP

Atlanta  ■  Washington  ■  Dallas

Resident in the Atlanta Office
L. LIN WOOD, ESQ.
Direct Dial No.: (404) 572-6633
E-Mail Address: llwood@pogolaw.com

August 31, 2007

**VIA FEDERAL EXPRESS, SATURDAY DELIVERY**

Rita K. Cosby
146 W. 57th Street
New York, New York 10019

Re:    "Blonde Ambition"

Dear Rita:

I think you are aware that I represent Howard K. Stern in connection with potential defamation litigation related to the deaths of Anna Nicole Smith and her son, Daniel. I am writing you with respect to your soon to be published book entitled "Blonde Ambition."

It has been reported by persons claiming to have advance copies of your book that certain passages in "Blonde Ambition" rely on Jackie Hatten as a source. It has been further reported that your book may contain false and defamatory accusations by Hatten against Mr. Stern. I am sure you are aware that you may be held liable for republishing another's false and defamatory statements. Hatten is not a credible or reliable source. I am certain you are familiar with Hatten's many media interviews. If not, you should review them as they clearly establish that basing any accusation against Mr. Stern on Hatten's statements will constitute republication by you with a reckless disregard for truth or falsity.

I hope these reports are inaccurate and that your book will not defame Mr. Stern. However, if it does, Mr. Stern will file a libel action against you and your publisher, Grand Central Publishing.

Sincerely,

L. Lin Wood

LLW/b
cc:    Howard K. Stern, Esq.
Krista Barth, Esq.

1206469/2

One Atlantic Center  ■  Fourteenth Floor  ■  1201 West Peachtree Street, NW  ■  Atlanta, GA 30309-3488
Tel: 404.572.6600  ■  Fax: 404.572.6999
www.pogolaw.com

# EXHIBIT "B"



POWELL
GOLDSTEIN LLP

Atlanta    ✶    Washington    ✶    Dallas

Resident in the Atlanta Office
L. LIN WOOD, ESQ.
Direct Dial No.: (404) 572-6633
E-Mail Address: llwood@pogolaw.com

August 31, 2007

**BY FACSIMILE (212-364-0926);**
**EMAIL (grandcentralpublishing@hbgusa.com); and**
**FEDERAL EXPRESS, SATURDAY DELIVERY**

Rita K. Cosby
c/o Author Mail
Grand Central Publishing
237 Park Avenue
New York, New York 10017

Re:    "Blonde Ambition"

Dear Rita:

I think you are aware that I represent Howard K. Stern in connection with potential defamation litigation related to the deaths of Anna Nicole Smith and her son, Daniel. I am writing you with respect to your soon to be published book entitled "Blonde Ambition."

It has been reported by persons claiming to have advance copies of your book that certain passages in "Blonde Ambition" rely on Jackie Hatten as a source. It has been further reported that your book may contain false and defamatory accusations by Hatten against Mr. Stern. I am sure you are aware that you may be held liable for republishing another's false and defamatory statements. Hatten is not a credible or reliable source. I am certain you are familiar with Hatten's many media interviews. If not, you should review them as they clearly establish that basing any accusation against Mr. Stern on Hatten's statements will constitute republication by you with a reckless disregard for truth or falsity.

I hope these reports are inaccurate and that your book will not defame Mr. Stern. However, if it does, Mr. Stern will file a libel action against you and your publisher, Grand Central Publishing.

Sincerely,

L. Lin Wood

LLW/b
cc:    Howard K. Stern, Esq.
       Krista Barth, Esq.

