USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/6/07

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
HOWARD K. STERN,                    :
                 Plaintiff,         :    MEMORANDUM DECISION
         - against -                :    07 Civ. 8536 (DC)
RITA COSBY and HACHETTE BOOK GROUP  :
USA, INC. d/b/a Grand Central
Publishing, and JOHN or JANE DOE,   :
                 Defendants.        :
- - - - - - - - - - - - - - - - - -x
```

**APPEARANCES:**     (See last page)

**CHIN, D.J.**

    In this libel case against the author and publisher of the best-selling book, <u>Blonde Ambition: The Untold Story Behind Anna Nicole Smith's Death</u> ("<u>Blonde Ambition</u>"), plaintiff Howard K. Stern seeks an order allowing expedited discovery on the issue of whether defendant Rita Cosby has sought to tamper with two witnesses by offering to pay them thousands of dollars for their testimony. Because Stern has presented substantial -- indeed, troubling -- evidence that Cosby has sought to improperly influence witnesses, the application is granted.

## BACKGROUND

**A.   The Facts**

    The facts are drawn from the complaint as well as the other materials submitted in support of Stern's motion.

    Vickie Lynn Marshall, who was more widely known as Anna Nicole Smith ("Smith"), was a model and actress who had gained

celebrity in part because of her marriage to the late J. Howard Marshall and the litigation that ensued over his estate. (See Compl. ¶¶ 1, 27). On February 8, 2007, Smith died "suddenly and unexpectedly" in Florida. (Id. ¶¶ 49-50). She was survived by a daughter, Dannielynn, who was born in the Bahamas and had been the subject of paternity proceedings to determine who was her biological father. (Id. ¶¶ 31-33, 41, 66). Plaintiff Howard K. Stern, Smith's "longtime lawyer, friend and companion," had believed he was Dannielynn's father and Smith had listed him on Dannielynn's birth certificate as her father. (Id. ¶¶ 1, 31). Eventually, DNA testing determined that Larry Birkhead was actually Dannielynn's biological father. (Id. ¶ 67; see id. ¶ 32).

On September 4, 2007, Cosby and defendant Hachette Book Group USA, Inc. ("Hachette") published Blonde Ambition. (Id. ¶ 79). The book quickly became a bestseller. (See id. ¶ 80).

At page 204 of Blonde Ambition, Cosby writes that Anna Nicole Smith's nannies in the Bahamas, Quethlie Alexis and Nadine Alexie, told "private investigators," in the presence of their attorney, that "Anna often stayed in bed and watched movies," including a video of Stern together with Birkhead. Cosby writes:

> "Is there one video she loved watching?" an investigator asked.
>
> "Yes," one of the nannies surprisingly said, "the one with Larry Birkhead and Howard . . . doing that thing."
>
> "You mean like two gay guys?" the investigator asked. "Having sex?"

> "Just like that," she nodded. The
> investigators were taken aback, and told me
> that the nannies were clearly embarrassed
> about it, since they were quite religious.
>
> "She'd lie in bed and watch it," Nadine
> affirmed.
>
> According to the nannies, she watched it over
> and over again.

(Blonde Ambition at 204).

On October 2, 2007, Stern filed this libel case against Cosby and Hachette, alleging that the above excerpt as well as other passages in the book are false and defamatory. In particular, Stern alleges that he "never engaged in any type of sexual activity whatsoever with Birkhead," and that "no videotape exists of any type of sexual activity whatsoever between [him] and Birkhead." (Compl. ¶¶ 120, 122). The complaint seeks not less than $60 million in compensatory and punitive damages. (Id. at 64). Cosby was served with the complaint on October 3, 2007.

Within a week, media reports surfaced that seemingly contradicted the above passage from Blonde Ambition. On October 10, 2007, the television show Larry King Live published a purported statement from one of the nannies on behalf of both nannies:

> The nannies never spoke to Rita Cosby before
> the book was written and indeed did not speak
> to private investigators relative to any
> allegations of homosexual acts which may or
> may not have occurred between Howard K. Stern
> and Larry Birkhead.

(http://transcripts.cnn.com/TRANSCRIPTS/0710/10/1K1.01.html) (last visited Oct. 18, 2007)).

- 3 -

The show also played an excerpt from an audio recording of a conversation purportedly between Cosby and an attorney for the two nannies, Elizabeth Thompson.[1] They are discussing a request by Cosby to speak to the two nannies. Cosby acknowledges that she wants to talk to them in part "to validate what [she] put into the book." (Add. A, ll. 16-19). This exchange follows:

