**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HOWARD K. STERN, <br><br> Plaintiff, <br><br> v. <br><br> RITA COSBY and HACHETTE BOOK GROUP USA, INC. d/b/a Grand Central Publishing, and JOHN OR JANE DOE, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

No. 07-CV-8536 (DC)

**DEFENDANT HACHETTE BOOK GROUP USA, INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

Douglass B. Maynard
Deborah J. Newman
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
(212) 872-1000
dmaynard@akingump.com

Karen E. Andrews
Hachette Book Group USA, Inc.
237 Park Avenue
New York, NY  10017
(212) 364-1560

*Counsel for Defendant Hachette Book*
*Group USA, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

RELEVANT FACTS ............................................................................................... 1

ARGUMENT......................................................................................................... 7

    I.     HACHETTE IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS
         NO EVIDENCE THAT IT PUBLISHED *BLONDE AMBITION* WITH ACTUAL
         MALICE .................................................................................................... 7

         A.    The Legal Standard for Summary Judgment ............................................. 7

         B.    The Elements of Libel.............................................................................. 7

         C.    Plaintiff is a Public Figure ...................................................................... 9

         D.    Hachette Did Not Publish With Actual Malice......................................... 13

         E.    Plaintiff Cannot Show Any Evidence of Actual Malice............................ 16

    II.    MS. COSBY'S STATE OF MIND CANNOT BE IMPUTED TO HACHETTE 20

    III.    PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES SHOULD BE DISMISSED
         .............................................................................................................. 22

    IV.    HACHETTE ADOPTS AND JOINS IN THE ARGUMENTS
         SET FORTH BY DEFENDANT RITA COSBY ................................................. 23

CONCLUSION...................................................................................................... 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................... 7, 9

*Bose Corp. v. Consumers Union*, 466 U.S. 485 (1984) ........................................................ 9

*Bressler v. Fortune Magazine*, 971 F.2d 1226 (6th Cir. 1992) ........................................ 19

*Brown v. Cara*, 420 F.3d 148 (2d Cir. 2005) ................................................................... 22

*Cantrell v. Forest City Publishing Co.*, 419 U.S. 245 (1974) ......................................... 21

*Carson v. Allied News Co.*, 529 F.2d 206 (1976) ........................................................... 10

*Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163 (2d Cir. 2000) ........................ 8, 10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................. 7

*Chaiken v. VV Publishing Corp.*, 119 F.3d 1018 (2d Cir. 1997) ................................ 16, 21

*Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir. 2001) ............................ 8, 9

*Connor v. Great Western Sav. and Loan Ass'n*, 69
    Cal.2d 850, 863, 447 P.2d 609 (Ca. S.C. 1968) ........................................................... 22

*Contemporary Mission, Inc. v. New York Times Co.*, 842 F.2d 612 (2d Cir. 1988) ..................... 11

*Coutee v. Barington Capital Group*, 336 F.3d 1128 (9th Cir. 2003) ............................... 22

*Curtis Publ'g Co. v. Butts*, 388 U.S. 130 (1967) ......................................................... 8, 10

*D.A.R.E. America v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270 (C.D. CA 2000) ......... 18, 21

*Davis v. Costas Gavras*, 654 F. Supp. 653 (S.D.N.Y. 1987) ......................................... 19

*DiBella v. Hopkins*, 403 F.3d 102 (2d Cir. 2005) ........................................................... 22

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) ................... 8

*Finance One Public Co. Ltd. v. Lehman Bros. Special Fin., Inc.*,
    414 F.3d 325, (2d Cir. 2005) ........................................................................................ 8

*Fodor v. Berglas*, No. 95 Civ. 1153 (SMS) 1995 WL 505522, at *5
(S.D.N.Y. Aug. 24, 1995) .................................................................... 10, 14, 16

*Geiger v. Dell Publ'g Co.*, 719 F.2d 515 (1st Cir. 1983)................................. 15

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ........................ 8, 9, 10, 11, 13, 14

*Gray v. St. Martin's Press, Inc.*, 221 F.3d 243 (1st Cir. 2000)...................... 18

*Harte-Hanks Comm'ns, Inc. v. Connaughton* 491 U.S. 657 (1989)................. 9

*Herbert v. Lando*, 781 F.2d 298 (2d Cir. 1986)........................................... 8

*Hotchner v. Castillo-Puche*, 551 F.2d 910 (2d Cir. 1977)............................. 14

*International Business Machines Corp. v. Liberty Mut. Ins. Co.*,
363 F.3d 137 144 (2d Cir. 2004) ...................................................... 8

*Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85 (S.D.N.Y. 1980)............ 17, 19

*McFarlane v. Esquire Magazine*, 22 Media L. Rep. 2033 (D.D.C. 1994) .......... 18

*McManus v. Doubleday & Co.*, 513 F. Supp. 1383, 1387 (S.D.N.Y. 1981) ........ 13, 14, 16

*Meeropol v. Nizer*, 560 F.2d 1061 (2d Cir. 1977)........................................ 10

*Murray v. Bailey*, 613 F. Supp. 1276 (N.D. Cal. 1985)................................ 15

*Nelson v. Globe Int'l, Inc.*, 626 F. Supp. 969, 977-78 (S.D.N.Y. 1986).......... 16, 21

*New York Times v. Sullivan*, 376 U.S. 254 (1964)...................................... 8, 9

*Price v. Viking Penguin, Inc.*, 881 F.2d 1426 (8th Cir. 1989) ....................... 14, 15

*Reuber v. Food Chem. News, Inc.*, 925 F.2d 703 (4th Cir. 1991)..................... 17

*Secord v. Cockburn*, 747 F. Supp. 779 (D.D.C. 1990) ................................. 18, 19

*St. Amant v. Thompson*, 390 U.S. 727 (1968)............................................. 9, 14

*Tavoulareas v. Piro*, 817 F.2d 762 (D.D.C. 1987) ..................................... 16, 17

*Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980) ........... 10

*Yiamouniannis v. Consumers Union*, 619 F.2d 932 (2d Cir. 1980).................. 9

## STATE CASES

*Prozeralik v. Capital Cities Comm'n, Inc.*, 82 N.Y. 2d 466 (N.Y. 1993) ..................................... 22

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 298 (2003)........................ 22

*Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 383 (1977) ........................................ 14

## STATUTES AND RULES

Fed. R. Civ. P. 56(c) ................................................................................................................ 7

Fed. R. Civ. P. 56(e) ................................................................................................................ 7

Civ. Code § 3294(a) ................................................................................................................ 22

## OTHER AUTHORITIES

*Sack on Defamation*, 3d Ed. (2008) ........................................................................................ 10

Defendant Hachette Book Group USA, Inc. ("Hachette") respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Hachette is entitled to judgment as a matter of law because Plaintiff Howard K. Stern, a public figure, cannot demonstrate that there is clear and convincing evidence that Hachette published *Blonde Ambition* with constitutional "actual malice." In book publishing, unlike magazine or newspaper publishing, the author is an independent contractor who does his or her own reporting, analysis and writing. The author is responsible for the truth of the contents of the book. Book publishers do not manage the reporting process or fact check the manuscript. In this case, Hachette reasonably relied on author Rita Cosby, an award-winning investigative journalist. Hachette reviewed Ms. Cosby's credentials as a journalist, read her proposal and met with her before deciding to purchase the rights to the book. Hachette editors worked with Ms. Cosby, reviewing her manuscript and suggesting editorial changes. All of their dealings with Ms. Cosby gave the editors confidence that she was a highly reputable journalist with great knowledge about the Anna Nicole Smith story and access to key sources. During the entire process, the editors were given no cause to doubt her credibility or her reporting. As a result, Hachette did not believe that any of the challenged passages in the book were false, nor did Hachette actually entertain serious doubts about the truth of those passages.

## RELEVANT FACTS

### Hachette Receives a Book Proposal from Ms. Cosby

Hachette learned about Ms. Cosby's book project in April 2007, when Amy

Einhorn, a senior editor at Grand Central Publishing, a division of Hachette, received a book proposal from Todd Shuster, a well-known literary agent. The proposal was for a book by journalist Rita Cosby about Anna Nicole Smith's turbulent life and tragic death, as well as the media frenzy that surrounded her. Affidavit of Amy Einhorn ¶ 10, Exh. B. Ms. Cosby's proposal detailed the public's fascination with "pop culture legend" Anna Nicole Smith, a "Playboy Playmate, reality TV Star, and tabloid icon." *Id.* Ms. Cosby began covering the Anna Nicole Smith story as a journalist for MSNBC, and she described her experience covering the story from the media "frontline," her unique access to the "players in the unfolding drama," and her knowledge of "previously unreported details." *See id.*

**Ms. Cosby's Experience in Journalism**

In addition to the book proposal, Ms. Einhorn received background information about Ms. Cosby that detailed her extensive career in journalism. These materials listed her various awards, including three Emmy awards, and information about "Rita Cosby Specials Unit," a division of MSNBC formerly led by Ms. Cosby that covered major news events, and "MSNBC Investigates," a long-running program that offered in-depth reporting of critical news stories for which Ms. Cosby was the primary anchor. There was a list of forty exclusive interviews conducted by Ms. Cosby, which included world leaders such as Ariel Sharon, Yassir Arafat and Mikhail Gorbachev, United States Attorneys General John Ashcroft and Alberto Gonzales, convicted criminals Erik Menendez and David Berkowitz, and four United States Presidents. *Id.* ¶ 9, Exh. A.

**Hachette Meets With Ms. Cosby**

Based upon Ms. Cosby's impressive credentials and the book proposal, which Ms.

Einhorn viewed as having great potential, a meeting was arranged with Ms. Cosby to discuss her proposal in further detail. *Id.* ¶ 11.  On or about April 12, 2007, Ms. Einhorn, Hachette associate publishers Les Pockell and Emi Battaglia, and Evan Boorstyn, who works in the publicity department at Hachette, met with Ms. Cosby, Mr. Shuster, her agent, and Bruce Littlefeld, who was going to help Ms. Cosby write the book. *Id.* ¶ 12. At the meeting, Ms. Cosby said the book, based on her prior reporting, would have significant and previously unreported information about Ms. Smith's story. *Id.* ¶ 13; Affidavit of Deborah Newman ("Newman Aff.") ¶ 3, Exh. A (Deposition of Evan Boorstyn at 17-18, 29).  Ms. Cosby did not want to reveal that information, however, because she was meeting with other publishers and wanted to protect her story.  Einhorn Aff. ¶ 13.

Ms. Einhorn and the other Hachette employees were impressed with Ms. Cosby. They found her to be professional, articulate, knowledgeable about the story, and enthusiastic about the project.  There was no question in any of their minds that Ms. Cosby was an experienced journalist who was exceedingly well-qualified to write a book about Anna Nicole Smith. *Id.*; Newman Aff. ¶ 4, Exh. B (Deposition of Leslie Pockell ("Pockell Tr.") at 32); Newman Aff. ¶ 5, Exh. C (Deposition of Jamie Raab at 45).

**Hachette Learns Some of the Newsworthy Items
That Ms. Cosby Intended to Include in Her Book**

Ms. Einhorn informed Mr. Shuster that although she was interested in Ms. Cosby's proposal, she felt, given the extensive media coverage of the Anna Nicole Smith story, that the book needed to contain information that the public had not already heard. *Id.* ¶ 14.  In order to address that issue, Mr. Shuster agreed to tell Ms. Einhorn some of the revelations that would be in the book. *Id.* ¶ 15.

