UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

HOWARD K. STERN,                                  :
                                                  :     No. 07 Civ. 8536 (DC)
                          Plaintiff,              :
                                                  :
              - against -                          :
                                                  :
RITA COSBY and HACHETTE BOOK GROUP :
USA, INC., d/b/a Grand Central Publishing, and    :          REDACTED
JOHN or JANE DOE,                                 :
                                                  :
                          Defendants.             :
------------------------------------------------------- x


**DEFENDANT RITA COSBY'S**
**MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT**


**Davis Wright Tremaine LLP**
**1633 Broadway**
**27th Floor**
**New York, NY  10019**
**(212) 489-8230**
**December 15, 2008**
*Attorneys for Defendant Rita Cosby*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 2

    A.     Events Covered by *Blonde Ambition* ............................................................... 2

         Events Leading Up to the Firestorm Surround Anna's Death ....................... 4

         Daniel Smith's Death ................................................................................... 4

         Anna Nicole Smith's Death ......................................................................... 6

         Stern and Birkhead's Paternity Dispute ..................................................... 8

    B.     Rita Cosby and *Blonde Ambition* ..................................................................... 9

         *Blonde Ambition* ...................................................................................... 10

    C.     The Complaint ................................................................................................ 11

ARGUMENT ...................................................................................................................... 11

    I.     COURTS ROUTINELY GRANT SUMMARY JUDGMENT IN LIBEL
         ACTIONS ....................................................................................................... 11

    II.     THERE IS NO TRIABLE ISSUE THAT PLAINTIFF STERN IS LIBEL
         PROOF AS A MATTER OF LAW ............................................................... 12

         Murder and Destruction of Evidence ........................................................ 14

         Kidnapping and Extortion .......................................................................... 15

         Pimping ...................................................................................................... 15

         Exploitation of Anna and Daniel's Death and Perjury ............................. 15

         Enabler to Anna's Addiction ..................................................................... 16

    III.     STATEMENTS IMPUTING HOMOSEXUALITY ARE NOT DEFAMATORY ... 17

    IV.     THERE IS NO TRIABLE ISSUE AS TO CERTAIN SUBSTANTIALLY TRUE
         STATEMENTS ................................................................................................ 20

DWT 12116592v2 3910089-000032

A.  It is Substantially True that Stern Committed Perjury When He Testified That He Did Not Receive Any Monetary Compensation for Providing Access to the Media After Daniel and Anna Nicole Smith's Death .............. 21

B.  It is Substantially True that Stern Committed Perjury When He Testified That He Was Dannielynn's Father ................................................................ 24

V.  THERE IS NO TRIABLE ISSUE OF ACTUAL MALICE ........................................ 25

A.  The Subjective Standard of Actual Malice Must Be Shown With Clear and Convincing Evidence, Not Merely the Preponderance of the Evidence .. 27

B.  The Undisputed Evidence Precludes a Finding of Actual Malice ................. 29

C.  Cosby Went Beyond Prior Reports and Court Records and Further Corroborated the Statements ............................................................ 31

D.  Plaintiff's Allegations to Support Actual Malice Do Not Withstand Scrutiny ........................................................................................ 35

    1.  Reliance on Biased Sources ........................................................ 35

    2.  No Evidence That Cosby Willfully Avoided Contrary Evidence ....... 40

    3.  Harding's Denial of Certain Quotes and Speer's Dispute With Certain Language Does Not Support Actual Malice ......................... 43

        (a)  Harding Quotes ................................................................ 44

        (b)  Speer Quotes ................................................................... 46

    4.  Post-Publication Events Do Not Evidence Serious Doubts ................ 47

    5.  Plaintiff's List of Grievances Does Not Amount to Actual Malice .... 48

VI.  THERE IS NO TRIABLE ISSUE THAT PLAINTIFF CANNOT ESTABLISH PUNITIVE DAMAGES ........................................................................ 48

CONCLUSION ........................................................................................ 49

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Albright v. Morton,*
    321 F. Supp. 2d 130 (D. Mass. 2004) ................................................................................19, 20

*Amrak Prods., Inc. v. Morton,*
    410 F.3d 69 (1st Cir. 2005) .................................................................................................19

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ............................................................................................................27

*Bement v. N.Y.P. Holdings,*
    307 A.D.2d 86 (1st Dep't 2003) .........................................................................................48

*Biospherics v. Forbes, Inc.,*
    151 F.3d 180 (4th Cir. 1998) ..............................................................................................34

*Bose Corp. v. Consumer Union of U.S., Inc.,*
    466 U.S. 485 (1984) ......................................................................................................26, 47

*Celotex v. Catrett,*
    477 U.S. 317 (1986) ............................................................................................................11

*Cerasani v. Sony Corporation,*
    991 F. Supp. 343 (S.D.N.Y. 1998) ................................................................................13, 16

*Chaiken v. VV Pub. Corp.,*
    119 F.3d 1018 (2d Cir. 1997) ..............................................................................................34

*Church of Scientology . v. Time Warner, Inc.,*
    903 F. Supp. at 640 (S.D.N.Y. 1995), *aff'd*, 239 F.3d 168 (2d Cir. 2001) .............................27

*Cobb v. Time, Inc.,*
    278 F.3d 629 (6th Cir. 2002) .....................................................................................38, 39, 40

*Copp v. Paxton,*
    45 Cal. App. 4th 829 (Ct. App. 1996) .................................................................................27

*Davis v. Costa-Gavras,*
    580 F. Supp. 1082 (S.D.N.Y. 1984) ....................................................................................12

*Dellefave v. Access Temporaries, Inc.,*
    2001 WL 25745 (S.D.N.Y. Jan. 10, 2001) .........................................................................18

*Desnick v. America Broadcasting Co.,*
    233 F.3d 514 (7th Cir. 2000) ..............................................................................................43

DWT 12116592v2 3910089-000032

*DiBella v. Hopkins,*
    403 F.3d 102 (2d Cir. 2005)............................................................................................49

*Donovan v. Fiumara,*
    442 S.E.2d 572 (N.C. Ct. App. 1994) ...........................................................................20

*Eastwood v. National Enquirer, Inc.,*
    123 F.3d 1249 (9th Cir. 1997) .......................................................................................27

*Edwards v. National Audubon Soc'y, Inc.,*
    556 F.2d 113 (2d Cir. 1977)...........................................................................................42

*Fairley v. Peekskill Star Corp.,*
    83 A.D.2d 294 (2d Dep't 1981) .....................................................................................20

*Fletcher v. San Jose Mercury News,*
    216 Cal.App.3d 172 (Ct. App. 1989).............................................................................45

*Flowers v. Carville,*
    310 F.3d 1118 (9th Cir. 2002) .......................................................................................30

*Fodor v. Bergles,*
    No. 94 Civ. 4761, 1995 WL 505522 (S.D.N.Y. Aug. 24, 1995) ...................................30

*Freedom Newspapers of Texas v. Cantu,*
    168 S.W.3d 847 (Tex. 2005).....................................................................................45, 48

*Gray v. St. Martin's Press,*
    221 F.3d 243 (1st Cir. 2000)..........................................................................................40

*Gross v. New York Times Co.,*
    281 A.D.2d 299 (1st Dep't 2001) ..................................................................................36

*Guccione v. Hustler Magazine, Inc.,*
    800 F.2d 298 (2d Cir. 1986)............................................................... 13, 14, 17, 20

*Hardin v. Santa Fe Reporter, Inc.,*
    745 F.2d 1323-24 (10th Cir. 1984) ................................................................................40

*Harte-Hanks Communications, Inc. v. Connaughton,*
    491 U.S. 657 (1989).....................................................................................25, 26, 41, 43

*Hatfill v. The New York Times Co.,*
    532 F.3d 312 (4th Cir. 2008) .........................................................................................26

*Holy Spirit Ass'n v. New York Times,*
    49 N.Y.2d 63 (1979) ......................................................................................................30

iv

*Howard v. Antilla*,
  294 F.3d 244 (1st Cir. 2002) ............................................................................26

*Immuno A.G. v. Moor-Jankowski*,
  145 A.D.2d 114, *aff'd*, 74 N.Y.2d 548 (1989), *vacated*, 497 U.S. 1021 (1990), *aff'd*,
  77 N.Y.2d 235 (1991), *cert. denied*, 500 U.S. 954 (1991) ....................................12

*In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993)........................................12

*Jackson v. Paramount Pictures Corp.*,
  68 Cal. App. 4th 10 (Ct. App. 1998)..........................................................28, 32, 41

*James v. Gannett Co., Inc.*,
  40 N.Y.2d 415 (1976) ....................................................................................18

*Jewell v. NYP Holdings, Inc.*,
  23 F.Supp.2d 348 (S.D.N.Y. 1998) ...................................................................13

*Kahn v. New York Times*,
  269 A.D.2d 74 (1st Dep't 2000) ...........................................................27, 28, 42

*Karaduman v. Newsday, Inc.*,
  51 N.Y.2d 531 (1980) ....................................................................................29

*Klaxon Co v. Stentor Elec. Mfg. Co.*,
  313 U.S. 487 (1941) ......................................................................................12

*Lawrence v. Texas*,
  539 U.S. 558 (2003).................................................................................19, 20

*Levesque v. Doocy*,
  557 F. Supp. 2d 157 (D. Me. 2008) ..................................................................37

*Lewittes v. Cohen*,
  2004 WL 1171261 (S.D.N.Y. 2004) ..................................................................18

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
  838 F.2d 1287 (D.C. Cir. 1988) .......................................................................29

*Loeb v. New Times Commc'ns Corp.*,
  497 F. Supp. 85 (S.D.N.Y. 1980) .....................................................................36

*Lohrenz v. Donnelly*,
  223 F. Supp. 2d ...........................................................................................47

*Lohrenz v. Donnelly*,
  350 F.3d 1272 (D.C. Cir. 2003) ..................................................................36, 40

DWT 12116592v2 3910089-000032

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991) ..........................................................................................21, 23, 26, 47

*McCoy v. Hearst Corp.*,
    42 Cal.3d 835 (1986) ...................................................................................................38

*McFarlane v. Esquire Magazine*,
    74 F.3d 1296 (D.C. Cir. 1996) ....................................................................................26

*McFarlane v. Sheridan Square*,
    91 F.3d ..........................................................................................................................47

*McFarlane v. Sheridan Square Press, Inc.*,
    91 F.3d 1501 (D.C. Cir. 1996) ...........................................................................37, 39, 42

*Mencher v. Chesley*,
    297 N.Y. 94 (1947). .......................................................................................................18

*Mitchell v. Tribune Co.*,
    343 Ill. App. 446, 99 N.E.2d 397 (Ill. App. Ct. 1st Dist. 1951).................................19

*New York Times Co. v. Sullivan*, 376 U.S. 254, 271-72 (1964)...............................25, 26

*Newton v. National Broadcasting Co., Inc.*,
    930 F.2d 662 (9th Cir. 1990) .......................................................................................27

*Nichols v. Item Publishers, Inc.*,
    309 N.Y. 596 (1956) ......................................................................................................18

*People v. Onofre*,
    51 N.Y.2d 476 (1980) ....................................................................................................20

*Philadelphia Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986).......................................................................................................20

*Prozeralik v. Capital Cities Commc'ns, Inc.*,
    82 N.Y.2d 466 (1993) ....................................................................................................49

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
    42 N.Y.2d 369 (1977) ........................................................................................21, 25, 35

*Rosanova v. Playboy Enters., Inc.*,
    580 F.2d 859 (5th Cir. 1978) .......................................................................................29

*Sassower v. New York Times*,
    48 A.D.3d 440 (2d Dep't 2008) ...................................................................................30

*Schermerhorn v. Rosenberg*,
    73 A.D.2d 276 (2d Dep't 1980) ...................................................................................18

*Scotto v. Almenas*,
    143 F. 3d 105 (2d Cir. 1998) ............................................................................................... 11

*Secord v. Cockburn*,
    747 F. Supp. 779 (D.D.C. 1990) ................................................................................. 37, 38, 42

*Sharon v. Time, Inc.*,
    599 F. Supp. 538 (S.D.N.Y. 1984) ...................................................................................... 40

*Silverman v. Clark*,
    35 A.D.3d 1 (1st Dep't 2006) .............................................................................................. 34

*Southwell v. Southern Poverty Law Center*,
    949 F. Supp. 1303 (W.D. Mich. 1996) ................................................................................ 40

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ............................................................................................... 26, 29, 40

*Stein v. Trager*,
    36 Misc.2d 227 (Sup. Ct. Erie County 1962) .................................................................... 18

*Steinhilber v. Alphonse*,
    68 N.Y.2d 283 (1986) ......................................................................................................... 34

*Stultz v. Cousins*,
    242 F. 794 (6th Cir. 1917) .................................................................................................. 19

*Sweeney v. Prisoners' Legal Servs. of N.Y.*,
    84 N.Y.2d 786 (1995) ......................................................................................................... 38

*Tavoulareas v. Piro*,
    817 F.2d 762 (D.C. Cir. 1987) ............................................................................................ 37

*Towne v. Eisner*,
    245 U.S. 418 (1918) ............................................................................................................ 18

*Tucker v. Fischbein*,
    237 F.3d 275 (3d Cir. 2001) ............................................................................................... 48

*Weinstein v. Friedman*,
    No. 94 Civ. 6803, 1996 WL 137313 (S.D.N.Y. Mar. 26, 1996), *aff'd*, 112 F.3d 507
    (2d Cir. 1996) ..................................................................................................................... 12

*Woods v. Evansville Press Co., Inc.*,
    791 F.2d 480 (7th Cir. 1986) .............................................................................................. 26

*Wynberg v. National Enquirer, Inc.*,
    564 F. Supp. 924 (C.D. Cal. 1982) ................................................................................ 13, 14

DWT 12116592v2 3910089-000032

**STATUTES**

N.Y. Civ. Rights Law § 74 .................................................................................................30

N.Y. Penal Law § 245.00 ...................................................................................................19


**OTHER AUTHORITIES**

225th Legislature Chapter 2 (2002) ..................................................................................20

Fed. R. Civ. P. 56(e)(2).......................................................................................................11

First Amendment .........................................................................................................20, 27

Hon. R. Sack, *Sack on Defamation* § 2.4.4, at 2-31 (3rd ed. 2006)..................................19

*Sexual Orientation Non-Discrimination Act*, L. 2002, ch. 2 ............................................20

Defendant Rita Cosby ("Cosby"), by her undersigned attorneys, Davis Wright Tremaine LLP, hereby submits this memorandum of law in support of her motion for summary judgment, dismissing the Complaint in its entirety.

## PRELIMINARY STATEMENT

Plaintiff Howard K. Stern ("Stern") introduced himself to the American public years ago as part of the "outrageous life" of Anna Nicole Smith ("Anna") portrayed on her reality television show, in which virtually no sexual act or demeaning behavior – including appearing under the influence of drugs or alcohol – was beyond the pale. When the media circus surrounding Anna's last year and her untimely death occurred, Stern was by Anna's side, providing interviews, even of intensely personal moments, brokering deals with the media and generally becoming the target of an onslaught of criticism. Thus, long before *Blonde Ambition*, the media had accused Stern of possible responsibility for Anna and her son's deaths, kidnapping, facilitating Anna's drug abuse, destroying evidence and generally exploiting Anna for profit. Stern even admits that this highly damning portrait of him was widespread and pervasive.

*Blonde Ambition*, the book at the center of this action, set out to report and explain the events surrounding Anna's death. The Book chronicles and corroborates the already much publicized portrait of Stern, and provides additional new details that fleshes out and gives new insights to the events surrounding Anna's death. Everything is entirely consistent with prior reports and the disclosed and undisputed facts.

Nonetheless, Stern's libel action challenges 19 passages from the Book. Based on the record documenting Cosby's voluminous research and her basis for each of the challenged passages, Cosby – an award winning journalist and the author of the Book – moves for summary on several independent grounds:

First, Stern's reputation was so tarnished and so low concerning the specific issues he challenges well before the Book was published that as a matter of law he is libel proof. (Point II)

Second, statements in the Book that identify Stern as gay or bisexual are not defamatory and must be dismissed for this independent reason.  (Point III)  Third, statements concerning Stern's alleged perjury are indisputably and substantially true.  (Point IV)

Even if some or all of the challenged Statements are deemed objective and defamatory facts and Stern could meet his burden of substantial falsity, Stern cannot defeat summary judgment by coming forward with evidence that would permit a reasonable jury to find by clear and convincing evidence that Cosby acted with constitutional actual malice, *i.e.*, with a high degree of subjective falsity of what she published.  To the contrary, the record is clear that Cosby relied on previously published – and unchallenged – reports across the media, official court records and scores of interviews.  No evidence exists that Cosby had any doubt about any of the challenged Statements.  (Point V)

Finally, plaintiff's claim to punitive damages must be dismissed.

