**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

HOWARD K. STERN,

       Plaintiff,

vs.                                    Case No. 1:07-CIV-8536-DC

RITA COSBY and
HACHETTE BOOK GROUP USA, INC., d/b/a       **REDACTED**
Grand Central Publishing, and
JOHN or JANE DOE,

       Defendants.

_____

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO**
**STRIKE CERTAIN EXHIBITS FROM CONSIDERATION ON SUMMARY JUDGMENT**

COMES NOW Plaintiff Howard K. Stern ("Stern") and, pursuant to Local Rule 7.1, hereby respectfully submits this memorandum in support of Plaintiff's motion to strike certain exhibits from consideration on summary judgment.

## INTRODUCTION

In support of Cosby's motion for summary judgment, Cosby attaches a declaration from herself and a declaration from her co-author Bruce Littlefield that substantially fail to comply with the requirements of Federal Rule of Civil Procedure 56. In their affidavits, both Cosby and Littlefield make numerous inadmissible statements that are: (1) not based on personal knowledge; (2) full of inadmissible evidence in the form of hearsay, conclusions, pure opinion, and character evidence; and (3) directly contradictory to their deposition testimony. These statements should be stricken from the record and not considered on summary judgment.

In addition to submitting largely inadmissible declarations, Cosby, Littlefield, and Cosby's counsel, Elizabeth McNamara, also attach hundreds of pages of never before seen, unauthenticated, hearsay internet printouts that purportedly reflect transcripts of newspaper

articles and television interviews (hereinafter, the "Internet Evidence"). Cosby never produced many of these transcripts to Stern during discovery and there is no evidence that Cosby or Littlefield had personal knowledge of any of the information contained in these articles. Moreover, Stern never had the opportunity to review these documents, to investigate the accuracy and reliability of their contents, or to depose any of the relevant individuals about the statements contained therein upon which Cosby now apparently relies. Instead, Cosby seeks to do an end-run around longstanding discovery procedures by offering these transcripts with the apparent hope of obtaining the benefit of their unauthenticated, hearsay contents without establishing that she had knowledge of them prior to the publication of *Blonde Ambition*. These unauthenticated transcripts should not be considered on summary judgment and Plaintiff's motion to strike should be granted.

## ARGUMENT AND CITATION OF AUTHORITIES

I.   **COSBY AND LITTLEFIELD'S DECLARATIONS ARE NOT BASED ON PERSONAL KNOWLEDGE, CONTAIN INADMISSIBLE HEARSAY, AND MAKE CONCLUSORY STATEMENTS THAT SHOULD NOT BE CONSIDERED ON SUMMARY JUDGMENT.**

An affidavit submitted in support of a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. Proc. 56(e)(1) (emphasis added). In other words, "[a]ffidavits must present evidence which is admissible and must not only be made on the personal knowledge of the affiant but must show that he possesses the knowledge asserted." *Universal Film Exchanges, Inc. v. Walter Reade, Inc.*, 37 F.R.D. 4, 5 (S.D.N.Y. 1965). "A court may 'strike portions of an affidavit that are not based on the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements.'" *Pugliese v. Verizon New York, Inc.*, 2008 WL 2882092, *5 (S.D.N.Y. 2008); *Perkins v.*

*Memorial Sloane-Kettering Cancer Center*, 2005 WL 2453078, *14 (S.D.N.Y. 2005). Significant portions of Cosby and Littlefield's declarations suffer from each of these problems and those inadmissible sections should be stricken.

### A. Cosby and Littlefield's Statements Not Based on Personal Knowledge Are Not Admissible.

Cosby and Littlefield spend a significant amount of time in their declarations discussing the life of Anna Nicole Smith, the purported public perception of Ms. Smith, how this purported public perception was shaped by various news articles and television programs, and how Stern fit into this mix. Neither Cosby nor Littlefield knew Ms. Smith, were involved in her life, or witnessed first-hand any aspects of Ms. Smith's life to which they testify in their declarations. Cosby herself admits that she "briefly met Anna only once, at an Oscar party several years ago...." Cosby Decl. ¶ 10. Littlefield also makes it clear that any knowledge he had about events that allegedly transpired in Ms. Smith's life he learned when he "immersed [him]self in the large amount of information about Anna Nicole Smith that was already in the public realm." Littlefield Decl. ¶ 11. Cosby and Littlefield simply have no personal knowledge of Ms. Smith, Stern, and their life, and are not competent to testify on these matters. Charts listing the statements Stern is challenging as inadmissible in the declarations of Cosby and Littlefield are attached hereto as Exhibits A and B, respectively.

A few examples of the statements concerning Ms. Smith and Stern testified to by Cosby and Littlefield demonstrate their complete lack of personal knowledge of these matters and the inadmissibility of the statements. Cosby writes:

> it was difficult to escape knowledge of Anna and her public persona. Anna first became known as the beautiful Amazon that graced the pages and the cover of Playboy magazine. Anna became a household name, however, when in 1994, at the age of 26, she married J. Howard Marshall III, a billionaire Texas oil magnate who was, at the time of their marriage, 89 years old and confined to a wheelchair.

> As a result of this marriage, Anna became widely perceived as a "gold digger" and I remember her becoming a regular punch line on talk and comedy shows.

Cosby Decl. ¶ 10.  Cosby has no personal knowledge of any of the information in this statement. Instead, she is merely summarizing information she claims was out in the public domain and providing inadmissible opinion testimony about how Ms. Smith was perceived by the public. Moreover, in her deposition, Cosby could not remember any of the alleged facts in this statement.  *See* Section II, *infra*.  Later, Cosby similarly testifies, "Close on the heels of her 'gold digger image,' was the common perception that she had drug or alcohol problems.  It was reported that Anna had gone to rehab in 1995."  Cosby Decl. ¶ 12.  This statement is again not based on personal knowledge, and instead Cosby merely asserts that it was "widely reported."

Littlefield makes numerous similar statements not based on personal knowledge.  For example, Littlefield explains:

> Like much of the public, I was already generally aware of the basic plotline surrounding Anna and her death: her rise to fame after posing for Playboy magazine and being the Guess? Jeans model; her jaw-dropping marriage to 88-year-old J. Howard Marshall, billionaire Texas oil magnate, which sealed her public perception as a "gold digger"; her seemingly chemically enhanced public appearances, where she had noticeably slurred speech; and, the most recent "Who's the Baby Daddy" dispute between Howard and Larry Birkhead ("Larry"), as well as the tragic death of Anna's son, Daniel Smith.

Littlefield Decl. ¶12.  Regarding the public and their interest in Ms. Smith, Littlefield also asserts, "Anna's death created a media frenzy that was virtually unrivaled....  Seemingly, the public could not get enough concerning anything related to Anna's death and the media did its best to deliver."  Littlefield Decl. ¶ 13.  Littlefield has no personal knowledge for this statement, does not explain the basis for making the statement, and instead hypothesizes about what members of the public may or may not have been thinking.

Numerous statements by Cosby and Littlefield, as demonstrated above and in Exhibits A and B, are not based "on personal knowledge, [do not] set out facts that would be admissible in evidence, [or] show that the affiant is competent to testify on the matters stated." *Pugliese*, 2008 WL 2882092 at *5. These statements are inadmissible, should be stricken from Cosby and Littlefield's declarations, and not considered on summary judgment.

**B.    Cosby and Littlefield's Statements Containing Hearsay Are Not Admissible.**

Cosby and Littlefield testify repeatedly about hearsay information that is not admissible and inappropriate in a declaration in support of a motion for summary judgment.    "Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge ... and a hearsay affidavit is not a substitute for the personal knowledge of a party." *Parks v. Lebhar-Friedman, Inc.*, 2008 WL 3833802, *1 (S.D.N.Y. 2008), *quoting Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988).

Cosby and Littlefield provide hearsay statements for two main purposes in their declarations: (1) background information on Anna Nicole Smith and Stern; and (2) previously published information allegedly relied upon by Cosby and consistent with the libelous statements contained in *Blonde Ambition*. The hearsay provided for both of these purposes is inadmissible, as the following examples demonstrate. *See* Exs. A and B.

Littlefield writes numerous paragraphs explaining what he knew about what Cosby did during her investigation for *Blonde Ambition*. For example, "Rita sought and obtained the views of others concerning Jackie Hatten's credibility;" "Rita confirmed Ms. Hatten's credibility with others;" "Rita pressed for information on Mark Hatten." Littlefield Decl. ¶¶ 42-43. Similarly, Cosby provides a tremendous number of conclusions regarding her investigation for *Blonde Ambition*. A small portion of these is as follows: "After returning to Los Angeles, it was later

reported Anna was pregnant;" "It was later reported that the only other people in the hospital room at the time of his death were Anna and Howard;" "Ultimately, the celebrity pathologist, Dr. Cyril Wecht concluded that Daniel died of a lethal interaction of the drugs Zoloft, Lexapro and Methadone." Cosby Decl. ¶¶ 13, 18.

Cosby and Littlefield also provide numerous summaries and statements about what members of the media were reporting prior to the publication of *Blonde Ambition*. As part of this hearsay evidence, both declarations include bullet point lists of "news breaks," "commentators' reactions," and "previously published reports." *See* Cosby Decl. ¶¶ 28, 145; Littlefield Decl. ¶ 51. A brief sampling of one of these lists contains the following hearsay statements:

- It was revealed that days before Anna's death, she was seriously sick with a fever approaching 105 but no one surrounding her (including Howard) forced her to go to the hospital.
- Reports of Anna's drug abuse were everywhere, with people describing her as a 'train wreck' and Howard K. Stern as her 'Svengali' 'he knew what her demons were … he was her enabler … he was her manipulator."
- Her use of methadone during her pregnancy drew particular attention, particularly when an airbill was released that evidenced that it had been prescribed under an alias and sent to the Bahamas a month before she gave birth.

