UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

HOWARD K. STERN,

                Plaintiff,

    - against -

RITA COSBY and HACHETTE BOOK GROUP
USA, INC., d/b/a Grand Central Publishing, and
JOHN or JANE DOE,

                Defendants.

---------------------------------------------------------------- x

No. 07 Civ. 8536 (DC)

ECF CASE

**ORAL ARGUMENT REQUESTED**

# DEFENDANT RITA COSBY'S REPLY MEMORANDUM OF LAW
# IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**Davis Wright Tremaine LLP**
**1633 Broadway**
**27th Floor**
**New York, NY  10019**
**(212) 489-8230**
**March 13, 2009**
*Attorneys for Defendant Rita Cosby*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ............................................................................................................................. 2

    I.     PLAINTIFF STERN IS LIBEL PROOF AS A MATTER OF LAW .................... 2

    II.    THERE IS NO TRIABLE ISSUE OF ACTUAL MALICE ................................. 3

        A.    Stern Mischaracterizes Cosby's Actions and the Content of the Book ...... 3

        B.    No Clear and Convincing Evidence of Actual Malice on the Remaining Statements at Issue .................................................................. 6

           1.    Statements 1 & 2 ............................................................................ 6

           2.    Statement 3 .................................................................................... 9

           3.    Statements 7 & 8 .......................................................................... 10

           4.    Statement 10 ................................................................................ 11

           5.    Statements 12 & 13 ..................................................................... 11

           6.    Statements 15 & 16 ..................................................................... 12

           7.    Statement 17 ................................................................................ 12

    III.   STATEMENTS IMPUTING HOMOSEXUALITY ARE NOT DEFAMATORY ................................................................................................ 14

    IV.   ANY REMAINING CLAIMS MUST BE DISMISSED UNDER THE INCREMENTAL HARM DOCTRINE .................................................................. 14

    V.    THERE IS NO TRIABLE ISSUE THAT PLAINTIFF CANNOT ESTABLISH PUNITIVE DAMAGES ................................................................ 15

CONCLUSION ........................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Broome v. Biondi*,
  No. 96 Civ. 805, 1997 WL 83295 (S.D.N.Y. Feb. 10, 1997) ..................................................... 3

*Cerasani v. Sony Corp.*,
  991 F. Supp. 343 (S.D.N.Y. 1998) ............................................................................................. 2, 3

*Church of Scientology Int'l. v. Behar*,
  238 F.3d 168 (2d Cir. 2001) ....................................................................................................... 13

*Church of Scientology Int'l. v. Time Warner, Inc.*,
  903 F. Supp. 637 (S.D.N.Y. 1995) ............................................................................................. 6

*Clyburn v. News World Commc'ns, Inc.*,
  903 F.2d 29 (D.C. Cir. 1990) ..................................................................................................... 10

*Cobb v. Time, Inc.*,
  278 F.3d 629 (6th Cir. 2002) ..................................................................................................... 8

*Desnick v. American Broadcasting Cos.*,
  233 F.3d 514 (7th Cir. 2000) ..................................................................................................... 13

*Edwards v. Nat'l Audubon Soc.*,
  556 F.2d 113 (2d Cir. 1977) ...................................................................................................... 13

*Fletcher v. San Jose Mercury News*,
  216 Cal. App. 3d 172 (Ct. App. 1989) ...................................................................................... 4

*Freedom Newspapers of Texas v. Cantu*,
  168 S.W.3d 847 (Tex. 2005) ...................................................................................................... 5

*Gallo v. Alitalia-Linee Aeree Italiane-Societa per Azioni*,
  585 F. Supp. 2d 520 (S.D.N.Y. 2008) ....................................................................................... 14

*Harte-Hanks Commc'ns v. Connaughton*,
  491 U.S. 657 (1989) .................................................................................................................. 9, 13

*Herbert v. Lando*,
  781 F.2d 298 (2d Cir. 1986) ...................................................................................................... 4, 13

*Jackson v. Paramount Pictures Corp.*,
  68 Cal. App. 4th 10 (Ct. App. 1998) ......................................................................................... 6

*Jewell v. NYP Holdings, Inc.*,
  23 F. Supp. 2d 348 (S.D.N.Y. 1998) ......................................................................................... 2, 14, 15

*Jones v. Globe Int'l.*,
   No. 3:94:CV01468, 1995 WL 819177 (D. Conn. Sept. 26, 1995) ............................................3

*Kahn v. New York Times*,
   269 A.D.2d 74 (1st Dep't 2000) ................................................................................................13

*Kelly v. State of New York,*
   131 A.D.2d 176 (3d Dep't 1987) ................................................................................................9

*Levesque v. Doocy*,
   557 F. Supp. 2d 157 (D. Me. 2008) .......................................................................................7, 11

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
   838 F.2d 1287 (D.C. Cir. 1988).................................................................................................. 4

*Lohrenz v. Donnelly*,
   223 F. Supp. 2d 25 (D.D.C. 2002)........................................................................................... 4, 9

*Masson v. New Yorker Magazine, Inc.*,
   501 U.S. 496 (1991).........................................................................................................2, 3, 12

*McFarlane v. Sheridan Square Press, Inc.*,
   91 F.3d 1501 (D.C. Cir. 1996).................................................................................................... 8

*OAO Alfa Bank v. Center for Public Integrity*,
   387 F. Supp. 2d 20 (D.D.C. 2005) .........................................................................................7, 10

*Perk v. Reader's Digest Ass'n, Inc.*,
   931 F.2d 408 (6th Cir. 1991)...................................................................................................... 6

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
   42 N.Y.2d 369 (1977) ..................................................................................................................1

*Rosanova v. Playboy Enters., Inc.*,
   580 F.2d 859 (5th Cir. 1978)...................................................................................................... 4

*Schwartz v. Time, Inc.*,
   71 Misc.2d 769 (Sup. Ct. N.Y. County 1972) ..........................................................................10

