UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

| | |
|---|---|
| HOWARD K. STERN, | : |
| Plaintiff, | : No. 07 Civ. 8536 (DC) |
| | : |
| - against - | : **ECF CASE** |
| | : |
| RITA COSBY and HACHETTE BOOK GROUP USA, INC., d/b/a Grand Central Publishing, and JOHN or JANE DOE, | : |
| | : |
| Defendants. | : |

------------------------------------------------------------ x

# DEFENDANT RITA COSBY'S SUPPLEMENTAL MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**Davis Wright Tremaine LLP**
**1633 Broadway**
**27th Floor**
**New York, NY  10019**
**(212) 489-8230**
**April 6, 2009**
*Attorneys for Defendant Rita Cosby*

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 2

      A.      Felony Complaint for Arrest Warrant.............................................................. 2

      B.      National Media's Reaction to the Criminal Charges
              Against Stern.................................................................................................. 4

ARGUMENT ..................................................................................................................... 7

I.      The Criminal Charges Against Stern Reaffirm and Compound His
        Already Tattered Reputation and Render Him Libel Proof ....................................... 7

CONCLUSION................................................................................................................ 12

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Buckley v. Littell*,
  539 F.2d 882 (2d Cir. 1976) ................................................................................................9

*Cardillo v. Doubleday & Co., Inc.*,
  518 F.2d 638 (2d Cir. 1975) ................................................................................................1

*Cerasani v. Sony Corp.*,
  991 F. Supp. 343 (S.D.N.Y. 1998) ...........................................................................2, 3, 8, 9

*Goldwater v. Ginzburg,*
  414 F.2d 324 (2d Cir. 1969) ................................................................................................9

*Guccione v. Hustler Magazine, Inc.*,
  800 F.2d 298 (2d Cir. 1986) .........................................................................................1, 3, 9

*Jewell v. NYP Holdings, Inc.*,
  23 F. Supp. 2d 348 (S.D.N.Y. 1998) ..............................................................................1, 11

*Jones v. Globe Int'l Inc.*,
  No. 3:94:CV01468, 1995 WL 819177 (D. Conn. Sept. 26, 1995) ....................................11

*Liberty Lobby, Inc. v. Anderson*,
  746 F.2d 1563 (D.C. Cir. 1984), *overruled on other grounds*, 477 U.S. 242 (1986) ................9

*Marcone v. Penthouse Int'l Magazine For Men*,
  754 F.2d 1072 (3d Cir. 1985) ..............................................................................................3

*Sharon v. Time, Inc.*,
  575 F. Supp. 1162 (S.D.N.Y. 1983) ...............................................................................8, 10

*Sharon v. Time, Inc.,*
  599 F. Supp. 538 (S.D.N.Y. 1984) ......................................................................................9

*Wynberg v. National Enquirer, Inc.*,
  564 F. Supp. 924 (C.D. Cal. 1982) ......................................................................................8

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. I ...............................................................................................................1, 8

Defendant Rita Cosby ("Cosby"), by her attorneys, Davis Wright Tremaine LLP, hereby submits this supplemental briefing in support of her motion for summary judgment, pursuant to the Court's March 26, 2009 Order.

## PRELIMINARY STATEMENT

Cosby's motion for summary judgment established that well before the publication of *Blonde Ambition*, plaintiff Howard K. Stern's ("Stern") reputation was so severely damaged that one "cannot envisage any jury awarding, or court sustaining, an award under any circumstances for more than a few cents' damages, even if [plaintiff] were to prevail on the difficult legal issues with which he would be faced." *Cardillo v. Doubleday & Co., Inc.*, 518 F.2d 638, 640 (2d Cir. 1975). Indeed, from his outrageous behavior on *The Anna Nicole Show* to the incredible but undisputed actions taken by him in the months leading up to and following Anna Nicole Smith's ("Anna") death, Stern generated an onslaught of media reports and public testimony regarding his role in Anna's demise, and that of her son, Daniel, as well as numerous other equally serious charges. As a result, Stern's reputation was well beyond repair before *Blonde Ambition* was published.

