UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x

HOWARD K. STERN,                        :

                 Plaintiff,     :

         - against -            :

RITA COSBY, HACHETTE BOOK GROUP         :
USA, INC. d/b/a Grand Central
Publishing, and JOHN OR JANE DOE,  :

              Defendants.    :

- - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-12-09

**OPINION**

07 Civ. 8536 (DC)

**APPEARANCES:**        (See last page)

**CHIN, District Judge**

       In this libel case,
plaintiff Howard K. Stern, the former
lawyer for and companion of the late
Anna Nicole Smith, sues defendants
Rita Cosby and Hachette Book Group
USA, Inc. ("Hachette"), the author and
publisher, respectively, of the best-
selling book <u>Blonde Ambition:  The
Untold Story Behind Anna Nicole</u>



<u>Smith's Death</u> (the "Book").  Stern contends that defendants
defamed him in the Book by falsely stating or suggesting, among
other things, that he had engaged in sex with the father of
Smith's child, "pimped" Smith to as many as fifty men a year, and
played a role in Smith's death.

Cosby and Hachette deny that they have libeled Stern. First, they argue that Stern is "libel-proof" -- that is, they contend that his reputation is already so bad that it cannot be further damaged. Second, they contend that the statements in question are not defamatory, and argue in particular that, in this day and age, statements suggesting that someone is homosexual are no longer libelous per se, as they no longer connote shame, contempt, or ridicule. Third, they argue that Stern has failed to present evidence from which a jury could find that they acted with actual malice.

Before the Court are defendants' motions for summary judgment. For the reasons set forth below, I conclude that a reasonable jury could find that Cosby, but not Hachette, is liable for defamation for certain of the statements in the Book. Accordingly, Hachette's motion is granted and Cosby's motion is granted in part and denied in part.

## BACKGROUND

### A. The Facts

On a motion for summary judgment, the Court construes all facts in the light most favorable to Stern, as the non-moving party. The following facts are drawn from the deposition transcripts, affidavits, declarations, and exhibits[1]:

---

[1]     Much of the evidence relied upon by the parties in litigating the motions -- including declarations and deposition testimony -- was submitted under seal. The Second Circuit has held that "documents submitted to a court for its consideration in a summary judgment motion are -- as a matter of law -- judicial documents to which a strong presumption of access

1.    **The Participants**

    a.    **Anna Nicole Smith**

        Smith was a model and actress who attained notoriety in 1994 when, at the age of 26, she married an 89-year-old billionaire named J. Howard Marshall III.  From then until her untimely death in 2007, she was frequently the subject of tabloids, celebrity gossip magazines, and entertainment shows. (See generally 12/15/08 McNamara Decl. Ex. Y (Smith obituary); Abby Goodnough and Margalit Fox, Anna Nicole Smith Is Found Dead in Florida, N.Y. Times, Feb. 9, 2007 (observing that "[f]or gossip columnists and supermarket tabloids, Ms. Smith's life provided endless fodder.")).  When Marshall died in 1995, Smith became embroiled in litigation over the Marshall estate with one of Marshall's sons.  Stern was one of Smith's attorneys.  (Stern Decl. ¶ 4).

        Smith had two children, Daniel, born in 1986, and Dannielynn, born in 2006.  (Id. ¶¶ 6-8).  Daniel died, apparently

---

attaches, under both the common law and the First Amendment." Lugosch v. Pyramid Co., 435 F.3d 110, 121 (2d Cir. 2006).  This presumption in favor of public access to documents is strongest where the documents "are used to determine litigants' substantive legal rights."  Id. (citing United States v. Amodeo, 71 F.3d 1044, 1049 (2d Cir. 1995)).  Here, the Court has relied on the sealed evidence in ruling on these motions for summary judgment, and thus the sealed materials are judicial documents to which a strong presumption of access attaches.  Accordingly, the sealed documents submitted in connection with defendants' motions for summary judgment will be unsealed, unless within five business days hereof any party shows compelling reasons why any particular materials should not be unsealed.

of a prescription drug overdose, in the Bahamas just a few days after Smith gave birth to Dannielynn in 2006.  (Id. ¶ 9).

From 2002 to 2003, Smith starred in a reality TV show on E! Entertainment called The Anna Nicole Show.  Stern and Smith's son, Daniel, regularly appeared on the show.  Both Smith and Stern often appeared to be intoxicated on the show, to the point where, in one episode, Stern appeared to lose consciousness.  Often Smith and Stern behaved in a bizarre manner, and in one episode Stern appears in drag after losing a bet.  (See Littlefield Decl. Ex. B (DVD of first season)).  According to Stern, many aspects of the show were staged.  (Stern Decl. ¶ 56).

Smith died of a prescription drug overdose on February 8, 2007 at a hotel in Florida.  (Id. ¶ 14; see generally Abby Goodnough, Anna Nicole Smith's Death Is Ruled an Accidental Drug Overdose, N.Y. Times, Mar. 27, 2007).

### b.   Howard K. Stern

Stern, an attorney, began doing legal work for Smith in 1997, and was co-counsel in her litigation regarding the Marshall estate.  (Stern Decl. ¶ 4).  His relationship with Smith became romantic in 2000, but they kept the romantic aspect of the relationship a secret until 2006.  (Id. ¶ 5).

Stern was present when Smith gave birth to Dannielynn in the Bahamas, and at the time he believed he was her father. (Id. ¶ 8).  After a lengthy and contentious paternity dispute

-4-

with Larry Birkhead, Smith's former boyfriend, Stern learned that
Birkhead was actually Dannielynn's father.  (Id. ¶ 20).

Stern was also present in Florida when Smith died, and
he was subsequently made the executor of her estate.  (Id. ¶¶ 14,
16).

After Daniel and Smith died, Stern was subjected to an
onslaught of media criticism, including the following
representative examples:

> ■  On March 27, 2007, the New York Post ran an
>    article intimating that Stern was involved in
>    Smith's death, and referring to Stern as Smith's
>    "devious companion."  (Cosby Decl. Ex. 16).[2]

---

[2]  Stern seeks to strike certain portions of Cosby's
declaration on several grounds, including that it is not based on
personal knowledge. The law is clear that "for summary judgment
purposes, '[a] supporting or opposing affidavit must be made on
personal knowledge.'" SCR Joint Venture L.P. v. Warshawsky, 559
F.3d 133, 138 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)(1)).
It is obvious that Cosby does not have personal knowledge of many
of the statements in her declaration -- for example, where she
describes details of Smith's life.  (See, e.g., Cosby Decl. ¶ 13
("In 2005 Anna [Nicole Smith] was living in Los Angeles and
dating Larry Birkhead when she met and became involved with a
wealthy developer from South Carolina, Ben Thompson.")).  Cosby's
knowledge of such events is, presumably, based on what she has
read and what other people told her -- in other words, hearsay.
Similarly, Stern's declaration makes statements of which he
cannot have personal knowledge -- for example, statements
regarding Cosby's state of mind.  (See, e.g., Stern Decl. ¶ 25
("Rita Cosby had every reason to doubt the credibility of her
sources, and the highly implausible claims supposedly being told
by them.")).  The Court will not consider any statement in any
affidavit or declaration that does not appear to be based upon
the affiant's or declarant's personal knowledge.

Stern also objects to Cosby's declaration on the ground
that many of the exhibits attached thereto, such as newspaper
articles, are hearsay. The newspaper articles, however, are not
offered for their truth. Rather, they are offered to show that

- On April 1, 2007, Geraldo Rivera said the following on his show:  "Like the entourage of sycophants and enablers who surrounded Elvis Presley, most of the people living off Anna Nicole did nothing to save her from herself.  And worse than enabling, people like lawyer turned companion Howard K. Stern facilitated her untimely demise by ensuring she had all the drugs she needed to die from."  (Id. Ex. 84).

- On April 2, 2007, a guest on Nancy Grace's CNN show said that "everyone points the finger at Howard Stern" vis-a-vis the death of Daniel Smith.  (Id. Ex. 34).

On March 12, 2009, the Los Angeles District Attorney filed a felony complaint against Stern and two of Smith's doctors.  (3/13/09 McNamara Decl. Ex. 9).  The six-count complaint alleges, inter alia, that Stern conspired with the doctors to provide Smith with excessive quantities of prescription drugs even though they knew she was addicted to the drugs.  (Id.).  The next day, the California Attorney General held a press conference in which he referred to Stern as Smith's "principal enabler."  (4/6/09 McNamara Decl. Ex. 1).

---

Stern was subjected to media criticism for his behavior.

Accordingly, Stern's motion to strike is granted in part and denied in part.

-6-

### c.   **Rita Cosby**

Cosby has been a journalist for more than twenty years, working as a correspondent and host for CBS, MSNBC, and Fox News. During that time she conducted a number of high-profile interviews, including of several heads of state, and has received three Emmy awards.   (Cosby Decl. ¶¶ 1-8).

Cosby started covering Smith around 2006, when she was a reporter for MSNBC.   (Id. ¶¶ 10, 13).   After Daniel Smith's death, Cosby began to devote much of her time to reporting on the events surrounding Smith -- the Bahamian coroner's investigation into the cause of Daniel's death, Smith's commitment ceremony to Stern,[3] Smith's own death, the paternity dispute between Stern and Birkhead, and the various court proceedings.   (Id. ¶¶ 15).

In the spring of 2007, Cosby began to consider leaving MSNBC to write a book.   (Id. ¶ 37).   She discussed with Bruce Littlefield, a writer she knew from college, the possibility of collaborating on a book together, and decided that a book about Smith and the media frenzy surrounding her life and death was the logical choice.   (Id.; Littlefield Decl. ¶ 8).

### 2.   **The Book**

Cosby and Littlefield wrote the Book together, based on Cosby's reporting.   (Cosby Decl. ¶ 38; Littlefield Decl. ¶ 9).

---

[3]      The commitment ceremony took place in the Bahamas on September 28, 2006.   Stern acknowledges that it was not a legal marriage under Bahamian or United States law.   (Stern Decl. ¶ 11).