1206544

# EXHIBIT "C"



POWELL
GOLDSTEIN LLP

Atlanta ▪ Washington ▪ Dallas

Resident in the Atlanta Office
L. LIN WOOD, ESQ.
Direct Dial No.: (404) 572-6833
E-Mail Address: llwood@pogolaw.com

August 31, 2007

**BY FACSIMILE (212-364-0941);**
**EMAIL (carol.ross@hbgusa.com); and**
**FEDERAL EXPRESS, SATURDAY DELIVERY**

Carol Ross, Esq.
Grand Central Publishing
237 Park Avenue
New York, New York  10017

     Re:   "Blonde Ambition"

Dear Ms. Ross:

    As you may be aware, I represent Howard K. Stern in connection with potential defamation litigation related to the deaths of Anna Nicole Smith and her son, Daniel. I am writing you with respect to Rita Cosby's book "Blonde Ambition," for which Grand Central Publishing is the publisher.

    It has been reported by persons claiming to have advance copies of Ms. Cosby's book that certain passages in "Blonde Ambition" rely on Jackie Hatten as a source. It has been further reported that Ms. Cosby's book may contain false and defamatory accusations by Hatten against Mr. Stern. I am sure you are aware that you may be held liable for republishing another's false and defamatory statements. Hatten is not a credible or reliable source. I am certain you are familiar with Hatten's many media interviews. If not, you should review them as they clearly establish that basing any accusation against Mr. Stern on Hatten's statements will constitute republication by you with a reckless disregard for truth or falsity.

    I hope these reports are inaccurate and that Ms. Cosby's book, published by Grand Central Publishing, will not defame Mr. Stern. However, if it does, Mr. Stern will file a libel action against Grand Central Publishing and Ms. Cosby.

                Sincerely,

                L. Lin Wood

LLW/b
cc:   Howard K. Stern, Esq.
     Krista Barth, Esq.

1206545

One Atlantic Center ▪ Fourteenth Floor ▪ 1201 West Peachtree Street, NW ▪ Atlanta, GA 30309-3488
Tel: 404.572.6600 ▪ Fax: 404.572.6999
www.pogolaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
HOWARD K. STERN

Plaintiff,

-vs-

RITA COSBY and
HACHETTE BOOK GROUP USA, INC.
d/b/a Grand Central Publishing

Defendants.

COPY

## COMPLAINT

GILBERTI STINZIANO
HEINTZ & SMITH, P.C.

*Attorneys for*            **Plaintiff**

555 EAST GENESEE STREET
SYRACUSE, NEW YORK 13202-2159
TELEPHONE (315) 442-0100

Notice of Entry                                              is hereby admitted.

Dated,

.............................................................
Attorney(s) for

STATE OF NEW YORK, COUNTY OF                    ss.:        **AFFIDAVIT OF PERSONAL SERVICE**

being duly sworn, deposes and says, that deponent is not a party to the action, is over 18 years of age and resides at

That on the           day of                 20      at approx. _____A.M./P.M. at No.
                                                        deponent served the within

upon
the                                          herein, by delivering a true copy thereof to    h    personally. Deponent knew the
person so served to be the person mentioned and described as follows:

| ☐ Male | ☐ White Skin | ☐ Black Hair | | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☐ Female | ☐ Black Skin | ☐ Brown Hair | ☐ White Hair | ☐ 21-35 Yrs. | ☐ 5'0''-5'3'' | ☐ 100-130 Lbs. |
| | ☐ Yellow Skin | ☐ Blond Hair | ☐ Balding | ☐ 36-50 Yrs. | ☐ 5'4''-5'8'' | ☐ 131-160 Lbs. |
| | ☐ Brown | ☐ Gray Hair | | ☐ 51-65 Yrs. | ☐ 5'9''-6'0'' | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | | ☐ Over 65 Yrs. | ☐ Over 6' | ☐ Over 200 Lbs. |

Other identifying features:

**MILITARY SERVICE**
☐

I asked the person spoken to whether defendant was in active military service of the United States or of the State of New York in any capacity whatever and received a negative reply. *Defendant wore ordinary civilian clothes and no military uniform.* The source of my information and the grounds of my belief are the conversations and observations above narrated.

Upon information and belief I aver that the defendant is not in the military service of New York State or of the United States as that term is defined in either the State or in the Federal statutes.