> THOMPSON: . . . I've highlighted -- numbered the pages where [the nannies are] featured and no one has spoken to them about it. It blows my mind.
>
> COSBY: Well, that's why I came here. That's why I came here.

(Id. ll. 23-27). Cosby and Thompson then talk about money:

> THOMPSON: And so my question is, what do you want? What you want then is in relation to this $15,000 to the magazine? Is that what you're saying? These are the expenses being paid?
>
> COSBY: Yes.
>
> THOMPSON: Through the magazine.
>
> COSBY: Yes.
>
> THOMPSON: And not through you? Because you can't do it.
>
> COSBY: Exactly, exactly.

(Id. ll. 44-53).

On October 12, 2007, the television show <u>On the Record with Greta Van Susteren</u> aired an audio recording of what

---

[1] A transcript of the excerpt of the conversation is included in the on-line transcript of the television show. (See http://transcripts.cnn.com/TRANSCRIPTS/0710/10/1K1.01.html (last visited Oct. 18, 2007)). The transcript of the conversation has been reproduced at the end of this decision as Addendum A ("Add. A") and the lines have been numbered for ease of reference.

purported to be a conversation between Cosby and Lincoln Bain, another representative of the nannies. (See Wood Aff. ¶¶ 5-7 & Ex. A).[2] The transcript shows Cosby talking to Bain about a payment of $3,000 -- or $3,000 per hour -- that would ostensibly be to pay the nannies' attorney for drafting an affidavit, with the understanding that "she [the attorney] can do whatever she wants with the money once I give it to her." (Add. B, ll. 70-72). In explaining her reluctance to pay more, Cosby refers to this lawsuit:

> I cannot do much more because then it would look outrageous. You know what I mean? Because the problem is now that I'm dealing with the court thing, you have to understand, my thought's it's going to come back.

(Id. ll. 41-45). She adds, however, "This doesn't mean that down the road I can't do more. Do you know what I mean?" (Id. ll. 53-54).

The transcript shows Cosby explaining her desire for a bill from the lawyer:

> COSBY: If I can get her [the attorney], if she gives me a bill saying, you know, that it's for consultation, investigation (INAUDIBLE) however you phrase it, consultation, investigation, preparation, execution of the affidavit for the nannies relating to, you know, whatever, the sex tape or however we want to phrase it, you know, or this affidavit that that way. And then she can send copies of the affidavit. Then I wouldn't, you know, I don't see that taking up a lot of her time or a lot of the nannies' time.

---

[2] The transcript of the conversation has been reproduced at the end of this decision as Addendum B ("Add. B") and the lines have been numbered for ease of reference.

. . .

> COSBY: And then, and then I think its legitimized, because my problem is, Lincoln, they'll kill me if I get out there and if they get out there, they're honest, they're all honest people. And if for some reason they, you know, at the inquest, if someone says, hey, did you ever get paid? You know?
>
> BAIN: Yeah.
>
> COSBY: You know, this way, I pay Liz [the attorney] and she does whatever. You know what I mean?
>
> BAIN: Yeah.
>
> COSBY: So, so are we cool?
>
> BAIN: Yeah. . . .

(Id. ll. 86-113). At another point in the conversation, Cosby says, "[B]ecause here is what my problem is, I can't have them all of a sudden get on the stand and say, oh yeah, I got money from Rita. Do you know what I mean?" (Id. ll. 65-68).

Finally, the transcript shows the following:

> COSBY: So I think that way everybody is covered and I think that that is a win-win. And that way so if it ever comes out, yeah I paid her, I'll say, I paid her cause these guys prepared the affidavit and that is a bona fide expense.
>
> BAIN: Yeah.
>
> COSBY: You know, and then I paid the attorney, and here is the bill for it. You know what I mean?
>
> BAIN: Yeah.
>
> COSBY: You know, that is a perfectly bona fide, you know, and that way, that way, that way you know cause otherwise you get into this whole thing if I get put under oath at some point now and they say, did you pay them

- 6 -

> a dime? And I can say, well, I paid the
> attorney for the affidavit. That's
> legitimate. You know what I mean?
>
> BAIN: Yeah, yeah.

(Id. ll. 139-55).

## B. Plaintiff's Order To Show Cause

On October 15, 2007, Stern moved by order to show cause for a preliminary injunction enjoining defendants from interfering with fact witnesses and destroying or altering evidence, and also seeking certain expedited discovery. In particular, Stern alleged that Cosby had attempted to engage in witness tampering by offering money to the nannies, through their representatives, to influence their testimony in this lawsuit. (Pl. Mem. at 1; Pl. Repl. Mem. at 1-2). The application was supported by transcripts of the above recordings of the alleged conversations between Cosby and the nannies' representatives, Thompson and Bain.