On or about the evening of April 16, 2007, Mr. Shuster told Ms. Einhorn two of the items, the only one of which she can remember was that Ms. Cosby's book would include the report that Anna Nicole Smith had walked in on Plaintiff having oral sex with Larry Birkhead. *Id.* Ms. Einhorn found this information to be unexpected, and highly relevant to the Anna Nicole Smith story that much of the public had been following intently. Ms. Einhorn believed that this information, which put the relationship between Plaintiff and Mr. Birkhead in a different perspective, was newsworthy. *Id.* The information that Ms. Einhorn received was not the reason that Hachette decided to publish the book. Given her journalistic experience and her prior coverage of the story and access to key sources, Ms. Cosby was uniquely qualified to write the book. *Id.* ¶ 16; *see* Newman Aff. ¶ 4, Exh. B (Pockell Tr. at 32). The information from Mr. Shuster confirmed that Ms. Cosby's book would indeed contain important, previously unpublished news. Einhorn Aff. ¶ 16.

**Hachette Enters into a Contract with Ms. Cosby**

On April 17, 2007, Ms. Einhorn sent Mr. Shuster an offer from Hachette to purchase world rights in Ms. Cosby's book for an advance of $405,000. Consistent with the discussion that the book should include the previously unreported material that Ms. Cosby said she had, Hachette's offer was contingent on the book having additional newsworthy revelations of a similar caliber to those shared with Ms. Einhorn by Mr. Shuster. Later that same day, Mr. Shuster accepted Hachette's offer on Ms. Cosby's behalf. *Id.* ¶ 18.

The formal contract between Hachette and Ms. Cosby was signed in May 2007. *Id.* ¶ 19; Exh. C. The contract provided that Ms. Cosby would deliver to Hachette a final

manuscript and photographs by June 12, 2007. The contract also contained an explicit

warranty from Ms. Cosby that all statements in the book as published would be true or

based on reasonable research for accuracy, and that the book would not give rise to a

claim for libel or defamation. The contract provided that Hachette could retain counsel to

review the manuscript but had no duty of independent investigation and, if it did retain

counsel, Ms. Cosby's obligations would not be changed. *Id.* These provisions are

standard in Hachette contracts and in most book publishing contracts. Einhorn Aff. ¶ 19.

**Hachette Sets a Production Schedule for the Book**

Soon after purchasing the book, Ms. Einhorn worked with Hachette's production

staff to set the publishing schedule for Ms. Cosby's book. Because of the high public

interest in the story and the timely nature of the book, it was important to publish the

book quickly. This type of schedule is known in book publishing as a "crash" schedule

and is used at times for time sensitive books. Ms. Einhorn worked with Hachette's

production staff to tighten the production schedule, while still providing Ms. Cosby the

time she needed to complete the manuscript and sufficient time for legal review. The

schedule was ultimately set so that the book would be available for sale in stores on

September 4, 2007, although the schedule could have been pushed back if Ms. Cosby

needed more time to complete her research or Hachette had any issues with the

manuscript. *Id.* ¶¶ 20-21. Ms. Cosby was to submit the manuscript by mid-June, but

would submit chapters to Hachette as they became ready. *Id.* ¶ 19. Ms. Einhorn arranged

for Linda Cowen, an outside attorney retained by Hachette, to be part of the review

process from the beginning, instead of after the manuscript was complete, as is more

common, to ensure adequate time for the legal review. *Id.* ¶ 20

**The Edit Process**

Ms. Cosby began submitting chapters of the manuscript in late May 2007. *Id.* ¶ 24. As was the case with the entire book, these chapters were based on research conducted by Ms. Cosby, who reviewed media reports and documents, and selected and interviewed sources for the book as she thought fit, without direction from Hachette. *Id.* ¶ 23; Affidavit of Mitchell Hoffman ("Hoffman Aff.") ¶ 6.

The role of the book editor is to assist the author in presenting his or her work to the reader in a clear and readable form. Editors do not fact check or second guess the author's methodology. Einhorn Aff. ¶¶ 4-5; Hoffman Aff. ¶¶ 3-4. The manuscript was edited by Ms. Einhorn until she left Hachette in mid-June 2007 to take a job at another book publisher. Mitch Hoffman, another very experienced editor, then took over and finished the process. Einhorn Aff. ¶¶ 24-25; Hoffman Aff. ¶5. Hachette relied on Ms. Cosby and did not do any independent factual investigation or fact checking in connection with the book. Einhorn Aff. ¶ 23; Hoffman Aff. ¶ 6.

Nothing happened during the edit process that gave the editors any cause to question Ms. Cosby's credibility, methodology or her reliance on her sources. On the contrary, Ms. Cosby, known to Hachette as an experienced journalist, displayed diligence in her reporting and a commitment to be accurate and truthful. Ms. Cosby showed great knowledge about the story and supported her reporting with prior media reports, documents and many interviews. Einhorn Aff. ¶¶ 26-27; Hoffman Aff. ¶¶ 7, 8, 13.

The Hachette editors did not find any portions of the book inherently unbelievable. They did not believe any passages of the book were false, nor did they entertain doubts about the truth of any passages. Had they ever had any such doubts, or come to question Ms. Cosby's credibility or reporting, Hachette would not have

published the book.  Einhorn Aff. ¶¶ 28-29; Hoffman Aff. ¶¶ 10-14.

## ARGUMENT

I.     **HACHETTE IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO EVIDENCE THAT IT PUBLISHED *BLONDE AMBITION* WITH ACTUAL MALICE**

### A.     The Legal Standard for Summary Judgment

The Federal Rules of Civil Procedure provide that summary judgment shall be rendered if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To carry its initial burden, the moving party must show that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  It is sufficient for the moving defendant to show the absence of proof on any of the essential elements of the plaintiff's case. *Id.* at 323.  Once a properly supported motion has been made, the burden shifts to the nonmoving party, who may not rest on mere allegations but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B.     The Elements of Libel

Under New York law, the elements of libel are:

1.  a written defamatory statement of fact concerning the plaintiff;
2.  publication to a third party;
3.  fault;
4.  falsity of the defamatory statement; and
5.  special damages or per se actionability.