REDACTED

Yet, he cannot possibly establish the personal animus and ill will toward him that is required to establish punitive damages.  (Point VI)  For all these independent reasons, plaintiff's complaint must be dismissed.

## STATEMENT OF FACTS

The facts relevant to this motion are not subject to any genuine dispute and are more fully described in the declarations of Rita Cosby and Bruce Littlefield.  To briefly summarize:

A.   **Events Covered by *Blonde Ambition***

Anna Nicole Smith ("Anna") was a model, sometimes actress, reality TV star, world-famous widow, and ultimately the star of her own personal drama:  a front-page paternity dispute, the tragic loss of her son, and her own untimely death.  She first became known as a

DWT 12116592v2 3910089-000032

Playboy centerfold but was also the "most famous gold digger in America"[1] who at the age of 27 married 88 year old billionaire Texas oil magnate, J. Howard Marshall III. Following Marshall's death several months later, the plaintiff Howard K. Stern ("Stern") was among Anna's lawyers in the litigation that ensued over her claim to his estate – a claim valued at approximately $450 million. *See* Affidavit of Elizabeth McNamara in Support of Rita Cosby's Motion for Summary Judgment, dated December 15, 2008 ("McN. Decl.") ¶ 30. Close on the heels of her public identification as a "gold digger," was the common knowledge that Anna had drug or alcohol problems. In the 1990's she went to rehab, but more recently, her public appearances were often noted for her visibly slurred speech and embarrassing behavior.[2] This image was all the more reinforced when she starred in her own reality show. *See* Declaration of Rita Cosby in Support of Motion for Summary Judgment, dated December 15, 2008 ("Cosby Decl."), ¶¶ 12-13.

It is in connection with this show that the public first came to really know Stern. In his role as Anna's "shifty lawyer and self-proclaimed best friend" on Anna's 2002-2003 E! Entertainment reality show, the *Anna Nicole Show*, Stern was her constant but platonic companion. Described by CNN as an "obscene train wreck" or by the *Boston Herald* as a "freak show," the *Anna Nicole Show* depicted Anna's "so outrageous" life and showed her to be "certifiably strange, even perhaps drug addicted." Declaration of Bruce Littlefield in Support of Rita Cosby's Motion for Summary Judgment, dated December 15, 2008 ("Littlefield Decl.") ¶ 15. Stern's presentation of self is hardly more flattering. He is hopelessly drunk on more than one episode, readily discusses such sexually explicit topics as his own masturbation habits, and repeatedly appears in drag (at Anna's behest or because he loses bets) including an episode where he prances about in drag to mimic and

---

[1] McN. Decl. ¶ 29.

[2] Cosby Decl. ¶ 14. CBS News, *Early Show* ("Anna Nicole Smith is raising eyebrows again with her latest outrageous behavior. At the American Music Awards Sunday night, [she] got plenty of people talking … behaving bizarrely and slurring her speech.").

make fun of a gay man who appeared on the show.  *See,* Littlefield Decl. ¶ 18.[3]

### Events Leading Up to the Firestorm Surround Anna's Death

*Blonde Ambition* focuses on Anna's untimely death at the age of 39 on February 8, 2007. Yet, to understand the death, and the media frenzy it created, one must first begin with a brief summary of the events leading up to her death.  The timeline is as follows:  in 2005, Anna is living in Los Angeles and dating Larry Birkhead when she met and became involved with a wealthy developer from South Carolina, Ben Thompson.  As a result, she grew close to the Thompson family and, along with Stern and her son, ended up spending much of the month of December 2005 with the Thompsons in South Carolina.  After returning to Los Angeles, it was reported a few months later that Anna was pregnant.  Soon after, she seemingly broke up with Birkhead, traveled to South Carolina in May 2006 to again be with the Thompsons, and ultimately ended up living in the Bahamas with Stern in a house called Horizons that was bought by Ben Thompson.  Even before the baby is born, however, Birkhead emerges to claim that he is the baby's father.  *See* Cosby Decl. ¶ 15.

### Daniel Smith's Death

On September 7, 2006, Anna gave birth to her daughter, Dannielynn Hope Marshall Stern (now Birkhead).  Three days later, her twenty-year old son, Daniel, died while visiting Anna in the Bahamian hospital where she was recovering from the delivery.  The only other people in the hospital room at the time of his death were Anna and Howard.  It was at this point that the media "feeding frenzy" began.  Cosby Decl. ¶ 18.

Just days after Daniel's death, Bahamian Coroner Linda Virgill held a news conference and described the death as "suspicious," but she cautioned that it did not mean that there was foul play.  Cosby Decl. ¶ 20.  It was then revealed that Daniel had died of a drug overdose, a

---

[3] Indeed, in 2002 Stern received a "Golden Turkey Award" in part because even though Anna came off as "lost and confused" on the Show, Stern proclaimed it was good for her, when it was evident that he was in it "for the money." Littlefield Decl. ¶ 15.

DWT 12116592v2 3910089-000032

combination of prescription drugs, with the primary culprit being methadone (a Schedule II narcotic often prescribed for heroin withdrawal or long term pain management).  He did not have a prescription for the drug, but it later came to light that a prescription for methadone had been written for Anna (in a false name) during her eighth month of pregnancy, only weeks before Daniel passed away.  Cosby Decl. ¶ 20.

In the months that followed Daniel's death, a steady drip of information emerged that was damning to Stern.  First, it was reported that nurses at the hospital found two pills in the bed Stern had been sleeping in, one of them being methadone.  Cosby Decl. ¶ 20.  Then, Ben Thompson's son-in-law Ford Shelly appeared on television to reveal that he saw Stern seemingly flush two pills down the toilet that he found in Daniel's clothing, only to declare "I took care of the problem."  *Id.* ¶ 30.  Then, private detective Jack Harding also appeared on numerous television shows describing how Daniel had met with him in August 2006, about a month before his death.  He wanted Harding to investigate Stern because he believed Stern "keeps feeding my mom drugs…he has total control over her….He's a Svengali.  Howard does not want me around because I want to get my mom off the drugs and away from him…to save her."  *Id.*  Finally, it was reported that the nannies who had been hired to take care of the newborn Dannielynn described Anna yelling at Stern on more than one occasion after Daniel's death "You did this!  You killed him!  You caused this!"  *Id.*

Anna and Howard's own actions during this period did little to stem the negative publicity.  First, less than two weeks after Daniel's death, and even before his funeral, Anna, with Howard acting on her behalf, made a deal through Getty Images to sell the last photos of Daniel alive to *In Touch Weekly* magazine for a reported $600,000.  Commenting on the sale, one publication noted, "Even before her son Daniel's body was cold, Stern was peddling pictures of Anna and Daniel in her hospital bed, the night before his death."  Cosby Decl. ¶ 21.  Then, on September 26, 2006, before Daniel's funeral, Stern appeared on CNN's *Larry King Live* and announced that he was the "proud father" of Dannielynn.  When Larry King asked Stern about

Birkhead's claim to paternity, Stern chastised Birkhead for going to the media before Daniel "was put to rest," ignoring the fact that he too was sitting in front of a camera.  Howard's declaration of paternity was met with public skepticism, as he had never before appeared to have a romantic relationship with Anna.  *Id.* ¶ 22.

On *Larry King*, Stern described Anna as being in "lock-down mode."  Yet, just two days later, and still well before Daniel would be buried, Howard and Anna participated in a "commitment ceremony" in which they exchanged vows and rings with a few friends on board the boat "Margaritaville" off the Bahamian coast.  Despite a released statement that the event was supposed to be "private", it was revealed soon afterwards that Stern had negotiated to sell photos of the ceremony through Getty Images to *People* Magazine for what was reported to be $1,000,000.  Cosby Decl. ¶ 24.

Then, a week before Daniel's funeral, Anna's estrangement from her mother, Virgie Arthur, became national news when Virgie went on CNN to warn that her daughter should be "careful about who you hang around with, because you may be next."  Anna's rejoinder was just as public.  In a November 1, 2006 "world exclusive" interview on *Entertainment Tonight*,[4] Anna appeared with Stern sitting next to her.  She seemed drugged, slurring her words as she attacked her mother, telling her to "bring it on Mom, Mommie Dearest, Bring it on!"  On the same show, *Entertainment Tonight* also aired footage from Dannielynn's cesarean birth, footage that ET advertised as "beautiful" and "uncensored", but which many perceived as crass, commercial and "disgusting."  Cosby Decl. ¶ 26.

### Anna Nicole Smith's Death

On February 8, 2007, Rita Cosby for MSNBC was the first to publicly reveal the official news that Anna Nicole Smith, at the age of 39, had died in a hotel room in the Hard Rock Hotel in Florida.  Coming just months after the death of her son, the news sent the media into a

---

[4] Around the same time, it was reported that Anna and Howard entered into an exclusive relationship with *Entertainment Tonight*.  Cosby Decl. ¶ 26.

maelstrom.  The two untimely deaths – with the common denominators of drug overdoses and Howard K. Stern – caused endless speculation and charges.  Cosby Decl. ¶ 27.

Not unlike the O.J. Simpson saga or the Monica Lewinsky scandal, the public and the media were obsessed with Anna's death.  A report compiled by the Project for Excellence in Journalism (PEJ) titled "Anna Nicole Smith, Anatomy of a Feeding Frenzy" provides a glimpse of the overwhelming coverage that Anna's death received.[5]  The PEJ report estimated that for the 23 days following Anna Nicole's death, "only two other stories during that time – the debate over Iraq and the 2008 presidential race – generated more attention than Smith's demise – and those only barely."  Littlefield Decl. ¶ 49.

Shortly after Anna's death, a hearing was convened in Broward County, Florida, to resolve a dispute that arose between Stern and Anna's mother as to where Anna should be buried.  Judge Seidlin held six days of hearings, broadcast on national television, allowing testimony to delve off-topic into "murder, money, drugs and lots of sex."  Cosby Decl. ¶ 32.  The televised testimony provided the public with a front row seat to Birkhead's and Stern's warring claims to paternity; vivid descriptions of Anna's methadone addiction and Stern's role as her "enabler"; Anna's mother's declaration under oath that she believed Anna and Daniel were murdered; and perhaps most damning for its sheer callousness, put into evidence was an excerpt from a video shot by Stern showing an eight month pregnant Anna so seemingly out of it she does not know she's pregnant, yet Stern is heard on the video declaring it is "worth money." *Id.* ¶ 32(a).  Ultimately, on February 22, 2007 the hearing came to a close with a finding that Anna would be buried in the Bahamas and Anna's funeral took place on March 2, 2007.  *Id.* ¶ 33-34.  Not long after, it was revealed that Anna died of a drug overdose, with chloral hydrate the main culprit.  Eight of the eleven drugs in Anna's

## REDACTED

possession or system were prescribed in the name of Howard K. Stern. *Id.* ¶ 30.

### Stern and Birkhead's Paternity Dispute

During the same period, the dispute over the paternity of Anna's daughter was escalating. In June 2006, Larry Birkhead first announced that he was the father of Anna's baby. In September, Birkhead appeared on various programs, expressing his concern about Anna's heavy drug use. Birkhead's public announcement, followed quickly by Howard's declaration of paternity on *Larry King Live*, began a months-long media and internet obsession with the "Who's the Daddy?" question. McN. Decl. ¶ 31.

Then, on October 2, 2006, Birkhead filed a paternity action in Los Angeles. The same day he appeared on MSNBC with Cosby. There, and elsewhere, it was reported that the lawsuit contained "damning allegations that Smith was taking methadone and that her attorney and boyfriend Howard K. Stern has been facilitating her habit." Further, Birkhead accused Anna of "fleeing to the Bahamas to keep her baby from being tested for drugs"[6] and that Stern was claiming to be the baby's father "for his own financial gain." Skepticism about Stern's claim to paternity increased when Anna and Howard refused to resolve the issue through DNA testing. McN. Decl. ¶ 32.

The paternity issue became even more complicated when Birkhead claimed in his paternity suit and Thompson confirmed, that Anna asked Thompson to allow his name to be listed as the "father" on Dannielynn's birth certificate. McN. Decl. ¶ 14. Soon after, the internet gossip site TMZ got hold of an affidavit filed in Birkhead's paternity suit by Laurie Payne, a friend of Anna and Thompson's, who attested that Anna had not only told her that the only possible fathers were Ben Thompson (who was incapable due to a vasectomy) and Larry

---

[6] Birkhead's contention was reinforced by Ford Shelley's testimony at the body custody hearing. Shelley testified that Anna's flight to South Carolina in May and subsequent move to the Bahamas was an attempt to move to a place where Birkhead would have a difficult time challenging paternity. Thus, further undermining the notion that Stern believed he was the father, Shelley testified that he put Stern in touch with a South Carolina attorney to see if that state was a favorable forum and when he learned it was not, Ford put them in touch with Bahamian counsel and they subsequently made the move to the Bahamas. McN. Decl. ¶ 20 (Hrg Trans. 2/22/07, Vol. 2 at 166).

Birkhead, but also that Anna would never have had sex with Stern, an idea that Anna said was "gross." McN. Decl. ¶ 15.

The question of paternity achieved new importance when Anna's will was released during the body custody hearings. Stern was designated as executor, and her estate was left to her son Daniel. However, the will expressly disinherited any future children – thereby excluding Dannielynn. Judge Seidlin raised doubts as to the validity of the will – "no woman in America who read this will [would] sign this will" – and the concern was echoed by numerous commentators. It was noted that if Stern was *not* the baby's biological father, his designation as executor under the will was in danger. McN. Decl. ¶ 20, (Hrg Trans. 2/20/07 Vol. 2 at 199-200).

In this context, Stern's refusal to take a DNA test acquired new meaning. As a result, when news leaked that Stern was negotiating with his opponent, Larry Birkhead, to resolve the paternity dispute, and discussions included dividing up Anna's homes and other assets, media commentators were aghast: "But isn't that kind of sick, that it would be trading bucks for babies, really?" Another implored Stern's former law partner Ron Rale, asking, "But just why not do the test?... We're at a kidnapping point, maybe. Maybe it's a kidnapping point." Cosby Decl. ¶ 35.

In early April 2007, in a move seen as a 180 degree turn, the former enemies, Stern and Birkhead, appeared to resolve all differences. When a Bahamian court ordered Stern to allow the paternity test, Stern announced that he would not contest custody if the DNA results showed that Birkhead was the father. When Birkhead was then announced to be the father, Stern and Birkhead held a joint news conference. Shortly thereafter, the baby's transition from Stern to Birkhead took place. Cosby Decl. ¶ 36.

**B.     Rita Cosby and *Blonde Ambition***

Cosby is an award winning a journalist for almost 20 years. During her career as a reporter, correspondent and host, most recently for MSNBC and Fox News, she has secured the most sought-after interviews, including of numerous world leaders, among them Yasser Arafat,

9

Prime Minister Ariel Sharon, President Clinton, Pakistani President Pervez Musharraf and Yugoslav President Slobodan Milosevic.  Many of the high-profile stories she covered involved breaking news that resulted from months of her in-depth dedicated investigative journalism, by cultivating contacts with law enforcement, government, and other sources.  Cosby Decl. ¶¶ 1-8.

While still at MSNBC, Cosby extensively covered the Anna Nicole Smith story.  She was in Florida for the body custody hearing and in the Bahamas for Anna's funeral.  When she resigned from MSNBC in March 2007 after the cancellation of her show, she (along with author Bruce Littlefield) decided to work full time on a book about Anna's death.  Cosby Decl. ¶ 9, 28, 39.  A book proposal was developed and sent to publishers early April.  Shortly thereafter, a deal was reached with Grand Central Publishing, a division of defendant Hachette Book Group USA, Inc. ("Hachette"), and the publishing agreement was executed on May 21, 2007.  *Id.* ¶¶ 41-43.

Given the timeliness of the subject, the manuscript was scheduled for delivery in early July 2007.  On delivery, Cosby worked closely with Hachette's editors and outside counsel.  The Book was published on September 4, 2007.  Cosby Decl. ¶ 43.