Cosby Decl. ¶ 28. All of these statements, and the ones listed in Exhibits A and B, are inadmissible hearsay. A hearsay affidavit is not a substitute for the personal knowledge of a party, and cannot be considered on summary judgment. *Parks*, 2008 WL 3833802 at *1.

### C. Cosby and Littlefield's Generalized and Conclusory Statements Are Not Admissible.

Cosby and Littlefield also engage in significant speculation and offer a number of wholly unjustified and conclusory assertions about the underlying facts of this case. Cosby and Littlefield's attempts to interject conclusory statements and personal opinions into the record without adequate factual basis should not be permitted. "Legal conclusions offered by both lay and expert witnesses are inadmissible." *Brown-Criscuolo v. Wolfe*, 2007 WL 2439421, * 1

(D.Conn. 2007), *citing High v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992).   Conclusory witness testimony is simply "not helpful because it does not allow the court to know what the true facts are because such testimony is composed of legal conclusions rather than factual assertions." *Id.,* *quoting U.S. Small Bus. Admin. V. Citibank*, 1997 WL 45514, *3 (S.D.N.Y. 1997) (internal formatting omitted).   "Portions of an affidavit stating ultimate facts or legal conclusions must … be disregarded." *Id.*

Littlefield consistently "instructs" the Court on what conclusions should be drawn from *The Anna Nicole Show*.  Littlefield writes, "Even more instructive – given Howard's focus in this action on the fact that he is depicted as a having had a sexual encounter with Larry Birkhead – is Howard's casual and consistent portrayal as a cross-dressing man on T*he Anna Nicole Show*." Littlefield Decl. ¶ 20.  He continues, "It is hard to gibe the plaintiff's sense of outrage over *Blonde Ambition*'s depiction of him engaging in a same sex tryst, with his evident willingness to prance about in drag on *The Anna Nicole Show*.  Remember, The Anna Nicole Show was put on the air as a *reality* show."  Littlefield Decl. ¶ 21 (emphasis in original).  Such conclusory and self-serving statements are not admissible, inappropriate for an affidavit, and should not be considered on summary judgment.

Cosby's declaration likewise contains many conclusory statements.  For example, Cosby writes: "Howard's declaration of paternity was met with almost universal surprise and doubt by the public;" "The timing of what some called the "phony" ceremony offended many;" "Yet, the perception that financial deals were at the center of the events continued;" " Since any question as to the will's validity cast doubt on Howard's designation as executor, Howard's posturing and negotiations surrounding DNA testing acquired a new meaning."  Cosby Decl. ¶¶ 20, 22, 32, 33. *See* Exs. A and B.

- 7 -

Cosby and Littlefield's declarations are replete with conclusory statements about public perceptions and what the Court should conclude in reviewing the evidence. The conclusions offered by these witnesses are inadmissible and should be stricken from these declarations. *Brown-Criscuolo*, 2007 WL 2439421 at * 1.

### D.   Littlefield's Statements Concerning His Beliefs On Cosby's State of Mind Are Not Admissible.

Rather than providing facts, Littlefield's affidavit provides statements about his own beliefs about this case – entirely inappropriate for consideration on summary judgment. Statements of belief are not admissible under Rule 56(e) and should not be considered on summary judgment. *King v. Livent, Inc.*, 161 Fed.Appx. 116, *118, 2005 WL 3556425 (2d Cir. 2005); *see also Patterson v. County of Oneid*a, 375 F.3d 206, 219 (2d Cir. 2004).

Littlefield's affidavit simply disregards this rule and instead offers numerous inadmissible statements concerning his own beliefs about Cosby's and even Stern's state of mind. *See* Exs. A and B. For example, Littlefield offers his beliefs about what Stern has said numerous times: "It seems that plaintiff believes that …;" "I am also aware that the plaintiff has argued that…;" "I understand that the plaintiff has challenged…;" "what plaintiff does not understand is that …." Littlefield Decl. ¶¶ 31, 46, 48, 53. Regarding Cosby, Littlefield states, "accuracy and fairness were her two overarching goals;" "Rita's focus on accuracy is readily apparent from a review of …;" "Rita took particular care in …;" "Rita was informed that …;" "Rita also learned that …." Littlefield Decl. ¶¶ 37, 38, 39, 54.

None of these statements meet the requirements of Rule 56(e). Cosby cannot reasonably assert that Littlefield should be allowed to testify about what Cosby did or thought or what Stern thought. Cosby does not – and cannot – explain how Littlefield could have personal knowledge of either Cosby's or Stern's inner thought processes. Littlefield's statements above are merely

allegations of belief and opinion regarding someone else's state of mind, which would never be allowed at trial and thus cannot be considered on summary judgment. *See Bain v. Wal-Mart Stores, Inc.*, 585 F.Supp.2d 449, (W.D.N.Y. 2008) (holding that affidavits "must be based on a personal knowledge from a competent source, and set forth such facts as would be admissible in evidence").

Courts repeatedly recognize the difficulty of allowing affiants to opine about mental states and criticize such attempts. *Joy v. Brown & Williamson Tobacco Corp.*, 1998 WL 35229355, at *3 (M.D. Fla. May 8, 1998) (holding that plaintiff's assertions that the decedent continued to smoke in part because of "her reliance upon the defendants' advertisements would seemingly be either speculation (he assumed her state of mind) or hearsay (she told him of her reliance on advertisements)" and "does not constitute admissible evidence"); *Williams v. Burns*, 540 F. Supp. 1243, 1249 (D. Colo. 1982) (denying summary judgment on a defamation claim and holding that "[w]hen the fact sought to be established by an affidavit in support of a motion for summary judgment involves the state of mind or motive of a person . . . summary judgment is particularly inappropriate and must be denied.") (quotations omitted). Littlefield should not be permitted to inject his own beliefs about what Cosby was thinking into the summary judgment record. Such testimony is improper and these statements should be stricken.

### E.   Cosby and Littlefield's Statements Containing Character Evidence Are Not Admissible.

Cosby and Littlefield offer numerous statements that go to the character of Cosby herself and to the character of Anna Nicole Smith.   Generally speaking, however, "evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." F.R.E. 404(a).

Paragraphs 4-8 of Cosby's Declaration set forth a detailed narrative regarding certain high profile stories Cosby has covered, exclusive interviews she has secured, and awards she has won. As a preliminary matter, this is simply irrelevant to the issues presented on Cosby's motion -- i.e. whether the statements published about Stern were defamatory, and whether Cosby published those statements with actual malice. Accordingly, because this testimony does not have a tendency to make the existence of defamatory meaning or actual malice more or less likely, as required by Federal Rule of Evidence 401, this testimony should be excluded under Federal Rule of Evidence 402.

Moreover, these statements regarding her accomplishments, when coupled with her assertions as to how she develops breaking news (¶ 7), and that she has never been sued for libel (¶ 8), make clear that the purpose of this testimony is to improperly bolster Cosby's credibility by inferring that in publishing *Blonde Ambition*, Cosby acted in conformity with this character evidence. This use of circumstantial character evidence is not allowed under Federal Rule of Evidence 404(a) and should be excluded. *See* F.R.E. 404 Advisory Committee Notes, 1992 Proposed Rules.

Cosby and Littlefield also devote numerous pages to the purported character of Anna Nicole Smith, in an effort to portray her life as one where "anything goes." *See* Exs. A and B. Ms. Smith's life and her character are not at issue in this litigation. What is at issue is whether or not Rita Cosby published *Blonde Ambition* with actual malice. Introducing evidence of Ms. Smith's character to prove that the stories contained in *Blonde Ambition* are consistent with that character is not appropriate or admissible. Since "it is the acts of the defendant [Cosby] that [are] at issue in the case, an extended side-trip into the character of the now-deceased [Ms. Smith] would [be] an irrelevant distraction." *U.S. v. Wright*, 206 F.Supp.2d 609, 614 (D.Del.

2002), aff'd 363 F.3d 237, *cert. filed* 2004 WL 2074402, *post-conviction relief denied in part* 2008 WL 4276206.  The portions of Cosby and Littlefield's declarations containing inadmissible character evidence concerning Ms. Smith should be stricken and not considered on summary judgment.

**F.   Cosby's Statements Relying on Confidential Sources Are Not Admissible.**

Cosby relies on the information obtained from confidential sources to support her allegations in Libelous Statements 3 and 10.  By choosing not to identify her confidential sources, Cosby is precluded from relying on any information from those sources in support of her motion for summary judgment.  In relying on New York's Shield Law which protects reporters from being held in contempt for refusing to divulge the identity of confidential sources, Cosby has simply not provided enough details about these alleged confidential sources to allow said information to be considered on summary judgment.  "By attempting to rely on their confidential sources to prove that they acted without malice, defendants deprive plaintiff access to valuable material evidence that comprises a critical element of plaintiff's cause of action." *Collins v. Troy Publishing Co.*, 213 A.D.2d 879, 881 (3d Dept. 1995).  Cosby and Hachette cannot use "as a sword the information which they are shielding from disclosure." *Id.* (citations omitted).

Redacted

Redacted

Cosby cannot insulate her reliance on sources from further inquiry merely by claiming she has used the source in the past and the information was always reliable. *Id.* Instead, Stern and this Court "must have the right to probe ... whether and to what extent any source [s]he had gave [her] information that supports the statement and whether [s]he had an adequate basis for believing in the reliability of this source or the accuracy of the information." *Id.* at 583. Without disclosing sufficient information to determine the reliability and credibility of these sources, Defendants should be precluded from relying on any information provided from these sources in defense of their claims.

## II.   COSBY AND LITTLEFIELD'S DECLARATIONS CONTAIN INADMISSIBLE CONTRADICTORY STATEMENTS THAT SHOULD NOT BE CONSIDERED ON SUMMARY JUDGMENT.