*Scotto v. Almenas*,
   143 F. 3d 105 (2d Cir. 1998)...................................................................................................... 8

*Sharon v. Time Inc.*,
   599 F. Supp. 538 (S.D.N.Y. 1984) .........................................................................................9, 10

*Sprewell v. NYP Holdings, Inc.*,
   43 A.D.3d 16 (1st Dep't 2007)..................................................................................................10

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987).....................................................................................................5

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. I ................................................................................................................. 2

**STATUTES AND RULES**

Local Rule 7.1 ..................................................................................................................... 1, 14

Local Rule 56.1 ....................................................................................................................... 1

N.Y. Penal Law § 245.00 ........................................................................................................ 14

Sexual Orientation Non-Discrimination Act, Ch. 2, 2002 N.Y. Laws ........................................ 14

Defendant, by her attorneys, Davis Wright Tremaine LLP, hereby submits this reply memorandum of law in support of her motion for summary judgment.[1]

## PRELIMINARY STATEMENT

Plaintiff Stern's Response to Defendants' Motions for Summary Judgment (hereinafter, "Opp.") significantly narrows the issues that remain on this motion.

*First*, attorney Stern's memorandum of law presents no opposition to Cosby's showing that the two alleged perjury statements are substantially true. As a matter of law, his conclusory denials of those statements   REDACTED   are insufficient to meet his burden on summary judgment and Statements 6 and 11 must be dismissed. Local Rule 7.1(a); *see also Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 382 (1977).

*Second*, Stern does not even attempt to meet his burden of establishing actual malice by clear and convincing evidence as to eight of the nineteen allegedly libelous statements, statements that he alleges depict him as being criminally responsible for Anna Nicole and Daniel Smith's deaths, engaging in a murder conspiracy, drugging Anna Nicole, committing perjury, obstructing justice, and destroying evidence (Statements 4, 5, 6, 9, 11, 14, 18 and 19). Instead, he focuses on those remaining Statements he claims "inflicted the most damage" to his reputation, Opp. at 39, n.13, most particularly the Book's depiction of him as being sexually intimate with Birkhead, or a "sexual deviant". Opp. at 1, 5, 16, 40-52;   REDACTED [2]

To support his claim that the remaining Statements were published with actual malice, Stern resorts to gross misrepresentations of the record, ultimately resting on his contention that a

---

[1] Because Local Rule 56.1 does not require that Cosby respond to Plaintiff's Statement of Material Facts, without waiver or admission, Cosby does not submit a response. Cosby will provide a response if the Court so requests. Cosby notes, however, that the vast majority of "facts" alleged by Plaintiff are immaterial, and to the degree some could be material, the cited evidence does not support the statement or they are disputed for reasons set forth in the Declarations of Rita Cosby and Bruce Littlefield. Indeed, Stern's Rule 56.1 Statement strays far afield from the purpose of Rule 56.1 by "disputing" established facts based on a parsimonious and self-serving representation of the evidence. *See., e.g.,* ¶ 35, disputes that Jack Harding "appeared on numerous television shows stating that Daniel had met with him in August 2006,"   REDACTED   ¶ 48, disputes that "eight of the eleven drugs in Anna's possession or system were prescribed in the name of Howard K. Stern, including the chloral hydrate," despite   REDACTED   and the autopsy report.   REDACTED   Cosby Dec. Ex. 41.

[2] Citations to Stern's deposition refer to pages attached to the Declaration of L. Lin Wood ("Wood Dec."), Ex. 1. Citations to Cosby's depositions refer to pages attached to Wood Dec. Exs. 2 and 3; citations to Martino, Clark, Vicedomine ("Vice"), Speer and Harding depositions refer to pages attached to the Second Declaration of Elizabeth McNamara ("McN. 2d Dec."), Exs 1, 2, 3, 4 and 5, respectively.

handful of Cosby's sources were biased and not credible. But he ignores much of the unrebutted facts, most particularly his own incredible actions, sworn testimony accusing him of various crimes and a wealth of previously published articles that he never challenged, which together painted such a damning portrait of Stern that Cosby had no reason to doubt the accuracy of each Statement. Indeed, Stern sorely misses the point when he argues that Cosby's motion seeks to "vilify[]" Stern, putting forth a "defense by disparagement." Opp. at 2. Rather, these documented events and prior news reports are put forth not to vilify, but to evidence the inherent credibility of the remaining Statements at issue and Cosby's good faith belief in their accuracy. In the end, given his reputation that long preceded *Blonde Ambition*, Stern effectively concedes that he has no damages. This Court's prior observation is equally valid here: claims such as this "'should be dismissed so that the costs of defending against the claim of libel, which can themselves impair vigorous freedom of expression, will be avoided.'" *Cerasani v. Sony Corp.*, 991 F. Supp. 343, 352 (S.D.N.Y. 1998), quoting *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 303 (2d Cir. 1986).

**ARGUMENT**

**I.      PLAINTIFF STERN IS LIBEL PROOF AS A MATTER OF LAW**

Stern's strained argument that the libel proof doctrine is no longer good law fails. To support this position, Stern conflates the libel proof doctrine with the incremental harm doctrine, and then erroneously claims that the Supreme Court held in *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991), that the incremental harm doctrine "is not allowed under federal law." Opp. at 24. Yet, the Court in *Masson* did not reference the libel proof doctrine in any way and instead only found that the incremental harm doctrine is not required by the First Amendment, ultimately leaving it up to each state to determine whether the doctrine is available. 501 U.S. at 523 ("As a question of state law, on the other hand, we are given no indication that California accepts this doctrine, though it remains free to do so."). And the law in New York could not be more clear: the incremental harm doctrine "is available under New York law," *Jewell v. NYP Holdings, Inc.,* 23 F. Supp. 2d 348, 387 (S.D.N.Y. 1998). Moreover, as Stern acknowledges, the libel proof doctrine is properly applied when, as here, "the allegations at issue had been previously widely reported," Opp. at 26, and numerous courts in this Circuit have applied the doctrine since

the ruling in *Masson*. *See Cerasani*, 991 F. Supp. at 354 (plaintiff libel proof on issue of murder even though he had been acquitted of the charge); *Jones v. Globe Int'l.*, No. 3:94:CV01468, 1995 WL 819177, at *10 (D. Conn. Sept. 26, 1995) (plaintiff libel proof where statements, even if untrue, did not "result in further meaningful injury to the plaintiff"); *Broome v. Biondi*, No. 96 Civ. 805, 1997 WL 83295, at *4 (S.D.N.Y. Feb. 10, 1997).