The six count felony complaint filed by the State of California against Stern on March 12, 2009 causes yet further and irreversible damage to Stern's already tarnished reputation and reinforces the conclusion that he is libel proof concerning the Statements at issue in this action. At bottom, both the libel proof and incremental harm doctrines are based on a damage analysis that weighs the possible benefit to a plaintiff to proceed with a trial when damages are likely to be nominal, at most, against the harm to a defendant and society to incur the costs associated with such a trial, particularly in light of First Amendment concerns. *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 303 (2d Cir. 1986); *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 392-395 (S.D.N.Y. 1998). Unlike the actual malice analysis that involves a snapshot in time and considers only the defendant's state of mind and knowledge at the time of publication, a plaintiff's reputation and its impact on any possible damages continues and evolves well after publication. Thus, post-publication events, like the felony complaint filed against Stern, are highly relevant to the analysis

of whether any jury could possibly award the plaintiff anything but nominal damages, even assuming (which Cosby disputes) Stern could overcome the significant independent bases for dismissal of this action. *Cerasani v. Sony Corp.*, 991 F. Supp. 343, 354 (S.D.N.Y. 1998).

The felony charges leveled against Stern are particularly relevant because they arise out of the very same events and involve some of the precise same allegations at issue in this action, including Stern's facilitation of Anna Nicole Smith's drug addictions and his possible responsibility for her death. Indeed, in light of the criminal charges, the media is now revisiting the exact same interviews, testimony and events – including what is described as the "devastating" clown video – that informed Cosby's belief in the Statements at issue and contributed to the destruction of Stern's reputation. As a result, in light of all that preceded *Blonde Ambition* and all that has been reinforced because of the criminal charges, the Statements at issue in this action could only cause Stern minimal harm, if any harm at all. In these circumstances, the law is clear that Stern's libel claim should be dismissed to avoid the costs associated with yet further litigation where the harm suffered is so minimal, and the cost to freedom of expression is so high.

## STATEMENT OF FACTS

### A. Felony Complaint for Arrest Warrant

On March 12, 2009, the State of California in the County of Los Angeles filed a Felony Complaint for Arrest Warrant against Stern for a total of six counts, including for conspiracy to prescribe, administer and dispense controlled substances to an addict; conspiracy to obtain a controlled substance by fraud, deceit or misrepresentation; conspiracy to repeatedly and excessively prescribe, furnish, dispense and administer drugs to Anna Nicole Smith; and unlawfully prescribing controlled substances of methadone, Ambien, hydromorphone, Dilauded, clonazepam, and Xanax. *See* McN. 2d Decl. Ex. 9. The Complaint alleges that Stern conspired with two of Anna Nicole Smith's doctors, Sandeep Kapoor and Khristine Eroshevich, between June 5, 2004 and January 26, 2007, just weeks before Anna's death. *Id*. Among the 95 overt acts alleged against the defendants in the Complaint are allegations that Stern directed Dr. Eroshevich "to bring excessive quantities of controlled substances to the Bahamas for Anna

Nicole Smith," and that he "dispensed excessive quantities of controlled substances to Anna Nicole Smith," while acting with the knowledge that she was an addict. *See id.*, Overt Acts 17, 18 and 20 for Count 1; Overt Act 6 for Count 2.[1]

On March 13, 2009, California Attorney General Jerry Brown held a press conference to discuss the charges, during which he stated that Stern was Anna Nicole's "principal enabler", echoing Judge Seidlin's observation two years earlier. *See* Third Declaration of Elizabeth McNamara in Support of Defendant Cosby's Supplemental Briefing ("McN. 3d Decl.") Ex. 1.[2] Attorney General Brown said that Anna Nicole "took the drugs almost to the point of stupefication," and had said in an earlier statement "these individuals repeatedly and excessively furnished thousands of prescription pills to Anna Nicole Smith, often for no legitimate medical purpose." *Id.* Brown explained that the attorney general's office has been pursuing the case since shortly after Smith's death. "It has taken so long because there have been hundreds of interviews, and tens of thousands of computer records that were looked at in California and abroad." *Id.* Consistent with commentary well before the Book, Brown also suggested that