On April 10, 2007, Todd Shuster, Cosby's agent, sent an email to Amy Einhorn, an editor at Hachette, pitching a book Cosby planned to write, then entitled Fame and Miss Fortune: Secrets from Inside the Anna Nicole Smith Media Storm.    (Einhorn Aff. Ex. B).    The email described Cosby's "one-of-a-kind work of investigative journalism" as follows:

> Drawing on her unique access to all of the major players in this widely followed tale of sex, drugs, and unbridled personal ambition, Cosby will reveal the tabloid media jockeying and closed-door shenanigans to which she alone has been witness in connection with this case.    She will also offer rare insight into what exactly makes the death of Anna Nicole Smith compelling to so many millions of people worldwide.

(Id.).    Einhorn was impressed with the proposal and thought that it had the potential to be a popular book, in part because she anticipated that the Book would contain previously unpublished information about Smith.    (Einhorn Aff. ¶ 10).

Schuster also sent Einhorn background materials on Cosby, including her curriculum vitae and a summary of her career, all of which impressed Einhorn and convinced her that Cosby was an accomplished journalist.    (Id. ¶ 9).

On April 12, 2007, Einhorn, along with several other Hachette employees, met with Cosby and Shuster to discuss the Book.    At this meeting Cosby revealed that the Book "would have a number of previously unreported explosive news items," but Cosby would not reveal what these items were, because she was still shopping the Book to other publishers.    (Id. ¶¶ 12-13).    Hachette was not interested in publishing the Book unless it contained

previously unreported information, however, so Einhorn arranged for Schuster to tell her two of the items in a phone call that took place on April 16, 2007.  (Id. ¶¶ 14-15).  Einhorn only recalls one of the items:  The Book would report that Smith had once walked in on Stern and Birkhead having oral sex.  (Id. ¶ 15).[4]  After Einhorn got off the phone, she sent an email to two of her colleagues characterizing what she had just heard as "holy shit" items.  (Id. ¶ 17).

The next day Hachette offered Cosby an advance of $405,000 plus royalties for the Book.  (Id. ¶ 18; id. Ex. C §§ 2-3).  They signed the agreement on May 21, 2007.  (Cosby Decl. ¶ 41).  The agreement required Cosby to deliver the final manuscript to Hachette by June 12, 2007.  (Einhorn Aff. ¶ 19).  Because Hachette wanted to publish the Book while interest in the story was still at its peak, Hachette put the Book's publication on a "crash" schedule, which meant that Cosby provided chapters to Hachette on a rolling basis, and Hachette had attorneys review each chapter as it came in.  (Id. ¶ 20).

The Book was published on September 4, 2007 and instantly became a bestseller.

Immediately after the Book was published, reports began to appear in the media contradicting aspects of the Book.  See Stern v. Cosby, 246 F.R.D. 453, 455 (S.D.N.Y. 2007) ("Stern I").

---

[4]     According to another editor at Hachette, the other item was probably the Book's claim that Stern "pimped" Smith for money.  (Pockell Dep. at 37-38).

**B.    Procedural History**

Stern filed the complaint on October 2, 2007, invoking the Court's diversity jurisdiction, and asserting a claim for libel based on the following nineteen statements in the Book (the "Statements"):[5]

- Statement 1:  Stern and Birkhead had oral sex at a party at a private home in Los Angeles.  Smith discovered them, laughed, and later remarked that Stern was gay.  (Book at 202-04).

- Statement 2:  Smith, in front of her nannies in the Bahamas, used to regularly watch a video of Stern and Birkhead having sex.  (Id. at 204).

- Statement 3:  Stern and Smith abused illegal drugs together, even when Smith was pregnant.  (Id. at 5, 79).

- Statement 4:  Stern had Mark Hatten falsely arrested and imprisoned for stalking Smith.  (Id. at 102).

- Statement 5:  Stern and Smith conspired to have Mark Hatten murder the son of Smith's late husband, J. Howard Marshall, so that Smith could inherit her former husband's entire estate.  (Id. at 102).

---

[5]    Many of the Statements are long passages from the Book; the Court has here set forth summaries.  Stern's complaint addresses the 19 Statements in paragraphs 92-370.

- Statement 6:  Stern perjured himself when he testified in a Florida proceeding that he was not compensated by Entertainment Tonight in connection with media coverage of Daniel Smith's death.  (<u>Id.</u> at 28).

- Statement 7:  Daniel Smith said that Stern arranged for men to have sex with Smith for money -- in other words, he "pimped" her.  (<u>Id.</u> at 31).

- Statement 8:  Daniel Smith thought that Stern generally took advantage of Smith.  Daniel also said that he saw Stern, on at least fifty occasions per year, drug Smith before "pimping" her.  (<u>Id.</u> at 31).

- Statement 9:  Stern destroyed evidence relating to Daniel Smith's death.  Specifically, Stern flushed down the toilet several pills he found in Daniel Smith's room at their home in the Bahamas.  (<u>Id.</u> at 51-53).

- Statement 10:  Stern stole substantial amounts of money from Smith and wired the money to offshore accounts.  (<u>Id.</u> at 165-66, 233-34).

- Statement 11:  Stern perjured himself when he testified in a Florida proceeding that he was the father of Dannielynn.  In fact, he knew he was not the father.  Stern also offered Birkhead a deal whereby Stern would abandon any claim to being

Dannielynn's father if Birkhead would permit Stern
to serve as executor of Smith's estate.
(Photograph caption in Book).

- Statement 12: Stern made additional offers to
Birkhead in exchange for permitting Stern to serve
as executor of Smith's estate.  (Book at 175-76,
198).

- Statement 13: Stern extorted or blackmailed
Birkhead based on Stern's knowledge that Birkhead
was gay.  (Id. at 176, 201-02).

- Statement 14: Daniel Smith told someone that
Stern "keeps feeding my mom drugs" and that Stern
was "a Svengali" because of the way he controlled
Daniel's mother.  (Id. at 30-31).

- Statement 15: Various people felt that Stern was
a threat to Anna's life.  (Id. at 104, 204).

- Statement 16: Stern was only after Smith's money,
and he had a financial motive to kill her.  (Id.
at 105).

- Statement 17: Five days before she died, Smith's
attorney faxed her will to one of Stern's
attorneys.  The will excluded Smith's children,
which aroused suspicion that Stern might have been
involved.  (Id. at 170-72).

- Statement 18: Smith thought that Stern was
involved in Daniel Smith's death, and at one point

yelled at Stern, "You did this!  You killed him!
You caused this!"  (<u>Id.</u> at 76-78, 91, 104, 166).

■    Statement 19:  Many people in Smith's inner circle
thought that Stern was involved in Smith's death.
(<u>Id.</u> at 7, 9, 10, 11-12, 18, 22, 25, 26).

On October 15, 2007 Stern moved, by order to show
cause, for a preliminary injunction to enjoin defendants from
tampering with witnesses or evidence and seeking certain
expedited discovery.  <u>See</u> <u>Stern I</u>, 246 F.R.D. at 456.  Stern's
motion was based on recordings of conversations between Cosby and
representatives of Smith's former nannies in the Bahamas that
appeared to show Cosby offering to pay the nannies for affidavits
supporting the veracity of Statement 2.  <u>See</u> <u>id.</u>  Defendants did
not object to the preliminary injunction but objected to the
request for expedited discovery.  I granted a preliminary
injunction orally on October 25, 2007 and followed with a written
decision ordering certain expedited discovery on November 6,
2007.  <u>See</u> <u>id.</u> at 458.

The parties thereafter engaged in discovery.  These
motions followed.  I held oral argument on July 7, 2009 and
reserved decision.

## DISCUSSION

First, I discuss the standards applicable to motions
for summary judgment.  Second, I consider defendants' arguments
that Stern is barred from suing for libel by the libel-proof
plaintiff doctrine.  Third, I turn to defendants' contention that

-13-

certain Statements are not defamatory.  Fourth, I address

defendants' arguments that Stern has failed to present any

evidence of actual malice.  Fifth, I discuss defendants'

assertion that Stern has failed to show that he is entitled to

present his claims for punitive damages to the jury.  Finally, I

consider defendants' arguments that even to the extent Stern has

pointed to actionable Statements in the Book, he is barred by the

incremental harm doctrine from seeking damages based on those

Statements.

## A.    Standard on a Motion for Summary Judgment

The standards governing motions for summary judgment

are well-settled.  A court may grant summary judgment only where

there is no genuine issue of material fact and the moving party

is therefore entitled to judgment as a matter of law.  See Fed R.

Civ. P. 56(c); accord Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 585-87 (1986).  Summary judgment should be

denied "if the evidence is such that a reasonable jury could

return a verdict" in favor of the non-moving party.  See NetJets

Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 178-79 (2d

Cir. 2008).  In deciding a motion for summary judgment, the court

must construe the evidence in the light most favorable to the

non-moving party and draw all reasonable inferences in the non-

moving party's favor.  In re "Agent Orange" Prod. Liab. Litig.,

517 F.3d 76, 87 (2d Cir. 2008).  The non-moving party cannot,

however, "escape summary judgment merely by vaguely asserting the

existence of some unspecified disputed material facts, or defeat

the motion through mere speculation or conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and quotations omitted).

In deciding a motion for summary judgment, the role of the court is not to ask whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Because the court's role is limited in this respect, it may not make factual findings, determine credibility of witnesses, or weigh evidence. See Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005); Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996); United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994).

## B. Is Stern Libel-Proof?

Defendants argue that Stern is libel-proof as a matter of law because of all the negative publicity he has received, and because he cast himself in a negative light when appearing on The Anna Nicole Show. Defendants contend that Stern's reputation was so bad prior to publication of the Book that it could not have been further damaged by the Statements, and thus the complaint must be dismissed. I disagree.