I conferenced the matter on October 18, 2007. The parties agreed to the entry of an order enjoining all parties from interfering with fact witnesses or destroying or altering evidence. Defendants objected, however, to the expedited discovery requested by Stern. (Tr. at 2-3).[3]

When asked whether Cosby denied the "overall accuracy" of the transcript of the alleged conversation between Cosby and Bain, Cosby's attorney responded: "[W]e think that it is only a

---

[3] References to "Tr." are page references to the transcript of the conference of October 18, 2007.

partial transcript, and it does not accurately in any way portray all of the facts." (Id. at 5). Nonetheless, counsel acknowledged that there had been "such a conversation" between Cosby and Bain, and that there was "no reason to believe that it is a manufactured tape." (Id.). Counsel insisted, however, that "Ms. Cosby had absolutely no intent to interfere with any witnesses," and submitted that "when the full evidence comes out in due course, it will be a decidedly different picture." (Id. at 6).

I reserved decision on Stern's request for expedited discovery, and set a deadline for all discovery, fact and expert, of April 18, 2008. (Id. at 9-10, 13). Defendants thereafter submitted memoranda of law opposing the request for expedited discovery, and Stern submitted reply papers.

### DISCUSSION

Rule 26(d) of the Federal Rules of Civil Procedure provides that "a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)," except in certain specified circumstances, or by order of the court. Fed. R. Civ. P. 26(d). Accordingly, absent agreement or one of the limited exceptions, a party seeking expedited discovery must obtain leave of the court. See, e.g., Ayyash v. Bank Al-Madina, 233 F.R.D. 325, 326 (S.D.N.Y. 2005); Notaro v. Kock, 95 F.R.D. 403, 404-05 (S.D.N.Y. 1982).

In deciding whether to allow expedited discovery, some courts in this District have applied the four-part test Judge

- 8 -

Edelstein set forth some years ago in <u>Notaro</u>:

> (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.

95 F.R.D. at 405; see, e.g., <u>Irish Lesbian & Gay Org. v. Giuliani</u>, 918 F. Supp. 728, 730 (S.D.N.Y. 1996); <u>Advanced Portfolio Tech., Inc. v. Advanced Portfolio Tech. Ltd.</u>, 94-5620, 1994 WL 719696, at *3 (S.D.N.Y. Dec. 28, 1994). More recently, courts have applied a more flexible standard of "reasonableness" and "good cause." See <u>Ayyash</u>, 233 F.R.D. at 326-27 ("this Court will assess the application [for expedited discovery] under the flexible standard of reasonableness and good cause") (citing cases). I agree that the more flexible approach is the better approach. See <u>Ayyash</u>, 233 F.R.D. at 326-27; <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor</u>, 194 F.R.D. 618, 623-24 (N.D. Ill. 2000) (noting that <u>Notaro</u> test was similar to rigorous standard required for granting preliminary injunction).

    Here, Stern has shown good cause for expedited discovery, and his desire to proceed on an expedited basis is reasonable in light of all the circumstances. Although Cosby insists, through her lawyer, that she had "absolutely no intent to interfere with any witnesses" (Tr. at 6), the two transcripts paint a very different picture. Indeed, they are highly troubling, for if they are accurate, they show that Cosby was attempting to obstruct justice by offering to pay money to the

nannies to "validate" what she had written on page 204 of <u>Blonde Ambition</u>. (Add. A, l. 16). If the transcripts are accurate, they show that Cosby was cognizant of how such a payment would look if it were ever publicly disclosed (Add. B, ll. 38-42, 60-64), and that she thus wanted to disguise the payment as a fee to the nannies' attorney for "consultation, investigation, preparation, execution of [an] affidavit for the nannies relating to, you know, whatever, the sex tape" (<u>id.</u> ll. 86-88), with the understanding that the attorney could then "do whatever she wants with the money" once Cosby gave it to her (<u>id.</u> ll. 68-69).