*E.g., Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).[1]

As the Supreme Court recognized in *New York Times v. Sullivan*, libel actions impinge on free speech rights and thus must be considered

> against the background of a profound national committment to the principle that debate on public issues should be uninhibited, robust, and wide-open and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks . . .

376 U.S. 254, 270 (1964).  In order to "assure to the freedoms of speech and press that 'breathing space' essential to their fruitful exercise," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974), libel plaintiffs have a "heavy burden of proof." *Herbert v. Lando*, 781 F.2d 298, 308 (2d Cir. 1986).

In *New York Times*, the Court ruled that the First Amendment mandates that a "public official" may not recover for libel "unless he proves that the statement was made with 'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was false or not."[2]  376 U.S. at 279-80.  That constitutional rule has been extended to cover "public figures" as well.  *E.g., Gertz*, 418 U.S. at 335, 342; *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 164 (1967); *Celle*, 209 F.3d at 183.  Moreover, the

---

[1] This Court need not conduct a choice of law analysis even if Plaintiff asserts that California law should apply.  In diversity actions, courts will not "have occasion to embark on a choice-of-law analysis in the absence of an 'actual conflict' between the applicable rules of two relevant jurisdictions." *Finance One Public Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005).  "In the absence of substantive difference, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." *International Business Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137 144 (2d Cir. 2004).  Accordingly, given that the law on libel is substantially the same in New York and California, this Court may apply New York law.  Moreover, regardless of which state's law applies, the Supreme Court has placed a significant constitutional overlay on libel actions, holding that in order to recover on a libel claim, public figures must show with convincing clarity that statements were made with "actual malice." *E.g., Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173-74 (2d Cir. 2001).

[2] Where, as here, the challenged publication involves matters of public concern, the plaintiff must also show that the defendant published the statements with actual malice in order to recover presumed or punitive damages.  *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985); *Gertz*, 418 U.S. at 349.

public figure plaintiff must make this showing by "clear and convincing" evidence. *Id.*

"Reckless disregard" is a subjective standard. *E.g., Harte-Hanks Comm'ns, Inc. v. Connaughton* 491 U.S. 657, 688 (1989). As the Supreme Court has emphasized,

> [it] is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts as to the truth of his publication.*

*St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added); *accord, e.g., Harte-Hanks*, 491 U.S. at 688; *Church of Scientology*, 238 F.3d at 174. To establish actual malice, a plaintiff is required to "demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose Corp. v. Consumers Union*, 466 U.S. 485, 511, n.30 (1984); *accord, e.g., Church of Scientology*, 238 F.3d at 174. Plaintiff must prove that defendant "realized the inaccuracy at the time of publication." *Bose*, 466 U.S. at 512; *accord, e.g., New York Times*, 376 U.S. at 286.

Whether the evidence in the record is sufficient to support a finding of actual malice is a question of law. *E.g., Harte-Hanks*, 491 U.S. at 685. In a libel action brought by a public figure, a genuine issue sufficient to defeat a summary judgment motion will exist only if the evidence presented in opposition is of sufficient "caliber or quantity to allow a rational finder of fact to find actual malice by *clear and convincing evidence*." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (emphasis added); *accord, e.g., Yiamouniannis v. Consumers Union*, 619 F.2d 932, 940 (2d Cir. 1980).

### C.    Plaintiff is a Public Figure

In *Gertz*, 418 U.S. at 342, the Supreme Court ruled that those "who, by reason of the notoriety of their achievements or the vigor and success with which they seek the

public's attention, are properly classed as public figures." As the Court explained,

> [t]he [public figure] designation may rest on either of two alternative
> bases: In some instances an individual may achieve such pervasive fame
> or notoriety that he becomes a public figure for all purposes and in all
> contexts. More commonly, an individual voluntarily injects himself or is
> drawn into a particular public controversy and thereby becomes a public
> figure for a limited range of issues.

*Id.* at 351. These two categories are often called "general purpose public figures" and

"limited purpose pubic figures." *Fodor v. Berglas*, No. 95 Civ. 1153 (SMS), 1995 WL

505522, at *5 (S.D.N.Y. Aug. 24, 1995). The determination of whether a plaintiff is a

public figure is a question of law for the court. *Celle*, 209 F.3d at 176.

Given the media frenzy that surrounded Anna Nicole Smith before and after her

death, his efforts to insert himself into that frenzy, and his pervasive fame and notoriety,

Plaintiff is properly considered a general purpose public figure. *See Robert D. Sack,*

*Sack on Defamation*, 3d Ed. (2008) ("that celebrities are, indeed, public figures is a

natural conclusion"); *Curtis Publ'g Co.*, 388 U.S. at 164 (holding that football coach

Wally Butts was a public figure); *Meeropol v. Nizer*, 560 F.2d 1061, 1066 (2d Cir. 1977)

(holding that the "extensive public debate revolving about the Rosenberg trial" rendered

the Rosenberg children "public figures for all purposes"); *Carson v. Allied News Co.*, 529

F.2d 206, 210 (1976) (finding Johnny Carson's wife to be an all purpose public figure);

*Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1294 (D.C. Cir. 1980) ("a general

public figure is a well-known 'celebrity,' his name a 'household word'").

By objective measure Plaintiff is a celebrity with "pervasive fame and notoriety."