### *Blonde Ambition*

Building on the wealth of previously published information surrounding the events, including her own reporting with MSNBC, the Book's focus was on Anna's untimely death as its sub-title indicates – "*The Untold Story Behind Anna Nicole Smith's Death*."  The Book's opening and closing chapters provide a detailed explanation of how events unfolded over the days leading up to and the day of Anna's death.  The overarching theme of the Book was the tragedy that drugs and drug abuse can cause.  Cosby Decl. ¶ 44.

As documented in thousands of pages produced in discovery, Cosby's research for the Book included scores of interviews – including friends of Anna's and Stern's and the attorneys representing all the various interested parties – and reviews of various court filings and testimony, countless prior articles and televised interviews and commentary (none of which to

her knowledge had been retracted or corrected), along with other documents.  The evidence

shows she meticulously tried to nail down facts and went back to sources repeatedly.  In the end,

while providing new insights and information, *Blonde Ambition*, confirmed the much publicized

events surrounding Anna's last months and her death.  At the time the Book was published,

Cosby believed the Book was entirely accurate and she had no doubts, let alone serious doubts,

about any of the information contained in the Book.  Cosby Decl. ¶ 46-51, 62.

## C.    The Complaint

About one month after the Book was published, Stern commenced this action on

October 2, 2007 (serving Cosby as she entered her book party with cameras capturing the

moment).  Cosby Decl. ¶ 173.  In his complaint, Stern alleges that the gist of the Book is that

Stern is a "despicable person worthy of public contempt."  Cplt. ¶ 84.  In particular, he identifies

19 passages from the Book that he challenges as being false and defamatory.[7] **REDACTED**
REDACTED                                but nonetheless seeks

$10,000,000 in compensatory damages and $50,000,000 in punitive damages.

## ARGUMENT

### I.

### COURTS ROUTINELY GRANT
### SUMMARY JUDGMENT IN LIBEL ACTIONS

On summary judgment, when the moving party, as here, demonstrates the absence of a

disputed issue of material fact, *Celotex v. Catrett*, 477 U.S. 317, 322 (1986), the non-moving

party must present "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

The non-moving party "may not rely on conclusory allegations or unsubstantiated speculation."

*Scotto v. Almenas*, 143 F. 3d 105, 114 (2d Cir. 1998).

Accordingly, courts in New York and elsewhere repeatedly recognize that early

---

[7] For ease of reference, each of the 19 challenged statements are identified and itemized in the attached Appendix A.

adjudication of defamation claims is necessary to protect freedom of speech from the chilling effect of unwarranted claims.  With words that particularly resonate here, "to unnecessarily delay the disposition of a libel action is not only to countenance waste and inefficiency but to enhance the value of such actions as instruments of harassment and coercion inimical to the exercise of First Amendment rights."  *Immuno A.G. v. Moor-Jankowski*, 145 A.D.2d 114, 128 (1st Dep't), *aff'd*, 74 N.Y.2d 548 (1989), *vacated*, 497 U.S. 1021 (1990), *aff'd*, 77 N.Y.2d 235 (1991), *cert. denied*, 500 U.S. 954 (1991).  Consequently, courts routinely grant dispositive motions in favor of libel defendants on exactly the threshold legal and constitutional questions presented here, where, as in this case, there are no genuine issues of material fact.[8]

## II.

## THERE IS NO TRIABLE ISSUE THAT PLAINTIFF STERN IS LIBEL PROOF AS A MATTER OF LAW

The gravamen of plaintiff's complaint is that *Blonde Ambition* portrays him as a "despicable person worthy of public contempt," by, he alleges, stating he engaged in a number of crimes, including murder, kidnapping, perjury and "criminal lewd acts involving homosexuality." Cplt. ¶84.  Yet, the irrefutable fact is that his reputation was so horribly tarnished concerning the specific issues he challenges well before the Book's publication that

---

[8] While plaintiff's residence shifted from California to the Bahamas back to California during the period of time covered by the Book, the defendants all reside in New York, where most of the reporting for the Book occurred and where the Book was published.  Thus, Cosby submits that New York law applies here.  A federal court sitting in diversity applies the choice of law rules of the forum state.  *See Klaxon Co v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Where the particular issue in question is liability of the author and the publisher for defamation in connection with a book, the issues "are of special concern to the book publishing, news, and film industries, to authors and artists, and to the states of their domiciles and principal places of business.  New York, as the national center of the publishing industry, has a significant interest in assuring that the risks and liabilities flowing from publishing and related options contracts, negotiated and largely performed here, will be uniform."  *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1092 (S.D.N.Y. 1984).  *See also Weinstein v. Friedman*, No. 94 Civ. 6803, 1996 WL 137313, at *7 (S.D.N.Y. Mar. 26, 1996), *aff'd*, 112 F.3d 507 (2d Cir. 1996) ("As the home of the defendants, New York has a strong policy in protecting its media defendants.").

However, given that the first step in New York's choice of law analysis is to determine whether an actual conflict of law exists, *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993) the court need not engage in any choice of law determination, as between California and New York, no conflict of law exists as to the libel defenses relied on here, including defamatory meaning, substantial truth, opinion or actual malice.

# REDACTED

Yet, the media did not act on its own.  Stern injected himself into the events covered and it was often his own actions that created the most commentary.  In short, the plaintiff is libel proof and his claims fail for this basic reason.[9]

The Second Circuit recognizes the commonsensical doctrine that:

> Where an allegedly libelous statement cannot realistically cause impairment of reputation because the person's reputation is so low…even nominal damages are not to be awarded.  Instead, the claims should be dismissed so that the costs of defending against the claim of libel, which can themselves impair vigorous freedom of expression, will be avoided.

*Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 303 (2d Cir. 1986).  Moreover, the application of the libel proof doctrine, as this Court recognized, is not limited to those who have been previously convicted of crimes.  *Cerasani v. Sony Corporation,* 991 F. Supp. 343, 354 (S.D.N.Y. 1998) (plaintiff, a mafia associate and racketeer, libel proof on issue of murder even though he had been acquitted of the charge).  Indeed, in *Guccione*, *supra*, the Second Circuit specifically rejected such a limitation and instead focused on previously published magazine and newspaper articles demonstrating the plaintiff's prior reputation on the subject of adultery and concluded that "[a]ny subsequent reporting … could not further injure his reputation on the subject."  800 F.2d at 304 (noting that "magazine and newspaper articles" were "extremely probative of [his] notoriety for adultery").  With facts that echo Stern's claims, *Wynberg v. National Enquirer, Inc.*, 564 F. Supp. 924 (C.D. Cal. 1982), which was cited with approval in *Guccione*, is instructive.  In *Wynberg*, the district court found plaintiff to be libel proof with respect to allegations "that Wynberg had an

---

[9] If not libel proof as to all claims, any remaining Statements in the action after considering the several independent bases for dismissal, must be dismissed under the incremental harm doctrine.  *See Jewell v. NYP Holdings, Inc.*, 23 F.Supp.2d 348 (S.D.N.Y. 1998).

established reputation for taking advantage of his personal relationship with Elizabeth Taylor for his financial gain." *Id.* at 928-29.  As the Second Circuit noted, while Wynberg enjoyed a checkered criminal history as well, the "reputation for taking advantage of women," arose from a number of previously published articles and these were "perhaps the more appropriate basis" on which to find him libel proof because they "showed that his reputation was already severely damaged with respect to the precise point of the alleged libel." *Guccione*, 800 F.2d at 303.

Here, by the time *Blonde Ambition* was published, virtually all of the challenged Statements concerning Stern had been the subject of widespread prior publication.  Indeed,


# REDACTED


Thus, by way of brief example, long before *Blonde Ambition* was published, the following are representative published sentiments concerning plaintiff on the very issues he challenges:

## Murder and Destruction of Evidence

- "Daniel's autopsy shows methadone levels of 'staggering number'…. And of course everyone points the finger at Howard Stern."  Cosby Decl. ¶ 30.

- "A source in the coroner's office says that one of the witnesses will testify that Stern allegedly gave Daniel methadone.  And we're told that the witness will testify that Stern flushed the remaining methadone down the toilet after Daniel died."  Cosby Decl. ¶ 126; Shelley described Stern seemingly flushing two pills, emerging to say "I took care of the problem."  Cosby Decl. ¶ 30.


# REDACTED

DWT 12116592v2 3910089-000032

- "Was it Murder?" questioned one magazine headline concerning Daniel's death, with a report that the nannies heard Anna shouting at Stern "You caused this! and "You killed him!"; another asking "Did Howard Do Her In?"; with one commentator suggesting "I think Howard K. Stern should get a criminal lawyer. He is the common denominator." Cosby Decl. ¶ 30; McN. Decl. ¶ 33.

- "Stern gave Anna the gun she used to kill herself and anyone with misguided sympathy for the wretched man ignores those facts"; "we are not just investigating a homicide. We may be investigating a double homicide." Cosby Decl. ¶ 30; McN. Decl. ¶ 33; 3/18/07 *Hannity & Colmes*.

**Kidnapping and Extortion**

In response to news that Stern was negotiating with Larry Birkhead over baby

Dannielynn, the media outrage directed at Stern was palpable as one commentator after another

weighed in:

- "child stealing"; "to me, this is kidnapping"; "He's been holding this baby hostage trying to extort money or some kind of deal basically out of Larry Birkhead;" "It's like negotiating with a terrorist. He is holding this baby hostage, using the baby for money;" "There's got to be someone, somewhere, a child advocate somewhere, that can take control of the situation. … That child is being held hostage." Cosby Decl. ¶ 147

**Pimping**

Anna was depicted as a "high class call girl" and Stern's exploitation of her was

condemned:

- "Howard Sold Anna for Sex!" screamed one headline, with a report that Stern "pressured her to have sex with men she didn't want to have sex with." (Star) Cosby Decl. ¶ 120

- "I mean you know what he is, he's a pimp. That's what he is. He's pimping Anna Nicole. He's living off her."; "she's a "high class call girl". Cosby Decl. ¶ 119.

**Exploitation of Anna and Daniel's Death and Perjury**

- "Howard:  A Million Tear$" and "Howard Cashing in on Anna's Death" are but two of the numerous headlines. Cosby Decl. ¶ 108.

- "Stern made millions by using Anna Nicole Smith…. Even before her son Daniel's body was cold, Stern was peddling pictures of Anna and Daniel…." Cosby Decl. ¶ 21.

DWT 12116592v2 3910089-000032

- *Entertainment Tonight*'s $2.5 million "make mockery of Stern's sworn testimony that he never got paid for interviews." Cosby Decl. ¶ 109.

- Anna's Bahamas lawyer blasted Stern in the press for "entreat[ing]" her to make a false declaration which she said was "entirely consistent" with his "apparent predilection to make false utterances when it suits your purpose" Cosby Decl. ¶ 116.

### Enabler to Anna's Addiction

- Commentators familiar with the facts of this case, including a judge, have called Howard an "enabler;" *see, e.g.*, ("A lot of people said that he knew exactly what her demons were and ... he fed them. He was an enabler."). Cosby Decl. ¶ 30 and 32(a).

- People testified to Howard's facilitation of Anna's addiction including Birkhead ("numerous" times he gave her drugs while detoxing); Ford Shelley ("he kept her in that state of mind by feeding her these drugs").[11]  McN. Decl. ¶ 20.

These are but a small sampling of the ubiquitous news reports condemning Stern and his actions. And, of course, these reports come on the heels of Stern's presentation of self over two seasons of "reality" on the *Anna Nicole Show*, dubbed "an obscene train wreck," and "the bigg[est] freak show on TV," which depicted Anna and Howard's "outrageous life" in which virtually no sexual act, including bestiality, was beyond the pale and over-indulgent partying, with Howard repeatedly dressing in drag, was the norm. *See*, Littlefield, ¶ 15.

Stern is hardly in a position to challenge the public image he created on the *Anna Nicole Show*. And with regard to all these previously published reports, Cosby was not aware of any retractions or corrections issued. As this Court noted in not dissimilar circumstances, it is "somewhat incredible" that Stern ignored all these media reports – which he plainly was familiar with – and now complains about *Blonde Ambition. Cerasani v. Sony Corp., supra*, 991 F. Supp at 354.[12] In the face of the "train wreck" he supported on the *Anna Nicole Show* and the widespread news articles depicting him as a murderer, pimp, drug pusher, perjurer and basic

---

[11] While Cosby does not contend that being called gay, even if false, is defamatory, this "charge" was also made concerning Stern before *Blonde Ambition* was published. Cosby Decl. ¶ 73.

[12] The only action commenced by Stern prior to the Book was his claim against Virgie Arthur's counsel, The O'Quinn law firm. Yet, as Ms. Cosby asserts, this lawsuit suit focused on O'Quinn's publicly voiced opinion that Howard had "murdered" Anna. Cosby Decl. ¶ 38.

16

exploiter of any opportunity for a buck, in this action Stern seeks $60 million to remedy an alleged loss of reputation caused by *Blonde Ambition*.

has no actual damages – having for years no income o

# REDACTED

As the Second Circuit noted, when "a person's reputation is so low ... even nominal damages are not to be awarded." *Guccione, supra*, at 303. In sum, plaintiff's reputation was so tarnished by the wealth of previously published reports concerning him that this Court should find him to be libel proof as a matter of law and dismiss all the challenged statements.

### III.

### STATEMENTS IMPUTING
### HOMOSEXUALITY ARE NOT DEFAMATORY

Referencing two scenes depicted in *Blonde Ambition*, one describing a tryst between Larry Birkhead and plaintiff in a "darkened bedroom" at a private home in Hollywood and the other identifying a video depicting Howard and Larry having sex that Anna was said to watch, Stern claims that these passages are defamatory because they convey to the reader that "Stern is homosexual and committed a criminal lewd act" and because they convey that Stern "engaged in a videotaped homosexual act." Cplt. ¶¶ 95, 123.[13] Yet, in today's culture – and most certainly in the milieu Stern has lived in for the past decade – saying someone is gay or bisexual, even if false, is not defamatory as a matter of law.

---

[13] Perhaps recognizing that there was a lack of foundation to his argument that simply saying someone is gay is defamatory, it appears that plaintiff may try to re-write his complaint and argue that his claim is really that the Book ~~used Larry Birkhead's homosexuality as leverage to "extort" concessions from Larry~~ **REDACTED** Yet, that is not what his complaint pleads and, in any event, ~~separate statement that addresses~~ the alleged "extortion" arising out of his negotiations with Birkhead. *See*, Statement 13, Cplt. ¶ 296. Thus, Statements 1 and 2 alleging that homosexuality constitutes engaging in "criminally lewd acts" should be summarily dismissed.

"Given welcome shifts in social perceptions of homosexuality ... there is good reason to question the reliability of ... precedents" establishing that an imputation of homosexuality is defamatory per se. *Lewittes v. Cohen*, 2004 WL 1171261, at *3, n.5 (S.D.N.Y. 2004).[14] Numerous state and federal courts around the country in the last two decades have overruled such precedent to find that an imputation of homosexuality is not defamatory per se, including Colorado, Delaware, Illinois, Maine, Massachusetts, Minnesota, New Jersey, North Carolina, Ohio, Virginia, and Wisconsin. This Court should join the ranks of these states.

To be defamatory, a statement must tend to "expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community." *Nichols v. Item Publishers, Inc.*, 309 N.Y. 596, 600 (1956).[15] Whether language is defamatory "depends, among other factors, upon the temper of the times, the current of contemporary public opinion, with the result that words, harmless in one age, in one community, may be highly damaging to reputation at another time or in a different place." *Schermerhorn v. Rosenberg*, 73 A.D.2d 276, 284-85 (2d Dep't 1980), *quoting Mencher v. Chesley*, 297 N.Y. 94, 100 (1947).

As Justice Holmes explained, "[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner*, 245 U.S. 418, 425 (1918). As social mores change, some statements that may once have been actionable lose their defamatory

---

[14] Since the claim at issue was time-barred, Judge Haight in *Lewittes* did not reach the "intriguing issues" surrounding whether saying someone is homosexual is defamatory. He did note, however, older precedents from this District and New York courts that have held that imputation of homosexuality is a defamatory phrase. *Lewittes*, 2004 WL 1171261, at *3, n.5. *See also Dellefave v. Access Temporaries, Inc.*, 2001 WL 25745 at *4, n. 1 (S.D.N.Y. Jan. 10, 2001) ("imputation of homosexuality" as a category of defamation per se "in twenty-first century Manhattan amounts to little more than an historical oddity" but dismissing claim because allegations were insufficient to state claim of such an imputation.) It is worth noting, however, that not all New York precedent finds imputations of homosexuality to constitute defamation per se. *See Stein v. Trager*, 36 Misc.2d 227 (Sup. Ct. Erie County 1962) (not defamation per se because homosexuality distinguishable from specific criminal acts).