Significant portions of Cosby and Littlefield's declarations should be stricken because their declarations are directly contradicted by their own deposition testimony. Cosby should not be permitted to rely on allegations in these declarations when Cosby and Littlefield testified at their depositions to the contrary. The Second Circuit has repeatedly stated that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Perkins*, 2005 WL 2453078 at *15; *Buttry v. General Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995); *see also* 11 Moore's Fed. Prac., § 54.14[1][f] (Matthew Bender 3d ed.) ("If a party's deposition and affidavit are in conflict, the affidavit is to be disregarded unless a legitimate reason can be given for the discrepancies."). Cosby and Littlefield's depositions discredit their declarations since they are in significant conflict. Those portions of their declarations and the exhibits attached thereto that conflict with their declarations should be stricken.

Cosby testified for three days in September of 2007, one year after the publication of *Blonde Ambition.* Redacted

Redacted

Redacted

Despite this behavior, Cosby has written an 82 page declaration in which she provides a narrative of Ms. Smith's life and attaches hundreds of pages of news articles she allegedly relied on while writing *Blonde Ambition.* Cosby devotes pages of her deposition to detailing what other news organizations have said about Ms. Smith and generally describing events Cosby alleges to have taken place in Ms. Smith's life. Redacted

Redacted basic details about Ms. Smith, such as when she met J. Howard Marshall, when J. Howard Marshall died, and when Ms. Smith was a Playboy centerfold. Redacted

Redacted

Redacted

Redacted                                                          Now, months after

Cosby's deposition, she claims to remember not only extensive aspects of Ms. Smith's life, but

numerous news reports and interviews that she did not produce or identify prior to her motion for

summary judgment.

Redacted                                                          Redacted

However,

in her declaration, Cosby now specifically references this interview as part of her evidence of

Jackie Hatten's credibility.  Cosby Decl., ¶ 74. Redacted

Redacted                                                          she cannot not rely on it to show

she did not publish *Blonde Ambition* with actual malice and all references to it in her declaration

should be stricken.

Similarly, in *Blonde Ambition* Cosby alleges that Stern was paid $1,000,000 by

*Entertainment Tonight* to film him while he went to the Bahamas after Ms. Smith's death.  *See*

*Blonde Ambition*, p. 28 (Libelous Statement 6). Redacted

Redacted

Redacted                          In her declaration, however, Cosby specifically cites and attaches

news articles regarding this issue.  Cosby Decl., ¶ 106, Exs. 38, 82-84, 98.  Since Cosby could

not recall a single source for this information or a single news organization who "reported" it, Cosby's contradictory statements in her declaration and the related exhibits should be struck.

Littlefield similarly discusses and attaches numerous articles and transcripts in his declaration that directly contradict his deposition testimony. Redacted

Redacted

Redacted                                   Despite this, Littlefield attaches numerous transcripts and articles to his declaration that were not produced as part of his working file and were printed after the publication of *Blonde Ambition*. *See* Littlefield Decl., ¶ 51. Redacted

Redacted

Redacted Littlefield cannot now assert that he was familiar with numerous news articles and transcripts Redacted

Redacted

Accordingly, Cosby and Littlefield's declaration testimony, as detailed above, should be stricken from consideration on summary judgment because it conflicts with their deposition testimony.

## III. THE INTERNET EVIDENCE CANNOT BE CONSIDERED ON SUMMARY JUDGMENT.

In support of Cosby's motion for summary judgment, Cosby, Littlefield, and Cosby's counsel Elizabeth McNamara attach numerous internet printouts of news articles and purported transcripts of television shows (the "Internet Evidence") to their declarations. A majority of these transcripts were not produced to Stern during discovery. This Internet Evidence not only

should have been produced to Stern during discovery, but its usage on summary judgment violates basic principles of admissibility and should not be considered by this Court.

A significant portion of the news articles and transcripts referenced by Cosby, Littlefield, and McNamara and attached to their declarations were printed solely for the purpose of Cosby's motion for summary judgment and are dated well after September 4, 2007, *Blonde Ambition's* publication date. Other exhibits are from Stern's production only. There is simply no evidence in the record that Cosby or Littlefield saw these news articles and transcripts prior to the publication of *Blonde Ambition.* Their deposition testimony, as highlighted above, clearly shows they has no personal knowledge of these exhibits or the information contained therein. Since all the exhibits in Exhibit C to this memorandum are "not based on the affiant's personal knowledge" and are inadmissible, the Court should strike them and not consider them on summary judgment. *Pugliese*, 2008 WL 2882092 at *5.

The Internet Evidence also contains pure hearsay that is inappropriate for consideration on summary judgment. Hearsay is any "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). While hearsay may be admitted at trial if the statement at issue is covered by an exception, (*see* Fed. R. Evid. 802), out-of-court statements that would be inadmissible hearsay at trial are not admissible as substantive evidence in a summary judgment motion. *Molina v. Jiffy Lube Int'l, Inc.,* 2008 WL 4541025, at *1 (S.D. Fla. Oct. 8, 2008). Here, Cosby has cherry-picked highly prejudicial news tidbits to prop up her unsupportable and defamatory statements, and now claims they are relevant to the actual malice inquiry. However, the Internet Evidence is nothing but hearsay statements – unsworn, out-of-court assertions of fact that cannot be observed by a fact finder or cross-examined by Stern. Moreover, Cosby cannot contend that

the Internet Evidence is not being offered for the truth of the matters asserted: Cosby specifically now contends for the first time in her motion papers that everything in *Blonde Ambition* was either previously reported or consistent with previous reports, relying on the inadmissible Internet Evidence as proof.  In other words, Cosby is seeking to rely on these exhibits for the truth, which directly conflicts with federal rules' prohibition against hearsay.  The transcripts and news articles listed in Exhibit C constitute inadmissible hearsay statements and should be stricken from the record.

## CONCLUSION

Cosby moved for summary judgment on the issue of actual malice, but she submitted exhibits that are not appropriate for this Court's consideration. Cosby and Littlefield's declarations are replete with statements not based on personal knowledge, are full of inadmissible evidence in the form of hearsay, conclusions, pure opinion, character evidence, and reliance on confidential sources, and are directly contradictory to their deposition testimony.  In addition, numerous exhibits cited by Cosby, Littlefield, and McNamara are contradicted by deposition testimony and constitute inadmissible hearsay.  For the foregoing reasons, this Court should provide Stern's requested relief by striking:

(i)      Portions of Cosby's declaration [D.E. 82];

(ii)     Portions of Littlefield's declaration [D.E. 71]; and

(iii)    Exhibits cited by Cosby, Littlefield, and McNamara.

Dated: February 11, 2009.

_____

L. Lin Wood (Georgia Bar No. 774588)
lin.wood@bryancave.com
*Appearing pro hac vice*
John C. Patton (Georgia Bar No. 567232)

jay.patton@bryancave.com
*Appearing pro hac vice*
Amy Stewart (Georgia Bar No. 141481)
amy.stewart@bryancave.com
*Appearing pro hac vice*

**BRYAN CAVE LLP**
One Atlantic Center
Fourteenth Floor
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
Tel: (404) 572-6600
Fax: (404) 572-6999

M. Krista Barth (Florida Bar No. 0461229)
*Appearing pro hac vice*

**ERIC M. SAUERBERG, P.A.**
Suite 102
200 Village Square
Palm Beach Gardens, Florida 33410
Tel:     (561) 776-0330
Fax:     (561) 776-0302


William J. Gilberti, Jr. (SDNY Bar Roll No.
        WG0171)
Lisa DiPoala Haber (SDNY Bar Roll No. LH0989)
Belina Anderson (SDNY Bar Roll No. BA5133)

**GILBERTI STINZIANO HEINTZ & SMITH, P.C.**
555 East Genesee Street
Syracuse, New York 13202
Tel: (315) 442-0100
Fax: (315) 442-0106

*Attorneys for Plaintiff*

# EXHIBIT A

## DECLARATION OF RITA COSBY
## SPECIFIC STATEMENTS SUBJECT TO MOTION TO STRIKE

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| 4 | In my years as reporter and host, I secured some of the most sought-after interviews on cable news, including with more than a dozen world leaders.  For example, I have conducted back to back interviews with Yasser Arafat in the West Bank and Prime Minister Ariel Sharon in Israel; interviewed then-Pakistani President Pervez Musharraf related to his country's relationships with Bin Laden and the United States; and spoke to former Yugoslav President Slobodan Milosevic by phone from the Hague. | Character evidence |
| 5 | I have covered stories ranging from feature interviews to in-depth investigations to breaking news.  By way of brief example, I have conducted headline-grabbing interviews with singer Michael Jackson before his child molestation trial, "Son of Sam" serial killer David Berkowitz, who wrote to me during the Washington D.C. sniper shootings in October 2002, and Dr. Jack Kevorkian.  I was the first reporter to see prisoners up close held at Guantanamo Bay where I witnessed an interrogation.  I conducted an exclusive television interview with the Montana Freemen during their 1996 standoff with the FBI.  After months of pursuit, even after all interview requests were denied by Attorney General Ashcroft, I received answers to my questions to Oklahoma City bomber Timothy McVeigh in a 2001 letter explaining why he bombed the Murrah Federal Building, a letter which is now on loan to the Newseum in Washington, D.C. | Character evidence |
| 6 | At Fox News, I was a lead reporter covering the 1996 Presidential campaign, following the candidates from the New Hampshire primary to election eve, and played a major role in Fox's coverage of the 2000 campaign.  With MSNBC, I traveled with law enforcement on patrol at the U.S.-Mexican border for stories about the war on drugs.  I spent over a week in New Orleans and other parts of the Gulf coast covering the aftermath of Hurricanes Katrina and Rita, including | Character evidence |

---

[1] To give the Court the full context of the inadmissible portions of each statement, full paragraphs of Cosby and Littlefield's declarations are included in Exhibits A and B.