Stern does not dispute, as evidenced by his own Bahamian affidavit, that the widespread previously published reports concerning allegations that he was responsible for Anna and Daniel's deaths, committed perjury, obstructed justice, destroyed evidence and drugged Anna render him libel proof on these topics. Opp. at 26-27; McN. Dec. Ex. R; Cosby Dec. ¶¶ 106-107, 112. Rather, he limits his opposition to those "unbelievable" allegations that he claims had not been published before, like "performing oral sex" on Birkhead. Opp. at 26. Thus, at the very least, the Court should find he is libel proof on the unchallenged Statements. (Statements 4-6, 9, 11, 12, 14-19.)[3]

## II. THERE IS NO TRIABLE ISSUE OF ACTUAL MALICE

### A. Stern Mischaracterizes Cosby's Actions and the Content of the Book

On this motion, there is no dispute as to the critical events surrounding Anna Nicole's tragic death, and the deplorable reputation Stern acquired in the resulting widespread press, all well before the publication of *Blonde Ambition*. *See* Defendant Rita Cosby's Memorandum of Law in Support of Summary Judgment ("Mov. Br.") at 2-9. Nonetheless, Stern would have this Court believe that Cosby somehow cast Stern as the "villain"; that she was so "desperate for attention-grabbing stories" that in writing *Blonde Ambition*, she "disregarded *all* positive information concerning Stern, ignored *all* information that refuted or conflicted with the stories she chose to tell, and specifically sought out biased and unreliable sources whose agenda aligned with her story line." Opp. at 1, 10, 39 (emphasis added). Yet, the unrebutted record belies each of these contentions and the fact that Stern strays so far from the evidence shows how desperate

---

[3] This conclusion is all the more warranted given the Felony Complaint For Arrest Warrant issued against Stern on March 12, 2009 for conspiring to prescribe, administer and dispense controlled substances to Anna. *See* McN. 2d Dec. Ex. 9. Should the Court find that Stern's allegations as to certain statements survive, given the severity of the statements that Stern effectively concedes he is libel proof regarding, any remaining Statements in the action must be dismissed under the incremental harm doctrine. *See infra*, Section IV.

he is to try and create something to support his considerable burden on actual malice.[4]

First, Cosby did not create Stern's reputation, his own actions did. From his own outrageous behavior on the *Anna Nicole Show* to the incredible but undisputed actions taken by him in the months leading up to and following Anna Nicole's death, Stern's actions dictated the commentary that followed. Stern's reputation as the "villain" of the story was sealed long before *Blonde Ambition*. Cosby did not create this picture; she reported on it. And it is those undisputed facts and prior reporting that necessarily informed Cosby's subjective belief in the Statements at issue.[5]

Next, Stern argues that Cosby was "an advocate against Stern,"[6] a position belied by the documented evidence demonstrating that she not only obtained positive statements concerning him but instructed her co-writer to make sure they were included in the Book. Opp. at 7 and 39;

---

[4] Stern's pattern of misrepresenting the record evidence is so consistent that we urge the Court to look carefully at all record cites. *See, e.g.,* below at pages 5, 8, 9, 11, 12 and footnotes 7, 8, 10, 13, 14, 17.

[5] In the context of a well-established public image of "outrageousness" where Anna Nicole perpetuated the view that she, and those surrounding her, lived a life where "anything" could and did happen, where attorney Stern appears on television engaging in public sexual activities while drunk, (Littlefield Dec. Ex. C, Scene 3) where sworn testimony documents his facilitation of Anna's addictions (*see* Cosby Dec. ¶ 30(a)), it was hardly "incredible" to believe that Stern might have a sexual encounter with Birkhead in a darkened room or would "supply Anna with a 'toot' of cocaine." In the context of undisputed report after report documenting Stern's seeming exploitation often for profit of the most dire tragedies – from taking a picture of Daniel while dead, to selling his last photos, to selling photos of their "commitment" ceremony before he's even buried, to granting an "exclusive" interview to ET days after Anna dies, to filming Anna eight months pregnant and apparently drugged because it's all "worth money" –it was hardly "incredible" to believe he would take money from sexually exploiting Anna while she was alive or that he would transfer money out of her accounts. Cosby Dec. ¶¶ 19, 22, 29, 68. In this context, Stern was described as "a master at manipulating the legal system" (Cosby Dec. Ex. 98), a "scum bag" (*id*., Ex. 17), an "enabler" (*id*., Ex. 26) and "drug pusher" (*id*., Ex. 27) and routinely accused of possibly being responsible for "murder" (*id.*, Exs. 23, 38, 48) or "kidnapping" (*id*., Ex. 50). Indeed, Stern's own actions led one commentator to note that "if a rattlesnake wore a suit, it would be Howard K. Stern" (*see id*. Ex. 98). Cosby had every reason to rely on these undisputed events and unchallenged news reports as informing her analysis, particularly since Stern took no action to correct or repudiate them. *See Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988) (good faith reliance on previously published reports in reputable sources precludes a finding of actual malice as a matter of law); *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 862 (5th Cir. 1978). Instead, he makes the conclusory observation that if Cosby "knew that the news reports were false" or had serious doubts about them, such reliance would be unjustified. Opp. at 35. Yet, nowhere does he provide any evidence that Cosby knew or had any serious doubts about the prior reports and testimony.