---

[1] Given many undisputed facts on which the felony charges are based, it is not surprising that Stern chose in this action not to challenge numerous statements in the Book regarding his funneling of drugs to Anna and others, although he evasively claims that he "never gave Ms. Smith drugs in an attempt to control her. He never kept Ms. Smith 'out of it,'" (Complaint ¶ 311) and that he "never drugged Ms. Smith or took any adverse action toward her in an attempt to inherit her money," (Complaint ¶ 318). The statements in the Book that Stern does not challenge include "Howard typically carried either a brown Coach bag or a black duffle bag. It was a repository for an assortment of drugs, which according to employees, friends, and court testimony, he doled out to Anna on an "as-he-thought-she-needed" basis. 'He was the pharmacist and that was the drugstore,' Ben Thompson said." Book at 44; "According to [the nannies'] statements, when Anna's psychiatrist, Dr. Khris, would visit from Los Angeles, she'd say Anna needed lots of medicine … Every four hours like clockwork, Howard would take a cup and go to Anna's bedroom. He'd wake her up and give her the medicine. Howard, they say, was always the one to give Anna her drugs." "When she'd fall, Howard wouldn't pick her up," [a nanny] noted. "But Howard didn't miss a beat when giving her those drugs." Book at 100-101.

[2] As explained in Cosby's Opposition to Motion to Strike, these news reports are admissible because none of them are being admitted for the truth of the matter asserted. Here, as was the case with many of the reports attached to Cosby, Littlefield, and McNamara's declarations, the reports establish the damage done to Stern's reputation before publication of the Book, for the purpose of showing him to be libel-proof. (In addition, many of the prior reports were attached to also establish Cosby's lack of actual malice.) "Evidence of a tarnished reputation is admissible and should be considered as a factor to mitigate the level of compensatory damages." *Marcone v. Penthouse Int'l Magazine For Men*, 754 F.2d 1072, 1079 (3d Cir. 1985) (citation omitted); *see also Guccione*, 800 F.2d at 304 (finding lower court had improperly excluded magazine and newspaper articles that appeared in widely circulated publications as evidence of plaintiff's poor reputation on the subject of adultery); *Cerasani*, 991 F. Supp. at 354 n.3 (taking judicial notice of the widespread newspaper coverage of criminal trial in determining that plaintiff was libel-proof).

Smith's death resulted from this funneling of drugs, remarking that, "This was done knowingly and it's done with tragic consequences."  See McN. 3d Decl. Ex. 2 at p.11.

Less than two weeks later, a spokesman for Florida's Broward State Attorney's Office announced that the Office would re-open its investigation into Anna's death.  A Broward County spokesman indicated that if authorities are able to link her overdose to someone supplying her with drugs, the suspects could be charged with murder:  "We are now examining that evidence to see where it might lead in relation to Ms. Smith's death here in Broward County in 2007."  See McN. 3d Decl. Ex. 3.  Then, Anna Nicole's father announced that he and Anna Nicole's mother Virgie Arthur may file a wrongful death suit against Stern.  See McN. 3d Decl. Ex. 4.

### B. National Media's Reaction to the Criminal Charges Against Stern

Beginning on March 12, 2009, the day the charges were filed, the news exploded across the media, from *Forbes*, *The New York Times*, *The Wall Street Journal* ("Documents obtained by the AP after her death showed most of the drugs found in her hotel room were prescribed in Mr. Stern's name and none were prescribed in Ms. Smith's own name.  The quantity was staggering,") and *The Washington Post* ("Anna Nicole Smith was given massive amounts of prescription drugs illegally by her boyfriend and two doctors for years before her death from an overdose, California's attorney general said on Friday"); to smaller local papers and their websites, such as *The Wichita Eagle*; *Everyday Christian:  Biblical Truth for Everyday Life* ("AG:  Anna Nicole Smith's boyfriend was 'enabler'"), and *Ohio.com* ("Busted.  Howard K. Stern.").  See McN. 3d Decl. Ex. 5.  Accompanying many media reports was Stern's damning police mug shot.[3]  Notably absent from any press coverage of the charges, however, was even a single mention of *Blonde Ambition* – a striking omission given Stern's implausible contention that it was the Book that caused him damage.