### 1. Applicable Law

The libel-proof doctrine is predicated on the notion that "a plaintiff's reputation with respect to a specific subject may be so badly tarnished that he cannot be further injured by

-15-

allegedly false statements on that subject."  <u>Guccione v. Hustler</u>
<u>Magazine, Inc.</u>, 800 F.2d 298, 303 (2d Cir. 1986); <u>see</u> <u>Merrill</u>
<u>Lynch, Pierce, Fenner & Smith Inc. v. Savino</u>, No. 06 Civ. 868
(LAP), 2007 U.S. Dist. LEXIS 23126, at *38 n.4 (S.D.N.Y. Mar. 23,
2007) ("The libel-proof doctrine . . . states that a plaintiff
who has established such a bad reputation that he cannot show
injury to his reputation is libel-proof and thus cannot maintain
an action for defamation.").  While the doctrine is most often
applied to plaintiffs with criminal convictions, it is not
limited to plaintiffs with criminal records.  <u>Cerasani v. Sony</u>
<u>Corp.</u>, 991 F. Supp. 343, 353 (S.D.N.Y. 1998).

     The Second Circuit has cautioned that the libel-proof
plaintiff doctrine is to be sparingly applied, as it is unlikely
that many plaintiffs will have such tarnished reputations that
their reputations cannot sustain further damage.  <u>See</u> <u>Buckley v.</u>
<u>Littell</u>, 539 F.2d 882, 889 (2d Cir. 1976) (noting that class of
plaintiffs to whom libel proof doctrine applies "is a limited,
narrow one"); <u>Guccione</u>, 800 F.2d at 303 ("The libel-proof
plaintiff doctrine is to be applied with caution, since few
plaintiffs will have so bad a reputation that they are not
entitled to obtain redress for defamatory statements, even if
their damages cannot be quantified and they receive only nominal
damages.") (citation omitted).

     There is some question, as the parties acknowledge, as
to whether the libel-proof plaintiff doctrine is valid in the
wake of the Supreme Court's decision in <u>Masson v. New Yorker</u>

-16-

Magazine, Inc., 501 U.S. 496, 523 (1991), where the Court held
that the incremental harm doctrine -- the "cousin" of the
libel-proof doctrine, Jewell, 23 F. Supp. 2d at 390 -- is not
properly grounded in the First Amendment, and therefore not valid
under federal law.   See Behar, 238 F.3d at 176 n.2 (noting that
"continued vitality after Masson" of the libel-proof plaintiff
doctrine is open question); Jewell, 23 F. Supp. 2d at 390 n.29
("Because Masson rejected any basis for grounding the incremental
harm defense in federal constitutional terms, the libel-proof
plaintiff doctrine seems similarly vulnerable.") (citation
omitted).

        Whether a plaintiff is libel-proof is a question of law
for the Court to decide.   See Guccione, 800 F.2d at 303 (holding
that plaintiff is libel-proof as matter of law); Cardillo v.
Doubleday & Co., 518 F.2d 638, 639 (2d Cir. 1975) (same);
Cerasani, 991 F. Supp. at 354 (same).

        **2.    Application**

        Here, even assuming the libel-proof plaintiff doctrine
continues to be viable, I conclude that it does not bar Stern's
suit.

        First, Stern should not be precluded from seeking
damages for being defamed by the Book merely because he was the
subject of critical discussion on tabloid television and in
celebrity gossip magazines.   Even assuming, for example, that
Geraldo Rivera and other celebrity journalists and talk show
hosts suggested that Stern had a hand in Smith's death, Stern

-17-

denies these accusations.  If indeed the accusations are false,
the fact that Stern might have been falsely accused before does
not mean that he could not be further injured if he was falsely
accused again.  That someone has been falsely called a thief in
the past does not mean that he is immune from further injury if
he is falsely called a thief again.  Moreover, there is a
qualitative difference between comments made on a tabloid
television show and written statements in a book purporting to be
the product of legitimate "investigative journalism," written by
-- as appears on the cover of the Book -- an "Emmy-Award Winning
Journalist."  The libel-proof plaintiff doctrine is to be
sparingly applied (if at all), and surely it is not to be applied
in a situation such as this.

          Second, much of the conduct detailed in the Book is
fundamentally different from the conduct that was the subject of
the allegations swirling in the tabloid media.  None of the media
reports prior to the publication of the Book referenced Stern
engaging in oral sex with Birkhead or making a video of himself
and Birkhead doing so.  The general thrust of the media reports
prior to publication of the Book was that Stern was a member of
Smith's bizarre inner circle who exploited Smith for money and
fame.  This is different in kind from many of the allegations in
the Book, and thus Stern's reputation could sustain further
damage -- and, indeed, he claims it has.  (See Stern Dep. at 490-
91, 554-60).  As then-Judge Scalia aptly put it, "[i]t is
shameful that Benedict Arnold was a traitor; but he was not a

shoplifter to boot, and one should not have been able to make that charge while knowing its falsity with impunity." Liberty Lobby v. Anderson, 746 F.2d 1563, 1568 (D.C. Cir. 1984), rev'd on other grounds, 477 U.S. 242 (1986).  So, too, here.

Similarly, the criminal complaint filed against Stern in California does not alter this conclusion.  While it undoubtedly does some damage to Stern's reputation, it is only an accusation and he is obviously presumed innocent in the matter. Moreover, the subject matter of the criminal complaint is different from most of the Statements at issue in this case.  The criminal complaint charges Stern with playing a role in obtaining prescription drugs for Smith.  It says nothing about promiscuous homosexual sex, "pimping," or any of the other Statements at issue here.

Finally, the fact that Stern was seen on certain episodes of The Anna Nicole Show in a negative light likewise does not render him libel-proof.  Although the show was a "reality show," Stern contends that much of it was staged, and many viewers undoubtedly watched the show with some skepticism. More importantly, the allegations in the Statements are significantly different and much more serious than the conduct Stern engaged in on the show.

Accordingly, defendants' motion for summary judgment on the ground that Stern is libel-proof is denied.

-19-

## C.    Are the Statements Defamatory?

Defendants argue that Statements 1 and 2, which impute homosexuality to Stern, are not defamatory, and that Statements 6 and 11 are substantially true, and therefore not actionable.

I begin by discussing the legal standard applicable to a defamation claim under New York law.  I then address defendants' arguments in turn.  I conclude that Statements 1 and 2 are defamatory, but not defamatory per se, and that Statement 6, but not Statement 11, is substantially true.

### 1.    Standard on a Claim for Defamation

To succeed on a claim for defamation under New York law,[6] a plaintiff must prove that a published statement is both false and defamatory.  Cytyc Corp. v. Neuromedical Sys., Inc., 12 F. Supp. 2d 296, 301 (S.D.N.Y. 1998).  Ultimately, New York law requires a libel plaintiff to prove five elements:

> (1) a written defamatory statement of fact
> regarding the plaintiff; (2) published to a
> third party by the defendant; (3) defendant's
> fault, varying in degree depending on whether
> plaintiff is a private or public party; (4)
> falsity of the defamatory statement; and (5)
> injury to plaintiff.

Meloff v. New York Life Ins. Co., 240 F.3d 138, 145 (2d Cir. 2001) (citation omitted).  In some circumstances, where the statement is so egregious that it is presumed to cause serious

_____

[6]    The parties agree that New York law governs this dispute, as the events giving rise to this suit -- namely, the writing and publication of the Book -- took place in New York. (Pl. Opp. at 23 n.8; Cosby Mem. at 12 n.8; Hachette Mem. at 8 n.1).

harm, the statement is defamatory "per se" -- and the plaintiff need not prove special damages, i.e., economic or financial loss. Sharratt v. Hickey, 20 A.D.3d 734, 735 (3d Dep't 2005).

Where the plaintiff is a public figure,[7] because of the First Amendment, more than these five elements is required.  The reason is simple:  "[O]ne of the prerogatives of American citizenship is the right to criticize public men and measures." Baumgartner v. United States, 322 U.S. 665, 673-74 (1944).  Thus, the Supreme Court requires a public figure plaintiff to prove, by clear and convincing evidence, that the defendant made the statements with "actual malice."  New York Times v. Sullivan, 376 U.S. 254, 279-80 (1964); accord Contemporary Mission, Inc. v. New York Times Co., 842 F.2d 612, 621 (2d Cir. 1988) ("Liability requires clear and convincing evidence of a knowing falsehood or 'subjective awareness of probable falsity.'") (internal citation and quotations omitted).

A statement is defamatory if it would "tend to expose one to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace." Kimmerle v. New York Evening Journal, Inc., 262 N.Y. 99, 102 (1933); accord Golub v. Enquirer/Star Group, 89 N.Y.2d 1074, 1076 (1997) (statement defamatory where it "tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the

---

[7]     Stern does not dispute that he is a public figure. (Pl. Opp. at 22 n.7).

community'") (quoting Mencher v Chesley, 297 N.Y. 94, 100 (1947)).  On a motion for summary judgment, the court's role is to determine whether a statement is "reasonably susceptible to the defamatory meaning imputed to it."  Levin v. McPhee, 119 F.3d 189, 195 (2d Cir. 1997).  If so, the court does not determine as a matter of law that the statement is defamatory, as that is the exclusive province of the jury.  See Jewell, 23 F. Supp. 2d at 360.

To determine whether a statement is reasonably susceptible to a defamatory meaning, the Second Circuit has instructed as follows:

> First . . . courts must give the disputed language a fair reading in the context of the publication as a whole. Challenged statements are not to be read in isolation, but must be perused as the average reader would against the whole apparent scope and intent of the writing.
>
> Second, courts are not to strain to interpret such writings in their mildest and most inoffensive sense to hold them nonlibelous.  A fair reading controls.
>
> Finally, the words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed.  It is the meaning reasonably attributable to the intended reader that controls.

Celle v. Filipino Reporter Enters., 209 F.3d 163, 177-78 (2d Cir. 2000) (internal citations and quotations omitted).