It may be, as Cosby's attorney argues, that the transcripts do not accurately "portray all of the facts" and that "the full evidence" will paint "a decidedly different picture." (Tr. at 5-6). The transcripts surely, however, establish good cause to believe that Cosby was attempting to tamper with the two witnesses. Stern's desire to explore this question expeditiously -- before full and normal discovery -- is reasonable and understandable, for if Cosby was actually attempting to obstruct justice, her efforts could very well have endangered the integrity of the judicial process.

Cosby and Hachette argue that expedited discovery is not necessary in light of the Court's order, entered on consent, prohibiting the parties from interfering with witnesses or destroying or altering evidence. I disagree. No court order was necessary to advise the parties that they could not interfere with witnesses or otherwise tamper with the evidence, and yet the

transcripts provide concrete evidence that Cosby attempted to engage in that very conduct. While the court order adds another layer of protection, it should not have been necessary at all.

Cosby also argues that she will be prejudiced if the Court orders expedited discovery. She contends that she "will be at an inherent disadvantage if her counsel is forced to prepare for the depositions Plaintiff seeks on an expedited schedule." (Cosby Mem. at 9). I am not persuaded that Cosby will be unfairly prejudiced. It may be that defense counsel will have to work harder and quicker to become "fully acquainted with the facts" and that defense counsel may have to do things in a different sequence from what she would otherwise have preferred, but I am sufficiently concerned about what I have heard on the recordings -- Cosby seemingly attempting to tamper with witnesses -- that I believe these matters should be explored expeditiously.

## CONCLUSION

Stern's application for expedited discovery is granted to the extent that expedited discovery is hereby allowed on the issue of whether Cosby attempted to interfere with potential witnesses and the extent and nature of those alleged efforts.

SO ORDERED.

Dated:   New York, New York
         November 6, 2007

DENNY CHIN
United States District Judge

- 11 -

## ADDENDUM A

From <u>Larry King Live</u>, October 10, 2007:

| | |
|---|---|
| 1<br>2<br>3<br>4 | THOMPSON:  Yeah, but why did you want to speak with them after the fact?  After you have already written the book?  Why, why do you want to speak to them about those issues? |
| 5<br>6 | COSBY:  Because I think it's important to speak with them. |
| 7 | THOMPSON:  To wh[o]m? |
| 8<br>9 | COSBY:  Um, well, to them and to you.  You know that's why. |
| 10 | THOMPSON:  But not to me.  I'm not the client. |
| 11 | COSBY:  No. |
| 12 | THOMPSON:  It's not my information. |
| 13<br>14<br>15 | COSBY:  I know.  But I do think it's important to speak with them.  And then also to -- to give credibility to them . . . . |
| 16<br>17<br>18 | THOMPSON:  So you want to validate what you put into the book, basically.  That's what we're doing right.  Right? |
| 19<br>20<br>21 | COSBY:  Well, that's some of it, but I also think -- can I tell you also, we also have separate than them, other people in the book.  So I'm comfortable. |
| 22<br>23<br>24<br>25 | THOMPSON:  Of course.  Let me tell you.  They featured prominently in this book.  I mean, I've highlighted -- numbered the pages where they're featured and no one has spoken to them about it.  It blows my mind. |
| 26<br>27 | COSBY:  Well, that's why I came here.  That's why I came here. |
| 28<br>29 | THOMPSON:  You came here to validate the information that you've already got, for your book. |
| 30<br>31 | COSBY:  Well, I have information elsewhere, just so you're aware.  But I do think. |
| 32<br>33 | THOMPSON:  OK, so page 204, you have that information elsewhere? |

| | |
|---|---|
| 34 | COSBY: Yes. |
| 35<br>36 | THOMPSON: That they said this? And the presence of their attorney who would be me, I wasn't anywhere. |
| 37<br>38 | COSBY: Well, I'm here to speak to them about it, that's important. |
| 39 | THOMPSON: That's important to you. |
| 40 | COSBY: No, absolutely, absolutely. |
| 41<br>42 | THOMPSON: It's not important to them, to be honest. It's not important to them. It's important to you. |
| 43 | COSBY: No, absolutely. |
| 44<br>45<br>46<br>47 | THOMPSON: And so my question is, what do you want? What you want then is in relation to this $15,000 to the magazine? Is that what you're saying? These are the expenses being paid? |
| 48 | COSBY: Yes. |
| 49 | THOMPSON: Through the magazine. |
| 50 | COSBY: Yes. |
| 51<br>52 | THOMPSON: And not through you? Because you can't do it. |
| 53 | COSBY: Exactly, exactly. |

(http://transcripts.cnn.com/TRANSCRIPTS/0710/10/1K1.01.html) (last visited Oct. 18, 2007) (emphasis added)).

**ADDENDUM B**

From <u>On the Record with Greta Van Susteren</u>, October 12, 2007:

```
 1    COSBY:  The only reason I'm mentioning this is that
 2            what I might be able to do is that, if it ever comes
 3            out that I paid, what I might be able to do is pay Liz,
 4            you see what I'm saying?  And give you guys the, you
 5            know, the three thousand.  Do you know what I mean?

 6    BAIN:   Uh-huh.

 7    COSBY:  Pay Liz, if she can give me a bill saying that
 8            it has to do with, like, you know, preparation for the
 9            affidavit, because that would make sense, because it's
10            directly applied to my case and my book.

11    BAIN:   OK.

12    COSBY:  Do you see what I'm saying?

13    BAIN:   Yeah.

14    COSBY:  So that may make everybody happy.  Do you see
15            what I'm saying?

16    BAIN:   Yeah.

17    COSBY:  That is why the affidavit is important.

18    BAIN:   Yeah.

19    COSBY:  Because what I could do is then give you guys,
20            that's what you had talked about was three thousand,
21            you know what I mean?

22    BAIN:   Yeah.

23    COSBY:  So like we could put the.

24            (CROSSTALK)

25    BAIN:   No.  They didn't they didn't talk about three.

26            (CROSSTALK)

27    COSBY:  . . . a bill that states it's the, you know,
28            the consultation, investigation, preparation.

29    BAIN:   When you say three thousand, when you say three
30            thousand what do you mean though?
```

| | |
|---|---|
| 31 | COSBY:  What's that? |
| 32 | BAIN:  When you say three thousand, what do you mean? |
| 33<br>34 | COSBY:  What I'm saying is for the meeting with her and with the nannies.  So even a brief meeting, you know? |
| 35<br>36 | BAIN:  No.  You were saying that they were paying three thousand an hour? |
| 37 | COSBY:  Correct. |
| 38 | BAIN:  Oh, OK.  I see what you're saying. |
| 39 | COSBY:  Right, which is what we talked about, right? |
| 40 | BAIN:  Um. |
| 41<br>42<br>43<br>44<br>45<br>46 | COSBY:  But, but, but now, Lincoln, I cannot do much more because then it would look outrageous.  You know what I mean?  Because the problem is now that I'm dealing with the court thing, you have to understand, my thought's it's going to come back.  Do you know what I'm saying? |
| 47 | BAIN:  Mm-hmm. |
| 48 | COSBY:  Do you understand that? |
| 49 | BAIN:  Yeah.  I understand that. |
| 50<br>51 | COSBY:  And I can't do much more because it is going to look like -- you know what I mean? |
| 52 | BAIN:  Yeah. |
| 53<br>54 | COSBY:  This doesn't mean that down the road I can't do more.  Do you know what I mean? |
| 55 | BAIN:  Yeah. |
| 56<br>57<br>58<br>59<br>60<br>61 | COSBY:  Um, but, but but right now what I could do is at least if she could give me a bill stating that and can give her the amount, she, she can give me a bill saying she paid for the you know that it covered the execution of the affidavit, if the affidavit relates to that, which she said it does, right? |
| 62 | BAIN:  Ummm I can, I can speak to her about it. |
| 63<br>64 | COSBY:  Because I would think she would have no problem with that.  You see what I'm saying?  Because then, |

| | |
|---|---|
| 65<br>66<br>67<br>68 | then it looks also -- because here is what my problem is, I can't have them all of a sudden get on the stand and say, oh, yeah, I got money from Rita.  Do you know what I mean? |
| 69 | BAIN:   Yeah. |
| 70<br>71<br>72 | COSBY:   You know what I'm saying?  And, and, and, she can do whatever she wants with the money once I give it to her.  Do you know what I mean? |
| 73 | BAIN:   Yeah. |
| 74<br>75 | COSBY:   (INAUDIBLE)   I actually spoke to my attorney this morning. |
| 76 | BAIN:   OK. |
| 77<br>78<br>79<br>80<br>81<br>82<br>83<br>84 | COSBY:   And he said, he said as long as she would do it, he said he would do it, then you know, he is a very ethical attorney.  He said, I would do it in a heartbeat.  He said, he said, he said if you, if you can get her to state that, you know, whatever we're talking and obviously it can't be some huge amount about something and go oh, you know what I mean?  Then it looks fishy. |
| 85 | BAIN:   Yeah. |