*See, e.g.,* Newman Aff. ¶ 7, Exh. E.; *generally* Memorandum of Law submitted by

defendant Rita Cosby in support of her Motion for Summary Judgment, especially Point

II, which describes the extent of the media coverage of Plaintiff, and the notorious nature

of that coverage.  Separate searches of the Westlaw database "ALLNEWSPLUS" for the

phrases "Howard K. Stern" and "'Howard K. Stern' and 'Anna Nicole Smith'" for the

period January 1, 1997 through August 30, 2007 yielded 15,559 and 14,082 documents,

respectively.  Newman Aff. ¶ 8, Exh. F.  Recent searches for "Howard K. Stern" on

Yahoo and Google have yielded results of 2,650,000 and 754,000, respectively.  *Id.* ¶ 9,

Exh. G.  A Yahoo search for "'Howard K Stern' and 'Anna Nicole'" yielded

approximately 2,160,000 results.  A Google search for the same phrase yielded

approximately 641,000 results.  *Id.*

There can be no doubt that Plaintiff is at a minimum a "limited purpose" public

figure with respect to the subject matter of the book.  His voluntary actions have

"invite[d] attention and comment."  *Gertz,* 418 U.S. at 345.  Determination of his status

focuses on "the nature and extent of [the] individual's participation in the particular

controversy giving rise to the defamation."  *Id.* at 352.  A plaintiff is a limited public

figure if he has:  "(1) successfully invited public attention to his views in an effort to

influence others prior to the incident that is the subject of the litigation; (2) voluntarily

injected himself into a public controversy related to the subject of the litigation; (3)

assumed a position of prominence in the public controversy; and (4) maintained regular

and continuing access to the media."  *Contemporary Mission, Inc. v. New York Times Co.*,

842 F.2d 612, 617 (2d Cir. 1988).

Plaintiff certainly meets these criteria.  Throughout much of the last decade,

Plaintiff has presented himself to the media as Ms. Smith's lawyer, spokesperson, and

constant companion.  Affidavit of Rita Cosby ("Cosby Aff") ¶ 13; Newman Aff. ¶ 10,

Exh. H.  Plaintiff first became known to the public when he represented Ms. Smith in the

high profile litigation surrounding her late husband's estate.  Newman Aff. ¶ 10, Exh. H.

He gained fame and notoriety when he chose to appear as a co-star on *The Anna Nicole*

*Show*, Ms. Smith's reality television program.  Cosby Aff ¶ 13; Affidavit of Bruce

Littlefield ("Littlefield Aff.") ¶¶ 14-24.

### REDACTED

Plaintiff's position of public prominence increased as the media became focused

on Ms. Smith's pregnancy, the paternity of her daughter, the death of her son, and her

own death.  *See* Cosby Aff. ¶ 16.  Plaintiff "voluntarily injected himself" into the public

controversies surrounding each of these events, consistently presenting himself to the

media as the authoritative source for all things Anna Nicole Smith by issuing press

releases, making public statements, appearing on television shows such as *Entertainment*

*Tonight* ("*ET*") and *Larry King Live*, and brokering the sale of photographs of himself

and Ms. Smith to the media.  *See* Newman Aff. ¶ 10, Exh. H; Cosby Aff. ¶¶ 16, 22, 24,

29, 49.

### REDACTED

Plaintiff's "regular and continued access to the media" continues to this day, as

evidenced by Plaintiff's statements to the press concerning this litigation.  *See* Newman

Aff. ¶ 11, Exh. 1.  Indeed, based on his public status Plaintiff was able to appear again on

*Larry King Live* in October 2007 and on the *Greta Van Susteren* show in April 2008 to

respond to *Blonde Ambition*, thereby supporting the Supreme Court's observation that "public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements then private individuals normally enjoy." *Gertz*, 418 U.S. at 344.

Given Plaintiff's pervasive public involvement in the events forming the basis for *Blonde Ambition*, he "must be classified as a public figure for the purpose of comment on these activities." *See McManus v. Doubleday & Co.*, 513 F. Supp. 1383, 1387 (S.D.N.Y. 1981).

### D.   Hachette Did Not Publish With Actual Malice

Hachette is entitled to summary judgment as a matter of law because there is no evidence in the record indicating that Hachette actually entertained serious doubts about the truth of any of the challenged statements. The record is uncontradicted that Hachette reasonably relied on Ms. Cosby, an award-winning journalist. Not only was Ms. Cosby an experienced investigative journalist, she had been covering the Anna Nicole Smith story for months. She was an expert in the story and had access to many of the central players. Moreover, during the edit process, Ms. Cosby gave no reason for the editors to question her good faith, her reporting or her reliance on her sources. On the contrary, the editors were impressed with her diligence and commitment to be accurate. She showed great knowledge of the story and supported her reporting with prior media reports, documents and many interviews. Einhorn Aff. ¶¶ 26-27; Hoffman Aff. ¶¶ 7, 8, 13.

The editors had no reason to doubt Ms. Cosby's credibility or her reporting. They did not believe that any of portion of the book was false, nor did they actually entertain any doubts regarding the truth of the book. Einhorn Aff. ¶¶ 26-28; Hoffman Aff. ¶¶ 10-

14.

It is well-established that a book publisher is "entitled as a matter of law" to rely

on an author's "reputation and experience," and there will be no finding of actual malice

where, as here, it publishes a book by an author it believes to be reliable. *McManus v.*

*Doubleday & Co.*, 513 F. Supp. 1383, 1389 (S.D.N.Y. 1981); *accord, e.g., Rinaldi v.*

*Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 383 (1977) (granting summary judgment

for publisher where it "placed its reliance upon [author's] reportorial abilities"); *Fodor*,

1995 WL 505522, at *6 (granting summary judgment for publisher on ground that "sole

reliance on the experience and positive reputation of the author does not demonstrate

malice"). Indeed, courts have found that a publisher who relied on an author's "proven

reportorial ability" is entitled to summary judgment even in circumstances, unlike those

at hand, where "serious factual questions concerning the credibility" of the author and his

source preclude summary judgment for the author. *McManus*, 513 F. Supp. at 1389-90

(S.D.N.Y. 1981).

The Supreme Court has repeatedly held that "failure to investigate does not in

itself establish bad faith." *St. Amant*, 390 U.S. at 732-33; *see also Gertz*, 418 U.S. at 332.