[15] Whether a statement has a defamatory meaning is a threshold question of law for the court and ripe for resolution on summary judgment. *See, e.g., James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 419 (1976).

18

sting.  In *Mitchell v. Tribune Co.*, 343 Ill. App. 446, 99 N.E.2d 397 (Ill. App. Ct. 1st Dist. 1951),

for example, the anachronistic notion that it was libelous to state that a white man was black, as

was found by the Sixth Circuit in *Stultz v. Cousins*, 242 F. 794 (6th Cir. 1917), was overruled.

Similarly, the notion that it is defamatory per se to say a woman is "unchaste" has evolved.  As

one Second Circuit judge recently suggested (with tongue slightly in cheek), "[m]any adult

American women might well consider it more harmful to be called 'unchased' than

'unchaste'[.]"  Hon. R. Sack, *Sack on Defamation* § 2.4.4, at 2-31 (3rd ed. 2006).

The basis for concluding that imputations of homosexuality was defamatory per se has

traditionally been that homosexual acts were illegal.  *See Albright v. Morton*, 321 F. Supp. 2d

130, 139 (D. Mass. 2004) ("While courts outside this jurisdiction are split on whether a statement

wrongfully identifying someone as homosexual is defamatory per se, their decisions rely on

statutes criminalizing same sex sexual acts ... and fail to incorporate more recent decisions

recognizing homosexuals' equal rights"), *aff'd sub nom*, *Amrak Prods., Inc. v. Morton*, 410 F.3d

69 (1st Cir. 2005).  Yet now that consensual sodomy between adults is no longer illegal under

the Supreme Court's ruling in *Lawrence v. Texas*, 539 U.S. 558, 578 (2003), the main underlying

basis for finding an imputation of homosexuality to be per se defamatory – the linkage with

criminality – is fatally undermined.[16]

Further, to justify a defamatory import the Court should reject the prejudice held by some

that homosexuals are less reputable than heterosexuals.  Indeed, over 10 years ago, the Court of

Appeals in North Carolina found that as the state "progresses through the mid 1990's, we are

unable to rule the bare allegation that an individual is "gay" or "bisexual" constitutes today an

---

[16] Plaintiff would be hard pressed to argue that the scene stumbled on by Jackie Hatten in a "darkened bedroom" in a private home after she had "walked down the hallway, peeking in rooms" would violate any "public lewdness" criminal statutes.  *See, e.g.,* N.Y. Penal Law § 245.00, requiring circumstances where one may be readily observed with "intent that he be so observed."  Nor does the fact that Birkhead and Stern made a sex videotape change the analysis.  Innumerable famous people have been found to have sex videotapes, *see,* Cosby Decl. ¶ 74, and participating in a personal sex video is not defamatory as a matter of law.  *See* McN. Decl. ¶ 38.

19

accusation which, as a matter of law and absent any 'extrinsic, explanatory facts,' holds that individual up to disgrace, ridicule or contempt." *Donovan v. Fiumara*, 442 S.E.2d 572, 580 (N.C. Ct. App. 1994) (internal citations omitted). Indeed, in overruling its *Bowers* precedent the Supreme Court recognized that the prior decision "demean[ed] the lives of homosexual persons." *Lawrence v. Texas*, 539 U.S. at 575. Then, the court in *Albright v. Morton,* 321 F. Supp. 2d 130, 137, 139 (D. Mass. 2004), concluded that "[c]ontinuing to characterize the identification of someone as a homosexual defamatory per se has the same effect" and would amount to "trading in the same kinds of stereotypes that recent case law and good sense disparage."[17]

Here, plaintiff's contention that it is defamatory to say he engaged in homosexual activity should be rejected.[18] Stern is relying on this Court to affirm a discriminatory, humiliating and outdated notion about the community's response to homosexuality. For this reason, plaintiff's claim arising out of Statements 1 and 2 should be dismissed.

## IV.

### THERE IS NO TRIABLE ISSUE AS TO
### CERTAIN SUBSTANTIALLY TRUE STATEMENTS

It is axiomatic that, "[s]ubstantial truth is all that is necessary to defeat a charge of libel." *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294, 297 (2d Dep't 1981); *see also Guccione*, 800 F.2d at 301. It is a bedrock principle of First Amendment jurisprudence that plaintiff bears the burden to "show the falsity of the statements at issue in order to prevail in a suit for defamation." *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986). It is not enough for

---

[17] New York's Court of Appeals, in striking down the State's sodomy statute, recognized that it is not the function of government "to provide either a medium for the articulation … of moral or theological values." *People v. Onofre*, 51 N.Y.2d 476, 488 n.3 (1980). Similarly, in enacting the McKinney's 2002 Session Laws of New York 225th Legislature Chapter 2 (2002), *Sexual Orientation Non-Discrimination Act*, L. 2002, ch. 2, New York's Legislature put into law the policy that gays and lesbians are to be treated no differently than anyone else.

[18] Given his relationship with Anna Nicole Smith, plaintiff's position that being labeled gay or bisexual is somehow defamatory is particularly ironic – or, as some might say, takes a high dose of chutzpah. Anna Nicole Smith was widely known to be bi-sexual and was a gay icon; she appeared in gay pride marches and frequented gay bars (as did plaintiff). Cosby Decl. ¶ 75. For her supposed lover to claim it is defamatory to say he was gay or bisexual is insulting.

plaintiffs to argue that references are in some way inaccurate; they must also establish that the

complained of statements are *substantially* false. *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42

N.Y.2d 369, 383 (1977) ("omission of relatively minor details in an otherwise basically accurate

account is not actionable"). In *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496 (1991), the

Supreme Court described the necessary inquiry as follows:

> Minor inaccuracies do not amount to falsity so long as "the substance, the
> gist, the sting, of the libelous charge be justified."

*Id.* at 517 (citation omitted). Thus, if the "gist" or "sting" of a statement is accurate, summary

judgment is warranted regardless of inaccuracies. *Id.* With discovery completed, it is now clear

beyond dispute that the two alleged "perjury" Statements are substantially true. For this

independent reason, plaintiff's claim arising out of Statements 6 and 11 should be dismissed.

**A.      It is Substantially True that Stern Committed Perjury When He Testified
That He Did Not Receive Any Monetary Compensation for Providing Access
to the Media After Daniel and Anna Nicole Smith's Death**

In his complaint, Stern challenges Statement 6 where the Book states that "[E]ven though

Howard testified under oath during the Florida court hearing over Anna's burial that he only

received the free flight, he was reportedly paid one million dollars ...."

# REDACTED

The resulting interview was prominently advertised for the subsequent airing on

ET in "sweeps" week.[19] Nor can he dispute that it was reported that he was paid at least

$1 million. Instead, he challenges the fact that he was actually paid for the exclusive and that he

# REDACTED

---

[19] In

intimate moments, Stern was roundly criticized for seeming to exploit what normally would be private grief. Cosby
Decl. ¶ 108.

in any way perjured himself when he testified about not receiving any compensation.

During the Florida hearing, an issue arose as to whether the relevant parties were somehow exploiting their connection to Anna through various media deals. Thus, on February 21, 2007, Stern testified as follows:

> Q. Since the death of Anna Nicole Smith's son Daniel, have you received directly any financial remuneration from any media, press or public relations?
>
> A. No, I have not.
>
> Q. Have you received, since the death of Daniel, have you received any third party benefits…from any news media….?
>
> A. When I was at the Hard Rock in Florida, Anna and I built up a strong relationship with *Entertainment Tonight*… After Anna passed I flew from Florida to the Bahamas with them and that's the only –
>
> \* \* \* \* \*
>
> Q. At any time, did you permit them to video you since the death of Anna Nicole Smith….?
>
> A. That one time.
>
> \* \* \* \* \*
>
> Q. Did you discuss with them, meaning the *Entertainment Tonight* people, any remuneration for the use of those tapes….?
>
> A. No.

McN. Decl. ¶ 20.

Yet,

REDACTED

REDACTED

REDACTED

REDACTED

Further, the fair distillation of Stern's Florida testimony is that he received no direct

compensation or "third party benefits" from the media since Daniel's death.

REDACTED



ıe

---

[20] Plaintiff further testified that he had no knowledge of this bank account in his name (even though regular payments from it were made to his counsel and people in the Bahamas to cover his expenses) or the CBS payment until he received the 1099 from CBS at the end of the year.  McN. Decl. ¶ 8 (Stern Dep. 322, 330, 344 and 349). Defendants were unable to confirm this rather incredible testimony with CBS since it claimed shield law-privileges and refused to disclose evidence concerning the negotiations.  It did, however, produce the relevant documents evidencing the agreement and payments to Stern.  McN. Decl. ¶ 25.

REDACTED

REDACTED

In sum, by any analysis, Statement No. 6 is substantially true and should be dismissed from this action.[22]

**B.      It is Substantially True that Stern Committed Perjury
         When He Testified That He Was Dannielynn's Father**

In his complaint, as Statement 11, Stern alleges that the following statement was libelous:

> Even though Howard K. Stern testified on the stand that he was the father
> of Dannielynn, he privately made this offer to Larry: "I will give you your
> baby if you leave me as executor of the estate." (*Blonde Ambition*, caption
> to photograph on unnumbered page)

Stern alleges that this statement is false because "he was not lying when he testified and made public statements regarding his belief that he was Dannielynn's biological father" Cplt. ¶ 275.

Certain facts regarding the paternity of Dannielynn and Stern's knowledge concerning her paternity are not subject to dispute.  Thus, for example, it is established that Larry Birkhead was determined to be the biological father; early in the pregnancy, Birkhead spent time with Anna in the hospital while she was detoxing and, as he testified, she acknowledged his paternity with Stern present (McN. Decl. ¶ 3 (Birkhead Dep. 90:21-92

REDACTED

nd" and not the baby's father (*id.* ¶ 19); and, it was

---

Images that he would "do an interview with the highest U.S. bidder (and possibly others depending on the sum)."
McN. Decl. ¶ 27.

REDACTED

not until weeks later, on September 28, 2002, *after* Thompson declined to be on the birth certificate, that Stern announces on *Larry King Live* that he is the "proud father." Cosby Decl. ¶ 20. Of course, during this entire period, even though he supposedly believed he was the father, Stern refused to submit to DNA testing. *Id.* at 33.

Stern has not, and cannot, deny this chain of events and contemporaneous documents. Independent of the innumerable press reports that almost uniformly concluded Stern was not, and could not be the baby's father – calling the contention a "myth" among other things – and the numerous sources Cosby had who all confirmed that Stern knew Birkhead was the father,[23] it strains credulity to conclude that Stern honestly believed he was the biological father of Dannielynn. There is no evidence to support that conclusion except for plaintiff's conclusory saying so, which is not sufficient. *See Rinaldi v. Holt, Rinehart & Winston*, 42 N.Y.2d 369, 382 (mere denial of plaintiff insufficient to raise a question of fact).

In sum, the undisputed evidence concerning paternity supports the conclusion that Stern knew full well he was not the baby's biological father when he testified that he was. Statement 11 should be dismissed.

### V.

### THERE IS NO TRIABLE ISSUE OF ACTUAL MALICE

Since its decision in *New York Times Co. v. Sullivan,* more than thirty-five years ago, the Supreme Court has recognized that "erroneous statement is inevitable in free debate and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.'" 376 U.S. 254, 271-72 (1964). To "carve out an area of 'breathing space' so that protected speech is not discouraged," *Harte-Hanks Communications, Inc. v.*

---

[23] *See* below at V, for discussion that Cosby had no possible reason to doubt the accuracy of this Statement.

*Connaughton*, 491 U.S. 657, 686 (1989), the Supreme Court requires public figure plaintiffs[24] to

establish that a false, defamatory statement was published with actual malice. *New York Times*,

376 U.S. at 279-80; *Masson*, 501 U.S. at 510. This standard, which protects "uninhibited, robust,

and wide-open" debate on public issues, *New York Times*, 376 U.S. at 270, requires the plaintiff

to prove that the defendant published a false statement "with 'knowledge that it was false or with

reckless disregard of whether it was false or not.'" *Masson*, 501 U.S. at 510 (quoting *New York

Times*, 376 U.S. at 279-80).

"The standard of actual malice is a daunting one." *Howard v. Antilla*, 294 F.3d 244, 252

(1st Cir. 2002) (quoting *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996)).

It focuses solely on the defendant's *actual* state of mind "at the time of publication." *Bose Corp.

v. Consumer Union of U.S., Inc.*, 466 U.S. 485, 512 (1984). "Mere negligence does not suffice."

*Masson*, 501 U.S. at 510. Rather, the term "[k]nowledge of falsity means ... that the defendant

was *actually* aware that the contested publication was false," *Woods v. Evansville Press Co.,

Inc.*, 791 F.2d 480, 484 (7th Cir. 1986) (emphasis added), and "reckless disregard of whether it

was false or not" means that the plaintiff must show "that the defendant *actually* had a high

degree of awareness ... of probable falsity." *Harte-Hanks*, 491 U.S. at 688 (emphasis added).

Thus, it is a subjective test as to the author's knowledge, not an objective one as to the

information available.

> [R]eckless conduct is not measured by whether a reasonably prudent man
> would have published, or would have investigated before publishing.
> There must be sufficient evidence to permit the conclusion that defendant
> *in fact* entertained serious doubts as to the truth of his publication.

*St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (emphasis added). Indeed, "[e]ven an *extreme

departure* from accepted professional standards of journalism will not suffice to establish actual

---

[24] There is no dispute that Stern is a public figure. *See*, Hachette Br., whose argument Cosby adopts. Given that plaintiff appeared on two seasons of the *Anna Nicole Smith Show*, gave televised interviews on *Larry King Live* and ET, and became a nationally known name during the Florida body custody hearings, plaintiff would be hard pressed to argue he is not a public figure. *See, e.g., Hatfill v. The New York Times Co.*, 532 F.3d 312, 318 (4th Cir. 2008).

malice." *Newton v. National Broadcasting Co., Inc.*, 930 F.2d 662, 669 (9th Cir. 1990) (emphasis added).

**A.      The Subjective Standard of Actual Malice Must Be Shown With Clear and Convincing Evidence, Not Merely the Preponderance of the Evidence**

As an additional safeguard, the First Amendment requires that plaintiffs prove actual malice by "clear and convincing" evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-57 (1986). This standard of proof imposes a "heavy burden [on plaintiffs], far in excess of the preponderance sufficient for most civil litigation." *Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1252 (9th Cir. 1997). Plaintiffs' evidence of actual malice "must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind." *Copp v. Paxton,* 45 Cal. App. 4th 829, 846 (Ct. App. 1996). Further, when multiple statements are at issue, as here, plaintiff must independently show by clear and convincing evidence that Cosby knew each statement was false or had serious doubts as to the truth of each statement. He cannot rely on evidence of supposed doubt as to any one statement to support a finding of actual malice as to another. *See Church of Scientology . v. Time Warner, Inc.*, 903 F. Supp. at 640 (S.D.N.Y. 1995), *aff'd*, 239 F.3d 168 (2d Cir. 2001) (the court "considers each allegedly libelous statement individually to determine whether a rational finder of fact could find actual malice by clear and convincing evidence."). In sum, "First Amendment protection cannot be emasculated by unwillingness on the part of a court to grant summary judgment where affirmative evidence of the defendant's state of mind is lacking. A libel suit cannot be allowed to get to the jury ... based on mere assertions of malice by the plaintiff." *See Church of Scientology Intern*, 903 F. Supp. at 640.

Plaintiff's substantial burden can best be demonstrated by a review of two representative cases. In *Kahn v. New York Times*, 269 A.D.2d 74 (1st Dep't 2000), for example, a reporter falsely reported that the plaintiff was sued by the SEC for stock fraud. It seems that she made a

27

mistake in "comprehending" a *Wall Street Journal* article that said no such thing.  The *Times* published a correction and the reporter agreed to obtain comment from the plaintiff should she report on him again, which she had not done in the first article.  Then, she runs a second article, but this time she misread a Bloomberg newswire and she falsely reports that the plaintiff was fined for securities fraud in Canada.  And she again failed to seek comment from the plaintiff. Emphasizing the subjective nature of actual malice, the First Department reversed the denial of summary judgment, finding that the reporter believed this information even if false and the plaintiff's argument that a jury "might, and legally could disbelieve" the reporter's denial of knowledge of falsity was insufficient to show clear and convincing evidence of actual malice. *Id.* at 79, internal citation omitted.