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
|  | live coverage of house to house visits with U.S. Marshals looking for fugitives, and search and rescue crews looking for survivors and bodies. |  |
| 7 | Many high-profile stories I have covered involved breaking news that was the result of sometimes months or years of in-depth investigative work.  I was the first to report the names and license plate numbers of the suspects in the Washington, D.C. Sniper shootings in 2002, a "scoop" that began with a tip from a citizen source and was later verified to me by law-enforcement sources.  My coverage of the downing of the Egyptair flight 990 crash off the coast of Nantucket in 1999 included reported breaking details of the investigation into the cause of the crash uncovered from my contacts with law enforcement and NTSB sources.  During coverage of the Monica Lewinsky investigation, I broke the news that a subpoena was imminent for President Clinton to testify before the grand jury – a scoop that, again, resulted from the cultivation of government sources.  In each of these instances, and many others, I developed breaking news through dedicated investigative journalism, by cultivating contacts with law enforcement, government, and other sources, following leads, and putting together the pieces through in-person or, most often, telephone interviews. | Character evidence |
| 8 | In my years as a journalist, I have received a number of awards, including three Emmy Awards, including in 1991 for an investigative report that led to the release of a bail bondsman imprisoned in Mexico, and in 1995 for a series called "Jury Pool" that explored threats of retribution by defendants or exposure by the media for jurors serving on high-profile cases.  I also received the Jack Anderson Award for a career of outstanding journalism and investigative excellence.  Prior to this action, in my almost 20 years of journalism, I have never been sued for libel. | Character evidence |
| 10 | Like much of America, I came to the Anna Nicole Smith story in 2006 with familiarity with her public persona.  I had briefly met Anna only once, at an Oscar party several years ago thrown by a mutual friend, Peter Nygard, with whom Anna had a three-year long relationship.  But it was difficult to escape knowledge of Anna and her public persona.  Anna first became | Character evidence<br><br>Conclusory statements<br><br>Lacks personal knowledge |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
|  | known as the beautiful Amazon that graced the pages and the cover of *Playboy* magazine.  Anna became a household name, however, when in 1994, at the age of 26, she married J. Howard Marshall III, a billionaire Texas oil magnate who was, at the time of their marriage, 89 years old and confined to a wheelchair.  As a result of this marriage, Anna became widely perceived as a "gold digger" and I remember her becoming a regular punch line on talk and comedy shows. | Hearsay |
| 11 | Although in the press Anna often expressed frustration with her depiction as a gold digger, emphatically maintaining that she and Mr. Marshall loved each other, Anna's reputation was reinforced by her ongoing associations with various wealthy men over the years.  I was aware of her relationship with billionaire fashion mogul Peter Nygard, for example, that resulted in modeling jobs and international luxury travel, and her more recent relationship with millionaire real estate developer Ben Thompson that resulted in her being able to gain residency in the Bahamas through a near million-dollar home that, depending on who you ask, was either a gift from Mr. Thompson or purchased by Mr. Thompson for Anna on very lenient mortgage terms.  I was also aware that on her 2002 reality television, show, *The Anna Nicole Show*, she participated in a matchmaking service called "The Millionaire's Club" which sets beautiful women up with extremely wealthy men. Seas. 1, Epis. 12 & 13.  This common perception of Anna as willing to "sell herself" for money or fame was only exacerbated shortly before her death when it was reported that she was in talks to star in a reality dating show in which the winner would get to marry her. | Character evidence  Conclusory statements  Lacks personal knowledge  Hearsay |
| 12 | Close on the heels of her "gold digger image," was the common perception that she had drug or alcohol problems.  It was reported that Anna had gone to rehab in 1995.  More recent, the common take away from her reality show, *The Anna Nicole Show* – with her "hanger- on" Howard K. Stern ("Howard"), described by one reviewer as her "shifty lawyer and self-proclaimed best friend," as her constant colleague – I understood that Anna often appeared to be out-of-it, an affect that was generally attributed in the media to drug | Character evidence  Conclusory statements  Lacks personal knowledge  Hearsay |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | use. In addition, over the years, many of Anna's public appearances resulted in media commentary concerning the fact that she appeared to be "on something," drunk, or both. Most famously, after an odd performance at the 2004 American Music Awards in which Anna introduced one of the winners and with visibly slurred speech asked the audience "Like my body?," the reviews of the show universally asked "what was she taking?" | |
| 13 | Although I had been aware of Anna Nicole Smith for years, I did not begin regular coverage until her daughter was born, the paternity suit heated up in earnest and Anna died on February 8, 2007.  In brief, the timeline of events that are the focus of *Blonde Ambition* is as follows: For years, Howard had been publicly known as Anna's attorney and friend on *The Anna Nicole Show*. In 2005, Anna was living in Los Angeles and dating Larry Birkhead when she met and became involved with a wealthy developer from South Carolina, Ben Thompson.   As a result, she grew close to the Thompson family and ended up spending much of the month of December 2005 with the Thompsons in South Carolina.  After returning to Los Angeles, it was later reported that Anna was pregnant.  Soon after, she seemingly broke up with Larry Birkhead, traveled to South Carolina in May 2006 to again be with the Thompsons, ultimately ended up in the Bahamas with Howard in a house called Horizons that was bought by Ben Thompson.  Then, Anna gave birth to her daughter in September 2006 and her son tragically died three days later.  Larry Birkhead again appeared to proclaim that he is the baby's father.  Soon after, Howard announced on *Larry King Live* that *he* is the father and approximately four months later Anna was found dead at the Hard Rock Hotel in Florida. | Character evidence<br><br>Lacks personal knowledge<br><br>Hearsay |
| 14 | One cannot consider my reporting on Anna's death in a vacuum.  There was wall-to-wall coverage that accompanied these events.  I was but one of hundreds, if not thousands, of reporters covering the death of Anna Nicole Smith.  Much like the O.J. Simpson trial, whether one approves or not, there is no dispute that all events surrounding Anna's death consumed the public and the subject dominated the news for several months in early 2007– particularly on cable television and in | Inadmissible opinion<br><br>Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | the tabloid press. | |
| 15 | As a reporter covering this story – indeed, I was the first reporter to get the official word that Anna Nicole Smith had died – I was avidly following the news coverage and made sure I became familiar with what had been previously reported as well.  With a story that is developing breaking news on a daily, and often hourly basis, I naturally kept abreast of what was being reported by my competitors in the media.  Plus, I was doggedly reporting the story as well. | Conclusory statements<br><br>Lacks          personal knowledge<br><br>Hearsay<br><br>Contradictory testimony |
| 16 | The media "feeding frenzy" that accompanied the aftermath of Anna's death really began with the September 7, 2006 birth of her daughter, Dannielynn Hope Marshall Stern (now Birkhead), and subsequent death, three days later, of her son, Daniel, when he visited his mother in the Bahamian hospital where she was recovering from the delivery | Conclusory statements<br><br>Lacks          personal knowledge<br><br>Hearsay |
| 17 | I will briefly recount the events that occurred over the next several months, but the fuller picture is contained in my Book and the numerous articles and documents that I attached to this declaration. | Conclusory statements<br><br>Lacks          personal knowledge<br><br>Hearsay<br><br>Contradictory testimony |
| 18 | Following Daniel's death, the Bahamian coroner Linda Virgil held a news conference and described the death as "suspicious." It was later reported that the only other people in the hospital room at the time of his death were Anna and Howard.  Ultimately, the celebrity pathologist Dr. Cyril Wecht concluded that Daniel died of a lethal interaction of the drugs Zoloft, Lexapro and Methadone.  Methadone, a Schedule II narcotic often prescribed for heroin withdrawal or long term pain management, was apparently the killer and Daniel did not have a prescription for it.  Notably, it was also reported that the nurses found two pills, including methadone, in the bed Howard slept in and it was later revealed that a prescription for methadone had been written for Anna (in a false name) during her eighth month of pregnancy and was sent to the Bahamas, only weeks before Daniel passed away. | Conclusory statements<br><br>Lacks          personal knowledge<br><br>Hearsay |
| 19 | Although Daniel's death was universally deemed to be a dreadful tragedy, in the weeks following his death, | Conclusory statements |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
|  | Anna and Howard made a series of decisions that I and others believed to call their motives into question. Less than two weeks after Daniel's death – and *before* he was buried – Anna, with Howard acting on her behalf, made a deal to sell the TV rights and last photos of Daniel to *Entertainment Tonight* and *In Touch Weekly* Magazine for a reported total of $600,000. As one publication later reported, "Even before her son Daniel's body was cold, Stern was peddling pictures of Anna and Daniel in her hospital bed, the night before his death." | Lacks personal knowledge<br><br>Hearsay |
| 20 | Then, in a September 26, 2006 appearance on CNN's *Larry King Live*, Howard K. Stern announced to the world that he was the "proud father" of Dannielynn. This event arose only a week after Larry had appeared on MSNBC with me, and only one day after Larry Birkhead had appeared on LKL. When asked by a noticeably surprised Larry King about Larry Birkhead's claim to paternity, while sitting on television, Howard questioned Birkhead's motives, chastising him for going to the media before Daniel "was put to rest." This was the beginning of a dispute that would occupy the public mind for more than the six months. Howard's declaration of paternity was met with almost universal surprise and doubt by the public. In fact, as part of my research for the Book, I learned that Anna and Howard had appeared on *Larry King Live* together in 2004 and insisted that they were not dating. Similarly, in an August 2002 appearance on *On the Record with Greta Van Susteren,* Anna refers to Howard as her "best friend." | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |
| 21 | As I later revealed in *Blonde Ambition,* Larry also asked for recommendations for counsel. I suggested a few names, including Debra Opri, a Los Angeles attorney that I was familiar with. Larry later hired Deb Opri and he filed his California paternity action on October 2, 2006. Later that day, Larry appeared with me live on MSNBC. On this show, as I later recounted in *Blonde* Ambition, I broke the news that Larry's paternity filings would reveal that Anna was taking methadone while pregnant and that Howard was facilitating her prescription drug habit. Further, I revealed that Larry said that Howard was claiming paternity for his own financial gain and that Anna was | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |

| Paragraph No. | Statement at Issue[I] | Reason for Inadmissibility |
|---|---|---|
| | in effect "father shopping" first asking another man – later revealed to be Ben Thompson – to claim that Dannielynn was his baby. I based these revelations on information from Larry Birkhead, publicly available documents and previously published information. Attached as Ex. 19 is a true and correct copy transcript of the Oct. 2, 2006 interview with Larry Birkhead. | |
| 22 | On his September 2006 *Larry King Live* appearance, Howard said that Anna was devastated and in "lock-down mode." Nonetheless, just two days later, and still weeks before Daniel would be buried, Howard and Anna participated in a non-binding "commitment ceremony" in which they exchanged vows and rings with a few friends on board the boat "Margaritaville" off the Bahamian coast. The timing of what some called the "phony" ceremony offended many. Then, despite Howard's attorneys' statement that the event was supposed to be "private", it was revealed soon afterwards that he had negotiated to sell photos of the ceremony through Getty Images to *People* Magazine for what was reported to be $1,000,000. Michael Scott, Anna's lawyer in the Bahamas, later said that he and Anna parted ways around this time as a result of a "financial transaction" which he didn't agree with. | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |
| 23 | Then, as I learned in my reporting and was reported elsewhere, Anna's mother, Virgie Arthur, was devastated to learn of her grandson's death from the media. Days later Anna reached out to her mother in a phone message, slurring her words before the message was abruptly terminated. As I report in *Blonde Ambition*, a week before Daniel's funeral, the estrangement between Anna and her mother became national news when Virgie Arthur went on CNN to plea for her daughter Vickie's life, better known to the world as Anna Nicole Smith, asking her to "be careful about who you hang around with, because you may be next." *Id.* at 105. | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |
| 24 | Following her mother's interview on CNN, it was reported that Anna and Howard entered into an exclusive relationship with *Entertainment Tonight*, said to be worth $1 million, which resulted in a series of interviews. Then, in a November 1, 2006 "world exclusive" interview, Anna appeared to me and many other viewers, to be drugged in some fashion, slurring | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | her words as she blasted her mother, Virgie Arthur, telling her to "bring it on Mom, Mommie Dearest, Bring it on!" *Entertainment Tonight* also aired additional footage from Dannielynn's caesarean birth on November 6, 2006 – footage that ET advertised as "beautiful" and "uncensored", but which many perceived as crass, commercial and "disgusting." | |
| 25 | All of this drama and media coverage paled in comparison to the media storm that began when on February 8, 2007, I was the first to officially reveal that Anna Nicole Smith, at the age of 39, had died in a hotel room in the Hard Rock Hotel in Florida. A true and correct digital copy of my report is attached hereto as Exs. 26 and 27. Coming just a few short months after the death of her young son, the news of Anna Nicole's sudden death at just 39 years of age sent the media into a frenzy from the outset. The two untimely deaths – with the common denominators of drug overdoses and Howard K. Stern – caused endless speculation, charges and counter-charges. | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |
| 26 | Upon Anna's death, I traveled down to the Bahamas and covered the story practically full time through Anna's March 2, 2007 funeral and beyond. During this period, I made two trips to the Bahamas, where I met with some of Anna and Howard's friends, and conducted more on-air interviews. I appeared daily, and sometimes multiple times per day, on MSNBC to report on the latest developments in the case, including trying to nail down the chain of events that occurred on the day that Anna died and the possible causes of her death. | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay<br><br>Contradictory testimony |
| 27 | I also continued to follow the many reports on my competitors, on CNN, FOX, and Court TV, not to mention the network morning shows and newspapers and magazines. I was able to follow much of the coverage personally. There were interviews on CNN and Fox with Anna's friends Jackie Hatten and Ford Shelley, bodyguard Moe Brighthaupt, Larry Birkhead, and private investigator Jack Harding as well as law enforcement and pathology experts that appeared on many of the shows to express their opinions on the cause of Anna's death and the possible connection with Daniel's death. | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay<br><br>Contradictory testimony |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| 28 | With cable television providing hours of daily commentary, reinforced by the print and broadcast media, almost every day provided new revelations and bizarre details about Anna's life.  To cite but a few news breaks that preceded and surrounded the Florida hearing in February concerning where Anna would be buried, I was aware of the following:<br><br>• It was revealed that days before Anna's death, she was seriously sick with a fever approaching 105° but no one surrounding her (including Howard) forced her to go to the hospital.<br>• Reports of Anna's drug abuse were everywhere, with people describing her as a "train wreck" and Howard K. Stern as her "Svengali" "he knew what her demons were ... he was her enabler ... her manipulator...." Attached as Exs. 19, 26 (at RC001899), 30 and 79 are true and correct copies of documents that reflect the material that I reviewed<br>• Her use of methadone during her pregnancy drew particular attention, particularly when an airbill was released that evidenced that it had been prescribed under an alias and sent to the Bahamas a month before she gave birth.  Attached as Ex. 14 is a true and correct copy of an article regarding her methadone use.<br>• Howard's possible role in the deaths of Anna and Daniel quickly surfaced with headlines like "Did Howard Do Her In?" and, when it was reported that a witness was going to testify at Daniel's inquest that Stern gave<br>• Daniel methadone and that the Bahamian Chief Magistrate indicated that they now had a "heightened interest in questioning" Howard, the drumbeat against him escalated.  "I think Howard K. Stern should get a criminal lawyer.  He is the common denominator" Attached as Ex. 27 are true and correct copies of documents or video referenced herein, which I am familiar with; *see also* the Declaration of Elizabeth McNamara ("McN. Decl.") Ex. R.<br>• The implications concerning Howard's involvement further increased when it was | Character evidence<br><br>Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay<br><br>Contradictory testimony |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | revealed that 8 of the 11 drugs in Anna's possession and system were prescribed in the name of Howard K. Stern, not Anna Nicole Smith, including the chloral hydrate which was ultimately attributed as the main cause of her drug overdose death.  Attached as Ex. 28 are true and correct copies of transcripts and reports reflecting this discussion.<br>• Ben Thompson's son-in-law, Ford Shelley, publicly revealed, and confirmed to Bahamian police, that he witnessed Howard finding two pills in Daniel's clothing shortly after his death and the seemingly flushing them down the toilet, to declare "I took care of the problem." (Ex. 29 at RC2808-2717; *see also* HKS2218-2221 (video)). Around the same time, private investigator Jack Harding appeared on numerous shows to report that Daniel had contacted him weeks before his death to have Howard investigated for "feeding my mom drugs...he has total control over her... he's a Svengali." *See*, Exs. 30 (transcript) and 31 (video) related to investigations by Jack Harding, a true and correct copy of which is attached.<br>• Dannielynn's nannies report they are fearful for their lives because they discovered Howard K. Stern wanted to know where they live and that they overheard Anna scream at him after Daniel's death "You did this! You killed him! You caused this!" Attached as Ex. 32 are true and correct copies of the transcripts.<br>• With all these developments, it was reported that "of course, everyone points the finger at Howard Stern" and that "worse than enabling people like lawyer turned companion Howard K. Stern facilitated her untimely demise by ensuring she had all the drugs she needed to die from ... Stern essentially gave Anna the gun she used to kill herself and anyone with misguided sympathy for the wretched man ignores these facts." Attached hereto at Exs. 34 and 84 are true and correct copies of the transcripts. | |
| 29 | Further, within days after Anna's death, Howard sat down in the Bahamas for an exclusive interview with | Conclusory statements |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | *Entertainment Tonight*, that included footage of Howard crying on ET's plane which flew him back to the Bahamas. This footage is attached hereto as Ex. 36. On CNN's *Larry King Live* one commentator suggested that viewers should put themselves in Stern's place: "What if the woman you loved all your life had just died hours ago, why are you on a plane with photographers in the plane with you following every step? Wouldn't you want to grieve? ... Who would bring cameras in? What is the upside of bringing cameras on a plane ... the upside is money, Howard." LKL at Ex. 27 at RC003362. | Lacks personal knowledge<br><br>Hearsay<br><br>Contradictory testimony |