[6] To seemingly support this conclusion, Stern points to a passing comment in Cosby's affidavit, where she is in fact showing that in the Book she presented both sides concerning Stern's eulogy, her view that it was an "angry tirade" and the view of Stern's then friends. Cosby Dec. ¶ 52, Book at 183-193. Further, even if true, there is nothing wrong with Cosby advocating a view regarding a subject of her Book. *See Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 46 (D.D.C. 2002) ("a media defendant's 'adversarial stance' may be 'fully consistent with professional, investigative reporting' and is not 'indicative of actual malice,'" (quoting *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 601 (D.C. Cir. 1988))), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003); *Fletcher v. San Jose Mercury News*, 216 Cal. App. 3d 172, 185-86 (Ct. App. 1989) (where reporter accused of trying to put words in a witness's mouth, court found the "fact that a reporter is aggressive and abrasive in attempting to ferret out information from reluctant individuals is … no more than evidence of zealous investigative reporting") (internal quotation and citation omitted); *Herbert v. Lando*, 781 F.2d 298, 309 (2d Cir. 1986) (actual malice concerns the defendant's attitude toward the truth, not toward the plaintiff).

Littlefield Dec. ¶¶ 46-47, Exs. O, P and Q; Cosby Dec. ¶¶ 51-53.  And his contention that Cosby ignored "all" positive stories and "all" evidence supporting Stern is refuted by the Book itself, which includes Stern's responses on a number of issues and numerous comments highly favorable to Stern.  *See id;* s*ee also* Book at 7, 10, 25, 28, 35-40, 45, 51, 58, 64-66, 75, 78-79, 81-82, 92, 94-96, 101, 104, 141-151, 188-189, 214, 229-230, 236, 239.  Indeed, despite Stern's observation that Jackie Hatten was one of Cosby's "main sources" (Opp. at 10, 18), the uniformly positive information from Stern's witness Eric Gibson and his family encompasses significantly more pages in the Book than the statements challenged from Hatten.  *Compare*, Book at 31 and 202-204, *with* Book at 16-17, 96-99, 101, 104, 107-109, 111-113, and 114-115.[7]

In the end, Stern's opposition rests on his position that Cosby relied on certain "unreliable and biased" sources.[8]  Yet, Stern ignores the fact that virtually everyone involved in Anna's life had some arguable agenda or bias, including Stern himself.  Further, Anna's world was one of constantly shifting allegiances, where people fluidly moved from friend to foe back to friend and Anna was not always honest about where someone stood at any given time.  Indeed, REDACTED

REDACTED

Thus, Larry Birkhead is now embraced as a trustworthy friend but in the months surrounding Anna's death he was in a pitched battle with Anna and Stern,

---

[7] Equally objectively false is Stern's contention that Cosby "intentionally disregard[ed]" an unidentified "mountain of information" from authorities that no foul play was suspected in the deaths of Daniel and Anna.  Opp. at 7.  First, there was no finding by authorities on Daniel's death before the Book was published.  REDACTED  Then, far from disregarding, the Book expressly includes the authorities' conclusion that Anna's death was accidental (Book at 214 and inside jacket cover), along with 10 full pages documenting Dr. Perper's press conference, including his observation that "no evidence has been revealed to suggest a crime occurred."  *Id.* at 141-151. REDACTED

[8] REDACTED
Spinning a routine event in the television industry (the cancellation of a show), Stern speculates that Cosby was "desperate to save her career" so she chose to "tak[e] advantage of … the death of Anna Nicole," Opp. at 3, 4, 39.  Yet, the evidence is uncontested that Cosby and Littlefield had long planned on writing a book together (Cosby Dec. ¶ 37; Littlefield Dec. ¶ 8) and she did not "take advantage" of Anna's death; it was *the* story at that time.  Likewise, Stern pulls out of thin air his contention that REDACTED  To the contrary, it is unrebutted that Cosby's dogged reporting had uncovered the minute-by-minute timeline of the day Anna died – the uncontested and almost entirely new reporting that constitute the opening and closing chapters of her Book.  *See* Cosby Dec. ¶¶ 39, 41.  Further, the law is clear that "managerial pressure to produce such [sensationalistic] stories cannot, as a matter of law, constitute evidence of actual malice."  *Tavoulareas v. Piro*, 817 F.2d 762, 796 (D.C. Cir. 1987).  *See also Freedom Newspapers of Texas v. Cantu,* 168 S.W.3d 847, 858 (Tex. 2005) ("'[E]vidence of pressure to produce stories from a particular point of view, even when they are hard-hitting or sensationalistic, is no evidence of actual malice.'" (quoting *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 425 (Tex. 2000))).

REDACTED

the oracle of Anna's relationships yet    Similarly, Ray Martino is now held up as REDACTED

Ben Thompson, in contrast, is now characterized as someone upon whom Cosby should not have relied, even though he bought Anna's Bahamas residence as a "gift," and was present for the birth of her daughter – REDACTED

In the context of this cast of personalities and their ever shifting allegiances, Stern improbably contends that Cosby should have segregated out and rejected wholesale information obtained from Jackie Hatten and Virgie Arthur (both widely credited and relied on by mainstream media) and Don Clark and Mark Speer (a 20-year decorated veteran of the FBI and a former LA County deputy sheriff, respectively). Yet, Stern ignores that Cosby tested each source, independently corroborated information, then filtered their information through the broad swath of prior reports and published each of the remaining Statements at issue in a good faith belief of its absolute accuracy. On this record, Stern has not met his daunting burden of establishing clear and convincing admissible evidence of actual malice. *See Perk v. Reader's Digest Ass'n, Inc.,* 931 F.2d 408, 412 (6th Cir. 1991); *Jackson v. Paramount Pictures Corp.*, 68 Cal. App. 4th 10, 32-36 (Ct. App. 1998).[9]