Responding to all this, *Entertainment Tonight* – widely seen as Stern's exclusive media outlet – released a statement by Krista Barth, Stern's Florida attorney.  See McN. 3d Decl. Ex. 6.

---

[3] The news was so widespread that it was one deemed by www.wral.com to be one of the "Top Stories this Week". *See* McN. 3d Decl. Ex. 5.

In it, she voiced the overriding theme of the news coverage of his indictment: the charges confirm and are consistent with the depiction of Stern as widely reported prior to the publication of *Blonde Ambition*. *Id*. Thus, much like Stern's own affidavit that was filed in the Bahamas and documented the ubiquitous press suggesting Stern was responsible for Daniel's death, destroyed evidence and was paid millions for exploiting Anna, now Stern's own counsel likewise acknowledged that, "Mr. Stern and I are mindful of the reality that he has for the past several years found himself on trial in the media. The media trial of Mr. Stern has been based on constant shouts of guilty ...." Blaming this press on "lies, speculation, rumor and gossip," Barth nonetheless acknowledged "the television, tabloid and Internet trial of Mr. Stern" that had taken place "in the court of public opinion ...." *Id*.

The "court of public opinion" was on vivid display on cable news stations following the charges against Stern. In particular, the shows resurrected much of the information that dominated the media surrounding Anna's death well before *Blonde Ambition* – information consistent with Stern's indictment and which corroborated many of the Statements at issue in this action. Thus, CNN's *Larry King Live* show on March 13 with guest host Joy Behar opened with the question: "Was Anna Nicole Smith drugged up and kept dazed by Howard K. Stern?" *See* McN. 3d Decl. Ex. 7. One guest, Lisa Bloom, an anchor for *In Session*, noted that "We know that she was taking these drugs for years. We saw her zoned out of her mind with the slurred speech on her reality show and every awards show. So it was pretty common knowledge that Anna Nicole was an addict." *Id*. Bloom also recalled Birkhead's "explosive testimony" during the body custody hearing about Stern giving Anna Nicole drugs from a duffel bag while she was in the hospital. *Id*. Yet, the commentary concerning Stern was not limited to his facilitating Anna's addictions, or even whether consequently he was responsible in some way for her death. Bloom also noted, "we all know he's the guy who held a baby month after month that wasn't his and refused to do a DNA test." (When Stern's counsel, Barth, tried to defend Stern's actions with regard to Dannielynn, arguing that Bloom did not know the background, Bloom responded, "I don't know what background would be to justify holding a baby that's not yours.") *Id*.

Similarly, Greta Van Susteren on Fox News covered the felony charges by replaying interviews and focusing on Stern's actions well before the Book was published. Thus, during her March 13th show she replayed a portion of the "infamous" and "shocking" clown video where Stern is seen taping a seemingly incoherent and eight months pregnant Anna Nicole while joking about a "mushroom trip." Van Susteren noted that the tape "could have new significance now that Stern ... [has] been charged for allegedly providing her with drugs." *See* McN. 3d Decl. Ex. 2.[4] She also replayed an interview with Tas Brighthaupt from July 2007, in which Tas talked about having "a lot of suspicions" based on Stern's behavior the day of Anna's death and said she felt like "we were being set up" when a package of prescription drugs was mailed to her and Moe's home. *Id*. Echoing similar perjury contentions at issue here, Van Susteren also spent significant time analyzing Stern's testimony from the February 2007 body custody hearings in Florida. One criminal attorney suggested there might be a "perjury charge down the road" over his statement to the Florida court that he was only aware of Dr. Kapoor prescribing Anna drugs, and failed to mention Dr. Eroshevich. Given the evidence that Stern was complicit in obtaining "thousands of pills" prescribed by Dr. Eroshevich as spelled out in the California criminal Complaint, the lawyers on Fox News could not come up with any innocent explanation for his testimony, with one suggesting that doing so would be "really, really difficult, because the D.A. will be able to prove that he did know about it. A lot of the prescriptions were in Howard's name…. He's got a lot to explain here, because he's going to be portrayed as nothing more than a legalized drug dealer." *Id*.