## 2.  **Are the Statements Reasonably Susceptible to a Defamatory Meaning?**

### a.  **Statements 1 and 2**

Stern argues that Statements 1 and 2, which impute homosexuality to him, are defamatory per se.  In support of his argument, Stern cites Appellate Division cases so holding.  <u>See, e.g.</u>, <u>Klepetko v. Reisman</u>, 41 A.D.3d 551, 552 (2d Dep't 2007) ("The false imputation of homosexuality is reasonably susceptible of a defamatory connotation.") (internal citation and quotations omitted); <u>Nacinovich v. Tullet & Tokyo Forex</u>, 257 A.D.2d 523, 524 (1st Dep't 1999) (holding that publications "depicting plaintiff as a homosexual, or implying such, are defamatory per se").

The New York Court of Appeals, however, has never held that a statement imputing homosexuality constitutes defamation per se.  Accordingly, this Court must predict what New York's highest court would do were the issue before it.  <u>See</u> <u>Michalski v. Home Depot, Inc.</u>, 225 F.3d 113, 116 (2d Cir. 2000) ("Absent law from a state's highest court, a federal court sitting in diversity has to predict how the state court would resolve an ambiguity in state law.").

The New York Court of Appeals has held that the following four categories of statements are defamatory per se: (1) those that accuse the plaintiff of a serious crime; (2) those that "tend to injure another in his or her trade, business or profession"; (3) those that accuse the plaintiff of having a "loathsome disease"; or (4) and those that impute "unchastity to

-23-

a woman." <u>Liberman v. Gelstein</u>, 80 N.Y.2d 429, 435 (1992).
Whether a statement is defamatory per se "depends, among other
factors, upon the temper of the times, the current of
contemporary public opinion, with the result that words, harmless
in one age, in one community, may be highly damaging to
reputation at another time or in a different place." <u>Mencher v.
Chesley</u>, 297 N.Y. 94, 100 (1947).  Thus, whether a statement is
defamatory per se can evolve from one generation to the next.[8]

The question, then, is whether the New York Court of
Appeals, in 2009, would hold that a statement imputing
homosexuality connotes the same degree of "shame, obloquy,
contumely, odium, contempt, ridicule, aversion, ostracism,
degradation or disgrace," <u>Kimmerle</u>, 262 N.Y. at 102, as
statements accusing someone of serious criminal conduct,
impugning a person in his or her trade or profession, implying
that a person has a "loathsome disease," or imputing unchastity
to a woman.[9]  I conclude that it would not.

The past few decades have seen a veritable sea change
in social attitudes about homosexuality.  First, and perhaps most
importantly, in 2003 the United States Supreme Court, in a
sweeping decision, invalidated laws criminalizing intimate

---

[8]    It is, for example, unlikely that the New York Court of
Appeals would today hold that it is libelous per se to state that
a white man is "colored" or a "negro," but that is precisely what
the Court held in 1926.  <u>See</u> <u>Sydney v. MacFadden Newspaper Pub.
Corp.</u>, 242 N.Y. 208, 213-14 (1926).

[9]    That New York law treats a statement accusing a woman,
but not a man, of unchastity as defamatory per se is both
antiquated and highly questionable.

-24-

homosexual conduct, holding that such laws violate the Fourteenth Amendment's Due Process Clause.  Lawrence v. Texas, 539 U.S. 558, 578 (2003).  Thus, to the extent that courts previously relied on the criminality of homosexual conduct in holding that a statement imputing homosexuality subjects a person to contempt and ridicule, see Plumley v. Landmark Chevrolet, 122 F.3d 308, 310-11 (5th Cir. 1997) (holding that calling person "faggot" was slander per se because doing so "impute[s] the crime of sodomy"), Lawrence has foreclosed such reliance.

            Second, in 2009, the "current of contemporary public opinion" does not support the notion that New Yorkers view gays and lesbians as shameful or odious.  A movement is currently afoot in the state to legalize gay marriage, see Jeremy W. Peters, Paterson Introduces a Same-Sex Marriage Bill, N.Y. Times, Apr. 16, 2009, at A1, and according to a recent opinion poll from Quinnipiac University -- an independent polling institute -- New York State residents support gay marriage 51 to 41 percent, with 8 percent undecided.  See Quinnipiac University Polling Institute, New York State Voters Support Same-Sex Marriage Quinnipiac University Poll Finds, June 23, 2009, http://www.quinnipiac.edu/x1318.xml?ReleaseID=1340.  The same poll found that New York State residents support civil unions 68 to 25 percent.  (Id.).  The fact that a majority of New Yorkers supports some sort of government recognition of same-sex relationships belies the notion that these same New Yorkers

regard gays and lesbians with "public contempt, ridicule, aversion or disgrace."

Finally, the New York Court of Appeals has not, in its most recent opinion touching on social attitudes toward homosexuality, given any indication that it perceives widespread disapproval of homosexuality in New York. In Hernandez v. Robles, a majority of the Court of Appeals rejected the argument that the New York Constitution compels recognition of same-sex marriage. 7 N.Y.3d 338, 356 (2006). The plurality opinion clearly recognized, however, that social attitudes toward gay and lesbian New Yorkers had changed dramatically in the past few years, see id. at 361 ("The idea that same-sex marriage is even possible is a relatively new one."), and that the New York legislature could permit same-sex marriage if it chose to. See id. at 358-59 (noting that "of course the Legislature may (subject to the effect of the federal Defense of Marriage Act) extend marriage or some or all of its benefits to same-sex couples"). The concurring opinion went even further, and suggested that the New York legislature should take up the issue. See id. at 379 (Graffeo, J., concurring) ("It may well be that the time has come for the Legislature to address the needs of same-sex couples and their families, and to consider granting these individuals additional benefits through marriage or whatever status the Legislature deems appropriate."). The Court of Appeals' opinion in Hernandez is simply inconsistent with the

notion that gays and lesbians are the subject of scorn and disgrace.

Judge McMahon, in 2008, considered this issue and reached the opposite conclusion.  See Gallo v. Alitalia-Linee Aeree Italiane-Societa Per Azioni, 585 F. Supp. 2d 520, 549-50 (S.D.N.Y. 2008).  Her carefully-considered decision was based largely on the fact that prejudice still exists against gays and lesbians in our society.  See id. ("This Court's decision to include homosexuality in the slander per se category should not be interpreted as endorsing prejudicial views against gays and lesbians.  Rather, this decision is based on the fact that the prejudice gays and lesbians experience is real and sufficiently widespread so that it would be premature to declare victory.  If the degree of this widespread prejudice disappears, this Court welcomes the red flag that will attach to this decision.") (citations omitted).  While I certainly agree that gays and lesbians continue to face prejudice, I respectfully disagree that the existence of this continued prejudice leads to the conclusion that there is a widespread view of gays and lesbians as contemptible and disgraceful.  Moreover, the fact of such prejudice on the part of some does not warrant a judicial holding that gays and lesbians, merely because of their sexual orientation, belong in the same class as criminals.  Accord Albright v. Morton, 321 F. Supp. 2d 130, 138 (D. Mass. 2004) ("If this Court were to agree that calling someone a homosexual is defamatory per se -- it would, in effect, validate that sentiment

-27-

and legitimize relegating homosexuals to second-class status.").[10]

        Stern argues principally that this Court is bound by New York Appellate Division cases -- several of which are cited above -- holding that an imputation of homosexuality is defamatory per se. I am not so bound. The rulings of intermediate appellate courts are "helpful indicators of how the state's highest court would rule," but they are not binding on me. See DiBella v. Hopkins, 403 F.3d 102, 112 (2d Cir. 2005). Only one of the Appellate Division cases considers the issue in any depth; the others fail to discuss the evolving social attitudes regarding homosexuality and merely state, in a conclusory manner, that an imputation of homosexuality is defamation per se. Cf. Lewittes v. Cohen, No. 03 Civ. 189 (CSH), 2004 U.S. Dist. LEXIS 9467, at *10 n.5 (S.D.N.Y. May 24, 2004) (citing several Appellate Division cases and concluding that "[g]iven welcome shifts in social perceptions of homosexuality . . . there is good reason to question the reliability of these precedents"). The only decision that does consider the issue is Matherson v. Marchello, 100 A.D.2d 233, 241-42 (2d Dep't 1984). That decision was from 1984, and even then the court struggled with the decision. See id. at 241 (holding issue "presents a far

_____

        [10]    I also note that amicus curiae Lambda Legal Defense and Education Fund, one of the largest gay and lesbian advocacy organizations in the country, argues that, because it is "neither shameful nor disgraceful to be identified as lesbian or gay, it is not defamatory per se to describe someone as gay." (Lambda Mem. at 1).

more subtle and difficult question").  Accordingly, while I have
carefully considered these cases, they are not controlling as I
consider how the New York Court of Appeals would rule on the
issue in 2009, after Lawrence v. Texas.

          Thus, I hold that Statements 1 and 2 are not defamatory
per se merely because they impute homosexuality to Stern.  They
are, however, nonetheless susceptible to a defamatory meaning.
Therefore, a jury will decide whether they are defamatory.

          Statement 1 alleges that Stern engaged in a sexual act
with Birkhead at a party in Los Angeles in 2005.  A reasonable
jury could find that engaging in oral sex at a party is shameful
or contemptible, and the fact that this conduct may not be
illegal does not alter this conclusion.  Cf. Jewell, 23 F. Supp.
2d at 363 ("While it may be true that these actions are not
'illegal or immoral,' the law does not require them to be either
in order for the statements to be capable of a defamatory
meaning.").  Moreover, it also appears from the record that, at
the time this alleged incident took place in 2005 (9/23/08 Cosby
Dep. at 604-05), Smith was dating Birkhead and/or still involved
in a relationship with Stern.  (Compare Book at 203-04 (implying
that Smith and Birkhead were dating at time of party) with Stern
Decl. ¶ 5 (stating that he and Smith had continuous romantic
relationship beginning in 2000)).  Thus, to the extent that the
Statement implies that Stern was unfaithful to Smith, this would
be further reason for a jury to find that the Statement is
defamatory.