| 86<br>87<br>88<br>89<br>90<br>91<br>92<br>93<br>94<br>95 | COSBY:   If I can get her, if she gives me a bill saying, you know, that it's for consultation, investigation (INAUDIBLE) however you phrase it, consultation, investigation, preparation, execution of the affidavit for the nannies relating to, you know, whatever, the sex tape or however we want to phrase it, you know, or this affidavit that that way.  And then she can send copies of the affidavit.  Then I wouldn't, you know, I don't see that taking up a lot of her time or a lot of the nannies' time. |
| 96 | COSBY:   You know? |
| 97 | BAIN:   Yeah. |
| 98 | COSBY:   Short term. |
| 99<br>100 | COSBY:   So then, then, then it is an easy thing for her and for the nannies to do.  You know? |
| 101 | BAIN:   Mm-hmm. |
| 102 | COSBY:   And then, and then I think its legitimized, |

| | |
|---|---|
| 103<br>104<br>105<br>106<br>107 | because my problem is, Lincoln, they'll kill me if I get out there and if they get out there, they're honest, they're all honest people.  And if for some reason they, you know, at the inquest, if someone says, hey, did you ever get paid?  You know? |
| 108 | BAIN:  Yeah. |
| 109<br>110 | COSBY:  You know, this way, I pay Liz and she does whatever.  You know what I mean? |
| 111 | BAIN:  Yeah. |
| 112 | COSBY:  So, so are we cool? |
| 113<br>114<br>115 | BAIN:  Yeah.  Uhm, [a]ctually, I'm going to, to, to actually speak to the nannies right now.  Um, and I'm going to speak to her too in person. |
| 116 | COSBY:  Great. |
| 117<br>118 | BAIN:  You were trying to explain something.  You were trying to explain. |
| 119<br>120 | COSBY:  You know I have definitely kept my end of the bargain with you. |
| 121<br>122 | BAIN:  You were trying to explain something to me you wanted me to say to her, but my phone was breaking up. |
| 123<br>124<br>125<br>126<br>127 | COSBY:  Oh, no, no, to Liz, what I was gonna say, the only thing I would need is -- from Liz is to get just a bill from her, you know, that it was, so it went towards the preparation of the affidavit or something like that.  You know what I mean? |
| 128 | BAIN:  Uh-huh. |
| 129<br>130<br>131 | COSBY:  See cause then if it ever comes back that I, that I gave any money, it could be, appear to be a legitimate expense, you know what I mean? |
| 132 | BAIN:  Yeah. |
| 133<br>134 | COSBY:  And then she can do whatever she wants with the money, you know what I mean? |
| 135 | BAIN:  Yeah. |
| 136<br>137 | COSBY:  Then, you guys can do whatever you guys want, you know what I mean? |

138      BAIN:  OK.

139      COSBY:  So I think that way everybody is covered and I
140      think that that is a win-win.  And that way so if it
141      ever comes out, yeah I paid her, I'll say, I paid her
142      cause these guys prepared the affidavit and that is a
143      bona fide expense.

144      BAIN:  Yeah.

145      COSBY:  You know, and then I paid the attorney, and
146      here is the bill for it.  You know what I mean?

147      BAIN:  Yeah.

148      COSBY:  You know, that is a perfectly bona fide, you
149      know, and that way, that way, that way you know cause
150      otherwise you get into this whole thing if I get put
151      under oath at some point now and they say, did you pay
152      them a dime?  And I can say, well, I paid the attorney
153      for the affidavit.  That's legitimate.  You know what I
154      mean?

155      BAIN:  Yeah, yeah.

156      COSBY:  You know, and then, and then you know no one
157      ever has to know whatever, wherever it goes.  You know
158      what I mean?

159      BAIN:  Yeah, yeah.

160      COSBY:  So it's a win-win, do you know what I mean?
161      That way it doesn't make anybody look bad, you know
162      what I mean?  And it doesn't make them look bad either,
163      you know?

164      BAIN:  Yeah, yeah.

165      COSBY:  So it is good for them and it is good for me,
166      you know what I mean?

167      BAIN:  Yeah, yeah, yeah.

168      COSBY:  Because that way, that way, that way they spend
169      a lot of time working on the affidavit and, then you
170      know what I mean?  And she spent time, so it wouldn't
171      be outrageous that I'd spent money taking care to help
172      that.  You know what I mean?

173      BAIN:  Yeah, yeah.

174      COSBY:  And that way if it ever comes out -- you know,