Courts have thus consistently held that a book publisher is not required to conduct its

own independent factual investigation. *Hotchner v. Castillo-Puche*, 551 F.2d 910, 914

(2d Cir. 1977) (book publisher's "failure to conduct an elaborate investigation did not

constitute reckless disregard for the truth"); *Fodor*, 1995 WL 505522, at *6 ("As long as

the publisher had no serious doubts as to a story's truthfulness, there is no duty to make

any independent investigation."); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1446 (8th

Cir. 1989) (granting summary judgment for book publisher that "undertook no factual

review"). As the First Circuit noted in *Geiger v. Dell Publ'g Co.*:

> To require a book publisher to check, as a matter of course, every potentially defamatory reference might raise the price of non-fiction works beyond the resources of the average man. This result would, we think, produce just such a chilling effect on the free flow of ideas as First Amendment jurisprudence has sought to avoid.

719 F.2d 515, 518 (1st Cir. 1983).

Here, consistent with this jurisprudence and as is customary in the book publishing business, Hachette reasonably relied on Ms. Cosby and did not conduct its own investigation. Einhorn Aff. ¶ 23; Hoffman Aff. ¶ 6. Before Hachette entered into a contract with Ms. Cosby, it carefully considered her background and experience as a reporter and her knowledge of the Anna Nicole Smith story. Einhorn Aff. ¶¶ 9-17. Moreover, Ms. Cosby represented and warranted in her book contract that the book would not contain libelous material, an undertaking that book publishers routinely extract from authors to ensure the accuracy of their books. Einhorn Aff. ¶ 19, Exh. C. *see Murray v. Bailey*, 613 F. Supp. 1276, 1281 (N.D. Cal. 1985) (stating that publisher did not act unreasonably where, among other things, author represented and warranted in contract that book was not libelous).

Hachette acted in good faith reliance on Ms. Cosby. The editors put in place a process that allowed sufficient time for Ms. Cosby's reporting and the legal review. Through all their dealings with Ms. Cosby and Mr. Littlefield and their review of the manuscript, the editors gained confidence in Ms. Cosby and had no cause to doubt the truth of what she was reporting. Hachette, like other book publishers, does not fact check the author's work and in the case there was no reason to deviate from that practice. Einhorn Aff. ¶¶ 5, 24-28; Hoffman Aff. ¶¶ 3-4, 6-14. Given these circumstances, Hachette is entitled to summary judgment as a matter of law. *See, e.g., Price*, 881 F.2d at

15

1446; *Fodor*, 1995 WL 505522, at *6; *McManus*, 513 F. Supp. at 1389; *see also Nelson v. Globe Int'l, Inc.*, 626 F. Supp. 969, (S.D.N.Y. 1986); *Chaiken v. VV Publishing Corp.*, 119 F.3d 1018, 1033 (2d Cir. 1997).

### E.   Plaintiff Cannot Show Any Evidence of Actual Malice

Hachette anticipates that Plaintiff will attempt to argue that Hachette acted with a reckless disregard for the truth by (1) making efforts to ensure that the book contained newsworthy items, (2) relying on Ms. Cosby when some of her sources were confidential or biased and she did not to contact Plaintiff prior to publication, and (3) deciding to publish *Blonde Ambition* notwithstanding a letter from Plaintiff's counsel making vague allegations about Ms. Hatten's credibility.

### 1.   The Fact That Hachette Sought Newsworthy Items Does Not Constitute Actual Malice

Plaintiff may argue that Hachette's efforts to ensure that *Blonde Ambition* contained newsworthy information that had not been previously reported, which Ms. Einhorn referred to in an email as "holy shit" items, supports a finding of actual malice. This argument is without merit.

In *Tavoulareas v. Piro*, 817 F.2d 762 (D.D.C. 1987) the court confronted the same argument.  In that case, plaintiff argued that a finding of actual malice by the Washington Post was supported by evidence that editor Bob Woodward pressured his reporters to write "investigative stories of wrongdoing" that Woodward called "holy shit" stories.  The court disagreed, stating that "an inference of 'reckless disregard' drawn from evidence of managerial pressure to produce high-impact stories is not permissible." *Id.* The court held that in order to permit such an inference, a plaintiff must show that such "managerial pressure to produce sensationalistic or high impact stories" was made with

"*little or no regard for their accuracy.*" *Id.* at 797 (emphasis original); *see Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85, 93 (S.D.N.Y. 1980) (fact that article was "hot news" was a "constitutionally impermissible evidentiary basis for a finding of actual malice"); *see also Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 716 (4th Cir.) (1991) ("The cases from *New York Times v. Sullivan* onward teach that evidence of a defendant printing material to increase its profits does not suffice to prove actual malice.").

Hachette's efforts to ensure that *Blonde Ambition* contained newsworthy, or "holy shit" items, "cannot reasonably be categorized as exhibiting such a distortive pressure." *See Tavoulareas*, 817 F.2d at 797; Littlefield Aff. ¶ 31. Indeed, Hachette's position is even stronger than that presented in *Tavoulareas* since Hachette did not manage Ms. Cosby's reporting. The record shows that Hachette took steps to ensure the book's accuracy, by relying on an author with an extensive background in investigative reporting and impressive credentials, and extracting an explicit warranty from Ms. Cosby that the book as published would be true or based on reasonable research for accuracy. Einhorn Aff. ¶¶ 9-13, 19, Exh. C. There is no evidence suggesting that Hachette was unconcerned with the truth of the book.

### 2. Hachette's Reliance on Ms. Cosby's Choice of Sources, and Her Decision Not to Contact Plaintiff Prior to Publication, Does Not Constitute Actual Malice

Plaintiff may also argue that Hachette, based on its review of the manuscript, was aware that certain of Ms. Cosby's sources were confidential or may have been biased against Plaintiff, and that such knowledge creates a triable issue of fact regarding actual malice. This argument is insufficient. As noted above, Hachette was entitled as a matter of law to rely on Ms. Cosby's investigation. The record is clear that Hachette's editors understood that Ms. Cosby trusted her sources, and they had no reason to question

17

Cosby's determination that her sources were credible.   Einhorn Aff. ¶¶ 26-28, Hoffman

Aff. ¶¶ 6-14.