In *Jackson v. Paramount Pictures Corp.*, 68 Cal. App. 4th 10, 19-20 (Ct. App. 1998), as another example, pop star Michael Jackson sued the television program *Hard Copy* over a report about authorities' supposed search for an "videotape" depicting Jackson "fondling a young boy." Trying to create a triable issue of fact on actual malice, Jackson presented evidence that the defendants' source fabricated the story and that the district attorney refused to confirm the claim when questioned by the reporter.  *Id.* at 22.  Even more significantly, another source testified that she told the reporter that the story "sounds like B.S." and "sounds like a setup," to which the reporter responded, "Yeah, that's what I thought." *Id.* at 24.  Although the reporter was warned that the story was false and "had doubts" about its veracity, the court held that there was no triable issue of fact on actual malice.  *Id.* at 24, 35-36.  The court reiterated that the actual-malice "standard does not require that the reporter hold a devout belief in the truth of the story being reported, only that he or she refrain from either reporting a story he or she *knows* to be false or acting in reckless disregard of the truth." *Id.* at 35 (emphasis in original).

Given this high standard of proof, courts routinely grant summary judgment dismissing the libel claims of public figures for failure to show actual malice by clear and convincing

evidence.

**B.      The Undisputed Evidence Precludes a Finding of Actual Malice**

Plaintiff has had every opportunity to thoroughly investigate Cosby's state of mind at the time *Blonde Ambition* was published. After discovery, plaintiff is unable to produce any evidence – let alone the clear and convincing evidence required – that Cosby believed any part of the Book was false or entertained any serious doubts as to the truth of the Book and particularly the challenged Statements.

The undisputed evidence clearly establishes that Cosby published the Book in good faith with a well-founded and sincere belief in the truth of the facts contained therein. Virtually every statement at issue had been previously published in reputable publications – most multiple times with much stronger language. Cosby was entitled to simply rely on these reports, but she went further. She also substantiated the information with documents, court records and multiple sources. Every statement at issue was amply documented and Cosby honestly believed in the accuracy of every challenged statement. On this record, Stern could not begin to establish actual malice and for this independent reason, the claims arising out of *all* the challenged Statements should be dismissed.

Courts consistently grant summary judgment when, as here, the challenged statements were previously reported by reputable publishers. In fact, the law is clear that Cosby could have published virtually all the challenged statements without *any* further investigation. If she had simply placed her reliance on the original publisher, there is no claim. *Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 550 (1980). Thus, good faith reliance on previously published reports in reputable sources precludes a finding of actual malice as a matter of law. *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988); *see also Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 862 (5th Cir. 1978) ("The subjective awareness of probable falsity required by [*St. Amant*] cannot be found where, as here, the publisher's allegations are supported by a

29

multitude of previous reports upon which the publisher reasonably relied."); *Flowers v. Carville*, 310 F.3d 1118, 1130 (9th Cir. 2002) ("One who repeats what he hears from a reputable news source, with no individualized reason external to the news report to doubt its accuracy, has not acted recklessly."); *Fodor v. Bergles*, No. 94 Civ. 4761, 1995 WL 505522 (S.D.N.Y. Aug. 24, 1995) (no actual malice in relying on previously published magazine article).

Here, as is demonstrated above in showing Stern is libel proof, virtually every statement at issue in this action was previously reported (in and on numerous publications) or was entirely consistent with such previously published information. Thus, it was previously reported that Stern was gay (Statements 1 and 2); that Stern facilitated Anna's drug addiction and controlled her like a "Svengali" (Statements 3 and 14); Mark Hatten's conviction notwithstanding his defense that Stern "set him up" was a matter of public record[25] and his allegation concerning being asked to do a "hit" on Pierce Marshall is confirmed by Stern's pleadings, as well as a previously published book (Statements 4 and 5); that Stern "reportedly" was paid $1 million by *Entertainment Tonight* (Statement 6); that Stern exploited Anna and acted like a "pimp" (Statements 7 and 8); that Stern seemingly "flushed" pills found in Daniel's clothing (Statement 9); that money being sent to Anna and Stern in the Bahamas suggested wire fraud (Statement 10); that Stern was *not* Dannielynn's biological father and that he lied about it (Statement 11); that Stern's negotiations over the baby amounted to "kidnapping" (Statements 12 and 13); and that Stern may be responsible in some fashion for Daniel and Anna's death, including outright

---

[25] As a separate basis for dismissal, Cosby's reliance on information obtained from various trial testimony or other sworn declarations is absolutely privileged and may not form the basis for a libel claim. *See*, N.Y. Civ. Rights Law § 74; *Holy Spirit Ass'n v. New York Times*, 49 N.Y.2d 63 (1979). The test is whether the description of trial testimony or other court documents is "fair and substantially accurate" and minor inaccuracies not fatal to the privilege. *Sassower v. New York Times*, 48 A.D.3d 440, 441 (2d Dep't 2008). Here, the following statements are based on Cosby's reliance on testimony and court documents and, as such, are absolutely privileged: (a) Virgie Arthur's testimony in the Florida hearing confirming the CNN quote used in the Book and reiterating her belief that Stern was responsible for Anna and Daniel's death (Statement 16); (b) Birkhead's testimony in the Florida hearing asserting his paternity, Stern's knowledge that Birkhead was the father (also supported by Laurie Payne's affidavit), and that Stern enabled Anna's drug dependency and was controlling, all consistent with Statements 11 and 14; and, (c) Debra Opri's petition to compel arbitration in her fee action against Birkhead, describing Birkhead's "roommate" Byron, consistent with Statements 1 and 2.

accusations of "murder" (Statements 15-19).  *See*, above, at Statement of Facts (A.); *see also*, Littlefield Decl. ¶¶ 48-52 Cosby Decl. ¶¶ 30-38; 71-170.

Cosby had no reason not to rely on these previously and widely published reports and public records.  To her knowledge, none of these statements were retracted or corrected by the many publishers.  Moreover, all of these previously published statements were entirely credible.  None can be considered in a vacuum, but must be filtered through the "outrageous" lives Anna and Howard lived, particularly when it came to anything to do with sex, drugs or their seeming unbridled willingness to exploit themselves for profit.  Cosby had no reason to doubt any of those previously published sources.

Since all of the Statements had been previously and specifically reported, or were consistent with prior reporting, the action should be dismissed for this reason alone.

## C. Cosby Went Beyond Prior Reports and Court Records and Further Corroborated the Statements

Cosby's research efforts in this case merely started with her knowledge of the vast wealth of previously published information that she relied on; that is not where she ended.  Every avenue pursued by Cosby led to corroboration for the Statements at issue.  She obtained multiple sources, often with independent corroborating information.  She challenged her sources; checked on their reliability; and, in the end, felt confident in the accuracy of the published information.  For each Statement of issue, she has produced her contemporaneous notes substantiating her sources; the evidence shows she repeatedly checks her sources to reconfirm information; that she pressed her co-author Bruce Littlefield and his two associates to meticulously nail down details and double check facts.  Of course, everything she learned – whether it be new or confirming of previously published information – was also filtered through the prism of the lives lived by Anna and Howard.  By necessity, the plausibility and accuracy of information had to be weighed in

this context.[26]  *See, e.g., Jackson*, 68 Cal. App. 4th at 34 (report of Michael Jackson sex video "did not come out of the blue" given prior accusations against the singer).

In the end, the entire process – including each Statement at issue here – showed a consistent pattern of corroboration, reliability and accuracy.  Her interviews, documents and court records reviewed by Cosby were consistent with the wealth of known and published information.  Cosby had no reason to doubt the accuracy of the Statements at issue and most certainly did not believe any of them to be false.  Cosby Decl. ¶¶ 60, 69-168.

To just briefly summarize Cosby's reporting concerning the challenged statements and her basis for firmly believing each challenged Statement to be true and accurate:[27]

- Statements 1 and 2:  Cosby had no reason to doubt Jackie Hatten's detailed firsthand description of the tryst between Stern and Birkhead.  Hatten had previously stated on Fox News that Stern was gay; the information was consistent with much previously published information about Birkhead's sexuality and Alex Denk's information about Birkhead's affair with a male reporter; not only had numerous news programs relied on Hatten, Cosby verified Hatten's credibility with a number of people, including Peter Nygard and Cyrus Nownejad.  Then, the idea of Stern and Birkhead having a sexual relationship was independently confirmed by ¯̄ when they described the videotape that the Nannies said Anna watched and, again, Cosby had no reason to doubt Don Clark, the ex-FBI Bureau Chief, or his colleague, Ms. Vicedomine.  Cosby Dec. ¶¶ 69-88.

- Statements 3 and 14:  The evidence was overwhelming that Anna was addicted and Stern enabled or facilitated her addiction, including Birkhead's testimony, Judge Seidlin's observation that he was an "enabler," Thompson's observation that Stern "was the pharmacist," and Nygard's that "friends don't let other friends drive drunk. In Howard's case, he gave her the car keys," as well as prior reports of Stern's giving Anna regular injections.  In this context, the fact that Anna and Howard "partied in their room" with what hotel workers "believe was cocaine" or that Stern would give Anna "a little snort in the nose" of some drug was hardly something to doubt.  And Then, Cosby confirmed

---

[26] Indeed, all one need do is sit down and watch the Clown video, made by Stern and documenting an eight-month pregnant Anna who was seemingly so out of it that she did not known she was pregnant, or look at the picture taken by Stern of Anna cradling her dead son, or consider participating in and selling pictures of a "commitment ceremony" two weeks after your son dies, and it is difficult to conceive of what you would find to be incredible. McN. Decl. ¶ 37 and Cosby Decl. ¶ 68.

[27] For a complete portrait of the reporting that underlies each of the challenged statements, we respectfully refer the Court to the Cosby Decl. ¶¶ 44-67, 71-170 and the Littlefield Decl. ¶¶ 33-47.

32

Harding's widely reported description of Daniel's concern that Stern was "feeding" his mom "mind numbing drugs" and called him a "Svengali" with him firsthand. Cosby Decl ¶¶ 89-96.

- <u>Statements 4 and 5</u>: Mark Hatten's conviction and his contention that he had been "set up" by Anna and Howard were a matter of public record. Nonetheless, Cosby corroborated Hatten's information with his lawyer and court records. Nor is there any dispute that Hatten did allege that he had been asked to participate in a conspiracy to arrange a "hit" on Pierce Marshall, that the FBI investigated the allegation and the investigation never went further. *See*, Cplt. ¶ 188. Yet, the Book's report is not substantively different and it had been previously reported that the FBI had opened an investigation concerning a hit on Pierce. Cosby Decl. ¶¶ 97-104.

- <u>Statements 6 and 11</u>: If the Book can be read to say Stern committed perjury when he testified that he was Dannielynn's father or that he had not received direct or "third-party benefits" from the media – or, even discussed money with the media – the Book is substantially true, as established above. Further, Cosby had no reason to doubt her multiple sources that confirmed that Stern knew he was not the father, including Birkhead's and Laurie Payne's sworn testimony, ⸮

  Nor was there any reason to doubt the multiple reports that Stern had "cashed in" on the tragedy of Anna's death; that is why the Book says that he was "reportedly paid one million dollars" from CBS's *Entertainment Tonight*. Cosby Decl. ¶ 105-116.

- <u>Statements 7 and 8</u>: The paragraph in the Book describing Daniel's contention that Stern was "pimping" Anna was consistent with Anna's "gold digger" reputation, the idea that she "sold herself" to gain advantages, whether it be a house in the Bahamas or expedited residency, and reports describing Stern as a "pimp" who was living off of Anna. Thus, when Cosby learned the specific description of the pimping from Jackie Hatten, it was entirely credible; all the more so when Jack Harding independently told Cosby that Daniel said Stern was "laying his mom."[28] Cosby Decl. ¶ 117-122.

- <u>Statement 9</u>: Cosby obtained the description of Stern taking two pills found in Daniel's clothing into a bathroom and flushing the toilet directly from Ford Shelley, who had previously reported the same information to the Bahamian police and numerous media. She also obtained the information concerning the Bahamian coroner from Ford Shelley, and corroborated it with Ben Thompson.

  aniel's death
  ⸮7) and indisputably Virgill was removed.
  Cosby Decl. ¶ 124-131.

- <u>Statement 10</u>: Cosby had learned early on directly from Birkhead that he believed Stern was stealing money from Anna. She also knew, and his lawyer confirmed it to the media, that in January Birkhead had gone to the Bahamian police to file charges

---

[28] ⸮

⸮.(a).

against Stern.  Thus, when she learned the details of what he said to the police from Birkhead's bodyguard Mark Speer – and ex-sheriff's deputy who she thoroughly investigated and believed was entirely credible – Cosby had no reason to doubt the informatior
cc  **REDACTED**

"  Similarly, she had no reason to doubt, and did not doubt, the entirely consistent information concerning the $37,000 wire transfer that came from both Don Clark and Wilma Vicedomine – two sources she tested and came to trust implicitly.  Cosby Decl. ¶ 132-141.

- Statements 12 and 13:  Stern's negotiations with Birkhead and that he was "holding this baby hostage, trying to extort money or some kind of deal basically out of Birkhead" was an opinion that was widely reported.[29]  In this context, Speer's entirely consistent observations and views were wholly credible, and were confirmed at least in part by Ford Shelley as well as Virgie Arthur's observations about the negotiation.  Further, Arthur's description of Birkhead saying that they were "fixing to tell … that I'm queer" was consistent with all the previously published information Cosby had about Birkhead's sexuality, as well as Alex Denk's revealing story about Stern's holding back the fact that Birkhead had a relationship with a male reporter during the body custody hearing.  All the information she had came together to paint a consistent, credible story.  Cosby Decl. ¶¶ 142-251.

- Statements 15-19:  Even if one agreed that the Book does imply that Stern was in some way "criminally involved" in Daniel's and/or Anna's death[30] – and we dispute

---

[29] With regard to Speer's obvious views based on disclosed facts, that the baby was being held "hostage" or that Stern's actions amounted to "kidnapping," these observations are classic opinions based on fully revealed facts and, for that independent reason, warrant dismissal.  "An expression of pure opinion is not actionable.  It receives the Federal constitutional protection accorded to the expression of ideas, no matter how vituperative or unreasonable it may be."  *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986).  Thus, where, as here, "a speaker plainly expresses 'a subjective view, an interpretation, a theory, conjecture or surmise, rather than [a] claim[] to be in possession of objectively verifiable facts, the statement is not actionable.'"  *Biospherics v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998).  For the same reason, Statements 15, 16, 18 and 19 should also be dismissed.  Thus, Jackie Hatten's statements to Peter Nygard that she believes "Anna was in imminent danger" and that she "felt" Howard "was increasingly drugging her so he could inherit the money," *see* Cplt. ¶ 317, and her opinions that Stern "may try to kill her … Howard is responsible for killing the boy and Anna's next," Cplt. ¶ 351, were plainly her strong opinions.  A conclusion all the more evident because she is talking about future possible events – something that by its nature cannot reflect "facts".  *See Silverman v. Clark*, 35 A.D.3d 1, 14 (1st Dep't 2006) (dismissing defamation cause of action where expressions of concern that carefully laid out factors might lead to inappropriate future conduct was not actionable as pure opinion).  Similarly, Virgie Arthur's statements to CNN about her views on why Stern was with Anna, why he might want to marry her and why she believed her daughter's life might be at risk were all obviously her personal opinions.  She revealed the basis for her views and she was also talking about future events – her fear for her daughter's safety.  Finally, in Statement 19, Stern recited a timeline of events on the day of Anna's death and claims that these events "imply" that he was criminally responsible for Anna's murder.  Even assuming this is a reasonable implication – which we dispute – it is clearly an opinion based on fully revealed facts that the Complaint does not dispute.  *See*, Cplt. ¶ 364.  Moreover, it was an opinion shared by numerous previously published commentators.  *See* Cosby Decl. ¶¶ 154-163.

[30] To establish liability for an implication, Stern must establish that Cosby intended or endorsed the implication.  *Chaiken v. VV Pub. Corp.*, 119 F.3d 1018, 1033 (2d Cir. 1997).  Here, of course, Cosby never attributes criminal

34

REDACT

that Book states or implies that conclusion – Cosby had no reason to doubt the various observations and opinions of Jackie Hatten, Virgie Arthur, Larry Birkhead and others that form the basis for these challenged statements; nor, did she have any doubt whatsoever concerning the fact that Anna was heard yelling at Stern "you killed hir                                         ; the accuracy of the timeline of events on the day of Anna's death. Indeed, the complaint does not even challenge as false any of the facts contained in the timeline. Finally, the passage concerning the faxing of Anna's will accurately reports what was initially revealed in court, as well as the "tongues wagging" reaction in the Courthouse, and the fact that the Book misstates whose fax machine was in error, does not change the gist of the comment. Cosby Decl. ¶¶ 152-168.