| 30 | As these revelations were reported, the focus of the story turned to a Florida courtroom. Immediately after Anna's death, a dispute arose between Howard and Anna's mother as to where Anna should be buried and a hearing was convened to resolve the issue. In what many thought should have been a one-day hearing, Judge Seidlin held six days of hearings and, as one commentator noted on NBC's Today Show, allowed testimony into "murder, money, drugs and lots of sex." I covered much of the hearing, but not all, reporting on the events for MSNBC from outside of the Florida courthouse. (I also followed the news that came out during the hearing and then, in the course of reporting Blonde Ambition, I obtained a partial transcript of the hearing.) Each day, and often each hour, brought new developments and the public came to know each of the major players, Howard K. Stern, Larry Birkhead and Virgie Arthur. The testimony revealed:<br><br>**(a)      Drugs**<br>• Larry Birkhead provided testimony about Anna's abuse of drugs, his unsuccessful efforts to get her to go to rehab and Howard's defense of Anna and her drug use ("She needed them to live"). McN. Decl. Ex. Q at 17:10-20:20; 23:9-24:6; 42-43; 48-49 [Hrg. Trans. 2/22/07,vol. 1]. In particular, Larry described how Anna was hospitalized during her pregnancy in order to detox. McN. Decl. Ex. Q at 262-64 and 268 [Hrg. Trans. 2/21/07, vol. 2]. Yet, Anna and Howard had brought a duffle bag containing drugs into the hospital and that on "multiple" occasions Anna | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay<br><br>Contradictory testimony |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | took additional drugs (with Howard's help) when the hospital would not give her more. McN. Decl. Ex. Q at 17:10-19:11; 45:14-47:8 [Hrg. Trans. 2/22/07, vol. 1]. He also explained that Anna could not drive, Howard ordered and picked up her drugs for her. *Id.* at 20:12-20.<br><br>• Virgie Arthur testified that Anna was on drugs and Howard kept her and Daniel away from her. McN. Decl. Ex. Q at 48:18-49:3, 55:19-24 [Hrg. Trans. 2/21/07, vol. 2].<br><br>• It was through Ford Shelley that an excerpt of a video of Anna eight months pregnant, shot by Howard, was introduced.  Later called the "clown video" because Anna is seen with a young girl and had clown makeup on, the video depicts Anna in what was commonly understood to be a highly drugged state.  She is so out of it that she does not understand that she is pregnant; the young girl becomes visibly concerned and wants to take Anna to the hospital; meanwhile, Howard appears oblivious, cracking jokes about Anna being on a "mushroom trip" and noting that the video could be "worth money." McN. Decl. Ex. Q at 161:22-162:19 [Hrg. Trans. 2/22/07, vol. 2].  Mr. Shelley testified that the video reveals that his daughter wanted to call him and was prevented by Howard, and that he would "never forgive" Howard for putting his daughter though that experience.  *Id.* at 171:7-10.<br><br>• Howard testified that Anna took methadone, but "not over the last five months" of her pregnancy. McN. Decl. Ex. Q at 201:17-202:2 [Hrg. Trans. 2/21/07, vol. 2].  Howard testified "there are times when she is more impaired than" she appeared in the video shown in court, *id.* at 196:23-197:5, and admitted that Anna's drug use sometimes left her in a haze. *Id.* at 200:15-201:2.  Howard testified that he ordered and picked up prescriptions for Anna. *Id.* at 216:24-217:6.  Howard testified that Anna had previously been to rehab and detox, and that whether Anna needed to go to rehab again was "open to interpretation." *Id.* at 194 [Hrg. Trans. 2/21/07, vol. 2].<br><br>• In the face of this testimony, Judge Seidlin | |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | indicated that Howard was an "enabler" of Anna's drug dependency. McN. Decl. Ex. Q at 11:5-11 [Hrg. Trans. 2/22/07, vol. 2]. | |
| | **(b)**     <u>**Paternity**</u> | |
| | •   Larry testified that Anna told him that he was the biological father of Dannielynn; he lived with Anna from August 2005 [244:16-22] until about May 2006 [269:19-270:21] when Anna left for South Carolina [250:2-6] and then the Bahamas; Howard asked him to deny that he was the father and otherwise interfered [245:5-16] with his relationship with Anna [26:19-27:18]; Howard was described as a "Svengali." McN. Decl. Ex. Q [Hrg. Trans. 2/22/07, vol. 1]. | |
| | •   Howard testified that, notwithstanding his role as her counsel, Anna and he had secretly had a relationship since 2000 and that "I believe that I am the father. And under the laws of the Bahamas, I am the father." McN. Decl. Ex. Q at 164:23-165:11, 168:23-25 Hrg. Trans. 2/20/07, vol. 2]. | |
| | •   Ford Shelley testified that Anna's quick escape to South Carolina in May and surprising subsequent move to the Bahamas was motivated by a desire for a favorable forum for unwed mothers where Larry would "not have any rights to the child." Shelley testified that Howard spoke to Shelley's South Carolina attorney and Bahamian counsel which resulted in the move. McN. Decl. Ex. Q at 165:16-166:23 [Hrg. Trans. 2/22/07, vol. 2]. | |
| | •   Ford Shelley also testified that, even though Anna had told him who the father of Dannielynn was, she had later emailed his father-in-law seeking DNA testing and child support as the father of Dannielynn on Oct. 10 and 11, 2006. Mr. Shelley then explained that his father-in-law had a vasectomy." McN. Decl. Ex. Q at 181:1-13 [Hrg. Trans. 2/22/07, vol. 2.]. | |
| | **(c)**     <u>**Murder**</u> | |
| | •   Virgie Arthur recounted her appearance on CNN in which she pleaded with her daughter to "please be careful" and explained that "I said that on national TV because I knew she was going to be next, my grandson did not overdose. Howard was | |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | there when he died and Howard was there when my daughter died." McN. Decl. Ex. Q at 96:15-97:5 [Hrg. Trans. 2/21/07, vol. 1]. | |
| | **(d)    Money** | |
| | • Much was made of whether the interested parties were profiting from Daniel and Anna's tragic deaths, with Virgie [Hrg. Trans. 2/21/07, vol. 1, 87:19-88:14, 124:25-127:12], Larry [Hrg. Trans. 2/22/07, vol. 1, 30:1-13] and Howard all denying any desire to exploit the deaths.  In particular, after acknowledging that he had no clients other than Anna, had earned virtually no income in recent history and relied entirely on Anna for room and board [Hrg. Trans. 2/20/07, vol. 1, 170:2-171:2], Howard expressly denied receiving since Daniel's death "directly any financial remuneration from any media"; denied that he received "directly or to any third party" any payment for interviews he gave to *Entertainment Tonight*; and denied that he even discussed any remuneration for the use of his interviews.  McN. Decl. Ex. Q at 143:14-151:12 [Hrg. Trans. 2/21/07, vol. 2]. | |
| | • Anna's will was introduced into evidence to support the conclusion that Howard was Anna's personal representative and could presumably dictate where she would be buried. People were shocked to learn that it expressly disinherited any future children, namely Dannielynn, leading Judge Seidlin to question the entire will's validity – including Howard's appointment as executor: "[It's] when – a fish has a little smell, you get rid of the whole fish.  This will is not just to take away a clause.  You got to say, Did she read this will? No woman in America who read this will, sign this will? What state of mind was she in [when she wrote this will]?" McN. Decl. Ex. Q at 199:20-200 [Hrg. Trans. 2/20/07, vol. 2]. | |
| 31 | Ultimately, on February 22, 2007 Judge Seidlin ruled that the decision concerning Anna's burial would be left to Dannielynn's court appointed guardian, Richard Milstein, who decided that Anna would be buried in the Bahamas.  With this decision, the drama moved to the Bahamas. | Conclusory statements<br><br>Lacks personal knowledge |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | | Hearsay |
| 32 | Finally, in the midst of all this drama, Anna's funeral took place on March 2, 2007.  Yet, the perception that financial deals were at the center of the events continued.  *Entertainment Tonight* had "exclusive" video coverage of the funeral, with Splash News also present to take still photographs.  I had been invited to the funeral by Virgie Arthur, and believe that I was the only non-ET, on-air reporter in attendance.  Just following the funeral, I interviewed Larry Birkhead at some length near his Bahamian counsel's office.  I also attended a post-funeral reception as a guest of the host, and spoke to others to get their reactions to the ceremony. | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay<br><br>Contradictory testimony |
| 33 | The doubts as to the validity of the will evidence by Judge Seidlin were echoed by numerous commentators.  Since any question as to the will's validity cast doubt on Howard's designation as executor, Howard's posturing and negotiations surrounding DNA testing acquired new meaning.  Thus, when I learned, and others reported, that Howard was in secret negotiations with Larry Birkhead – his supposed enemy – to resolve the paternity dispute, not surprisingly, a key point of negotiation was Howard's status as the executor.  Further, the news that Howard may concede that Larry is the father in exchange for one of the homes (Bahamas and Los Angeles) and other assets, caused one commentator to observe: "But isn't that kind of sick, that it would be trading bucks for babies, really?"  Another journalist, when interviewing Anna's counsel and Howard's former law partner Ron Rale, asked, "But just why not do the test?... We're at a kidnapping point, maybe.  Maybe it's a kidnapping point." | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay<br><br>Contradictory testimony |
| 34 | Ultimately, closure was reached in early April 2007 when Howard and Larry's public relationship turned by 180 degrees, and they suddenly resolved all differences.  When a Bahamian court ordered Howard to allow the paternity test, Howard announced that he would drop all challenges to custody if it was determined that Larry was the father.  When Larry was then announced to be the father, Howard and Larry held a joint news conference.  Shortly thereafter, the baby's transition from Howard to Larry took place. | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| 35 | All of this reporting, my own and that of my colleagues in the media, was part of my understanding of the story as I was writing *Blonde Ambition*.  Of course, once I decided to do the book, I did significant additional reporting.  But, as a foundation for my book, I had no reason to doubt this widely reported information and no reason not to rely on all the previous reporting concerning these events.  I was not aware of Howard requesting or obtaining any corrections concerning any of these news reports. | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay<br><br>Contradictory testimony |
| 36 | In the late spring of 2007, I learned that Howard had commenced a libel action against John O'Quinn (Virgie Arthur's lawyer) for suggesting that Howard was involved in Anna's death.  The media coverage regarding the suit focused on O'Quinn's publicly voiced opinion that Howard had "murdered" Anna.  Because the gist of the claims in Howard's complaint were reported in the media, I did not obtain or read a copy of the actual complaint.  *See N.Y. Post*, Apr. 14, 2007 ("Stern filed a slander lawsuit [after]. . . O'Quinn suggested Stern "murdered" Anna); *see also* MSNBC, 4/13/07 "*Howard K. Stern Files Slander Lawsuit*," which is attached at Ex. 52, and is consistent with my recollection of the claims. | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay<br><br>Contradictory testimony |
| 40 | Days later, Grand Central verbally accepted the book proposal and Bruce and I started working more than full-time on the project.  Because of the timeliness of the news, it was agreed that the book would be done on a quick schedule.  Thus, they wanted the manuscript delivered just a few months later.  Bruce had worked on several fast turnaround book projects before and believed we could meet the schedule.  Of course, I was used to working on daily deadlines so the schedule did not concern me.  Further, I had already been reporting the story for months and had a wealth of my own reporting as well as the reporting of others, including court records and other documents. | Contradictory testimony |
| 43 | With the bookend chapters describing the events surrounding Anna's death, the rest of the Book briefly fills in the background story of Anna's life, and then explores in detail what happened following Daniel's death – with a focus on the escalating paternity dispute, Anna's financial pressures, and the legal dispute with Ben Thompson over ownership of Horizons in the | Conclusory statements<br><br>Hearsay |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | Bahamas.  Next, the Book relays the events following Anna's death – with the focus on the body custody hearing, Dr. Perper's autopsy report, Anna's funeral, and the resolution of the paternity dispute. | |