### B. No Clear and Convincing Evidence of Actual Malice on the Remaining Statements at Issue

**1.   Statements 1 & 2.** Stern consistently asks this Court to consider information in isolation and ignore the reams of corroborating information that lent credibility to the Statements

---

[9] With regard to each statement, Stern must independently show by clear and convincing evidence that Cosby knew the statement was false or had serious doubts as to the truth of the statement. *See Church of Scientology Int'l v. Time Warner, Inc.*, 903 F. Supp. 637, 640 (S.D.N.Y. 1995), *aff'd sub nom.*, *Church of Scientology Int'l. v. Behar*, 238 F.3d 168 (2d Cir. 2001).

at issue.  Thus, with regard to Statements 1 and 2, it is unrebutted that in addition to Jackie Hatten's firsthand account and the independently confirming description of the videotape obtained from Don Clark and Wilma Vicedomine, Cosby had no reason to doubt the Statements given her knowledge of Anna's bisexuality and penchant for watching others having sex; Howard's explicit sexual behavior at a party on the *Anna Nicole Show*, where Anna fondles near-naked strippers, while Stern grabs himself and performs a lap dance for the group; evidence substantiating Birkhead's bisexuality, including a previously published unchallenged article; Alex Denk's description of Stern's phone call about Birkhead's affair with a male reporter; and Speer's description of Stern and Birkhead's "familiar embrace."  *See* Cosby Dec. ¶ 73-84; Littlefield Dec. Ex. C, Scene 3.  REDACTED [10]

Stern ignores entirely this context in which the information had to be evaluated and instead focuses exclusively on the alleged bias and credibility of Jackie Hatten, Don Clark and Wilma Vicedomine.  Thus, he claims that Cosby had reason to doubt Hatten because Ray Martino, Larry Birkhead and Eric Gibson all told her Hatten was no longer in Anna's life.  Opp. at 40.[11]  Yet, Cosby was well aware that people slipped in and out of Anna's life, or, REDACTED

Indeed, although supposedly turned away by Anna in the Bahamas, Cosby had it firsthand from Peter Nygard (a reputable business man and long-time friend that she had no reason to doubt) that Anna in fact wanted to see Hatten when she learned of her visit.  Cosby Dec. ¶ 77; Nygard Dec. ¶¶ 14-15.  Finally, Stern disregards evidence

---

[10] Stern's repeated conclusory observation that the tryst was "inherently incredible" is never explained; nor does he buttress this conclusion by falsely implying that the tryst occurred while Birkhead "was in a custody dispute" with Anna.  Opp. at 5, 26, 31, 33.  It is undisputed that the event occurred in 2005, before Anna was pregnant. Opp. at 40.  There was no reason to doubt this behavior.  Indeed, Anna appeared in a pornographic video with another woman in *Anna Nicole Exposed*, REDACTED it was also widely reported that Anna had sex in the pool at the Playboy Mansion shortly after her wedding to Marshall, Book at 132; McN. 2d Dec. Ex. 14 at 81; *see Levesque v. Doocy*, 557 F. Supp. 2d 157, 169 (D. Me. 2008) (no actual malice even though statements "were so absurd that they should have raised the defendants' truth-seeking antennae"); *OAO Alfa Bank v. CPI*, 387 F. Supp. 2d 20, 50-51 (D.D.C. 2005) (no actual malice where "fantastic" allegations reported as fact).

[11] Cosby disputes that Birkhead ever communicated this information (Cosby Dep. at 349), and Gibson did not either; nor was she ever asked if Gibson had during her deposition.  And this is in part borne out by the taped transcript of the Gibson interview which occurred before she spoke with Hatten  REDACTED
REDACTED  Moreover, Gibson and Martino's knowledge could be at most limited since Gibson only met Anna in September 2006, Gibson Dec. ¶ 2, REDACTED
Nonetheless, solely for purposes of summary judgment, Cosby will assume she was so told.

that Cosby investigated Hatten's background and tested her credibility by going over the information

REDACTED

[12] Cosby also knew that Hatten had already publicly indicated that Howard was gay and that <span style="text-align:center">REDACTED</span>

Cosby Dec. ¶ 78.[13]

Stern resorts to similar misrepresentations to construct an argument that Cosby should have doubted Don Clark and Wilma Vicedomine, who independently corroborated the evidence that Stern and Birkhead had a sexual relationship.  Reading Stern's opposition you would have no idea Don Clark had 20 plus years of service with the FBI, including a 1993 stint as the head of terrorism for the FBI's New York Bureau                               REDACTED

Stern would have Cosby simply reject their evidence because they now were associated with Virgie Arthur, who was biased against Stern – a fact that is well documented in the Book.  *See* Book at 42, 105, 201.

Ignoring their credentials which made them inherently credible, Stern instead over and over claims that Cosby "knew" that Clark and Vicedomine were supposedly helping Virgie extract control of the Marshall Litigation.  Opp. at 13, 14, 15, 47.  Yet, if true, the evidence he cites to shows nothing of the kind,                    REDACTED

---

[12]                         REDACTED

[13]                         REDACTED
*See Cobb v. Time, Inc.*, 278 F.3d 629, 635, 638 (6th Cir. 2002) (no actual malice where reporters relied upon a source who "had been consistent regarding the details of the story" even though he was paid for his account, had a criminal background, provided a bizarre story and gave information that was denied by another witness); *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1511-13 (D.C. Cir. 1996). Stern also attempts to imply that Hatten's timing in telling Cosby about the sex tryst was somehow suspicious. Opp. at 45. Yet, this is just the kind of unsupported speculation that is not allowed to rebut summary judgment. *Scotto v. Almenas*, 143 F. 3d 105, 114 (2d Cir. 1998) (the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation"). Nor can Stern's contention that other journalists "treated Hatten with the skepticism and doubt she deserved" (Opp. at 43) withstand scrutiny. While Bonnie Stern and Ron Rale did dispute Hatten on *Larry King Live* on Feb. 12, 2007, Larry King nonetheless brought Hatten back as Anna's "close" or "good" friend without any skepticism. Cosby Dec. Ex. 27. She appeared on numerous other programs as well where she was not met with any doubt including when she was interviewed by Greta van Susteren, who Stern's counsel, Krista Barth, describes as a "well known and respected journalist." Barth Dec. ¶ 28. Why should Cosby not credit her? For compendium of Hatten appearances, *see* McN. 2d Dec. ¶ 15.