On March 16, 2009, Geraldo Rivera also dedicated much of his airtime on Fox News to discussing the criminal charges against Stern, with segments titled "It's No Accident: Does evidence directly link Howard K. Stern to Anna and son Daniel's deaths?", "Is He Guilty? Judge Seidlin on Howard K. Stern," and "She Was Incoherent: Anna's Bahamas home was drug infested." *See* McN. 3d Decl. Exs. 8-10. Commentator and former prosecutor Kimberly

---

[4] Van Susteren also replayed Stern's response to the clown video, in which he claimed the video is "totally taken out of context" but admitted that the notion that he supplied her with drugs was "out there in the media." *Id*. For a consideration of the context, *see* McNamara Decl. Ex. GG.

Guilfoyle said that she believed that the Attorney General was not finished with charges against Stern, and that Stern and the two doctors had systematically and methodically given Anna the drugs that ultimately caused her demise. McN. 3d Decl. Ex. 8. One of Cosby's sources, former FBI agent Don Clark, was a guest on the show and he said that he stands behind the February 2007 affidavit he filed in the body custody hearing stating that he believed Stern was intimately involved in the deaths of both Anna and Daniel, and that Stern could not avoid direct criminal implications in their deaths. *Id*.

Perhaps Geraldo Rivera best summarized the public perception of Stern when he appeared on *The O'Reilly Factor* on March 13, 2009, in the wake of the news about the criminal charges:

> Howard K. Stern, this two bit Machiavellian figure in Anna Nicole's life was a total snake. He was a leach on Anna Nicole Smith. He was the one that was providing her with methadone, with sedatives. 450 pills, Bill, in a five week period. His name is on many of the prescriptions. It was just a matter of time. We believe that Stern and Khristine Eroshevich and Sadeep Kapoor, the two doctors who were supplying her, these people kept her in a stupor. And Stern did it, we believe, so he could stay close to Anna Nicole, his only source of income. And remember, the Marshall estate is the pot at the end of the rainbow.

*See* McN. 3d Decl. Ex. 11.

## ARGUMENT

### I.

### THE CRIMINAL CHARGES AGAINST STERN REAFFIRM AND COMPOUND HIS ALREADY TATTERED REPUTATION AND RENDER HIM LIBEL PROOF

Cosby established in her motion for summary judgment that Stern's reputation was so tarnished by both his own actions and the accusations in the national media against him before the publication of *Blonde Ambition,* that he could sustain no greater damage by any of the statements in the Book and was therefore libel proof. Mov. Br. at 12-17.[5] Much of the

---

[5] In opposition, Stern did not dispute that it had been "previously widely reported" that he bore some responsibility for Anna and Daniel's deaths, that he destroyed evidence, committed perjury, facilitated Anna's drug addictions and

pre-publication news reports concerning Stern are consistent with and accurately foretold the criminal charges he faces now.  As a result, it is hard to imagine that a jury would find that Stern's reputation suffered any damage from the challenged Statements, given the "constant shouts of guilty" in the "court of public opinion" that has taken place "for the past several years," now bolstered by the criminal charges against him, which arise out of the same events.  *See*, K. Barth Statement, McN. 3d Decl. Ex. 6.

The libel proof doctrine weighs the "likelihood of significant recovery" in light of a severely tarnished reputation, like Stern's, against First Amendment interests that protect "disseminators of news and views on public issues against burdensome litigation."  *Sharon v. Time, Inc.*, 575 F. Supp. 1162, 1168, 1172 (S.D.N.Y. 1983) (finding that the Commission report at issue did not so severely harm "Sharon's formidable reputation as to render him libel proof").  The libel proof analysis thus turns on whether the plaintiff will be able to show *more* than nominal damages.  When a plaintiff engages "in conspicuously anti-social or even criminal behavior, which is widely reported to the public," and suffers a diminished reputation, "there comes a time when the individual's reputation for specific conduct, or his general reputation for honesty and fair dealing is sufficiently low in the public's estimation that he can recover only nominal damages for subsequent defamatory statements."  *Wynberg v. National Enquirer, Inc.*, 564 F. Supp. 924, 927-28 (C.D. Cal. 1982).  In such cases, First Amendment considerations must prevail over an individual's interest in his reputation.  *Id*.  Claims such as these "'should be dismissed so that the costs of defending against the claim of libel, which can themselves impair vigorous freedom of expression, will be avoided.'"  *Cerasani*, 991 F. Supp. at 352, quoting *Guccione*, 800 F.2d at 303.  Accordingly, the Second Circuit has provided that "in those instances where an allegedly libelous statement cannot realistically cause impairment of