Statement 2 alleges that Stern made a sex tape with Birkhead.  This allegation would expose Stern to contempt among most people -- even if, arguably, not among the social circles in which he and Smith traveled.[11]  Moreover, while the record does not reveal when the sex tape was allegedly made, to the extent that Smith was dating Stern at that time, again a reasonable jury could find that Stern was unfaithful to Smith, and that his infidelity was shameful.

For these reasons, I conclude that Statements 1 and 2 are susceptible to a defamatory meaning, but are not defamatory per se.  Accordingly, Stern will have to prove special damages as to each of these Statements.[12]

### b.    **Statements 6 and 11**

Defendants argue that Statements 6 and 11 are substantially true, and therefore cannot be defamatory.

Under New York law "it is 'fundamental that truth is an absolute, unqualified defense to a civil defamation action,' and 'substantial truth suffices to defeat a charge of libel.'"  Weber

---

[11]    I reject, as absurd, Cosby's argument that Statement 2 is not susceptible to a defamatory meaning because sex tapes are commonly made by celebrities, and do not expose those celebrities to contempt.  (Cosby Mem. at 19 n. 16; Cosby Decl. ¶ 74).

[12]    It is not clear to the Court whether either defendant moves for summary judgment as to damages, but I am satisfied that Stern has adduced sufficient evidence of damages to get to a jury.  Under New York law, "a plaintiff entitled only to nominal damages of one dollar is entitled to the vindication which a jury verdict can bring."  Sharon, 599 F. Supp. at 586.  Here, Stern has alleged damages to his reputation in the tens of millions of dollars, and he is entitled to have a jury determine the amount of damages, if any.

v. Multimedia Entm't, Inc., No. 97 Civ. 0682 (JGK), 2000 U.S.
Dist. LEXIS 5688, at *29 (S.D.N.Y. May 2, 2000) (quoting
Guccione, 800 F.2d at 301).  The Supreme Court has held that,
where the "the substance, the gist, [or] the sting" of a
statement is true, it cannot be libelous.  Masson, 501 U.S. at
517 (internal citation and quotation omitted).

### i.    **Statement 6**

Statement 6 reads in full as follows:

> "I just want her to be with Daniel," Howard
> K. Stern cried to Entertainment Tonight
> cameras on his flight from Florida to the
> Bahamas on Entertainment Tonight's private
> plane.  Even though Howard testified under
> oath during the Florida court hearing over
> Anna's burial that he only received the free
> flight, he was reportedly paid one million
> dollars to allow the entertainment news
> magazine to exclusively tape him and tag
> along as he went back to the Bahamas to
> secure Anna's five-month-old baby, Dannielynn
> -- the baby he was claiming to be the father
> of.

(Book at 28).  Cosby argues that this statement is substantially
true, because on February 21, 2007, Stern testified in a Florida
proceeding that, since the death of Daniel Smith, he had not
"received directly any financial remuneration from any media,
press, or public relations."  (12/15/08 McNamara Decl. Ex. R).

Stern concedes that he signed a contract with
Entertainment Tonight.  (Stern Decl. ¶ 81 ("I signed the contract
because I needed the money to bring Anna back to the Bahamas.").
He claims, however, that he subsequently told the network that he
did not want to go through with the contract and that his mother,

-31-

without his knowledge, subsequently told Entertainment Tonight to proceed with the contract.  (Id. ¶¶ 82-83).  Stern claims he was "shocked" when he learned he had received $150,000 for the interview.  (Id. ¶¶ 81-82).

The gist of Statement 6 is true, even if some of the details were wrong, and Cosby's motion is therefore granted as to it.  Stern did in fact sign a contract with Entertainment Tonight, and he was paid $150,000 -- not $1 million -- for permitting the network to film him on the plane.  His statement in the proceeding was, if technically correct, nonetheless misleading.  No reasonable jury could conclude otherwise. Accordingly, Statement 6 is substantially true, and therefore not actionable.

### ii.  **Statement 11**

Statement 11 reads in full as follows:

> Even though Howard K. Stern testified on the stand that he was the father of Dannielynn, he privately made this offer to Larry:  "I will give you your baby if you leave me as executor of the estate."

(Photograph caption in Book).  Cosby argues that this Statement is substantially true because Stern knew when he testified that he was not Dannielynn's father.  As Stern points out, however, while there may have been indications prior to his testimony that he was not the father, he did not know that as fact until an April 2007 paternity test proved that Birkhead was Dannielynn's father.  (Stern Decl. ¶¶ 105-06).

Moreover, Stern also challenges Statement 11 for its accusation that he sought to "trade" Dannielynn in exchange for being named executor of Smith's estate.  (Compl. ¶ 276; Stern Decl. ¶ 104).  According to Birkhead, he never told Cosby any such thing.  (Birkhead Decl. ¶ 15).

Because Cosby has not submitted any evidence to show that Statement 11 is substantially true, her motion for summary judgment as to Statement 11 is denied.

### c.   Remaining Statements

The parties do not appear to dispute that the remaining Statements are susceptible to a defamatory meaning, and having reviewed the Statements, I agree.  Accordingly, a jury will determine whether the remaining Statements are defamatory.

## D.   Did Defendants Act with Actual Malice?

Both defendants argue that Stern has failed to present sufficient evidence of actual malice.  First, I discuss the legal standards for determining the existence of actual malice.  Second, I address the evidence of actual malice on the part of Cosby and Hachette, in turn.

### 1.   Actual Malice Standard

The Second Circuit has explained the standard of actual malice as follows:

> Despite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication.  If it cannot be shown that the defendant knew that the statements were

> false, a plaintiff must demonstrate that the
> defendant made the statements with reckless
> disregard of whether they were true or false.
> The reckless conduct needed to show actual
> malice is not measured by whether a
> reasonably prudent man would have published,
> or would have investigated before publishing,
> but by whether there is sufficient evidence
> to permit the conclusion that the defendant
> in fact entertained serious doubts as to the
> truth of his publication.

Church of Scientology Int'l v. Behar, 238 F.3d 168, 174 (2d Cir.

2001) (internal citations and quotations omitted).   The plaintiff

bears the burden of proving actual malice by clear and convincing

evidence.   Anderson v. Liberty Lobby, 477 U.S. 242, 255-57

(1986).

Factors for a court to consider in determining whether

a defendant acted with actual malice include (1) whether a story

is fabricated or based on an unverified, anonymous source; (2)

whether the allegations at issue "are so inherently improbable

that only a reckless person would have put them in circulation";

and (3) whether there are any obvious reasons to doubt the

truthfulness of the defendant's source or the accuracy of the

source's report.   Behar, 238 F.3d at 174 (quoting and citing St.

Amant v. Thompson, 390 U.S. 727, 732 (1968)).

In determining whether a plaintiff has adduced

sufficient evidence to reach a jury, the Court may consider

plaintiff's evidence of actual malice in the aggregate.   See

Tavoulareas v. Piro, 817 F.2d 762, 794 n.43 (D.C. Cir. 1987) (en

banc) ("We recognize that each individual piece of evidence

cannot fairly be judged individually against the standard of

-34-

clear and convincing evidence.  Plaintiffs are entitled to an
aggregate consideration of all their evidence to determine if
their burden has been met."); McFarlane v. Sheridan Square Press,
91 F.3d 1501, 1510 (D.C. Cir. 1996) (citing Tavoulareas for same
proposition); Bolden v. Morgan Stanley & Co., 765 F. Supp. 830,
834 (S.D.N.Y. 1991) (denying defendant's motion for summary
judgment based on "aggregate of plaintiff's evidence" of actual
malice); but see Church of Scientology v. Time Warner, Inc., 903
F. Supp. 637, 641 (S.D.N.Y. 1995) ("[T]he Court considers each
allegedly libelous statement individually to determine whether a
rational finder of fact could find actual malice by clear and
convincing evidence.") (emphasis added).

### 2.  Cosby

There is substantial evidence in the record from which
a reasonable jury could find that Cosby acted with actual malice
vis-a-vis several of the Statements.  As discussed below, two of
Cosby's sources accuse her of trying to get them to say untrue
things, and two deny what she attributed to them entirely.  Cosby
also relied on sources who were obviously biased against Stern,
and the record also contains evidence that Cosby tried to bribe
two other sources.  This is sufficient evidence of actual malice
to take to a jury, at least with respect to certain Statements.

### a.  Statement 1

A reasonable jury could find that Cosby acted with
actual malice vis-a-vis Statement 1.

First, a reasonable jury could find, by clear and
convincing evidence, that there are "obvious reasons to doubt"
the truthfulness of Jackie Hatten, Cosby's source for Statement
1.  Behar, 238 F.3d at 174.  A jury could so find based on the
following:

- Mark Hatten, Jackie's brother, was convicted of
  stalking Smith and assaulting one of Smith's
  neighbors, and evidently Mark Hatten believed that
  Stern falsely accused him of these crimes.  (Stern
  Decl. ¶¶ 28, 72-73).  Similarly, according to
  Stern, Smith cut Jackie Hatten out of her life in
  2000 and referred to Jackie and her brother as
  "psychos," "stalkers," and "crazy."  (Cosby Decl.
  ¶ 39).  A reasonable jury could find, based on
  this evidence, that Jackie Hatten was so biased
  that it was reckless of Cosby to rely on her for
  the Statement.