```
175          and you know and hopefully it never would, but you know
176          if it ever did, then it was a legitimate expense.
```

(Wood Aff. Ex. A).

**APPEARANCES**

```
For Plaintiff Howard K. Stern:

     POWELL GOLDSTEIN LLP
          By:  L. Lin Wood, Esq.
               Nicole Jennings Wade, Esq.
               John C. Patton, Esq.
               Luke A. Lantta, Esq.
               Katherine V. Hernacki, Esq.
     One Atlantic Center, 14th Floor
     1201 West Peachtree Street, N.W.
     Atlanta, Georgia  30309

          - and -

     GILBERTI STINZIANO HEINTZ & SMITH, P.C.
          By:  William J. Gilberti, Jr., Esq.
               Lisa DiPoala Haber, Esq.
               Belina Anderson, Esq.
     555 East Genesee Street
     Syracuse, New York  13202


For Defendant Rita Cosby:

     DAVIS WRIGHT TREMAINE LLP
          By:  Elizabeth A. McNamara, Esq.
               Elisa L. Miller, Esq.
     1633 Broadway
     New York, New York  10019


For Defendant Hachette Book Group USA, Inc.:

     AKIN GUMP STRAUSS HAUER & FELD LLP
          By:  Douglass B. Maynard, Esq.
               Deborah J. Newman, Esq.
     590 Madison Avenue
     New York, New York  10022
```