Courts have repeatedly rejected the argument that an author's reliance on

confidential or biased sources creates a triable issue regarding a publisher's actual malice.

For example, in *D.A.R.E. America v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270,

1284 (C.D. CA 2000), where the publisher relied on an author who was ultimately

revealed to have fabricated material, the court stated: "relying on an author's

representations about sensitive and anonymous sources is de rigeur in the publishing

industry as a measure of respect for an author's resources and the privacy of persons

volunteering sensitive information."   Thus, the court held that a publisher's failure to

conduct its own investigation of a source's credibility is not evidence of actual malice:

"if a defendant has not acted with reckless disregard of the truth by failing to contact the

subject of a planned publication, then a fortiori, a defendant has not acted improperly by

failing to contact third parties or sources of information contained in the publication." *Id.*

Similarly, where, as here, there is no evidence that a defendant possessed

subjective doubt about a source's credibility, courts have repeatedly held that the source's

bias against the plaintiff does not support a finding of actual malice. *McFarlane v.*

*Esquire Magazine*, 22 Media L. Rep. 2033 (D.D.C. 1994) (reliance upon a single source

who may have been biased insufficient to create a triable issue regarding actual malice);

*Secord v. Cockburn*, 747 F. Supp. 779 (D.D.C. 1990) (plaintiff must establish that "even

in relying upon an otherwise questionable source the defendant actually possessed

subjective doubt").   Clearly, if an author's decision to rely on a biased source is not

evidence of actual malice, a publisher's decision to rely on the author's determination

that the source is credible is similarly non-probative. *See, e.g., Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 252 (1st Cir. 2000) (plaintiff failed to show that publisher acted with actual malice, notwithstanding that author relied on sources who were prejudiced or had limited knowledge); *Secord*, 747 F. Supp. at 794 (summary judgment warranted where plaintiff failed to show publisher acted with actual malice, notwithstanding that author may have relied on unreliable sources); *Bressler v. Fortune Magazine*, 971 F.2d 1226, 1233 n. 7 (6th Cir. 1992) ("reliance on hostile sources does not itself necessarily constitute actual malice.")

Any argument that a triable issue of fact is raised by Cosby's decision not to contact Plaintiff prior to publication is similarly unavailing. "If the caselaw is clear on any point it is that an author is under no duty to divulge the contents of a book prior to publication in order to provide the subject an opportunity to reply." *Secord*, 747 F. Supp. at 788; *see Loeb*, 497 F. Supp. at 93 ("failure to verify statements with the plaintiff and reliance on some biased sources, in themselves, do not amount to reckless disregard of the truth"); *Davis v. Costas Gavras*, 654 F. Supp. 653 (S.D.N.Y. 1987) ("plaintiff cannot prove actual malice merely by asserting that a publisher failed to contact the subject of his work"). Hachette was entitled to rely on Ms. Cosby's decision to refrain from apprising Plaintiff of the book's substance prior to publication, and that reliance certainly does not evidence a "reckless disregard for the truth."

### 3.   Hachette's Decision to Proceed with the Publication Notwithstanding Plaintiff's August 31 Letter Does Not Constitute Actual Malice

The Complaint alleges that prior to publication Plaintiff's counsel wrote a letter to Hachette challenging the credibility of Jackie Hatten, one of Ms. Cosby's sources. Compl. ¶ 75, Exh. C.  That letter, dated August 31, 2007, stated that the book "may

contain false and defamatory accusations by Hatten against Mr. Stern." Compl. Exh. C. Without giving any basis for the claim, the letter asserted that Ms. Hatten "is not a credible source." The letter merely said that a review Ms. Hatten's "media interviews," would establish that "any accusation against Mr. Stern on Hatten's statements will constitute republication by [Hachette] with a reckless disregard for truth or falsity," *id.* but did not in any way explain what about Ms. Hatten's prior interviews supported that assertion.

Plaintiff may argue that Hachette's publication of *Blonde Ambition* after receiving the August 31 letter supports a finding of actual malice. That argument fails. Plaintiff's bald assertion that Ms. Hatten is not credible cannot be substituted for evidence that Hachette shared that view. In fact, nothing in the record suggests that Hachette "entertained serious doubts as to the truth of statements" attributed to Ms. Hatten. Ms. Cosby, of course, had reviewed Ms. Hatten's prior media appearances and believed her to be credible. Cosby Aff. ¶ 74-76, 80. There was no reason – and the letter provided none – for Hachette to second guess Ms. Cosby's evaluation of her source.

## II.    MS. COSBY'S STATE OF MIND CANNOT BE IMPUTED TO HACHETTE

Plaintiff claims, without any supporting factual allegations, that "the publication of Blonde Ambition was a joint venture of Cosby and Hachette," Compl. ¶ 375, and further that Ms. Cosby's "state of mind" with respect to the publication of *Blonde Ambition* "is imputed to Hachette[] as a matter of law." *Id.* ¶ 373-74.

The law is to the contrary.[3] It is well-settled that actual malice must be

---

[3] Hachette does not imply or suggest that Ms. Cosby has committed any acts or omissions indicating that she acted with actual malice, or that she acted with actual malice. In fact, Hachette believes that the evidence shows the opposite.

established independently for a publisher and an author, unless the author is found to be an employee of the publisher under traditional doctrines of respondeat superior. *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 253 (1974); *see Chaiken v. VV Publishing Corp.*, 119 F.3d 1018, 1033 (2d Cir. 1997).