In short, as more fully explained in Cosby and Littlefield's affidavits, Cosby published each of the challenged statements with a firm and sincere belief in the accuracy of the information. Even if the statements are indisputably false, Cosby's well-founded belief in their accuracy, precludes a finding of actual malice. *Rinaldi*, 42 N.Y.2d at 382.

**D.** **Plaintiff's Allegations to Support Actual Malice Do Not Withstand Scrutiny**

In his complaint, Stern advances a number of arguments in support of his claim of actual malice, including that Cosby relied on sources who were supposedly not credible or biased, or that she failed to sufficiently investigate the claims, because she did not get comment from Stern on all the Statements and she failed to review the O'Quinn lawsuit. Whether considered separately or collectively, none of the arguments preclude the dismissal of the action.

**1.** **Reliance on Biased Sources**

Stern attempts to meet his burden of establishing "clear and convincing" evidence that Cosby knew the Statements at issue were false or had serious doubts as to their accuracy by attempting to discredit each of her many quoted sources. In Stern's view, it seems that virtually anyone other than himself, is "biased," "inconsistent" and otherwise inherently unreliable. Yet, it could not be more clear that relying on biased sources – even a convicted felon – does not support a finding of actual malice.

---

liability to Stern, to the contrary, she reports the conclusion of the Florida police that there was no "foul play" in connection with Anna's death. Book at 214.

Reliance on an allegedly biased source does not constitute legally sufficient evidence that a journalist had serious doubts as to the source's credibility or the accuracy of the information. *See Lohrenz v. Donnelly*, 350 F.3d 1272, 1284 (D.C. Cir. 2003) (fact that defendants "acted on the basis of a biased source and incomplete information" did not establish actual malice); *Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85, 93 (S.D.N.Y. 1980) ("failure to verify statements with the plaintiff and reliance upon some biased sources, in themselves, do not amount to reckless disregard of the truth"). The reason for this rule is apparent: the fact that a source has some alleged bias does not itself logically support a conclusion that the source is not credible or possesses information that is not accurate. *See Gross v. New York Times Co.*, 281 A.D.2d 299 (1st Dep't 2001) (That "some of the Times' sources may have borne plaintiff ill-will ... is not probative of actual malice since it does not warrant the inference that the Times ... entertained serious doubts about the truth of the complaint of statements").

Here, Stern contends that Virgie Arthur, Ford Shelly and Vicedomine were all biased and should not have been credited. Yet, Virgie Arthur's alleged bias arising out of her "very public legal battle with Stern" (Cplt. ¶ 305) was made clear to any reader of *Blonde Ambition* which chronicles the body custody hearing and her attempt to preclude the Bahamian burial. Moreover, Arthur's CNN attack on Stern was followed by a description in full of Anna's rejoinder, challenging her mother to "Bring it on!" Book at 107. Ford Shelley and his father-in-law's legal battle with Anna was likewise fully revealed in the Book. Indeed, one chapter is aptly titled "Residency and Eviction". Then, the fact that private investigators

**REDACTED**  worked for an "interested party" is indicated when they are first introduced in the Book.

In each instance Cosby re-confirmed these witnesses' quotes (indeed, Arthur restated her's under oath in the Florida hearing and Shelley reported the same information to the Bahamian police) and she knew that Arthur and Shelley were widely quoted and relied upon in

36

the media.  Further, she was often able to obtain independent corroborating information (for example, she confirmed details learned from the investigators concerning the day of Anna's death with the Florida police).  Taking comfort in knowledge that someone has reported the same information to the police or under oath belies any good reason to have serious doubts.  *See, e.g.,* *Tavoulareas v. Piro,* 817 F.2d 762, 791 (D.C. Cir. 1987) (knowledge source provided same information to House Subcommittee).

Next, Stern argues that Cosby should have disregarded statements from Jackie Hatten, Jack Harding, Mark Hatten, Tas Brighthaupt and the two Nannies because they were unreliable or inconsistent.  *See* Cplt. ¶¶ 118, 316, 171, 269, 134.  Yet, he has not and cannot establish that she actively doubted *any* of these sources.

It is not enough to simply state that a source is unreliable.  The plaintiff must "show that the author was subjectively aware that the source was unreliable, *i.e.,* that her use of the source was knowingly or recklessly in disregard of the truth." *Secord v. Cockburn,* 747 F. Supp. 779, 789 (D.D.C. 1990); *see also McFarlane v. Sheridan Square Press, Inc.,* 91 F.3d 1501, 1511-13 (D.C. Cir. 1996) (finding no actual malice where defendant knew that source had credibility problems and was aware of the incongruities between source's representation that he had been at a meeting in Paris and the stamps in his passport).  The court will not find actual malice even where a journalist reports statements "so absurd that they should have raised the defendants' truth-seeking antennae and caused them to question the accuracy of the (source) as a whole." *Levesque v. Doocy,* 557 F. Supp. 2d 157, 168, 170 (D. Me. 2008) (granting summary judgment where television journalist failed to confirm the accuracy of quotations described as "extraordinary stuff" that turned out to be a joke).

Indeed, even "[t]he use of convicted felons cannot alone constitute a fact of actual malice. Rather, the plaintiff must specifically establish that there were surrounding circumstances in relying upon a particular felon as a source which would constitute evidence of a knowing and

37

reckless disregard of the truth." *Secord*, 747 F. Supp. at 794 (finding no actual malice when the author relied upon a convicted felon as a source and pointed out that fact in the book, providing a basis for the reader to assess the credibility of the sources' allegations); *McCoy v. Hearst Corp.*, 42 Cal.3d 835, 852, 863-64 (1986) (when reporter relied on a prisoner's affidavit and reporter had "questions about some of the information," court observed that "[i]t may be appropriate to fault [the reporter] for his credulity, his failure to be more cynical or guarded" but no clear and convincing evidence he actually thought the prisoner's story to be false); *Sweeney v. Prisoners' Legal Servs. of N.Y.*, 84 N.Y.2d 786, 793-94 (1995) (reliance on a convicted felon who presumably lacked credibility did not satisfy actual malice standard).

Consider, for example, *Cobb v. Time, Inc.*, 278 F.3d 629, 637 (6th Cir. 2002), where the Sixth Circuit found no actual malice when the reporters relied upon a source who had been paid for his account, had a criminal background, had provided a bizarre story, and had given information that was denied by another witness. The court noted that the reporters were aware of the source's "sketchy past" and acted accordingly by attempting "to corroborate as much of [the source's] story as possible, recognizing that they would probably be unable to corroborate any one-to-one conversations." *Id* at. 638. The court also noted that although the source's story "was curious, it was not an 'obvious reason' to doubt [the source's] veracity or the accuracy of his reports with respect to the two statements at issue." *Id*. at 638. In the end, even though the reporters failed to ask any of their interviewees the ultimate question at issue – did the boxer Cobb participate in a fixed fight – the court accepted the reporters' representation that they "ultimately concluded that they believed [the source], because [he] had been consistent regarding the details of the story." *Id*. at 635.

Here, Cosby's belief in the challenged sources was well-founded and sincere. Cosby had repeatedly questioned Jackie Hatten about the new information she obtained from her, confirming that she was consistent about the details she was sharing. She also confirmed Hatten's credibility

with at least two others, including Cyrus Nownejad, an attorney to Alex Denk (Anna's former bodyguard and personal trainer), Cosby Decl. ¶ 80, and her longtime friend, Peter Nygard, who was also friends with Hatten. Cosby Decl. ¶ 79, see also the Declaration of Peter Nygard, dated September 15, 2008 ("Nygard Decl.") ¶¶ 11-16. Both Hatten and Harding were being widely interviewed, quoted, and relied upon as a source by numerous media figures, as was Tas Brighthaupt. Cosby Decl. ¶¶ 76, 95, 1141-142.[31] Similarly, information from the nannies – including that they heard Anna yell at Howard "you killed him" – was widely reported and it was reported that they also provided a statement to the Bahamian police. Cosby did not doubt and had no good reason to doubt any of these sources. Cosby Decl. ¶ 167.[32]

Finally, Cosby's reliance on Mark Hatten does not evidence any actual or serious doubts about his information. First, Cosby revealed the facts of his conviction in the Book, despite his contention that Stern had set him up. Second, Cosby corroborated his criminal record and his defense contentions with Hatten's counsel and corroborated with a law enforcement source that Hatten had alleged that Anna and Stern had wanted him to arrange a "hit" on Pierce Marshall, J. Howard Marshal's son. Indeed, Stern admits that an FBI investigation of Hatten's allegations did in fact occur, Cplt. ¶ 188, and a fair reading of the Book makes it clear that no charges were ever filed based on these allegations. Book at 102. *See,* Cosby Decl. ¶¶ 82, 95 and 143.[33]

---

[31] Indeed, the PEJ Special Index Report about media coverage, on which Stern relied in his filings in the Bahamas, noted that the week of February 18-23 "was marked by a mini-media tour from Smith's friend Jackie Hatten, who pointed the finger of blame at Stern for the tragedy that befell the model/reality star." Littlefield Decl. ¶ 49.

[32] Stern argues incorrectly, that "Defendants recognized at least one inconsistency in Tas Brighthaupt's statements," thereby supposedly establishing Tas was not a reliable source. (*See* Book, 231)." Complaint ¶ 271. As a matter of law, one inconsistency does not an unreliable source make. *See Cobb,* 278 F.3d at 637. Moreover, Cosby alerted the reader to the inconsistency within two pages of the allegedly defamatory statements at issue, so that the reader could make his or her own determination. (*See* Book, 233-34; Statement 10). Similarly, the Book reports that the Nannies were fired and Stern's lawyers contention regarding their credibility. Book, at 78-79. Nor does it change the analysis that information from Tas and the Nannies (at least with regard to the videotape) came from secondary sources, Don Clark and Wilma Vicedomine. As the D.C. Circuit found, "there is no authority for the proposition that anything short of interviewing those with first-hand information amounts to 'willful blindness.'" *McFarlane v. Sheridan Square Press,* 91 F.3d at 1501.

[33] Stern may argue that Cosby's use of confidential sources evidenced a "reckless disregard for the truth," including her reliance on "hotel workers" and a Bahamian male employee who gave Cosby a videotaped interview (Statement 3)

## 2.     No Evidence That Cosby Willfully Avoided Contrary Evidence

Plaintiff argues that Cosby purposefully avoided obtaining the truth by (1) not seeking his comment (and in certain narrow areas, Larry Birkhead's), (2) not obtaining and watching the videotape the Nannies describe, and (3) failing to obtain a copy of the O'Quinn lawsuit.  Thus, plaintiff argues that this constitutes evidence of actual malice because she "purposely [sic] avoided learning the truth."  Cplt. ¶ 382 and 283.  As a matter of law and fact, the arguments fail.

The law could not be more clear that even a total failure to investigate does not establish actual malice.  *St. Amant*, 390 U.S. at 730 (no actual malice where defendant lacked personal knowledge of plaintiff's activities, relied solely on a witness' affidavit though the record was silent on the witness' reputation for veracity, and defendant failed to verify the information with those who might have known the facts); *Hardin v. Santa Fe Reporter, Inc.*, 745 F.2d 1323-24 (10th Cir. 1984) (finding no actual malice where source's statements clearly were not based on fact and the reporter was negligent in failing to investigate the source's background.)

Instead, "[a] failure to investigate may support an inference of actual malice *only* if that failure constituted a 'purposeful avoidance of the truth.'"  *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 46 (D.D.C. 2002), *aff'd* 350 F.3d 1272 (D.C. Cir. 2003) (citation omitted).  Thus, there must be clear and convincing evidence that the defendant was aware of evidence that would likely

---

(Book, 79)  Yet, case after case has established that the mere fact that certain sources are confidential does not establish that an author had actual or serious doubts about information.  Instead, courts repeatedly hold that "summary judgment is proper even without disclosure of a confidential source, if the plaintiff fails to produce evidence that the article in question is either (1) inherently improbable, or is (2) published with serious doubts about the truth of its contents."  *Southwell v. Southern Poverty Law Center*, 949 F. Supp. 1303, 1311 (W.D. Mich. 1996); *Sharon v. Time, Inc.*, 599 F. Supp. 538, 583 (S.D.N.Y. 1984) ("Even where one or more sources is not revealed, the record may nevertheless establish the absence of an adequate factual basis for a finding of actual malice.")  Indeed, when the reporter produces his or her detailed notes from the confidential source – and here, Cosby has produced her notes and a typed transcript of the interview – there can be little doubt as to the existence of the source.  Thus, absent evidence that the reporter actually seriously doubted the information, there is no evidence of actual malice.  *Gray v. St. Martin's Press*, 221 F.3d 243, 253 (1st Cir. 2000) (reporter produced redacted notes with confidential source leaving not "much basis to doubt that some source did exist").  This conclusion is particularly true given the wealth of corroborating information for the statements evidencing Anna's addiction, Stern's facilitation of it and ▒▒▒▒▒▒▒▒▒▒▒▒  e. Cosby Decl. ¶¶ 89-96.   ▒. Stern Dep. at 464:8-17.  *See, e.g. Cobb v. Time, supra*, at 638-39 ("sting" of the statement same even though article said boxer tested positive for cocaine when in fact he tested positive for marijuana).  In this context, the Statements were hardly incredible.

contradict her information, but nonetheless did not investigate that evidence.  The leading case

for the proposition is *Harte-Hankes Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989).

There, the defendant's sole source for an allegation that plaintiff had attempted to bribe grand

jury witnesses was a witness who made certain incredible claims.  The witness asserted that her

claims could be proven by a tape recorded session with plaintiff and seven individuals.  The

reporter interviewed six of the witnesses (and quickly discredited their denials), but refused to

review the available tape recording or interview the seventh available witness because it was

believed that witness could not be discredited.  *Id.* at 658.  On these extraordinary facts – a far

cry from anything plaintiff could argue here – the Supreme Court concluded that the evidence of

a clear intent to avoid the truth was sufficient to support a finding of actual malice.  *Id.* at 693.

    Here, the plaintiff did not have ready access to, but purposefully avoided, the videotape

described by the Nannies.  To the contrary, the unrebutted evidence is that Cosby repeatedly

sought their comment, but was unable to obtain it.  Cosby Decl. ¶ 88.  *See, also, Jackson v.*

*Paramount Pictures Corp.*, 68 Cal.App.4th 10 (Ct. App. 1998) (failure to obtain or review video

of Jackson supposedly fondling a young boy before reporting on its existence not evidence of

actual malice).

    Further, Stern cannot rely on Cosby's failure to consult with him prior to the publication

of the Book as evidence of actual malice:[34]

> If the caselaw is clear on any point it is that an author is under no duty to
> divulge the contents of a book prior to publication in order to provide the
> subject an opportunity to reply….  The decision of an author of what to
> specifically include in a book is the quintessential exercise of her First
> Amendment rights and to impose the duty that an author must first apprise
> the subject of the book of her substantive decisions would fundamentally
> undermine that exercise.  For example, this Court can easily imagine the
> case in which an author informs the subject of a book of the contents to be
> published and is in turn threatened with a lawsuit by the subject unless

---

[34] Here, Cosby did obtain and use Stern's comments or perspective on any number of issues in dispute and

*See*, Cosby Decl. ¶ 53-54; Littlefield Decl. ¶ 46-47.

> specific changes are made.  Such prepublication threats, made to influence
> an author to change or eliminate specific contents of a book, would
> constitute a fundamental chilling of First Amendment rights.

*Secord*, 747 F. Supp. at 788-89 (internal citations omitted) (finding no actual malice existed in

writing of book that alleged that plaintiff engaged in illegal drug trafficking, torture, murder and

attempted assassination); *see also McFarlane v. Sheridan Square Press*, 91 F.3d at 1510-11

(publisher knew plaintiff had sued another author for defamation based upon similar allegations,

and so could reasonably expect plaintiff to offer denials regardless of the facts); *Khan*, 269

A.D.2d at 79 (failure to obtain comment after promise to do so not evidence of actual malice).