| 44 | My reporting for the Book built on the significant reporting that I had already done when I was covering the story for MSNBC.  All told, I interviewed approximately 50 individuals who were involved in Anna's life in some way or could provide insight into some aspect of her story.  When reporting for the Book, I went back to many of the individuals with whom I had spoken to previously, and learned even more.  We gathered certain court transcripts, pleadings and affidavits.  We also read as many articles and viewed as many news programs and interviews – including those with individuals with whom I couldn't reach – as we could.  The reporting that went into *Blonde Ambition* was entirely consistent with the investigative reporting that I had been doing my entire career.  While *Blonde Ambition* breaks news and adds new details to already known events, at bottom, *Blonde Ambition* confirmed the media coverage of these events that had preceded the Book. | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay<br><br>Contradictory testimony |
| 49 | I also spoke with counsel for various parties, including Larry's attorney Deb Opri, Howard's attorneys Krista Barth and Ron Rale, and Virgie Arthur's attorneys John O'Quinn and Debra Rose.  I also spoke with unassociated attorney Milton Evans in the Bahamas for an understanding of how Bahamian law was fairly flexible in establishing a claim of paternity.  It was generally considered impossible to get an interview with Howard following Anna's death.  After his September 2006 *Larry King Live* appearance to suddenly announce paternity, and the widely reported "exclusive" deal he and Anna made with *Entertainment Tonight* was announced, to my knowledge Howard gave no media interviews except to *Entertainment Tonight* and *People Magazine.* | Inadmissible opinion<br><br>Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |
| 50 | Howard's claims in this action focus on certain negative statements and opinions concerning him.  Again, everything said about Howard in *Blonde Ambition* had either been previously reported or was consistent with prior reports and court records.  I spoke with a number of people who were friends of Howard | Conclusory statements<br><br>Lacks personal knowledge |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
|  | or represented Anna and/or Howard.  When a source had a particular bias – as did virtually everyone involved in this saga – I revealed the information that would inform the bias. | Hearsay<br><br>Contradictory testimony |
| 51 | This can be seen, for example, with regard to the issue of whether Howard controlled Anna (or, acted as her "Svengali"), as it was commonly reported.  Numerous sources – also widely reported before my book – claimed that Howard controlled or blocked access to Anna.  Larry Birkhead and Virgie Arthur testified to that effect in the Florida hearing.  Anna's old friend, Jackie Hatten said the same thing, as did Jack Harding in his numerous television appearances before my book.  Yet, in my book, I also quoted sources who took a different view on the topic.  Thus, I made sure to include the contrary observations of King Eric, Brigitte and Mrs. Gibson – all good friends of Howard and Anna's.  King Eric is quoted in the Book as saying that, "Howard Stern doesn't push anything on Anna Trust me, nobody push nothing on Anna.  Whatever she does, she wanna to do it." (Book at 104).  Similarly, Mrs. Gibson observed that "Howard wasn't controlling. I have never seen that of him.  He was the quietest man going." (Book at 104).  I also included Alex Denk's observation that he thought that Howard had always been good to Anna.  (Book at 208). | Conclusory statements<br><br>Lacks          personal knowledge<br><br>Hearsay<br><br>Contradictory testimony |
| 54 | Other considerations did factor into the decision not to try to interview Howard concerning some of the book's new revelations.  It was extremely important to me that the fact that I was writing a book remain confidential (and as a result, I did not tell any of my sources that the project I was working on was a book).  I felt that the confidentiality of the Book and possibly the Book itself would be jeopardized if I reached out to Howard concerning some of the new allegations in the Book.  I was well aware that Moe Brighthaupt, Anna's bodyguard, had signed a book deal, only to see it be cancelled after Howard's attorneys entered the equation.  Further, I was informed that Moe had been threatened by both Howard and Ron Rale, an attorney and long time good friend of Howard's. (*See* Littlefield Decl. ¶¶ 53-56). | Conclusory statements<br><br>Lacks          personal knowledge<br><br>Hearsay |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| 55 | Similarly, I learned that the Nannies believed that Howard had called their home to intimidate them following statements they had made to *Controversy TV*, that Jack Harding had been threatened after a surprise visit by John Nazarian, a private investigator who worked for Howard, and that a similar Nazarian intimidation had been experienced by a member of Deb Opri's staff, Larry Birkhead's attorney.  Consequently, both Bruce Littlefield and I were concerned for our own safety.  *See* Exs. 32-33, *supra*, for a true and correct copy of *Controversy TV* broadcasts and transcripts, including a *Controversy TV* report titled "*Howard K. Stern Exposed*." In fact, after discussing such concerns, we decided not to include Bruce Littlefield or our literary agent, Todd Shuster, in an acknowledgements page of the Book. | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |
| 56 | Finally, given what I understood to be Howard's "exclusive" relationship with *Entertainment Tonight*, coupled with the very hostile reaction I received from Howard's counsel surrounding my presence at Anna's funeral, I was quite confident that Howard would not be willing to speak with me in any event.  As a result, I relied on the many other sources I had, including both friends and antagonists of Howard, as well as my own observations during my coverage, for a complete picture of Howard and his relationship with Anna. | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |
| 61 | In the course of this action, plaintiff has suggested that there is something suspect about conducting interviews over the phone (versus in person) or relying on confidential sources.  I will briefly address both points. | Inadmissible opinion<br><br>Conclusory statements |
| 62 | First, plaintiff's contention regarding phone interviews represents a serious misunderstanding of the way that journalism is practiced.  The vast majority of newsgathering is done over the telephone particularly when the ultimate product is not for television, but for a newspaper, magazine, or book, when a visual is not required and in national news stories, like the death of Anna Nicole Smith, where witnesses and sources are far flung.  This is especially the case for investigative pieces, where the important focus may be less the visage of a particular interviewee, but background information learned from a variety of sources.  I am quite sure that if one were to pick up today's *New York Times*, for example, much of the reporting done for the | Inadmissible opinion<br><br>Conclusory statements<br><br>Lacks personal knowledge |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | stories contained in the paper will have taken place from the reporter's desk at the *Times'* office or foreign bureau. Nor do phone interviews undermine your ability to assess a source's credibility. Sometimes I have met or seen the source interviewed in another context. But even when I have not, credibility is determined by any number of factors – for example, the detail and consistency of reports; how the information gibes with other known information; other information developed by the source – and personally meeting a source is by no means necessary. Moreover, the ability to call a source back to re-confirm details or follow up on new information, is critical to the development of an investigative piece, and rarely, if ever, could be accomplished in person. | |
| 63 | Next, the use of confidential sources is a similar staple of basic journalism, as is readily evident from a review of any daily newspaper or book of investigative journalism. The plaintiff has raised confidential sources as an issue, but what is perhaps most surprising about the statements he challenges in *Blonde Ambition* is that virtually every statement is based on identified sources and previously published information. Very few statements at issue involve confidential sources and none are exclusively based on confidential information. Nonetheless, plaintiff suggests that the fact that a source seeks to remain confidential indicates that the source is not credible and should not have been trusted. This is inconsistent not only with my own experience, but with the history of investigative journalism in this country. In my experience, sources often refuse to provide information without a promise of confidentiality, and if a journalist is unable to provide that promise, his or her ability to gather news is impaired and the media's essential public function is weakened. | Inadmissible opinion<br><br>Conclusory statements<br><br>Lacks personal knowledge<br><br>Confidential sources |
| 64 | Some of the most important news stories of the last few decades – most famously Watergate, and more recently, the NSA wiretapping scandal and abuses at Abu Ghraib – have been the result of information obtained from confidential sources. Confidential sources were an important part of many of the stories I discuss above, including the D.C. Sniper case (which included confidential law enforcement sources), as well | Inadmissible opinion<br><br>Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | as my reporting on the rescue of POW Jessica Lynch and the capture of Saddam Hussein (both of which included information from confidential military sources). | Confidential sources |
| 65 | Perhaps in an ideal world, everyone would be willing to go on the record when giving information to a journalist, but that is simply not reality.  Individuals may seek to maintain their anonymity for a myriad of understandable reasons: they fear retaliation from their business superiors or they are law enforcement or government officers who are forbidden from speaking to the press, or they fear civil reprisal from individuals or the public.  In the case of *Blonde Ambition*, certain sources requested anonymity because they feared retaliation in the way of lawsuits by those related to the Anna Nicole Smith investigation – vividly demonstrated in this action when plaintiff sued my source Mark Speer, only hours before he was supposed to be deposed in this action.  It is, of course, critical that a journalist evaluate each source's motives and potential biases in his or her effort to establish the credibility of a source's information.  That someone has requested confidentiality is merely one piece of the puzzle, and does not, itself, suggest that a source's information is not credible. | Inadmissible opinion