REDACTED

[34] Stern's speculative and demonstrably false evidence, even considered in the light most favorable to him, hardly amounts to a purposeful avoidance of the truth.  *See* Mov. Br., V.D.2; *Lohrenz*, 223 F. Supp. 2d at 50-51 (distinguishing *Harte-Hanks Commc'ns v. Connaughton,* 491 U.S. 657 (1989)).

2.  **Statement 3.**  Cosby has outlined in detail the pervasive news reports and testimony establishing Stern's facilitation of Anna's addictions that made it entirely credible that Stern and Anna previously "partied in their room" at the Hard Rock Hotel with what hotel workers "believe was cocaine" or that Stern gave Anna "methadone and cocaine" while she was pregnant.  Cosby Dec. ¶¶ 89-96, 30(a).  Stern does not rebut any of this evidence and REDACTED REDACTED  Instead, Stern belatedly claims that Cosby cannot rely on her two confidential sources for the specifics of these Statements – sources she tested and found credible.  Opp. at 52-53.  Yet, the law could not be more clear that Stern waived any such argument:  having chosen not to file a motion to compel the identity of the confidential sources or preclude their testimony, he is foreclosed from seeking the preclusion of the evidence on

---

[14] Stern also spins a series of speculative theories REDACTED

Stern also huffs that Cosby never asked "anyone" in the Bahamas "a single question about the nannies," Opp. at 49, when the Book expressly reveals that Cosby not only asked Stern's Bahamian counsel about the nannies, but also published his response denouncing them.  Book at 78-79. REDACTED Likewise, in an attempt to discredit them as a source, Stern states that the nannies "spoke very limited English," but one need only watch the video clips to realize their English is easily understandable.  *See* Cosby Dec. Exs. 36, 48. Stern contends without citation that Cosby "scrupulously avoided" speaking to the nannies before the Book was published.  Opp. at 51.  Yet, again, the unrebutted evidence is to the contrary. REDACTED  Nor is there any support in the record – and Stern points to none – for his statement that Cosby went to the Bahamas after publication to validate her account. REDACTED  Stern has cited no case law where post publication evidence was used to support a finding that a reporter had serious doubts as to the accuracy of information at the time of publication.  Instead, he cites *Kelly v. State of New York,* 131 A.D.2d 176, 180 (3d Dep't 1987) (a non-media case where post-publication actions showed continued animus against plaintiff, but not used as evidence of knowledge as to falsity) and *Sharon v. Time Inc.*, 599 F. Supp. 538, 581 (S.D.N.Y. 1984) (where post-publication evidence was used to support a finding as to how Time interpreted the meaning of the paragraph at issue, not on the issue of knowledge of falsity).  Rather, the law is clear that events occurring after publication do not inform the reporter's subjective state of mind at the time of publication.  *See* Mov. Br. at 47-48.

summary judgment. "The Court does not see the wisdom in allowing plaintiffs to lie in the weeds until a motion for summary judgment is filed, and then spring the issue at summary judgment, denying defendants any right to use the evidence at all." *OAO Alfa Bank*, 387 F. Supp. 2d at 52 n.53, 53 (granting summary judgment where journalist relied upon two confidential sources); *see also Clyburn v. News World Commc'ns, Inc.,* 903 F.2d 29, 35 (D.C. Cir. 1990) (allowing defendant to rely on five confidential sources where plaintiff did not appeal district court's denial of motion to compel the source's identity). Having failed to move to compel Cosby to disclose her sources, Stern cannot object to Cosby's reliance upon them now.[15]

   3.   **Statements 7 & 8.**  Stern does not rebut any of the evidence Cosby relied on that lent credibility to these Statements, including two independent sources that the media routinely relied on and the previously published reports and widely held view that Anna was a "gold-digger" and that Stern treated her as his "cash cow". Cosby Dec. ¶¶ 117-122; Littlefield Dec. ¶¶ 12, 23. Instead, he argues the Statements were inherently incredible, yet he does not deny any of the other events in Anna's life that would otherwise be considered "incredible", but for the fact that they are established to be true, some via graphic video. *See*, *supra*, n. 5,10. Thus, in the context of the established facts surrounding the world of Stern and Anna, there was no reason to view the Statements as inherently incredible. Instead,             REDACTED

Mov. Br. at 44-46. On these undisputed facts, Stern does not meet his burden of showing clear and convincing evidence of actual malice.[16]

---

[15] Nor does Stern distinguish in any way the cases establishing that summary judgment is routinely granted notwithstanding the use of confidential sources. Mov. Br. at 44, n.33. *See also Sprewell v. NYP Holdings, Inc.*, 43 A.D.3d 16, 21-22 (1st Dep't 2007) (reversing motion to preclude use of confidential source information and granting summary judgment where article relied on two confidential sources); *Schwartz v. Time, Inc.*, 71 Misc.2d 769 (Sup. Ct. N.Y. County 1972). Indeed, the Court in *Sharon v. Time*, 599 F. Supp. at 583, upon which Stern relies heavily, found that "a reporter's reliance on the shield law should not necessarily prevent a court from granting summary judgment in his … favor," particularly when, as here, the reporter provides notes for the interviews and explains why she found the information credible. Cosby Dec. ¶¶ 94-95. And his argument that Cosby should have checked with the Gibsons to see if the employee confidante "existed," Opp. at 52, is nonsensical. She interviewed him on videotape. Why would she need to confirm that he existed?
[16] Nor does he meet his burden by suggesting that Cosby      REDACTED      or others about these statements or should have consulted Anna's reality show to discern the layout of her house. Opp. at 56. The law could not be