---

exploited the deaths for his personal benefit. Opp. Br. at 23-28.  Instead, he focused on what he called the "unbelievable" allegations, such as that he "performed oral sex on Larry Birkhead" or gave a "pregnant Ms. Smith a daily snort in the nose to get high."  Opp. at 26-27.  In response, Cosby contends that if not libel proof concerning *all* Statements, any Statements remaining after consideration of actual malice and other defenses, could at most evidence incremental harm and for that independent reason, the action should be dismissed.  Reply at 14-15.  The felony charges against Stern only underscore that conclusion.  *See below*, at 10-11.

reputation because the person's reputation is already so low … even nominal damages are not to be awarded." *Guccione*, 800 F.2d at 303.[6]

This assessment is necessarily informed by the recent felony criminal charges leveled against Stern and their attendant publicity. And the fact that the charges were filed after the publication at issue does not in any way diminish their relevance. Indeed, a remarkably similar scenario was before this Court in *Cerasani*. There, like here, criminal charges were filed against the plaintiff well after the publication at issue. 991 F. Supp. at 348, 353. Indeed, similar to the timing of Stern's recent criminal charges, "while the motions in this case were *sub judice*, Cerasani was arrested and indicted on RICO, extortion and other charges" related to a scheme to manipulate stock. *Id.* at 348. The new criminal charges were not set aside as somehow irrelevant because they came down long after the movie at issue; rather, the Court detailed and considered the charges at some length. *Id*. Ultimately, the new indictment – coupled with Cerasani's prior criminal history, a previously published book leveling many similar charges that he did not challenge and "recent widespread press coverage" surrounding the new RICO indictment – led the Court to conclude that plaintiff was libel proof. *Id.* at 353. In finding that the plaintiff was libel-proof, this Court held that the movie at issue did not portray the plaintiff "engaged in conduct notably worse than that described … from the witness stand, depicted in the book, and publicized by the press, and no reasonable jury could conclude otherwise." *Id*. at 354.[7]

---

[6] Stern ignores this principle when he argues that even if he is "only entitled to nominal damages of a single dollar, in New York a plaintiff is entitled to vindication which a jury verdict can bring." Opp. at 28. That principle only holds, however, when the plaintiff's reputation has not already been irretrievably destroyed largely as a result of his own actions, like Stern's. Thus, in each case Stern cites for this proposition either the libel proof doctrine was not even at issue, as in *Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1976), and *Goldwater v. Ginzburg,* 414 F.2d 324 (2d Cir. 1969), or had been rejected. *Sharon v. Time, Inc.,* 599 F. Supp. 538, 586 (S.D.N.Y. 1984). Further, in an effort to show actual damage, Stern digs deep to uncover and rely on an ill-informed homophobic comment by a reader on TMZ. Opp. at 27. Any reliance by Stern on cases that apply state law other than New York law in analyzing the incremental harm defense, such as *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563 (D.C. Cir. 1984), *overruled on other grounds*, 477 U.S. 242 (1986), is irrelevant to this action.

[7] Like in *Cerasani*, it is "incredible" that Stern was well aware of but did not challenge or seek corrections to this damning portrait in the media, except for his action against the O'Quinn law firm. 991 F. Supp. at 354.