- In an appearance on Fox News that Cosby claims she
  saw prior to being told by Hatten about the
  incident (Cosby Decl. ¶ 73), Hatten stated several
  times that she "had been told that Howard was
  gay."  (Stern Decl. Ex. 13 (video of interview)).
  Notably, however, Hatten did not state in that
  interview that she knew Stern was gay, or that she
  had seen him engage in sexual acts with another
  man; instead she alluded to the fact that he would

frequent gay bars with Smith.  (Id.).  As Stern
points out, if Hatten really had witnessed Stern
and Birkhead engaging in sexual contact at a
party, she undoubtedly would have said so during
that interview.[13]  The fact that she did not
suggests she may have fabricated the story, and
the fact that Cosby never questioned her on this
point suggests Cosby was so desperate to find
explosive items to include in the Book that she
simply did not care.  Cf. Babb v. Minder, 806 F.2d
749, 755 (7th Cir. 1986) ("Reckless conduct may be
evidenced in part by failure to investigate
thoroughly and verify the facts . . . particularly
where the material is peculiarly harmful or
damaging to the plaintiff's reputation or good
name.") (internal citations and quotations
omitted).

Second, a reasonable jury could find that Statement 1
was so "inherently improbable that only a reckless person" would
have published it.  Behar, 238 F.3d at 174 (internal citation and
quotation omitted).  The inherent improbability in this Statement
is not that two men had sex at a party, but that these two men
did so, in a bedroom at a party in a stranger's house in Los

---

[13]     Hatten certainly was not shy about making incendiary
charges on national television:  In a February 13, 2007 interview
she suggested Stern was responsible for the deaths of Smith and
her son.  (Cosby Decl. ¶ 76; id. ex. 29).

Angeles, precisely when Smith and Jackie Hatten were themselves walking around in the house and entering bedrooms.  Stern and Birkhead maintain that they are heterosexual, and, as discussed above, there is evidence in the record to suggest that Smith had some type of relationship with <u>both</u> men at the time the incident occurred.  Both men, moreover, were key players in the tabloid drama that was Smith's life -- Birkhead as the father of one of Smith's children and Stern as her lawyer and companion -- and the allegation that they had a sexual relationship was nothing short of explosive.  Perhaps too explosive.  In other words, printing a claim that Birkhead and Stern had sex would be a way to make it to the top of the bestseller list, and a reasonable jury could find that Cosby ignored the inherently improbable nature of the Statement in her zeal to write a blockbuster book.

   b. **Statement 2**

    There is substantial evidence in the record from which a reasonable jury could find that Cosby acted with actual malice vis-a-vis Statement 2.

    First, Cosby's conduct after the Book was published is evidence from which a reasonable jury could find that she had subjective doubts as to the veracity of Statement 2.[14]  After

---

   [14] I reject Cosby's argument that I cannot consider evidence of events that took place after publication of the Book in evaluating whether Cosby acted with actual malice.  The fact that Cosby tried to obtain an affidavit from the nannies under the circumstances alleged is properly considered as evidence of her state of mind when she wrote the Book.  See <u>Sharon v. Time, Inc.</u>, 599 F. Supp. 538, 581 (S.D.N.Y. 1984) (considering post-publication evidence and holding that such evidence "could be

-38-

Stern filed this lawsuit, Cosby traveled to the Bahamas and attempted to meet with the nannies who had purportedly observed Smith watching the sex tape. See Stern I, 246 F.R.D. at 455. In a conversation with Lincoln Bain, one of the nannies' representatives, Cosby proposed paying the nannies to sign an affidavit attesting to the accuracy of the statements she attributed to them in the Book. (Id. at 455-56). Cosby was adamant in the conversation, however, that the payment go through the nannies' attorney, because making a payment directly to the nannies would raise serious questions in this court proceeding:

> I cannot do much more because then it would look outrageous. You know what I mean? Because the problem is now that I'm dealing with the court thing, you have to understand, my thought's it's going to come back.

(Id. at 456). Cosby suggested that the attorney send her a bill for services rendered in connection with the affidavit, and she then had this exchange with Bain:

> COSBY: So I think that way everybody is covered and I think that that is a win-win. And that way so if it ever comes out, yeah I paid her, I'll say, I paid her cause these guys prepared the affidavit and that is a bona fide expense.
>
> BAIN: Yeah.
>
> COSBY: You know, and then I paid the

_____

weighed by the jury as part of a possible factual basis for finding that [defendant] had recklessly disregarded the truth"); see also United States v. Lorenzo, 534 F.3d 153, 161 (2d Cir. 2008) (holding, in criminal context, that "'false exculpatory statements made to law enforcement officials are circumstantial evidence of a consciousness of guilt and have independent probative force'") (quoting States v. Johnson, 513 F.2d 819, 824 (2d Cir. 1975)).

> attorney, and here is the bill for it.  You
> know what I mean?
>
> BAIN:  Yeah.
>
> COSBY: You know, that is a perfectly bona
> fide, you know, and that way, that way, that
> way you know cause otherwise you get into
> this whole thing if I get put under oath at
> some point now and they say, did you pay them
> a dime?  And I can say, well, I paid the
> attorney for the affidavit.  That's
> legitimate.  You know what I mean?
>
> BAIN: Yeah, yeah.

(Id.).  Cosby also made clear that once she had paid the

attorney, the attorney "can do whatever she wants with the

money," and that "down the road" she could do more.  (Id. at 455-

56).

        As I noted in Stern I, Cosby's actions are extremely

troubling, and suggest that she was attempting to obstruct

justice by tampering with witnesses.  (Id. at 457-58).  Presented

with this evidence, a reasonable jury could conclude that Cosby

knew she had fabricated Statement 2 and was desperate to come up

with an after-the-fact verification of one of the more salacious

and explosive allegations in the Book.

        Second, a reasonable jury could find that there were

"obvious reasons" to doubt the truthfulness of Cosby's sources

for this Statement, Don Clark and Wilma Vicedomine.  Clark and

Vicedomine were Cosby's only sources for the claim that Stern and

Birkhead made a sex tape that Smith used to watch.  (Cosby Decl.

¶ 82).  Clark and Vicedomine were private investigators working

for John O'Quinn, an attorney who represented Smith's mother,

-40-

Virgie Arthur.  (Cosby Decl. ¶ 82).  Prior to writing the Book,
Cosby was aware that they worked for O'Quinn, and that O'Quinn,
on behalf of Arthur, was challenging Stern's custody over Smith's
daughter.  (9/23/08 Cosby Dep. at 573).  Cosby also knew that
there was "animosity" between Stern and Arthur, that Stern had
sued O'Quinn for libel, and that one of the claims in Stern's
suit arose out of an interview Cosby conducted with O'Quinn on
MSNBC.  (Id. at 577-78).  Moreover, after the Book was published,
Clark lied on national television about being the source for the
sex tape story.  (See Clark Dep. at 304-05 ("Q.  This statement
was not the truth when you said it on national television that
you didn't have any idea how Rita Cosby got her information about
it.  That was not the truth, was it, Mr. Clark?  A.  That was not
the truth.")).  A reasonable jury could find that Cosby's
reliance on these two sources for such an explosive allegation is
evidence of actual malice, because Cosby was aware of their
possible bias and/or unreliability.  Cf. Secord v. Cockburn, 747
F. Supp. 779, 789 (D.D.C. 1990) (holding that actual malice
requirement met where "author was subjectively aware that the
source was unreliable").

        Finally, a reasonable jury could conclude that
Statement 2 is so "inherently improbable that only a reckless
person" would have published it.  Behar, 238 F.3d at 174
(internal citation and quotation omitted).  I understand that
Smith and Stern led what many people would describe as an
unorthodox lifestyle.  Even in the context of an unorthodox

lifestyle, however, Statement 2 is hard to fathom.  Not only does
Statement 2 allege that Stern (Smith's lawyer and companion) and
Birkhead (the father of Smith's child) had sex together, but that
(1) they made a video of their sexual activity, (2) Smith
obtained or was provided with a copy of the video, (3) she
regularly viewed the video, (4) to entertain herself, (5) in
front of the nannies.  Viewing the evidence in the light most
favorable to Stern, I conclude that a reasonable jury could find
that this Statement was inherently improbable, Cosby knew or
should have known that it was not true, and she wrote the
Statement with actual malice.

### c.    **Statement 3**

Cosby's source for this Statement regarding Stern's and
Smith's drug use was anonymous.  By not filing a motion to compel
prior to summary judgment to obtain the names of these anonymous
sources, Stern has waived the right to challenge the credibility
or reliability of those witnesses now.  See Oao Alfa Bank v. Ctr.
for Pub. Integrity, 387 F. Supp. 2d 20, 52 n.53 (D.D.C. 2005)
("The Court does not see the wisdom in allowing plaintiffs to lie
in the weeds until a motion for summary judgment is filed, and
then spring the issue at summary judgment, denying defendants any
right to use the evidence at all.").  Cosby's motion for summary
judgment as to Statement 3 is therefore granted.

### d.    **Statements 4 and 5**

Stern argues that Cosby's reliance on Mark Hatten as
the source for these two Statements is evidence of actual malice

-42-

because Hatten was so unreliable and biased that it would be reckless to rely on him.  The evidence of bias Stern cites is that Hatten was convicted of stalking Smith and assaulting one of Smith's neighbors, and that Hatten claims Stern set him up. (Stern Decl. ¶ 73).  Cosby acted recklessly, Stern argues, in relying on a source so obviously biased as Hatten.

It is a close call, but I disagree that a jury could find that Cosby acted with actual malice in reporting Hatten's accusations.  While the two Statements convey the point that Hatten was accusing Stern of framing him, they also make clear that Hatten was arrested, convicted, and sentenced to seven years in prison.  A reasonable jury could only conclude that Hatten's allegations were nothing other than the bitter complaints of a convicted felon, and from the way Cosby presents them it is clear that Cosby was not adopting Hatten's views.  While merely reporting what another has said obviously does not insulate a reporter from liability for defamation, under these circumstances a reasonable jury could not conclude that Cosby acted with actual malice in repeating Hatten's allegations in the Statements.

### e.    Statement 6

As discussed above, Statement 6 is dismissed on the ground that it is substantially true.