Here, there is no question that Ms. Cosby was an independent contractor, not an employee of Hachette. Under New York law, the distinction between an employee and an independent contractor lies in the fact that "the [employee] 'undertakes to achieve an agreed result and to accept the directions of his employer as to the manner in which the result shall be accomplished,' while the [independent contractor] 'agrees to achieve a certain result but is not subject to the orders of the employer as to the means which are to be used.'" *Chaiken*, 119 F.3d at 1033. Other relevant factors include, who supplied to the place of employment, whether payment is by time or the job and whether the employer withholds taxes or social security. *See generally Nelson v. Globe Int'l, Inc.*, 626 F. Supp. 969, 977-78 (S.D.N.Y. 1986).[4]

Application of this test demonstrates that Ms. Cosby was an independent contractor. She controlled the manner in which *Blonde Ambition* was written; she selected and interviewed sources without any guidance from Hachette; she was paid a fee for the book and was not salaried by Hachette. *See* Einhorn ¶¶ 18-19, 23, Exh. C; Hoffman Aff. ¶¶ 6-7. Facts like these have established that a worker is an independent contractor. *See Nelson*, 626 F. Supp. 978.

Plaintiff's contention that "[t]he publication of *Blonde Ambition* was a joint venture of Cosby and Hachette," Compl. ¶ 375, is equally unfounded. "'The indicia of

---

[4] The analysis applied under California law to distinguish an employee from an independent contractor is substantially similar. *See D.A.R.E. America*, 101 F. Supp. 2d at 1279.

the existence of a joint venture are: acts manifesting the intent of the parties to be associated as joint venturers, mutual contribution to the joint undertaking through a combination of property, financial resources, effort, skill or knowledge, a measure of joint proprietorship and control over the enterprise, and a provision for the sharing of profits and losses.'" *Brown v. Cara,* 420 F.3d 148, 159-160 (2d Cir. 2005) (citing *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.,* 309 A.D.2d 288, 298, 765 N.Y.S.2d 575 (2003)).[5]  None of these factors are present here.  *See* Einhorn Aff., Exh. C.

## III.   PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES SHOULD BE DISMISSED

Plaintiff cannot possibly prove that he is entitled to punitive damages and thus that claim should be dismissed.  Under New York law, even if Plaintiff was able to demonstrate that Hachette published *Blonde Ambition* with actual malice (which he cannot) he is not entitled to an award of punitive damages unless he can also prove common law malice.  Plaintiff must prove that Hachette acted with "hatred, ill will, spite, criminal mental state or that traditionally required variety of common-law malice." *Prozeralik v. Captial Cities Comm'n, Inc.,* 82 N.Y. 2d 466, 479-80 (N.Y. 1993); *see also DiBella v. Hopkins,* 403 F.3d 102, 122 (2d Cir. 2005).[6]

Plaintiff's claim for punitive damages should be dismissed because there is absolutely no evidence in the record to support the necessary finding against Hachette. There is no evidence that anybody at Hachette was motivated by anything other than his

---

[5] The elements necessary to establish a joint venture under California law are substantially similar. *See Connor v. Great Western Sav. and Loan Ass'n,* 69 Cal.2d 850, 863, 447 P.2d 609, 615 (Ca. S.C. 1968).

[6] California law is substantially similar.  A plaintiff cannot recover punitive damages without proving by clear and convincing evidence that the defendant "has been guilty of oppression, fraud or malice." Cal. Civ. Code § 3294(a).  "Malice" includes "despicable" conduct by the defendant that is carried on by a willful and conscious disregard of others' rights. *Id.; see also Coutee v. Barington Capital Group,* 336 F.3d 1128, 1135 (9th Cir. 2003).

or her professional interest in publishing a book about Anna Nicole Smith and the controversy surrounding her life and death.  Indeed, Plaintiff does not even allege that Hachette acted with hatred, ill will or spite toward Plaintiff.  *See* Compl. 396.

## IV.     HACHETTE ADOPTS AND JOINS IN THE ARGUMENTS SET FORTH BY DEFENDANT RITA COSBY

Hachette hereby adopts and joins in the arguments made by defendant Rita Cosby in support of her motion for summary judgment.

**CONCLUSION**

For the forgoing reasons, Hachette respectfully requests that its motion for

summary judgment be granted, and that Plaintiff's claims against Hachette be dismissed

in their entirety.

Dated:   New York, New York
         December 15, 2008

AKIN GUMP STRAUSS
HAUER & FELD LLP


By:   _/s/ Douglass Maynard_____

Douglass B. Maynard
Deborah J. Newman
One Bryant Park
New York, New York 10036
(212) 872-1000
dmaynard@akingump.com

Karen E. Andrews
Hachette Book Group USA, Inc.
237 Park Avenue
New York, New York 10017
(212) 364-1560

*Counsel for Defendant Hachette Book Group
USA, Inc.*

## CERTIFICATE OF SERVICE

I, Deborah J. Newman, hereby certify that on this 15th day of December, 2008, I caused a true and correct copy of the foregoing Notice of Motion, Memorandum of Law in Support of Hachette Book Group USA, Inc.'s Motion for Summary Judgment, Affidavit of Amy Einhorn with accompanying exhibits, Affidavit of Mitchell Hoffman, Affidavit of Deborah Newman with accompanying exhibits, and Statement of Undisputed Facts Pursuant to Local Rule 56.1, with confidential material contained therein redacted pursuant to the Consent Protective Order Governing Confidential Material So Ordered by the Court on February 14, 2008 and the Order of the Court dated December 12, 2008, to be served by electronic filing with the District Court for the Southern District of New York, and true and correct redacted and unredacted copies of the foregoing materials to be served by electronic mail on L. Lin Wood, Esq., Powell Goldstein LLP, Fourteenth Floor, 201 W. Peachtree Street, NW, Atlanta, Georgia 30309, counsel for Plaintiff Howard K. Stern, and Elizabeth McNamara, Davis Wright Tremaine LLP, 1633 Broadway, New York, New York 10019, counsel for Defendant Rita Cosby.

Deborah J. Newman