The logical basis for the well-established principle that a failure to contact the plaintiff

for comment does not evidence actual malice is that it is widely recognized that a plaintiff like

Stern will undoubtedly deny the allegations.  Thus, obtaining his denial would not necessarily

inform her steadfast belief in the truth of the statements.  Publishers need not accept "denials,

however vehement; such denials are so commonplace in the world of polemical charge and

countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of

error." *Edwards v. National Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977).

Cosby chose not to seek a comment from Stern (and Birkhead after he became a solid

ally of Stern's), first because she had no doubts as to the accuracy of the information she had

gathered, and second because she could anticipate his response from his public statements.

Moreover, Cosby had legitimate concerns about her safety and Stern's possible retribution

against her should she bring to his attention some of what she had learned from sources and

planned to include in the Book.[35]  She already knew that Anna's bodyguard Moe Brighthaupt

had his proposed book cancelled when Stern learned about it and she knew that Debra Opri, Jack

Harding and the Nannies all claimed to be threatened by Stern or people associated with Stern.

---

[35] The validity of this concern became even more evident from discovery in this action, revealing that Vicedomine
had her trash rifled through and then placed on the internet with commentary from Art Harris and Stern's suing the
witness Speer only hours before his deposition.  McN. Decl. ¶ 6 (Vicedomine Dep. 21-24).

Accordingly, given her confidence in the accuracy of her information, as courts have repeatedly made clear, Cosby had no duty to divulge the contents of the Book prior to publication in order to provide Stern the opportunity to reply.

Finally, Stern will no doubt argue that Cosby's failure to obtain a copy of his complaint against the O'Quinn law firm (Virgie Arthur's lawyers) evidences a willful failure to obtain contradictory information concerning the allegations in that complaint. Stern commenced an action against O'Quinn in April 2007, challenging O'Quinn's published opinions that Stern was responsible for Anna's death.

Cosby Decl. ¶ 38. Yet, the factual flaw in Stern's argument is that *if* she had reviewed the O'Quinn complaint, it reveals nothing more than Stern's general denial that he "murdered" Daniel and Anna or that he had Anna's will faxed to Florida days before her death. *Id.* No facts repudiating these conclusions are contained in the complaint. McN. Decl. ¶ 24. Thus, unlike the audiotape in *Harte-Hanks* that would have exposed the falsity of the information at issue, Cosby's failure to review the complaint (even though she was aware of its allegations from media reports) would not have caused her to doubt any reputed statements. *See, e.g., Desnick v. America Broadcasting Co.*, 233 F.3d 514, 520 (7th Cir. 2000) (reporter's failure to examine court record of similar allegations where a judgment was obtained not actual malice since plaintiff could not show that the record would have alerted the reporter to any actual falsity).

**REDACTED**

However, given all the corroborating information concerning the substance of their statements and Cosby's clear contemporaneous notes documenting them, this hardly constitutes clear and

43

convincing evidence to support such a challenge.

REDACTED

- - -

REDACTED

REDACTED

REDACTED

suspected "foul play" when he said virtually identical statements in televised interviews with

Nancy Grace and Court TV).[37]  See also McN. Decl., ¶¶ 34-37.

In stark contrast, Cosby has thirteen pages of hand written notes from her interview with

REDACTED

[37] He denied telling an *In Touch* reporter the same thing, but she too has produced her notes verifying that he did make the statements to her.  Similarly, he denied at his deposition that he ever said that Daniel thought Howard had "complete control of my mom", and Howard "wants me out of the picture." (McN. Decl. ¶ 10, at 251, 253)  Yet, again, Harding told Anderson Cooper *on camera* on March 26, 2007 virtually the same exact quote: "He felt that – well, Stern was jealous of him, and Stern wanted control, and wanted the boy out of the picture altogether." (McN. Decl. ¶ 36)  Finally, Harding's denials regarding Daniel being afraid of Stern (*Id.* at ¶ 10 at 251), ring hollow when Harding told Nancy Grace, again on camera, on March 14 about Stern, "Danny didn't like him.  He was afraid of him," and on March 17 told her "And the boy was frightened to death of Stern, according to what he told me... But he – as I said, he was frightened to death." (McN. Decl. ¶ 36).

44

Harding, which contain virtually all of the statements attributed to him in the Book, dated May 9, 2007. On May 10, 2007, Cosby sent an email to Littlefield, letting him know that Harding had confirmed information already obtained from Jackie Hatten, that Daniel had talked about Stern pimping out his mother for sex. Cosby Decl. ¶¶ 95, 123. Any review of these materials make it absolutely clear that Cosby obtained and corroborated this information for Harding. Cosby Decl. ¶¶ 95, 123-124. Given his similar denials concerning other statements he verifiably made to various media on camera, there simply is no basis to credit Harding's denial of the pimping allegation.

Evidence of conflicting testimony – ¡      REDACTED

– does not create a question of fact on actual malice, particularly when, as here, the journalist has contemporaneous notes documenting the quote in question. Consider, for example, *Fletcher v. San Jose Mercury News*, 216 Cal.App.3d 172 (Ct. App. 1989). There, five different witnesses testified that they either flat out did not make the statements attributed to them in the story or indicated that they were misquoted. *Id.* at 182. Further, the evidence showed that the reporter was "devious" and "tried to put words in the witness' mouth." *Id.* at 185. Nonetheless, given the reporter's notes and evidence that he had similar information from another source, the alleged fabricated quotes "was not so improbable as to support the inference that [the reporter] had deliberately falsified" the witness remarks. In the end, the Court affirmed the dismissal of the claims, finding that the evidence of actual malice "is neither clear nor convincing." *Id.* at 189. *See, also, Freedom Newspapers of Texas v. Cantu*, 168 S.W.3d 847 (Tex. 2005) (summary judgment granted even though plaintiff denied he used the phrase "No Anglo can be Sheriff" and an audiotape in the reporter's possession supported that conclusion).

REDACTED

REDACTED

REDACTED

police in January 2007, including that Stern was "funneling" money to his parents in offshore accounts.  (Book, 165; Statement 10.)  Speer also described how he overheard Stern say to Birkhead when he saw his baby for the first time, "I will give you your baby, if you leave me as executor of the Estate," and told Cosby he "felt like arresting Howard then and there for kidnapping and holding the baby for ransom.  If I could have."  (Book at 198; Statement 12.)

REDACTED

REDACTED

REDACTED

REDACTED

46

REDACTED

In *Masson*, 501 U.S. at 516, the Supreme Court held that if "an author alters a speaker's words but effects no material change in meaning, including any meaning conveyed by the manner or fact of expression, the speaker suffers no injury to reputation that is compensable as a defamation." The Court emphasized that the common law of libel "overlooks minor inaccuracies and concentrates upon substantial truth." 501 U.S. at 497. In short, none of Speer's quibbles with the text of the two challenged Statements change the gist or story of the information and for this reason do not further an argument in support of actual malice.

### 4.     Post-Publication Events Do Not Evidence Serious Doubts

Stern also is likely to attempt to rely on Cosby's post-publication trip to the Bahamas for evidence of actual malice, specifically supposed evidence that she had doubt about the nannies' statements regarding the existence of the sex video of Stern and Birkhead. (Statement 12). Of course, ·

REDACTED

(Cosby Dep., Nov. 15, 2007 at 277:17-20; 311:23-25; 327:12-16.) Moreover, the law could not be more clear that post-publication events do not inform an analysis of actual malice. Because the actual malice inquiry is subjective – it is solely concerned with the defendant's state of mind at the time when she acted – the inference of actual malice must "necessarily be drawn *solely* upon the basis of the information that was available to and considered by the defendant prior to publication." *Lohrenz v. Donnelly*, 223 F. Supp. 2d at 46, *quoting  McFarlane v. Sheridan Square*, 91 F.3d at 1508 (emphasis added); *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984) (evidence must establish that

47

defendant "realized the inaccuracy at the time of publication").[39] Thus, as a matter of law, Cosby's motive and intention after publication when she traveled to the Bahamas and tried to meet the nannies cannot be considered in evaluating her state of mind before the Book was published.

### 5.       Plaintiff's List of Grievances Does Not Amount to Actual Malice

Whether considered individually or collectively, plaintiff's arguments to support actual malice – including biased sources or a failure to get this comment – cannot begin to meet his burden of establishing clear and convincing evidence that Cosby knew or had serious doubts as to any of the challenging statements.  As shown above, none of these allegations taken separately create an issue as to actual malice.  Moreover, these allegations *in combination* do not amount to the creation of an issue as to actual malice.  *See Tucker v. Fischbein*, 237 F.3d 275 (3d Cir. 2001) (J. Alito) (Plaintiff's 24 different theories to support actual malice not sufficient); *see also Bement v. N.Y.P. Holdings,* 307 A.D.2d 86, 91 (1st Dep't 2003) (evidence of actual malice insufficient despite plaintiff's contentions that defendant "fail[ed] to read treatment beforehand"; made "minimal efforts to contact plaintiff to verify the treatment's accuracy; and fail[ed] to "inquire" of source "as to the accuracy of the treatment").[40]

### VI.

### THERE IS NO TRIABLE ISSUE THAT PLAINTIFF CANNOT ESTABLISH PUNITIVE DAMAGES

In New York, evidence of actual malice is insufficient, by itself, to justify an award of

---

[39] The same holds for the letter plaintiff's counsel sent on August 31, 2007, only days before the Book was officially published challenging her reliance on information from Jackie Hatten.  Cplt., Ex. B.  At that point, the Book was printed, bound  and about to be distributed.  Thus, this "notice" – which lacks any details – would not inform Cosby's state of mind or knowledge at the time the Book was published.

[40]*See, also, Freedom Newspapers of Texas*, 168 S.W.3d at 854-58, the Court found there was no evidence of actual malice despite plaintiff's claims that (1) defendant attributed words to speaker that were not a direct quote, (2) defendants made a deliberate and material change in meaning of the plaintiff's remarks, (3) defendant had ill will toward plaintiff, (4) defendant was under pressure to produce story from a particular point of view, (5) defendant published second story after learning of plaintiff's denials; (6) defendants had raised questions after reading the article during the editorial process, and (7) expert journalist criticized defendant's handling of the story and noted there was biased reporting.

punitive damages, because actual malice focuses only on the defendant's state of mind in relation to the truth or falsity of the published information. *Prozeralik v. Capital Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479-80 (1993). Instead, punitive damages can only be awarded upon the additional showing of "hatred, ill will, spite, criminal mental state or that traditionally required variety of common-law malice" towards the plaintiff. *Id.; see also DiBella v. Hopkins*, 403 F.3d 102, 122 (2d Cir. 2005).

Here, there is no genuine issue of material fact regarding Cosby's mental state in relation to Stern – she did not harbor any hatred, ill will, spite, or criminal mental state towards him that could support a finding of common-law malice. The complaint does not even allege that Cosby acted with hatred, ill will or spite in relation to Stern. (Cplt. ¶ 396.)

REDACTED

Littlefield

Decl. ¶¶ 46-47. In short, as a matter of law plaintiff is not entitled to punitive damages and that claim must be dismissed.

## **CONCLUSION**

For the foregoing reasons, this Court should grant summary judgment in favor of Cosby and dismiss the complaint with prejudice.

Dated: December 15, 2008
New York, New York

DAVIS WRIGHT TREMAINE LLP

By: _____

Elizabeth A. McNamara
Elisa Miller
Deborah Adler

1633 Broadway
New York, New York 10019
(212) 489-8230
*Attorneys for Defendant Rita Cosby*

49

TO:   L. Lin Wood
      Powell Goldstein LLP
      One Atlanta Center, 14th Floor
      1201 West Peachtree St., NW
      Atlanta, GA 30309
      *Attorneys for Plaintiff*

      Douglass Maynard
      Akin Gump Strauss Hauer & Feld LLP
      1 Bryant Park
      New York, NY 10036
      *Attorneys for Defendant Hachette Book Group USA, Inc.*

DWT 12116592v2 3910089-000032

**APPENDIX A**

**ALLEGEDLY LIBELOUS STATEMENTS IDENTIFIED IN THE COMPLAINT**

**Libelous Statement 1:  Criminal Lewd Act and Homosexuality**

One of Anna's closest friends, Jackie Hatten, says she knows what Howard has on Larry.

One night at a friend's house in Los Angeles, Jackie was supposed to meet Larry Birkhead for the first time.  Anna had been telling her about the blond-haired, blue-eyed photographer that she'd been seeing, and wanted her to meet him.  Late that night at the party, Jackie went looking for Anna around the house.  Jackie walked down a hallway, peaking into rooms.  In one darkened bedroom, she came upon two men – Howard K. Stern and another man, whom she was about to discover, was Anna's boyfriend, Larry Birkhead.

She says both men had their shirts off and Howard was down on his knees.  Larry was sitting in a big oversized loveseat chair and both men had their pants down around their ankles.  "Howard's head was down into Larry's crotch," Jackie told me.  "Their bodies were intermingled.  It was obvious what was happening." Anna suddenly walked up behind her and laughed out loud when she also saw what the two men were doing.

"The boys didn't stop," Jackie said.  "They were engrossed and making their own sounds." Jackie said she and Anna watched the scene from about fifteen feet away.  "Definitely close enough to see what was happening."

Jackie was shocked.  Anna wasn't.  She grabbed her friend's arm.  "Come here, come here, come here," Anna said.  "Howard … you know he's gay, I told you.  And if Larry wants to do it, I can't complain because I do, what I do," Anna's sexual escapades with women were openly discussed between she and her friends.  "I guess anything goes," Anna had laughed.

* * * * *

The following day after the Howard and Larry man-on-man shenanigans, Jackie and Anna talked about what they had seen in the bedroom at their friend's house.  "Oh, you were freaked out about last night," Anna giggled.

"I wasn't expecting to see that!" Jackie said.  Anna laughed and laughed.  She thought it was the funniest thing ever that the night Jackie was supposed to meet Anna's boyfriend, Larry Birkhead, he was being intimate with her lawyer, Howard K. Stern.  They never discussed it again.  And Jackie never met Larry face to face.

(Blonde Ambition, 202-04.)

According to Jackie Hatten, Daniel's godmother, Anna Nicole told her, "Eeeew! I'd never sleep with Howard, if he's the last person on earth.  He's gay!"

(Blonde Ambition, 67.)

**Libelous Statement 2:  Videotaped Homosexual Act**

Without knowing what Jackie Hatten had seen, Anna's nannies, Quethlie Alexis and Nadine Alexie, accompanied by their attorney, told private investigators some details about Howard and Anna's home life.  Howard, they said, was always on his computer and Anna often stayed in bed and watched movies.  "Is there one video she loved watching?" an investigator asked.

"Yes," one of the nannies surprisingly said, "the one with Larry Birkhead and Howard … doing that thing."

"You mean like two gay guys?" the investigator asked.  "Having sex?"

"Just like that," she nodded.  The investigators were taken aback and told me that the nannies were clearly embarrassed about it, since they were quite religious.

"She'd lie in her bed and watch it," Nadine affirmed.

According to the nannies, she watched it over and over again.

(Blonde Ambition, 204.)

**Libelous Statement 3:  Illegal Cocaine Use**

Hotel workers say Anna and Howard often partied in their room during prior visits with what they believe was cocaine and that both were often heard sniffling and cleaning up "stuff" around the room when hotel staff came in, while others saw white powder on the counters.

(Blonde Ambition, 5.)

And, he [the employee confidante] says, the drugs were bad – both before Daniel's death when she was pregnant and after Daniel's death when she was not.  He said he saw Anna using numerous drugs, including both methadone and cocaine while pregnant.  "Every other day Howard would give her a little snort in the nose and get her high …."

(Blonde Ambition, 79.)

**Libelous Statement 4:  Filing a False Police Report**

Anna dated Jackie's brother, Mark. That relationship ended in his arrest and imprisonment.  Hatten, an artist, served a seven-year sentence for making "terrorist threats" against Anna and blames Howard K. Stern for his imprisonment.  Hatten claims that it was all a setup by Howard K. Stern, who, he says, called police and told them Anna had a stalker that was on his way to his house with a gun.  Jackie said that her brother and Anna had just had a big fight and he was coming over to pack up his stuff since they had been living together.

(Blonde Ambition, 102.)

**Libelous Statement 5:  Conspiracy to Commit Murder**

Law enforcement sources confirmed that in June 2000, the FBI interviewed Hatten in prison.  He claimed Anna Nicole and Howard K. Stern wanted him to arrange a hit on Pierce Marshall, J. Howard Marshall's son and their bitter rival in the war for her late husband's money.  The FBI asked him to wear a wire and secretly tape Anna Nicole, which he later refused to do.  Hatten told me on the phone from prison that he still loved her and didn't want to see her get sent to prison.  He also claims that Howard once gave him two small pills, saying they were aspirin.  Hatten says the pills knocked him out, and he was unconscious for at least twenty-four hours.