Conclusory statements

Lacks personal knowledge

Hearsay

Confidential sources |
| 66 | In this action, Howard K. Stern has made allegations that a number of statements in *Blonde Ambition* are false and defamatory, or raise a false and defamatory implication.  It is worth noting, however, that there are any number of statements in the book that Howard does *not* challenge.  Often these unchallenged statements reflect consistent information to statements or opinions that are challenged.  Thus, for example, Howard has challenged Jack Harding's much publicized statements concerning Daniel Smith's contention that Howard was "feeding my mom drugs," was "a Svengali" and "kept his mother 'out of it' all the time'." (Cplt. ¶ 310) Yet, he does not challenge numerous other statements in the Book evidencing that Howard supplied or enabled Anna's drug use and sought to control her access to people, including statements from Larry Birkhead, Jackie Hatten, Moe Brighthaupt, Peter Nygard, Ben Thompson, the nannies, and Judge Seidlin. | Inadmissible opinion

Conclusory statements

Lacks personal knowledge

Hearsay |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| 67 | Similarly, in his complaint Howard challenges Mark Speer's depiction of Howard's negotiations with Larry Birkhead (Cplt. ¶ 283) but fails to challenge the numerous other statements in the Book reflecting Howard's negotiations with Larry, including that he looked like a "sneaky bastard" (Book at 208) and that ultimately it was observed that he and Larry "reached a deal...on behalf of the almighty dollar'" (Book at 238). | Inadmissible opinion<br><br>Conclusory statements<br><br>Hearsay |
| 68 | Finally, none of these statements can be considered in a vacuum. Everything I learned in my reporting was filtered through the wealth of information I had concerning Anna and Howard's "outrageous" lives, their public personas, where it was perceived that almost anything can and did happened. In this period of time, I knew Howard had taken a picture moments after Daniel's death in the hospital, showing Anna cradling her dead son on the hospital bed. (I was sent a copy of the photograph, which I attach as Ex. 65.) I also knew that Howard had video showing Anna, then eight months pregnant, so out of it she did not even know she was pregnant that he thought it would be "worth money," and he had participated in and sold pictures of a "commitment" ceremony when Daniel had not even been buried. Given this backdrop, there was not much I did or could learn about Howard that would surprise me. This does not mean, however, that we failed to vet the statements in the Book, whatever plaintiff may contend. I will now address each of the statements at issue in this action and the reporting that went into them. | Inadmissible opinion<br><br>Character evidence<br><br>Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |
| 69 | The statements identified in plaintiff's complaint as Statements 1 and 2 are described as "Criminal Lewd Act and Homosexuality" and "Videotaped Homosexual Act." (Cplt. ¶¶ 92, 119.) Plaintiff references two scenes depicted in *Blonde Ambition* on pages 202-204 describing a tryst between Larry Birkhead and Howard that occurred at a Los Angeles party and a video depicting Howard and Larry having sex that Anna was said to watch. He also challenges a passing reference where Jackie Hatten describes Anna's reaction to the notion that she had a sexual relationship with Howard: "Eeeew! I'd never sleep with Howard, if he's the last person on earth. He's gay." (Book at 67.) Plaintiff contends these passages are defamatory because they | Conclusory statements |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | convey to the reader that "Stern is homosexual and committed a criminal lewd act involving homosexuality" and because it conveys that "Stern engaged in a videotaped homosexual act." (Cplt. ¶¶ 95, 123.) | |
| 70 | I am at a loss to understand how these statements, even if false, would defame Howard. Engaging in a homosexual tryst, even if videotaped, does not reflect poorly on someone and in the 21st Century it most certainly is not a "criminal lewd act." With gay marriage increasingly common and statutory equal rights afforded to gay and lesbian citizens, there is little support for the conclusion that Howard should be held in low esteem because he may be bisexual or, even gay. Further, the plain language of the passage does not support the contention that the "lewd act" occurred, as plaintiff alleges, in a "place where others might be present who would be offended by such conduct." (Cplt. ¶ 95.) The tryst was said to have occurred at a private home in Los Angeles, after all – hardly a location teeming with homophobes. More important, the tryst was *not* depicted as occurring in a public place. Rather, the Book makes clear that Jackie came upon the scene when she went "looking for Anna around the house." The book noted that "Jackie walked down the hallway, peaking into rooms." She came upon Howard and Larry in a "darkened bedroom." (Book at 202.) | Inadmissible opinion<br><br>Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |
| 71 | Further, Anna's described reaction most certainly did not evince outrage or concern: she "laughed and laughed. She thought it was funniest thing ever." (Book at 203.) Indeed, plainly putting the episode in the context it deserved, the Book reports Anna's telling comment to the scene: Howard... you know he's gay, I told you. And if Larry wants to do it, I can't complain because I do, what I do." Anna's sexual escapades with women were openly discussed between she and her friends. "I guess anything goes," Anna had laughed. *Id.* | Inadmissible opinion<br><br>Conclusory statements<br><br>Lacks personal knowledge |
| 72 | Finally, the fact that Howard and Larry videotaped a sexual encounter does not make the acts any more negative. In recent history, numerous stars had sex videotapes leaked to the internet, including Pamela Anderson, Paris Hilton, Rob Lowe and others. A | Inadmissible opinion<br><br>Character evidence |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | possible sex videotape was hardly something that would raise an eyebrow in the milieu of Anna and Howard's life. | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |
| 73 | Even accepting that these two statements could be defamatory, I had no reason to doubt the accuracy of the statements.  In fact, I did not doubt their accuracy and believed (and still believe) both statements to be true.  In the highly-charged sexual world of Anna's "outrageous" life (as sold on *The Anna Nicole Show*) where Howard dressed in drag and the press called his sexuality "ambiguous," I most certainly did not see Howard and Larry having sex as inherently incredible.  Indeed, the report was consistent with prior reports that I had no reason to doubt.  I was aware, for example, that Jackie previously appeared on Fox News and said that Howard was gay.  I never knew Howard to challenge that statement or Fox News to correct it.  Further, there were numerous previously published reports that Larry was gay or bisexual, which was consistent with widespread reporting that Anna was bisexual.  I knew that the National Enquirer had reported that Larry had a relationship with a man, Kerrick Ross, and that Larry had never sued the paper; nor did it issue a retraction. Further, Anna was an icon for the gay community.  More than once she appeared in gay pride marches and I even remember seeing a photograph of Anna with both Howard and Larry at a gay club. | Contradictory testimony |
| 74 | My reporting confirmed these prior reports.  The depiction of the tryst challenged in Statement 1 comes from Jackie Hatten's first hand observation.  Jackie Hatten was an old friend of Anna's and had appeared on numerous television shows expressing her concern for Anna and distrust of Howard.  Despite the Complaint's allegations to the contrary, I had no reason to doubt Ms. Hatten's credibility.  Prior to my conversation with her, I had seen Ms. Hatten appear on numerous news programs on CNN, FOX News, MSNBC, and Court TV, among others.  The journalists with whom she interviewed, included Larry King, Greta Van Susteren, Joe Scarborough, Nancy Grace | Contradictory testimony |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | and others.  All are reputable journalists and many have been colleagues and friends of mine for years.  Ms. Hatten was consistently introduced as Anna's "good friend" for "many, many years" and "Daniel's Godmother" I had, and have, no reason to doubt their conclusions that Jackie Hatten was a longstanding friend of Anna's, as she claimed to be.  I came to this conclusion despite the fact that on one of Ms. Hatten's earliest appearances on CNN's *Larry King Live,* Bonnie Stern, Howard's sister, and Ron Rale, Anna's counsel, also appeared.  Both Ms. Stern and Mr. Rale challenged whether Ms. Hatten remained a good friend of Anna's in the last years of her life.  A transcript of the 2/12/07 LKL appearance is attached as Ex. 27.  Yet, this challenge – no different than plaintiff's allegations in this action – did not subsequently cause any of the numerous journalists and news organizations like CNN, Fox and others to stop relying on Ms. Hatten.  Additional media appearances by Ms. Hatten are reflected in documents at Ex. 69.  Indeed, she again appeared on CNN's *Larry King Live* and was again introduced as Anna's "longstanding friend." A transcript of Jackie Hatten's appearance on *Larry King Live* Feb. 21 is attached hereto as Ex. 68. | |
| 76 | It should not be lost that during these many appearances, Ms. Hatten's allegations were often considerably stronger than describing a one-night gay tryst.  (*See, e.g.,* Jackie's appeared on *John Gibson*, A transcript of Ms. Hatten's Feb. 13, 2007 appearance on *John Gibson*, when she said "In my opinion, it would be murder, premeditated murder for both counts ...." is attached as Ex. 29.  While all this prior reporting informed my analysis, I did not simply rely on the fact that numerous media had previously relied on Jackie Hatten and presumably found her credible.  I began speaking with Jackie Hatten soon after Anna died, and continued speaking with her on numerous occasions when reporting for the Book.  I found her to be consistent and felt that she seemed to genuinely care for Anna.  When she did not know something, she told me so.  Further, I was able to independently confirm a number of pieces of information that Ms. Hatten told me – for example, information about Anna's 1995 stint in rehab – which only gave me greater confidence in | Contradictory testimony |

| Paragraph No. | Statement at Issue[1] | Reason for Inadmissibility |
|---|---|---|
| | her credibility.  With regard to the tryst that she witnessed, she recounted the story on more than one occasion and she was always consistent.  I pressed her for additional details concerning the events and she told me the location and other facts.  Ms. Hatten had been called by Anna to meet her at the home of someone Anna knew in Los Angeles, and, while she could remember the location, she did not know the last name of the owner.  Jackie Hatten had told me this story before I made my deal with Grand Central.  My notes include the information I learned from Jackie Hatten.  *See* Ex. 70. | |
| 81 | Redacted | Contradictory testimony |
| 83 | Redacted<br><br><br><br>independently corroborate certain information she told me (like information she obtained from Mark Speer, discussed below), which added to her credibility.  Also, Redacted          was meticulous in her accuracy and was quick to tell me what she knew and did not know. Her retelling of information was always consistent. Finally, I would often independently confirm what she told me with Redacted which gave me further confidence. | Conclusory statements<br><br>Lacks personal knowledge<br><br>Hearsay |
| 84 | Redacted | Conclusory statements<br><br>Lacks personal knowledge |