4.     **Statement 10.**  Stern's opposition concerning Statement 10 now only focuses on the report that he was funneling money to his parents and that Tas Brighthaupt saw a $37,000 wire transfer on Stern's computer the day Anna died.  Opp. at 57-61; Book at 165, 233-34.  Yet, again, he does not rebut the fundamental facts demonstrating Cosby's good faith belief in these statements, most particularly that this information was obtained from independent sources that necessarily corroborate each other.  *See* Cosby Dec. ¶¶ 132-141.  Instead, Stern once again resorts to misrepresenting the evidence and this time labeling a former LA County deputy sheriff, Mark Speer, "biased and delusional," even though the undisputed record establishes Cosby thoroughly vetted him.  Opp. at 58; Cosby Dec. ¶¶ 132-141 .  There is no evidence that Cosby concluded that Speer was "delusional" nor any reason she should.[17]  And Speer's bias, if any, was against Larry Birkhead, not Stern.  *See* Opp. at 57.  Speer's information, which Cosby confirmed was also independently told to Vicedomine, was credible, reliable and consistent with everything she knew.

Far from incredible, information received from Clark and Vicedomine – sources she trusted implicitly – regarding the $37,000 wire transfer was consistent with and corroborating of Speer's information.  Nor did she learn anything from law enforcement to undermine this statement, as Stern strains to suggest.  Opp. at 60.     REDACTED

– all published in the Book.  Book at 19-27, 222-225, 234; McN. 2d Dec. Ex. 12.

5.     **Statements 12 & 13.**  Cosby established that (a) Speer's opinion that Stern's actions in refusing to submit to DNA testing amounted to "kidnapping," was consistent with numerous reports that also called his actions "child stealing" or "holding the baby hostage" and (b) Arthur's description of Birkhead's concern that Stern was threatening to reveal that he

---

more clear that if a journalist does not doubt the information she has – even if "surprising and over-the-top" – she has no duty to engage in further investigation.  *Levesque,* 557 F. Supp. 2d at 170-171.

[17] That Speer suggested that Stern and Birkhead were in cahoots is hardly evidence of "delusion" when it was widely reported that they were in a deal concerning paternity and Anna's estate.  *See* Cosby Dec. ¶¶ 144-150.  Also,
REDACTED

Opp. at 57-58.     REDACTED

was "dating men" was consistent with a call Alex Denk received from Stern about knowing Birkhead was dating a male reporter, but keeping the information quiet. Cosby Dec. ¶¶ 144-150; Littlefield Dec. ¶ 51. Stern does not rebut any of this information. Instead, he resorts to quibbling semantics; thus, REDACTED

[38] Such quibbles in testimony that do not change the gist or sting of the statement do not support the finding of actual malice. *Masson,* 501 U.S. at 497, 517.

6. **Statements 15 & 16.** Stern provides no authority to rebut the clear law that when a speaker speculates about future events, the statements are not actionable as pure opinion. Mov. Br. at 34, n.29. Nor does he provide any basis for why Cosby could not re-report Hatten's and Arthur's widely reported predictions regarding Anna's possible death – indeed, Arthur even testified to her concern. Cosby Dec. ¶ 154.[19] Stern's only argument is that Cosby must have known these opinions to be false because of the Medical Examiner Perper's report. Yet, again, he blatantly ignores the fact that Cosby reported the Medical Examiner's conclusion in the Book, and almost in full reports the Medical Examiner's press conference. Book at 141-151. Thus, the previously reported statements by Arthur, Hatten, and the Medical Examiner are put in full and proper context.[20]

7. **Statement 17.** Stern does not dispute that questions regarding the timing of when Anna's will was faxed to him arose during the Florida hearing, that these concerns were widely reported and that the media generally found the fax line to be suspicious. Cosby Dec. ¶

---

[18] The fact that Arthur was in conflict with Stern is made clear in the Book. Book at 42, 105, 201. Further, Stern's use of an excerpt from an otherwise confidential deposition that Cosby does not have access to in order to evaluate the context in which this testimony appears is improper.

[19] Moreover, in the context of the Book, it is clear that Cosby is providing the history of the events in the last months of Anna's life, and that Virgie's statements on CNN was a significant event at the time, one that caused Anna to appear on ET and challenge Virgie to "bring it on." Cosby's republication of reports that she did not believe to be false are not actionable as a matter of law. *See supra*, n. 5.

[20] He also ignores the fact that notwithstanding Perper's conclusions, it was still widely reported that Stern bore some responsibility for Anna and Daniel's deaths. Cosby Dec. Exs. 34, 78, 84, 98.

156.  Further, there is no dispute that Krista Barth denied in court that she received the will before Anna's death and explained that there was an error with the fax machine. All this was reported in the Book. *See* Book at 170-172. In his Opposition, Stern first glosses over the fact that Barth never put into evidence in the Florida hearing any proof that the fax line was an error, and so there was no additional evidence establishing when the fax was received.[21] Next, he gives great weight to the fact that Cosby did not obtain a copy of the O'Quinn complaint, in which Stern challenges a similar statement by O'Quinn. Opp. at 1, 68. Yet, he never explains how reviewing the O'Quinn complaint would have established that the reported information was in fact false. To the contrary, the complaint does nothing more than include a conclusory denial that the will was faxed before Anna's death, no attached fax logs or other evidence. McN. Dec. Ex. T. Knowledge of a denial – which are "commonplace in the world of polemical charge" – does not support a finding of actual malice. *Edwards v. Nat'l Audubon Soc.*, 556 F.2d 113, 121 (2d Cir. 1977). A failure to review a complaint or other evidence can *only* evince an avoidance of the truth when unlike here, it can be shown that the evidence would have established the falsity of the information. Notably, Stern does not distinguish *Desnick v. American Broadcasting Cos.*, 233 F.3d 514, 520 (7th Cir. 2000) (reporter's failure to examine court record of similar allegations not actual malice since record would not have alerted the reporter to any actual falsity); *compare*, *Harte-Hanks*, 491 U.S. at 690-91 (if reviewed audiotape, falsity would be established), *supra* at II.B.1.