The same is true for Stern.  The Statements at issue in this action do not portray Stern engaged in conduct notably worse than the portrait created by the new felony charges, his own actions on *The Anna Nicole Show*, the vivid and damning testimony during the body custody hearing in Florida and the broad swath of media commentary routinely condemning him. (Indeed, entirely independent of *Blonde Ambition*, Stern's own actions caused the media outcry, from taking a picture of Daniel while dead, to selling Daniel's last photos as well as photos of the "commitment" ceremony even before Daniel had been buried, to refusing DNA testing while holding on to the baby.  Thus, Stern was accused of "murder," "kidnapping," "child stealing" and destroying evidence; he was described as an "enabler" who "facilitated" Anna's addictions; and, his sworn testimony was called a "mockery." Mov. Br. at 14-16.)  The recent felony charges and resulting publicity that reaffirmed and recounted many of these same depictions only further sealed this portrait of Stern for any jury pool.  It would be next to impossible for a jury to distinguish any damage to Stern's reputation supposedly caused by the Book, from his tattered reputation before the Book and the reaffirming damage caused by the felony charges.  Thus, Stern simply cannot show that any of the challenged Statements at issue in this action depict him in a worse light than does the tidal wave of condemnation in the "court of public opinion" that his attorney Barth described.[8]

In the end, Cosby has established several independent grounds for dismissal of the action – Stern is libel proof, certain Statements are not defamatory or substantially true and all were published in good faith belief as to their accuracy and thus without actual malice – but should any Statement remain, the action must *still* be dismissed under the incremental harm doctrine.  As with the analysis of whether Stern is libel proof, the incremental harm doctrine focuses on damages and Stern's reputation, and the recent criminal charges against Stern are also admissible and highly relevant for this independent reason.  "[T]he incremental harm defense is

---

[8] Stern cannot find comfort in *Sharon v. Time, Inc.*, 575 F. Supp. at 1171.  In *Sharon*, the court found the plaintiff was not libel-proof because "[n]o finding or statement in the report or in the article is comparable in its seriousness and potential reputational impact to the statement upon which this suit is based."  The contrary is true for Stern: both the indictment and the pre-publication press surrounding Anna's death are either entirely consistent with or far worse in terms of seriousness and potential reputational impact to Stern than the Statements at issue in the Book, starting with the widely reported contention that he bore some responsibility for Anna's death.

based upon the view that some wrongs simply should not be actionable primarily because society is better off avoiding the costs associated with litigation where the harm suffered is incremental." *Jewell,* 23 F. Supp. 2d at 392 (declines incremental harm defense on motion to dismiss, finding statements that suggest plaintiff is responsible for bombing sufficiently distinct from the non-actionable statement that he was a suspect); s*ee also, Jones v. Globe Int'l Inc.*, No. 3:94:CV01468, 1995 WL 819177, at *10-11 (D. Conn. Sept. 26, 1995) (given plaintiff's conviction *after* publication which revealed his sexual attraction to women's shoes, certain challenged statements about plaintiff "possessing dozens of bras and silk panties" were "details that, even if untrue, do not add materially to the injury" and were dismissed under the incremental harm doctrine).

Here, no doubt in light of all the press and prior testimony that preceded *Blonde Ambition*, in his opposition brief Stern did not even press his claims, for example, that Statements were published with actual malice that he alleges depict him as criminally responsible for Anna and Daniel's deaths, engaging in a murder conspiracy, committing perjury, obstructing justice, and destroying evidence.  Opp. Br. at 39-69.  Now, adding to the inherent damage by these non-actionable Statements comes the indisputable fact that Stern has been charged with six felonies involving a conspiracy to unlawfully facilitate Anna Nicole's drug addictions.  Next to these serious criminal charges, any remaining challenged Statements – particularly regarding Stern's sexual proclivities, or giving Anna a "toot" of cocaine, or exploiting her sexually – cannot further demean Stern's reputation.  Accordingly, even a viable claim will be dismissed when, as here, it is rightly determined that "the incremental benefit to plaintiff from continuing a suit outweighs the harm to the defendant and society." *Jewell*, 23 F. Supp. 2d at 394.  Stern's libel claim regarding any remaining Statements should be dismissed because any harm that his reputation suffered from them would be incremental compared to the greater harm he has suffered unrelated to the Statements in the Book.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment in favor of Cosby and dismiss the complaint with prejudice.

Dated: April 6, 2009
      New York, New York

                        DAVIS WRIGHT TREMAINE LLP


                        By:  s/Elizabeth A. McNamara
                            Elizabeth A. McNamara
                            Deborah A. Adler

                        1633 Broadway
                        New York, New York 10019
                        (212) 489-8230
                        lizmcnamara@dwt.com

                        *Attorneys for Defendant Rita Cosby*