### f.    Statements 7 and 8

There is sufficient evidence from which a reasonable jury could find that Cosby acted with actual malice vis-a-vis Statements 7 and 8.  Jack Harding is the source for Statement 7,

and Jackie Hatten for Statement 8, but Cosby corroborated each
Statement by reference to the other, and thus they are properly
considered together.  (See Cosby Decl. ¶ 117 ("These two sources
[Harding and Hatten] independently told me consistent information
which helped to corroborate it and make it more credible."); id.
¶ 121 ("[G]iven the detail of Jackie's [Hatten] story which was
reinforced by Jack Harding's independent statement, I absolutely
believed Daniel's description of the pimping.")).

        First, there is evidence that Cosby fabricated quotes.
Jack Harding is the source for Statement 7.  During his
deposition, Harding unequivocally denied making Statement 7 to
Cosby, or to anyone else:

            Q.  The fact of the matter is, whether he
            would demean his mom that way or not, the
            truth of the matter is that Daniel Smith
            never made that statement to you; right?

            A.  No.

            Q.  He didn't; is that right?

            A.  That's right.

            Q.  And in fact -- truth and in fact, you
            never told Ms. Cosby that Daniel had told you
            that Howard was having people lay his mom,
            pimping her for sex?

            A.  No.

            Q.  You didn't tell her that, did you?

            A.  I didn't tell her that, but she kept
            asking me that and I kept saying, "I -- I
            have no idea.  He never said that to me."

            Q.  And you never told anyone that Daniel
            Smith told you that Howard K. Stern was
            having people lay his mom or pimping her for
            sex?

                            -44-

A.    No.

(Harding Dep. at 60-61).

Cosby argues that this Court should disregard Harding's denial for three reasons:  first, the denial is "nothing more than a failure to remember by a sick and tired elderly man"; second, Harding, in other interviews, acknowledged making statements that he denied making in his deposition; and, finally, Cosby's notes from her interview of Harding and a subsequent email she sent reflect what she wrote in the Book.

Cosby's arguments fail, however, because she is arguing credibility.  It is for a jury -- not the Court -- to consider conflicting testimony, make credibility determinations, and weigh the evidence.  Even assuming Harding made statements elsewhere that contradict his deposition testimony here, it is up to the jury to resolve the conflicts.

Second, a reasonable jury could find that Statements 7 and 8 are so inherently improbable that Cosby was reckless in including them in the Book.  It is one thing to point out the various unorthodox aspects of Smith's life.  It is another thing entirely, however, to state that Smith knowingly acted as a prostitute (with all the money she had), with Stern as her "pimp," or that Stern drugged her and "pimped" her to as many as fifty men a year.  It will be up to a jury to determine whether this Statement is as inherently improbable as it sounds.[15]

---

[15]    Cosby's argument that she did not, as a matter of law, act with actual malice because she relied on previous reports intimating that Stern was "pimping" Smith is rejected, as there

-45-

g.    **Statement 9**

Stern argues that the sources for this Statement are unreliable.  The only evidence he cites is that the sources had previously made the accusation to the Bahamian police after Daniel Smith's death.  (Stern Decl. ¶ 95).  It is not clear to the Court how this undermines, rather than reinforces, the sources' reliability, and Stern does not elaborate.  In any event, this is not evidence that Cosby acted with actual malice.

h.    **Statement 10**

Stern argues that the sources for this Statement are biased and unreliable, and cites as evidence the fact that Mark Speer had taken sides in a dispute involving Larry Birkhead and his attorney.  Stern also makes much of the fact that, in his deposition, Speer quibbled with some of the language Cosby used to describe things he had said, but never denied the substance of what he told Cosby.  (See, e.g., Speer Dep. at 176-82).  Based on this evidence, and even considering the other evidence of actual malice in the record, no reasonable jury could find that Cosby acted with actual malice vis-a-vis Statement 10.

---

is evidence that Cosby either knew the allegation was false, or was reckless as to its truth or falsity.  See Flowers v. Carville, 310 F.3d 1118, 1130 (9th Cir. 2002) ("[I]f someone knows that the news story is false, he can't sanitize his republication by purporting to rely on the news source.  Nor can he claim immunity if he has conflicting information from another source and recklessly disregards it.").

-46-

### i.    Statement 11

The Statement itself identifies Birkhead as its source, but Birkhead has submitted a declaration explicitly and unequivocally denying ever telling Cosby that Stern offered to abandon his paternity claim in exchange for being named executor of Smith's estate.  (See Birkhead Decl. ¶ 15 ("Rita Cosby's claim . . . that I told her that Howard made an offer that included him 'giving' me Dannielynn is a deliberate fabrication.  I never told her anything of the sort.").  It will be up to a jury to determine who is telling the truth.  If the jury believes Birkhead in this respect, it could reasonably find that Cosby acted with actual malice.

### j.    Statement 12

Stern focuses on Birkhead's denials that any of the statements Speer allegedly overheard took place, but Speer was Cosby's source for this Statement, not Birkhead.  While Stern consistently maintains that Speer was unreliable, the evidence supporting his contention is not sufficient for a reasonable jury to find that Cosby acted recklessly in relying on Speer.

### k.    Statement 13

Virgie Arthur, Stern's mother, is the source for this Statement.  (Cosby Decl. ¶ 148).  For the same reasons discussed above in the context of Statement 2, a reasonable jury could find that Cosby's reliance on Arthur for such a sensational allegation was reckless, and therefore evidence of actual malice.

1.    **Statement 14**

Stern does not, either in his brief or declaration, adduce any evidence -- other than Stern's claim of falsity -- of actual malice as to Statement 14, and it is therefore dismissed.

m.    **Statements 15-19**

These Statements generally suggest that Stern was complicit in the deaths of Smith and her son, Daniel, and are the most serious accusations in the Book, as Cosby's counsel acknowledged at oral argument.  (7/7/09 Tr. at 8 ("The most damning allegation at issue is that [Stern] was in some way responsible for Anna Nicole's death and responsible for Daniel's death.")).  Cosby attributes them to a number of different sources, including Virgie Arthur and Jackie Hatten.  As discussed above, a reasonable jury could find that there are obvious reasons to doubt the truthfulness of Arthur and Hatten, and in light of the seriousness of the allegations -- which in substance accuse Stern of murder -- and the evidence of actual malice in the record as to other Statements, I conclude that whether Cosby acted with actual malice vis-a-visa Statements 15 to 19 is a question for the jury.  Accordingly, Cosby's motion for summary judgment on Statements 15-19 is denied.

To summarize, Cosby's motion for summary judgment is granted as to Statements 3, 4, 5, 6, 9, 10, 12, and 14, and denied as to Statements 1, 2, 7, 8, 11, 13, 15, 16, 17, 18, and 19.

-48-

3.    **Hachette**

The only issue as to Hachette is whether Hachette acted with actual malice with respect to publication of the Book.  I conclude there is insufficient evidence in the record from which a reasonable jury could find, by clear and convincing evidence, that Hachette acted with actual malice, and therefore I grant Hachette's motion for summary judgment.

The only evidence Stern adduces that Hachette acted with actual malice is that Hachette did not investigate the reliability of Cosby's sources or the accuracy of her claims. Hachette does not dispute that it did not independently fact-check anything in the Book.  (Einhorn Aff. ¶ 5).[16]  The law is clear, however, that a book publisher has no independent duty to investigate an author's story unless the publisher has actual, subjective doubts as to the accuracy of the story.  See Lohrenz v. Donnelly, 350 F.3d 1272, 1284 (D.C. Cir. 2003); Hotchner v. Castillo-Puche, 551 F.2d 910, 914 (2d Cir. 1977) (holding that publisher's "failure to conduct an elaborate independent investigation did not constitute reckless disregard for truth"). The First Circuit explained the reason for this rule as follows:

> To require a book publisher to check, as a matter of course, every potentially defamatory reference might raise the price of non-fiction works beyond the resources of the average man.  This result would, we think, produce just such a chilling effect on the

---

[16]    Indeed, Einhorn stated that she is not aware of a single book publisher that has an in-house fact-checking department.  (Id. ¶ 6).

> free flow of ideas as First Amendment
> jurisprudence has sought to avoid.

Geiger v. Dell Pub. Co., 719 F.2d 515, 518 (1st Cir. 1983).  A
book publisher is permitted to rely on an author's reputation and
experience without having to independently fact-check a book.
See McManus v. Doubleday & Co., 513 F. Supp. 1383, 1389-90
(S.D.N.Y. 1981) (denying summary judgment as to author but
granting as to publisher because publisher was "entitled as a
matter of law to rely on [author's] proven reportorial ability").

Stern adduces no evidence that anyone at Hachette had
any actual, subjective doubt as to any of Cosby's reporting.[17]
Rather, he appears to suggest that they should have had doubts.
He argues as follows:

- ■ "Hachette knew that Cosby's primary sources for a
  majority of her information were Clark and
  Vicedomine and that all of the information they
  provided was hearsay or double hearsay without any
  corroboration."  (Stern Opp. at 71).

- ■ "Hachette knew that Cosby had absolutely no
  corroboration for the other major claims in [the
  Book], including that Jackie Hatten saw Stern
  performing oral sex on Birkhead at a party in Los
  Angeles and that Stern pimped Ms. Smith out to at

_____

[17]    The actual malice of an author cannot be imputed to the
publisher unless the author is an employee of the publisher.  See
Chaiken v. VV Publ. Corp., 119 F.3d 1018, 1033-34 (2d Cir. 1997).
Stern does not allege -- nor could he -- that Cosby was
Hachette's employee.

least fifty or possibly as many as one hundred men
in a year without her knowledge."  (Stern Opp. at
71).

As discussed above, however, Cosby did have sources -- however
unreliable -- for these Statements, and Hachette had no duty to
investigate the reliability of these sources or the accuracy of
Cosby's reporting.[18]  Hachette, moreover, was entitled to rely on
the accuracy of the reporting of a journalist with three Emmys
under her belt.