(Blonde Ambition, 102).

**Libelous Statement 6:  Perjury**

"I just want her to be with Daniel," Howard K. Stern cried to *Entertainment Tonight* cameras on his flight from Florida to the Bahamas on *Entertainment Tonight*'s private plane.  Even though Howard testified under oath during the Florida court hearing over Anna's burial that he only received the free flight, he was reportedly paid one million dollars to allow the entertainment news magazine to exclusively tape him and tag along as he went back to the Bahamas to secure Anna's five-month-old baby, Dannielynn – the baby he was claiming to be the father of.

(Blonde Ambition, 28).

**Libelous Statement 7:  Pimping**

Daniel also told the private investigator that Howard was having people "lay his mom" – pimping her for sex.  Daniel didn't elaborate further to Harding.

(Blonde Ambition, 31.)

**Libelous Statement 8:  Fraudulent Inducement for Prostitution**

However, Jackie Hatten, Daniel's godmother, told me Daniel confided in her that "he'd seen Howard give his mom uppers and downers and then guys would come to the house, talk to Howard and go into his mom's bedroom and close the door." According to Jackie, Daniel called it the "Millionaire's Club," a reference to an episode on Anna's E! Entertainment Television reality show, in which she had gone out on arranged dates with super wealthy men.  Unlike the show, however, Daniel told Jackie that the men he saw, at least fifty of them in a year, would go into his mom's bedroom for hours.  Then, from his vantage point hiding behind the door in his bedroom, he'd see the guys coming out adjusting their clothes and discretely palming Howard money on the way out the door.  Daniel said he'd then see his mom being "all drugged out and groggy" in her bedroom.

… Jackie said she and Daniel firmly believed Anna had no idea Howard was getting paid on the side.  "When Anna was not sober, she was easy to take advantage of.  My friend Anna was Howard Stern's cash cow.  Howard was taking.  advantage of Anna in every way, up until, and including, her death."

(Blonde Ambition, 31.)

**<u>Libelous Statement 9:  Obstruction of Justice and Destruction of Evidence</u>**

When they got back to the Horizons house the day Daniel died, Ben and Anna went to Howard's bedroom, while Gaither Thompson, Ben's son, and Ford Shelley, Ben's son-in-law, went to Anna's bedroom where Howard had started rifling through all of Daniel's things. Howard and Anna had separate bedrooms, approximately one hundred feet apart.  While Ben comforted Anna, Ford says Howard was aggressively searching through Daniel's jeans, his shoes, his t-shirt, and baseball cap, which were all laid out on the bed in Anna's room.

Both Gaither and Ford saw two pills fall out of Daniel's front pocket.  "They were two white tablets," Ford Shelley said, "odd shaped.  I'm not sure what they were."

Howard took the pills, went into the bathroom and closed the door.  Suspicious of what Howard was doing, Ford walked over to the bathroom door and heard the toilet flush.  When he came out of the bathroom, Ford Shelley says Howard proclaimed, "I took care of the problem."

"Why are you doing this?" Ford asked.  "1 wouldn't have done that if I were you."

After a long pause, Howard said, "Well, I did."

Ford believes Howard was protecting Daniel and Anna, but told me, "Jesus Christ!  I can't believe he'd destroy evidence like that."

(Blonde Ambition, 51.)

On the drive back to the house Howard and Ford Shelley were in a separate vehicle from [coroner Linda] Virgill.  According to Shelley, Howard called and told someone on the other end of the phone, "Go put the pills away now!" He explained the coroner was on the way ….

"What are you doing?" Ford asked.  "Maybe Daniel took something that would've killed him."

For the rest of the drive, Howard was silent.  "He clearly wanted to hide those pills before the coroner got there and started snooping around."

\* \* \* \* \*

… Ford Shelley says Howard repeatedly told Linda Virgill, as he would also tell other Bahamian authorities, that there were no drugs present and no drug history for Daniel.  "There is no way any drugs could've played a role," Howard said.

Ford says he was shocked by Howard's clear lie.  They knew Howard had taken those pills out of Daniel's pocket before he made those statements to the coroner and also had all the pills in the house as well as the "goodie bag" put away.  "He had already tampered with evidence," Ford said.

4

(Blonde Ambition, 52-53.)

## Libelous Statement 10:  Theft, Money Laundering and Wire Fraud

Going on record, Larry Birkhead told police that Howard was funneling approximately $15,000 at least every other week, wiring it to his parents in offshore accounts.  According to Larry, several million dollars had been wired.  He said that Bahamian police should check Howard's bank accounts and Anna's checkbook.

* * * * *

Birkhead had also told Bahamian police that he often saw Howard injecting Anna and that "Howard was stealing money from Anna, sending money to his parents and offshore banks in the amount of $15,000 every week or two weeks."  Larry further said that millions of dollars were funneled from Anna's accounts to Howard's.  "I saw Howard signing checks to himself and to Howard's banks in the States and offshore."

(Blonde Ambition, 165-66.)

She [Tas Brighthaupt] also made a surprising discovery.  When she sat in one of two chairs at the foot of Anna's bed to work on the computer, she noticed Howard's computer was on and open on the floor to the right of the chair.  A $37,000 wire transfer he had made that morning was still illuminated on the screen.  Tas says she was on the phone with Moe when she saw the wire transfer message.  (Police did check Howard's computer for e-mails sometime after her death, but were not informed of any wire transfers and therefore did not check for any.)  Both the boat broker and handyman know of no large amount like this that would have been associated with the boat.

(Blonde Ambition, 233-34.)

## Libelous Statement 11:  Fraudulent and Perjurious Statements Regarding Dannielynn's Paternity

Even though Howard K. Stern testified on the stand that he was the father of Dannielynn, he privately made this offer to Larry:  "I will give you your baby if you leave me as executor of the estate."

(Blonde Ambition, caption to photograph on unnumbered page.)

## Libelous Statement 12:  Kidnapping for Ransom

On the drive home from that secret meeting, Mark Speer, who was in the car, overheard the discussions taking place between Larry Birkhead and Ford Shelley.  They were talking about Howard's offer to Larry behind closed doors.  The deal was if Larry agreed not to contest Howard remaining as executor of Anna's estate, then Larry could have his baby.

Mark Speer said later that he was surprised Larry seemed receptive to the idea.  As conversations with Howard continued over the next few days, Howard sweetened the deal.  If

DWT 12215887v1 3910089-000032

Larry agreed not to contest the will and allowed Howard to remain executor of Anna's estate as well as keep control of Anna's "name and likeness," Howard would:

- Drop all legal claims for custody of Dannielynn and "give you your baby."

- Allow Larry to "run the show" in California.

- Let Larry live in Anna's Studio City house….

- Pay all the bills.

- Provide several thousand dollars a month in allowance … and pay for a rental car.

He also promised Larry that he would "take care of you the way I took care of Anna.

(Blonde Ambition, 175-76.)

Mark Speer heard first hand Howard's proposal to Larry: "I will give you your baby, if you leave me as executor of the estate." Speer, a retired deputy sheriff later told me, "I felt like arresting Howard then and there for kidnapping and holding the baby for ransom, If I could have."

Larry responded to Howard: "I'm not going to leave you as executor."

Howard then said to Larry:  "It only makes sense if I keep running her businesses.  I'll also pay you an on-going fee."

(Blonde Ambition, 198).

## Libelous Statement 13:  Extortion or Blackmail of Larry Birkhead

She [Debra Opri] worried that since they were so close to getting a positive resolution in court without any side deals, Larry would be making a big mistake cutting a deal.

As they prepared for the funeral of Anna Nicole Smith, why was Larry going against both his family's wishes and those of his counsel?

What did Howard K. Stern have on Larry Birkhead?

(Blonde Ambition, 176.)

At the Hilton Hotel the day that Virgie and Larry had met, Virgie says she had an eye-opening conversation with a desperate and nervous young man.  Virgie asked Larry Birkhead about Howard.  "What does he have on you?"

"They have so much stuff on me," Larry told her.

"Son, what kind of stuff?  Virgie asked.

6

"They're fixing to tell all about me," he said.  "They say they caught me dating other men.  That I'm queer."

\* \* \* \* \*

What Howard knew about Larry was something Larry didn't want the world – but perhaps more importantly his devout Southern Baptist family – to find out.  It is his skeleton in the closet.  And, like others involved in this sordid tale, it is often these kept secrets that make people act in ways and do things that they normally would not do.

● ● ●

One of Anna's closet friends, Jackie Hatten, says she knows what Howard has on Larry.

(Blonde Ambition, 201-02.)

## Libelous Statement 14:  Drugging Anna Nicole Smith

He [Daniel Smith] told Harding he wanted him to investigate what Howard K. Stern was doing to his mom and people around her….  "Howard also keeps feeding my mom drugs," he continued, "mind-bending drugs.  He has total control over her like a, like a …"

"Svengali?"  Harding asked.

"Yeah," Daniel said.  "That's it!  He's a Svengali…."  He explained that ever since Howard had come into their lives, he had purposely kept his mother "out of it all the time."  Harding said Ray Martino had told him before that Anna had cleaned up for a while, but had gone "off the deep end with drugs" when she hooked up with Howard.

(Blonde Ambition, 30-31.)

## Libelous Statement 15:  Criminal Involvement in the Death of Anna Nicole Smith As Evidenced by Financial Motive

Jackie told Peter that Anna was in imminent danger.  She felt Howard was increasingly drugging her so he could inherit the money.  She said someone needed to save Anna's life to "take her away from Howard."

(Blonde Ambition, 104.)

Jackie Hatten did speak to Larry Birkhead on the phone shortly after Daniel died.  She told Larry, "I am worried about Anna, that she'll be next."

(Blonde Ambition, 204.)

7

**Libelous Statement 16:  Criminal Involvement in the Death of Anna Nicole Smith As Evidenced by Financial Motive**

Anna's mother Virgie Arthur also felt that Howard K. Stern was after Anna's money and went on television to say so….

\* \* \* \* \*

A week before Daniel's funeral, Virgie went on CNN and said, "… But if Howard marries Vickie and Daniel's gone, that leaves Howard and the baby to inherit whatever money she has." And then she made her point even clearer.  "If Howard Stern marries her and she ends up dead, then who does the money go to?" Howard K. Stern.

(Blonde Ambition, 105.)

**Libelous Statement 17:  Criminal Involvement in the Death of Anna Nicole Smith As Evidenced by the Fax of Ms.  Smith's Will**

On the top of the faxed copy of the will sent from Anna's attorney and Howard's good friend, Ron Rale, to Howard's Florida attorney, Krista Barth, it said "2/3 RAR" and "2:18 a.m." February 3 – which would indicate that it was sent just five days before Anna died and several months after Daniel was already dead.  Her will possibly being faxed five days before her death had tongues wagging outside and inside the courthouse.  On the face of it, such an action would seem to be quite suspicious.

\* \* \* \* \*

Judge Seidlin pointed out what many were thinking – no woman in her right mind would ever sign a will that excludes her future children.  But then he took Krista Barth's word that her fax machine in her office was messed up since she was claiming her daily office logs could confirm that the fax came after Anna died.  But it seemed to go unnoticed that normally the time stamped on top of a fax is from the outgoing fax machine, not the incoming fax machine.  The outgoing fax machine belonged to Ron Rale, Howard's long-time friend.

(Blonde Ambition, 170, 172.)

**Libelous Statement 18:  Criminal Involvement in the Death of Daniel Smith**

She [Ms.  Smith] told several employees, who have gone on record, that she was afraid Howard may have had something to do with Daniel's death.

\* \* \* \* \*

Both nannies have repeatedly said that they overheard Anna telling Howard K. Stern around the time of Daniel's funeral: "You did this!  You killed him!  You caused this!" And that they had also heard Anna scream at him: "Get out of here!  Just wait for the inquest!'

(Blonde Ambition, 76, 78.)

Even more shocking perhaps, Quethlie Alexis and Nadine Alexie told investigators that when Howard tried to console Anna and gently get her to release Daniel's body, she looked right at Howard and screamed, "You caused this! You did this. Get away from me, you bastard!" It was a surprising and uncomfortable moment for the small crowd.

(Blonde Ambition, 91.)

"He may try to kill her," Jackie said. "Howard is responsible for killing the boy and Anna's next."

(Blonde Ambition, 104.)

Speer told me that Larry's mission at the time was to get Howard arrested and convicted for the death of Daniel and the continued drugging of Anna Nicole.

(Blonde Ambition, 166.)

## Libelous Statement 19:  Criminal Involvement in the Death of Anna Nicole Smith

Apparently, none of them wanted to argue with Anna to make her go to the hospital, not her medically trained friends or her live-in lawyer Howard K. Stern.

(Blonde Ambition, 7.)

Whether because of the insanity of the day – or the confusion of trying to keep a story straight – the times that certain things occurred on the day Anna died get blurry among all those involved.

(Blonde Ambition, 9.)

But Moe says something was peculiar that morning. Howard's behavior.

(Blonde Ambition, 10.)

They were waiting at the elevator bank to go up to the room when Howard came out of the elevator they were about to get into. Tas says he was "fidgety, strange acting" and that "he seemed surprised when he saw us."

"What's up?" Moe asked.

"I just came down to use my cell phone:" Howard said.

"Why?" Moe asked. "It works just fine in the room."

Howard stuttered. "Ah, ah."

According to Tas, "He didn't say' anything, and then just went upstairs in the elevator with all of us." When she thinks back on the day, she said, "I still cannot get over his behavior at that moment."

9

The entire group walked into Room 609 and Tas says Howard was "talking in a normal, in a loud voice, which in hindsight seems strange given that Anna was supposed to be sleeping. He wasn't whispering," He shouted out to Anna, saying, "Anna we have guests." Also, Howard did something that in retrospect seems "calculated," Tas says. "He stood in front of the living room area in between the two rooms, with his back to the master bedroom. So we could barely look into 607." Tas also recalled it was "like he was intentionally blocking our view of Anna inside the next room,"

(Blonde Ambition, 11-12.)

The strange thing about Howard's noon appointment was that it wasn't at noon at all. "Howard had a one o'clock appointment with me," the boat handyman told me. "Definitely one o'clock."

(Blonde Ambition, 12.)

Anna was lying on her right side and right shoulder, facing the left wall, atop soft Egyptian cotton sheets. She was naked. Friends and former boyfriends of Anna's told me that her sleeping in the nude was very strange – that Anna never slept in the nude …. It is one of the many details that doesn't seem right about the scene in room 607 that day.

(Blonde Ambition, 18.)

… Howard's first visible reaction when he got the news that all was not well with Anna could be described as surprising by some. "It didn't seem like an upsetting call to him at all," the handyman told me …. After Howard ended his call, he said in a monotone, unemotional voice, "I have an emergency and have to leave."

In fact, after Howard got the call, the handyman says Howard answered several questions for him …. Howard then said goodbye and walked back to the car.

(Blonde Ambition, 22.)

… But when Howard got back to the hotel in front of a crowd of eyewitnesses, his response was much more heightened. He was seen running through the hotel and was very upset, quite different from his initial response when he received the call at the boat basin.

(Blonde Ambition, 25.)

Approximately 2:15 p.m., it was Moe, rather than Howard, who ran beside the gurney carrying the tabloid icon to the waiting ambulance below …. But it was Moe, rather than Howard, who took the ride in the ambulance with Anna to the hospital. And it was Moe, about a half an hour later in the emergency room of Memorial Regional Hospital, who gave doctors the nod to stop their resuscitation efforts.

* * * * *

Howard eventually went to the hospital, but not at his request.  An eyewitness says after thirty minutes to an hour of him being in the room and talking to detectives, the hospital called and asked for Howard's presence.  Another person on the scene told me, "He was in no rush to go."

* * * * *

Howard K. Stern had been quite busy.  He began talking to his media contacts right away …. *Entertainment Tonight* … was already en route to Hollywood, Florida, and was confirmed for a block of rooms at the Hard Rock that Howard personally called to reserve before 4 p.m.  Given that Anna had just been pronounced dead at 2:49 p.m., it was shocking to many of those present that Howard could even think of any media at that moment, much less make an exclusive deal so soon after her death pronouncement.  But he did ….

(Blonde Ambition, 26.)

DWT 12215887v1 3910089-000032