Even if this somehow could support a finding of actual malice – which it does not – Statement 17 is still not actionable under the subsidiary meaning doctrine established in this Circuit in *Herbert*, 781 F.2d at 298, and affirmed in *Church of Scientology Int'l. v. Behar*, 238 F.3d 168 (2d Cir. 2001). The Court in *Behar* explained that when a "'published view' of a plaintiff is not actionable as libel, other statements made in the same publication are not 'actionable if they merely imply the same view, and are simply an outgrowth of and subsidiary to those claims upon which it has been held that there can be no recovery.'" *Behar*, 238 F.3d at 175, quoting *Herbert*, 781 F.2d

---

[21] Cosby's misinterpretation of Barth's statement – testimony that she indisputably did not have a copy of, Cosby Dec. ¶ 156 n.49 – is at most a mistake in "comprehending" which is not indicative of actual malice. *Kahn v. New York Times*, 269 A.D.2d 74 (1st Dep't 2000).

at 312.  Here, Stern has not produced evidence to survive summary judgment as to the three other challenged statements that he contends suggest that he was responsible for Anna's death, Statement 15, 16 and 19 and those statements must be dismissed.  See, *supra* at II.B.6, and Opp. at 39, n.13.[22]  Since Statement 17 is alleged to have the same meaning, Cplt. ¶ 341, under the subsidiary meaning doctrine, it has to be dismissed as well.

### III. STATEMENTS IMPUTING HOMOSEXUALITY ARE NOT DEFAMATORY

On this motion, Cosby established that given changing social mores, this Court should join other state and federal courts around the country in the last two decades that have overruled precedent that held that an imputation of homosexuality was defamatory per se.  There is ample room in New York's law to find the same here and Statements 1 and 2 should be dismissed.  *See* Sexual Orientation Non-Discrimination Act, Ch. 2, 2002 N.Y. Laws (codifying the policy that gays and lesbians are to be treated no differently than anyone else).[23]

### IV. ANY REMAINING CLAIMS MUST BE DISMISSED UNDER THE INCREMENTAL HARM DOCTRINE

Given Stern's failure to argue or present admissible evidence to support a finding of actual malice on the most serious of the alleged statements, compounded by the evidence that he has perjured himself in the past, this is a case where any statement that might remain in the action because arguably there is a question of fact on actual malice should nonetheless be dismissed under the incremental harm doctrine.  "[T]he incremental harm doctrine compares the harm caused by non-actionable elements of an article to the harm caused by the actionable portions and dismisses the latter when the difference in harm is 'incremental.'"  *Jewell*, 23 F. Supp. 2d at 388.[24]  New York recognizes the incremental harm doctrine, *supra* at I., and it does so in part because "New

---

[22] As for Statement 19, Stern's complaint does not even allege any falsity and, not surprisingly, he does not press any argument on this Statement in his Opposition brief.  Cplt. ¶¶ 364-370; Local Rule 7.1.

[23] Plaintiff relies heavily on *Gallo v. Alitalia-Linee Aeree Italiane-Societa per Azioni*, 585 F. Supp. 2d 520, 549 (S.D.N.Y. 2008), where the Court found an imputation of homosexuality could be found offensive "when directed to a man married to a woman," which is not the circumstance here.  Further, Stern's arguments that the statements are defamatory apart from imputations of homosexuality utterly fail (engaging in sex in a "darkened bedroom" in a private home does not violate any "public lewdness" criminal statutes.  *See, e.g.*, N.Y. Penal Law § 245.00.  *See* Mov. Br. 19, n.16); nor is there any distinction between the culture of New York City and Hollywood or any taboo associated with sex videos.

[24] The doctrine is distinguished from the libel proof doctrine, where a reputation has already been so damaged that further falsehoods do not cause additional damage; here, "a plaintiff is harmed, but the question is whether the ability to recover for that harm, when it is incremental to non-actionable harm, is justified." *Jewell*, 23 F. Supp. 2d at 394.

York has consistently chosen to provide libel defendants with greater protection than that afforded by federal law." *Jewell*, 23 F. Supp. 2d at 391.

Here, Stern does not contest the most damning of Statements in this action, and Cosby submits that he has not met his burden on actual malice concerning the remaining Statements. Yet, should this Court find otherwise, any remaining Statement could only cause a harm that is *at most* incremental. It is at most an incremental harm if Stern is now believed to have engaged in homosexual activities, or encouraged Anna to engage in sex for money, or negotiated a deal with Larry Birkhead, in comparison to the non-actionable harm (like murder, perjury, destruction of evidence). Thus, for this independent reason, the action should be dismissed.

## V. THERE IS NO TRIABLE ISSUE THAT PLAINTIFF CANNOT ESTABLISH PUNITIVE DAMAGES

In his Opposition, Stern makes only a cursory effort to rebut Cosby's showing that there is no genuine issue of material fact that Cosby lacked the hatred, ill will or spite towards Stern that could support a finding of common-law malice and punitive damages. Stern's Opposition fails to address the fact that the Complaint does not allege that Cosby acted with common law malice. (Cplt. ¶ 396.) Nor does Stern address the fact that the uncontested record shows that Cosby not only solicited but published positive comments concerning Stern. *See, supra*, at 4-5. There is simply no basis for a finding of punitive damages.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment in favor of Cosby and dismiss the complaint with prejudice.

Dated: March 13, 2009
New York, New York

DAVIS WRIGHT TREMAINE LLP

By: _____
Elizabeth A. McNamara

1633 Broadway
New York, New York 10019
(212) 489-8230
lizmcnamara@dwt.com
*Attorneys for Defendant Rita Cosby*