        While there is evidence in the record, discussed above,
from which a reasonable jury could find that Cosby had subjective
doubts as to the accuracy of certain of the Statements in the
Book, there is no evidence to suggest Hachette was aware of any
of it.  There is, for example, nothing in the record to suggest
that Hachette was aware that Cosby pressured sources to lie, as a
jury could so find, or that, after the Book was published, Cosby
traveled to the Bahamas in an apparent effort to tamper with
witnesses.  There is simply no evidence in the record -- much
less clear and convincing evidence -- from which a reasonable

---

        [18]    Stern also suggests, in a single conclusory sentence,
that Hachette investigated certain sources, "uncovered serious
concerns and reasons to doubt their credibility, and purposely
chose not to investigate further."  (Stern Opp. at 73).  Stern
does not cite to any evidence in the record to show that Hachette
investigated any of the sources, and the Court's own review of
the record had not revealed any.

jury could find that anyone at Hachette had the same knowledge as
Cosby as to the reliability of these sources.[19]

  This conclusion is unaffected by the fact that
Hachette, pursuant to its standard practice, contractually
required Cosby to submit all her source materials to Hachette's
outside counsel to conduct a libel review.  Stern does not point
to any evidence that the review conducted by Hachette's attorney
resulted in anyone at Hachette entertaining any subjective doubts
as to the accuracy of Cosby's reporting.  Even assuming the
outside attorney had actual doubts -- and Stern submits no
evidence of any -- her doubts could not be imputed to Hachette,
as it is undisputed that she was not Hachette's employee.  See
Murray v. Bailey, 613 F. Supp. 1276, 1282 (N.D. Cal. 1985)
(holding, in context of actual malice inquiry, that "stringent

---

[19] The Court has concluded, as discussed above, that the
jury can consider whether the inherently improbable nature of
certain of the Statements is evidence that Cosby acted with
actual malice when she published them.  I have considered whether
a jury could infer actual malice as to Hachette based on these
same Statements, and I conclude that it could not.  In Revell v.
Hoffman, 309 F.3d 1228, 1233 (10th Cir. 2002), the Tenth Circuit
was confronted with a similar situation.  There, the plaintiff's
only evidence of actual malice was the inherent improbability of
various passages in a book regarding the Oklahoma City bombing.
The Tenth Circuit affirmed the District Court's grant of summary
judgment to the defendants, concluding that the plaintiff
"confuses what might be considered some evidence of actual malice
with what, standing alone, will suffice to carry his burden of
proving actual malice."  Id.  The Tenth Circuit refused to permit
the plaintiff to proceed to trial based solely on inherent
improbability because "[r]equiring publishers to finance trials
based on such nebulous allegations would severely burden First
Amendment rights."  Id. at 1234.  The Tenth Circuit's conclusion
applies with equal force to this case.  Under the circumstances,
I conclude that the inherently improbable nature of certain of
the Statements, without more, is insufficient evidence of actual
malice to reach a jury.

standards required by the First Amendment make application of an agency theory inappropriate").

Nor is it sufficient that Hachette was anxious to publish the Book as soon as possible and with as many blockbuster stories as possible.  There is nothing improper or even remarkable about the fact that Hachette, a for-profit publisher, was interested in producing a best-selling book, and the law is clear that absent evidence of "pressure to produce sensationalistic or high-impact stories with little or no regard for their accuracy," pressure to publish sensational stories "cannot, as a matter of law, constitute evidence of actual malice."  Tavoulareas, 817 F.2d at 796-97.

Stern's remaining arguments as to Hachette are similarly meritless.  He argues that one of Einhorn's innocuous notations on a manuscript of the Book and Hachette's post-publication marketing efforts constitute evidence of actual malice, but they are no such thing, and are certainly not clear and convincing evidence.

Because there is insufficient evidence in the record from which a reasonable jury could find, by clear and convincing proof, that Hachette acted with actual malice, Hachette's motion for summary judgment is granted, and the complaint is dismissed as to it.

**E.   Punitive Damages**

Punitive damages are available under New York law "'to punish a person for outrageous conduct which is malicious,

-53-

wanton, reckless, or in willful disregard for another's rights.'"
DiBella v. Hopkins, 403 F.3d 102, 122 (2d Cir. 2005) (quoting
Prozeralik v. Capital Cities Commc'ns, 82 N.Y.2d 466, 479-80
(1993)).  Satisfying the actual malice standard does not suffice.
(Id.).  To be entitled to punitive damages, a defamation
plaintiff must prove that the defendant acted, toward the
plaintiff, with "hatred, ill will, spite, criminal mental state
or that traditionally required variety of common-law malice."
Prozeralik, 82 N.Y.2d at 479-80.

There is evidence in the record from which a reasonable
jury could find that Cosby acted with hatred, ill will, or spite
toward Stern.  For example, Eric Gibson, a friend of Smith's and
Stern's, provided a declaration that suggests Cosby may have
acted out of ill will toward Stern.  (See Gibson Decl. ¶ 3 ("I
realized when I talked to Ms. Cosby that she was trying to get me
to say negative, and untrue, things about Howard and how he
treated Anna Nicole.  During our conversation Ms. Cosby was
trying to put false words in my mouth.")).  In a similar vein,
Birkhead claims that Cosby once told him that she was going to
"nail Howard to the wall" and "destroy" him.  (See Birkhead Decl.
¶ 12).  This is sufficient evidence that Cosby acted with hatred,
ill will, or spite to permit the claim to reach the jury.  Cosby,
for her part, will be able to provide the jury with evidence that
she treated Stern fairly in the Book.

-54-

## F.   The Incremental Harm Doctrine

Cosby argues that the Court should grant summary judgment and dismiss the complaint even as to the actionable statements based on the incremental harm doctrine.   The incremental harm doctrine "measures the difference between the harm caused by non-actionable statements when compared with the harm caused by purportedly actionable statements and dismisses the latter when the difference is incremental."   Jewell, 23 F. Supp. 2d at 387.[20]   Under this doctrine, the Court should dismiss a claim, even one based on a false statement, where the Court determines that the plaintiff's "reputational interest in avoiding further adverse comment . . . is minimal when compared with the First Amendment interests at stake."   Simmons Ford, Inc. v. Consumers Union of U.S., Inc., 516 F. Supp. 742, 751 (S.D.N.Y. 1981).

Here, the doctrine does not warrant dismissal of the complaint.   Like the libel-proof plaintiff doctrine, the incremental harm doctrine is to be sparingly applied, if at all. Several of the Statements at issue in this case  -- including the Statement that Stern made a sex tape with Birkhead and that Stern "pimped" Smith -- are particularly salacious and damaging to Stern's reputation.   Moreover, the actionable Statements are

---

[20]   As discussed above, the Supreme Court in Masson, 501 U.S. at 523, held that the incremental harm doctrine is not available under federal law.   In Jewell, however, Judge Preska, in a comprehensive and well-reasoned decision, predicted that the New York Court of Appeals would hold that the doctrine is available under New York law.   23 F. Supp. 2d at 392.

significantly different from the non-actionable Statements.    I
cannot say, therefore, that the damage caused by these Statements
is only incremental compared to the damage caused by those
Statements I have held to be non-actionable.    See Liberty Lobby,
746 F.2d at 1568 (Scalia, J.) (criticizing incremental harm
doctrine because "it rests upon the assumption that one's
reputation is a monolith, which stands or falls in its entirety.
The law, however, proceeds upon the optimistic premise that there
is a little bit of good in all of us -- or perhaps upon the
pessimistic assumption that no matter how bad someone is, he can
always be worse.").

Accordingly, I hold that the incremental harm doctrine
does not bar Stern's case from proceeding to a jury.

## CONCLUSION

For the foregoing reasons, Stern's motion to strike is
granted in part and denied in part, Cosby's motion for summary
judgment is granted as to Statements 3, 4, 5, 6, 9, 10, 12, and
14, and denied as to Statements 1, 2, 7, 8, 11, 13, 15, 16, 17,
18, and 19, and Hachette's motion for summary judgment is granted
in its entirety, and the complaint is dismissed as to Hachette.

The Court will conduct a pre-trial conference on
September 11, 2009 at 12:00 p.m. in Courtroom 11A.

SO ORDERED.

Dated:    New York, New York
         August 12, 2009

DENNY CHIN
United States District Judge

-56-

## APPEARANCES

For plaintiff Howard K. Stern:

                    BRYAN CAVE LLP
                         By:  L. Lin Wood, Esq.
                              John C. Patton, Esq.
                              Amy Stewart, Esq.
                    One Atlantic Center
                    Fourteenth Floor
                    1201 West Peachtree Street, N.W.
                    Atlanta, Georgia  30309

                         - and -

                    ERIC M. SAUERBERG, P.A.
                         By:  M. Krista Barth, Esq.
                    200 Village Square
                    Suite 102
                    Palm Beach Gardens, Florida  33410

                         - and -

                    GILBERTI STINZIANO HEINTZ & SMITH, P.C.
                         By:  William J. Gilberti, Jr., Esq.
                              Lisa DiPoala Haber, Esq.
                              Belina Anderson, Esq.
                    555 East Genesee Street
                    Syracuse, New York  13202

For defendant Rita Cosby:

                    DAVIS WRIGHT TREMAINE LLP
                         By:  Elizabeth A. McNamara, Esq.
                              Elisa Miller, Esq.
                              Deborah Adler, Esq.
                    1633 Broadway
                    New York, New York  10019

For defendant Hachette Book Group USA, Inc.:

                    AKIN GUMP STRAUSS HAUER & FELD LLP
                         By:  Douglass B. Maynard, Esq.
                              Deborah J. Newman, Esq.
                    One Bryant Park
                    New York, New York  10036

                         - and -

                         KAREN E. ANDREWS, ESQ.
                         Hachette Book Group USA, Inc.
                         237 Park Avenue
                         New York, New York   10017

For Amicus Curiae Lambda Legal Defense and Education Fund, Inc.:

                         THOMAS W. UDE, JR., ESQ.
                         Lambda Legal Defense and Education Fund, Inc.
                         120 Wall Street
                         Suite 1500
                         New York, New York   10005